## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JEVIC HOLDING CORPORATION, et al., | ) | Case No. 08-11006 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF | ) | Adv. No. 08-51903 |
| UNSECURED CREDITORS, on behalf of | ) | |
| the bankruptcy estates of JEVIC HOLDING | ) | |
| CORPORATION, et al., | ) | |
| | ) | Related to Adv. Docket Nos. 5, 6, 9, |
| Plaintiff, | ) | 10, 29, 33, and 37 |
| | ) | |
| v. | ) | |
| | ) | |
| THE CIT GROUP/BUSINESS CREDIT, | ) | |
| INC., in its capacity as Agent, | ) | |
| SUN CAPITAL PARTNERS IV, LP, | ) | |
| SUN CAPITAL PARTNERS | ) | |
| MANAGEMENT IV, LLC, and | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Bruce Grohsgal
Robert J. Feinstein
John A. Morris
Beth E. Levine
PACHULSKI STANG ZIEHL &
JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899

*Counsel for the Official Committee of
Unsecured Creditors*

Stephen M. Miller
Erika F. Johnson
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899

Benjamin C. Ackerly
Robert S. Westermann
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA 23219

*Counsel for The CIT Group/Business
Credit, Inc.*

## OPINION[1]

Before the Court is a motion to dismiss (the "Motion") [Adv. Docket No. 5] filed by the CIT Group/Business Credit, Inc. ("CIT").  By the Motion, CIT seeks the dismissal of all claims in the complaint and objection to claims, as amended (the "Complaint") [Adv. Docket No. 17] filed by the Official Committee of Unsecured Creditors (the "Committee") of Jevic Holding Corporation ("Jevic") that initiated this adversary proceeding.  Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012, CIT seeks to dismiss the Complaint with prejudice on the ground that the Committee has failed to state a claim upon which relief can be granted.  For the following reasons, the Court will grant in part and deny in part the Motion.

## I. BACKGROUND

On May 20, 2008 (the "Petition Date"), Jevic and various of its affiliates (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware. Founded in 1981, Jevic was a trucking company that provided regional and interregional transportation services across the United States and portions of Canada.  In 2004, after years of profitability, Jevic began experiencing a prolonged financial downturn from which it never rebounded and which eventually led Jevic into bankruptcy.

Until 2006, Jevic was wholly owned by SCS Transportation, Inc. ("SCS").  Earlier that year, Jevic hired an investment banking firm to explore its financial and strategic alternatives.

---

[1]    "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." FED. R. BANKR. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

On June 30, 2006, Sun Capital Partners IV, LP ("Sun") purchased Jevic from SCS for $77.4 million (the "Acquisition").[2]  To finance the Acquisition, Sun obtained a $90 million loan (the "Acquisition Facility") from Bank of Montreal[3] to cover the purchase price and transaction costs. The Acquisition Facility was evidenced by a demand note, secured by all assets of Jevic and JHC, and guaranteed by Sun.

Within a month of the Acquisition, Jevic entered into a credit agreement administered by CIT to refinance the Acquisition Facility (the "Refinancing Facility").  Under the Refinancing Facility, Jevic obtained a revolving line of credit in the amount of $85 million (the "Revolver") and a $16.2 million term loan (the "Term Loan"), for a total credit facility in the amount of $101.2 million.  The Refinancing Facility was secured by a first lien on all of Jevic's assets including its accounts receivable and stock, but the Term Loan was separately secured by two specific real estate properties owned by Jevic (the "Properties").  The proceeds of the Refinancing Facility were used to pay off the Acquisition Facility and to finance the transaction costs and fees.

Jevic was almost immediately in default of various provisions of the Refinancing Facility.  In exchange for relaxing certain covenants, CIT obtained from Jevic various concessions and required Jevic to market the Properties and, upon their sale, to apply the sale proceeds of the Properties toward the outstanding principal of the Term Loan.  Accordingly, within several months of the Acquisition, Jevic sold the Properties for approximately $20 million

---

[2]      For the sake of accuracy, the Court notes that Jevic was formally purchased by Jevic Holding Corporation ("JHC"), Sun's wholly owned investment vehicle, but for the purpose of ruling upon the Motion, the Court generally refers to Sun as the acquiring entity.

[3]      The Court notes that the parties refer to Bank of Montreal by the name of its affiliate, Harris Bank.

and delivered the proceeds to CIT.  Jevic simultaneously entered into 20-year leases with the new owners of the Properties in order to continue to use the Properties for its ongoing business operations.  The Committee refers to the sale of the Properties, the turnover of sale proceeds to CIT, and the execution of the leases in the aggregate as the "Sale-Leaseback."  After the Sale-Leaseback, Jevic's obligations on the Refinancing Facility diminished: the Term Loan was paid in full and the Revolver was reduced to $55 million.

Notwithstanding these various transactions, Jevic's financial condition continued to deteriorate.  Unable to meet its obligations under the Refinancing Facility, Jevic entered into a forbearance agreement with CIT, which was amended several times to extend the expiration date.  The forbearance agreement finally expired without further extension on May 12, 2008. Eight days later, Jevic declared bankruptcy.  Since the Petition Date, the Debtors have shut down their business operations and have liquidated their assets through a sale under 11 U.S.C. § 363.

As of the Petition Date, the Debtors' total liability on the Refinancing Facility was $50,417,204, and CIT has filed proofs of claim against the Debtors in this amount.  Shortly after the Petition Date, the Court authorized the Debtors to obtain debtor-in-possession financing on a secured basis (the "DIP Financing Order") [Docket No. 118].  CIT is also the senior DIP financing agent.  Under the terms of the DIP Financing Order, the Committee was granted standing to challenge the validity, enforceability, or priority of the Debtors' obligations, including the liens on Jevic's assets securing the Refinancing Facility.

On December 31, 2008, the Committee timely objected to CIT's claims under the Refinancing Facility by filing a joint objection and complaint to initiate this adversary proceeding.  CIT filed a motion to dismiss, and thereafter, the Committee filed the amended

Complaint to add Sun and various of its affiliates (collectively, the "Sun Defendants") as defendants and allege various claims against the Sun Defendants based upon 11 U.S.C. §§ 510, 544, and 548 for their role in the same transactions already described in the Complaint.[4]  With the Court's permission, the Committee and CIT have each filed supplemental memoranda citing additional authority in support of their respective positions on the Motion.

This matter has been fully briefed and argued, and it is ripe for decision.

## II.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (F), (H), and (O).

## III.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012(b), is aimed to test the sufficiency of the factual allegations in the plaintiff's complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citations omitted).  The chief inquiry when ruling on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).  The movant carries the burden of demonstrating that

---

[4]    The Court notes that the Complaint, as amended, mirrors the original complaint mirrors in all relevant respects as it relates to CIT.

dismissal is appropriate.  Paul v. Intel Corp. (In re Intel Corp. Microprocessor Anti-Trust Litig.),
496 F. Supp. 2d 404, 408 (D. Del. 2007).

      In light of the U.S. Supreme Court's recent decisions in Bell Atlantic Corp. v. Twombly,
550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Third Circuit Court
of Appeals has instructed courts to conduct a two-part analysis when considering a motion to
dismiss for failure to state a claim.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.
2009).  First, the Court should separate the factual elements from the legal elements of a claim.
Id.  The court must assume the veracity of the factual allegations set forth in the complaint, draw
all reasonable inferences from the facts alleged, and construe all allegations in the light most
favorable to the plaintiff.  Iqbal, 129 S.Ct. at 1949-50;  Rea v. Federated Investors, 627 F.3d
937, 940 (3d Cir. 2010) (citation omitted).  The credibility of the facts alleged by the plaintiff are
not at issue in a motion to dismiss because "Rule 12(b)(6) does not countenance . . . dismissals
based on a judge's disbelief of a complaint's factual allegations."  Twombly, 550 U.S. at 556
(citations omitted).[5]  However, the presumption of truth does not extend to any conclusory
statements of law because the Supreme Court has held that "on a motion to dismiss, courts 'are
not bound to accept as true a legal conclusion couched as a factual allegation.'"  Twombly, 550
U.S. at 555.[6]  The Court may therefore disregard any legal conclusions in the complaint.  Fowler,
578 F.3d at 210-11.

---

[5]    See also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) ("[O]n a Rule
12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed
merely because it appears unlikely that the plaintiff can prove those facts or will ultimately
prevail on the merits.").

[6]    See also Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir.
2001) ("While facts must be accepted as alleged, this does not automatically extend to bald

Second, the Court must determine whether the factual allegations "are sufficient to show that the plaintiff 'has a plausible claim for relief.'" Id. at 211 (quoting Iqbal, 129 S.Ct. at 1950) (internal quotation marks omitted).  But, the incorporation of only some factual allegations may not suffice at the pleading stage because the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.[7]  Considering the merits of a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).  But, where a complaint fails to plead "enough fact to raise a reasonable expectation that discovery will reveal evidence [to support the claim]," the motion to dismiss must be granted as to such claim.  Twombly, 550 U.S. at 556.  Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950 (citation omitted).

Finally, to survive a motion to dismiss, a complaint must comport with the requisite pleading requirements set forth in the Federal Rules of Civil Procedure.  Constructive fraudulent transfer claims are specifically governed by Federal Rule of Civil Procedure 8 rather than by the heightened Rule 9(b) pleading standard.  See, e.g., China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc., 788 F. Supp. 815, 819 (D. Del. 1992); Charys Liquidating Trust v. McMahan Sec. Co. (In re Charys Holding Co.), 443 B.R. 628, 632 n.2 (Bankr. D. Del. 2010); Astropower

---

assertions, subjective characterizations, or legal conclusions.") (citations omitted) (internal quotation marks omitted).

[7]    The Supreme Court's plausibility standard does not require a plaintiff to demonstrate a likelihood of success at trial, but it does require showing "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (citation omitted).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 1950 (quoting Rule 8(a)(2)).

Liquidating Trust v. Xantrex Tech., Inc., (In re AstroPower Liquidating Trust), 335 B.R. 309, 333 (Bankr. D. Del. 2005).  Federal Rule of Civil Procedure 8(a)(2), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7008(a), requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The Supreme Court has stated that the purpose of Rule 8 is "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957) (internal quotation marks omitted).[8]  The Supreme Court and the Third Circuit have both stated that "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  Id. at 555 n.3; Fowler, 578 F.3d at 211 (citations omitted).[9]  Thus "it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."  Fowler, 578 F.3d at 210.[10]

---

[8]     The Supreme Court explained that "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  Twombly, 550 U.S. at 555 n.3.

[9]     The Third Circuit has observed that, in light of the Supreme Court's recent decisions in Twombly and Iqbal, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."  Fowler, 578 F.3d at 210.  The Supreme Court noted that while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Iqbal, 129 S.Ct. at 1950.

[10]    To survive a motion to dismiss, "[t]he plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim."  Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.), Bankr. No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120, at *4 (Bankr. D. Del. Sept. 16, 2008).  "[L]egal conclusions can provide the framework of a complaint," Iqbal, 129 S.Ct. at 1950, but must be accompanied by facts because "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citation omitted).  The Third Circuit has also cautioned that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  See also Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir. 2001

## IV. DISCUSSION

As it relates to CIT, the Complaint contains seven claims for relief grounded in the following causes of action: constructively fraudulent transfers under 11 U.S.C. §§ 544 and 548, preferential transfers under § 547, recovery under § 547, aiding and abetting breach of fiduciary duty, and equitable subordination under § 510.  The Court addresses the sufficiency of the Committee's allegations with respect to each of these causes of action in turn.

### A.      Fraudulent Transfer Claims (Claims I through IV)

In Claims I and II, the Committee alleges that the Debtors' obligations on the Refinancing Facility, the liens on Jevic's assets which secure the Refinancing Facility, and the payments made on account of the Refinancing Facility, including the turnover of the proceeds from the sale of the Properties, are all constructively fraudulent transfers under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act ("UFTA").  Complaint ¶¶ 137-52.  In Claims III and IV, the Committee alleges that these same transfers and obligations are also voidable as fraudulent transfers under 11 U.S.C. § 548(a).  Complaint ¶¶ 153-64.  In support of its fraudulent transfer claims, the Committee argues that the Acquisition, the Acquisition Facility, the Refinancing Facility, and the Sale-Leaseback should all be viewed as component transactions that must be collapsed in a single integrated transaction, which in the aggregate comprise the leveraged buyout ("LBO") of Jevic by Sun.  The Court first addresses the Committee's argument for collapsing these transactions and then considers whether the Committee has adequately alleged fraudulent transfer claims against CIT under §§ 548 or 544, or both.

### 1.      Collapsing the Transactions

(internal quotation marks omitted) (quoting 2 James Wm. Moore, Moore's Federal Practice § 12.34[1][b], at 12-61 to 12-63 (3d ed. 2001)).

The Third Circuit has recognized the propriety of collapsing multiple transactions and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability.  United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1301-03 (3d Cir. 1986), cert. denied, 483 U.S. 1005 (1987).  See also Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 212–13 (3d Cir. 1990); In re Old CarCo LLC, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) (quoting In re Sunbeam Corp., 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct.").  In Tabor, the Third Circuit explained that where a series of transactions were all "part of one integrated transaction," a court could look "beyond the exchange of funds" in one transaction and consider the "aggregate transaction."  Tabor, 803 at 1300, 1302 (emphasis in original).  An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability.  See id. at 1302; HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995) ("This [collapsing] approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent."); Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 498 (Bankr. D. Del. 2010).

To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions.  See, e.g., Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.), Bankr. No. 08-11407, Adv. No. 10-51389, 2011 WL 3101809, at *11 (Bankr. D. Del. July 25, 2011) ("Instead of focusing on one of several

transactions, a court should consider the overall financial consequences these transactions have

on the creditors.") (citations omitted).  While the transactions that are sought to be collapsed may

be structurally independent and distinct from one another, courts focus their analysis "not on the

structure of the transaction but the knowledge and intent of the parties involved in the

transaction."  Official Committee of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet

Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 91 (D. Del. 2002) (internal

quotation marks omitted) (citations omitted).  See also Orr v. Kinderhill Corp., 991 F.2d  31, 35-

36 (2d Cir. 1993); Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In

re Hechinger Inv. Co. of Del.), 327 B.R. 537, 546 (D. Del. 2005); MFS/Sun Life Trust–High

Yield Series v. Van Dusen Airport Serv. Co., 910 F. Supp. 913, 934 (S.D.N.Y.1995); Rosener v.

Majestic Management, Inc. (In re OODC, LLC), 321 B.R. 128, 138 (Bankr. D. Del. 2005).

The courts in this District have considered the following factors when assessing whether

the parties to the transactions sought to be collapsed had the requisite knowledge and intent to

warrant consideration of the asserted transactions in the aggregate: whether all parties involved

in the individual transactions had knowledge of the other transactions; whether each transaction

sought to be collapsed would have occurred on its own; and whether each transaction was

dependent or conditioned on the other transactions.  See, e.g., Preferred Bank, 2011 WL

3101809, at *12; Mervyn's, 426 B.R. at 497.

Whether the relevant parties to the various transactions had notice of the overall scheme

has been a central issue for courts that have applied the collapsing theory.  See, e.g., Tabor, 803

F.2d at 1302-03 (finding that the party in the first transaction had knowledge of the financial

consequences of subsequent transactions); Liquidation Trust of Hechinger Inv. Co., 327 B.R. at

11

546-47 (finding that defendants had knowledge of the consequences of subsequent transactions); Mervyn's, 426 B.R. at 497-98 (finding sufficient facts to show that defendant had knowledge of each transaction).  "[C]ourts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme." HBE Leasing, 48 F.3d at 635-36.

Whether the parties had the requisite intent can be ascertained by demonstrating that the transactions sought to be collapsed are interdependent because "[e]ach step of the [collapsed] [t]ransaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent."  Liquidation Trust of Hechinger Inv. Co., 327 B.R. at 547.  The passage of some time between the various transactions sought to be collapsed is not fatal if they are sufficiently related.  Boyer v. Crown Stock Distribution, Inc. (In re Boyer), 587 F.3d 787, 795-96 (7th Cir. 2009).  For example, in Boyer, the Seventh Circuit collapsed transactions that were about three years apart, finding that they were all "an integral part of the LBO."  Id.  See also Orr, 991 F.2d at 35; Kipperman v. Onex Corp., 411 B.R. 805, 837 (N.D. Ga. 2009).

Ultimately, in the LBO context, courts will frequently collapse a series of transactions upon a showing that these transactions are part of "an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout."  Rosener, 321 B.R. at 138.  Neither time nor transactional formalities can shield a party involved in such a series of transactions.  With respect to lender liability specifically, the Third Circuit explained in Tabor that where a lender has been "intimately involved" with the overall transaction at issue, "[t]ry as they might to distance themselves from the transaction now, they cannot rewrite history."  Tabor, 803 F.2d at 1303 n.8.

12

Here, the Committee seeks to collapse the Acquisition, the Acquisition Facility, the Refinancing Facility, the liens on Jevic's assets to secure the Refinancing Facility, and the Sale-Leaseback into one integrated transaction which, in the aggregate, should be viewed as Sun's leveraged buyout of Jevic (the "Jevic LBO").  In support of its argument, the Committee alleges that the overall intent of the transacting parties, viz., Sun, Bank of Montreal, CIT, and Jevic— was to enable, facilitate, and effectuate the Jevic LBO.  The Committee further asserts that CIT was aware of Sun's intentions to acquire Jevic from the start, even though the Acquisition Facility was initially provided by another bank.  According to the Committee, Sun "turned to CIT to provide a 'comprehensive financing solution'" to facilitate its acquisition of Jevic. Complaint ¶ 39.  The Complaint alleges that Sun and CIT negotiated for a June closing date months before the Acquisition occurred, but CIT was unable to close at that time.  Id. ¶¶ 42-44. To avoid delaying the closing, the Committee alleges that Sun obtained the Acquisition Facility from Bank of Montreal to serve as a "bridge facility" for the purpose of effectuating the Acquisition "until CIT was prepared to move forward with what would then be permanent financing." Id. ¶ 45.  By the end of July, CIT had refinanced the Acquisition Facility through the Refinancing Facility.  Id. ¶ 51.  The Committee contends that "Sun would not have caused [its subsidiary] to borrow $90 million under [the Acquisition Facility], and Sun would not have guaranteed . . . repayment of the [Acquisition Facility], if Sun was not all but certain that CIT would successfully complete the re-financing in a short period of time." Id. ¶ 50.

CIT argues that the Committee has failed to allege bad faith or an intent to defraud Jevic's creditors.  However, the Court notes that the Complaint includes allegations of collusion between Sun and CIT to maximize the Refinancing Facility.  The Committee argues that the

Refinancing Facility, which exceeded the Acquisition Facility by more than $10 million, was the result of a collaborative and calculated effort by Sun and CIT to render unrealistically high asset valuations and revenue projections for Jevic with an eye towards obtaining the highest possible loan package.  Id. ¶¶ 51-75.  The Committee maintains that CIT would not have funded the Refinancing Facility—the Revolver and the Term Loan—without these allegedly excessive valuations and projections.  See, e.g., id. ¶¶ 73, 76-77, 109.

The Court is satisfied that the Committee has sufficiently pleaded that there is cause to collapse the series of transactions which are allegedly comprised in the Jevic LBO.  Based on the Committee's allegations, the Court could conclude that CIT, Sun, Bank of Montreal, and Jevic were all apprised of the overall goal—Sun's acquisition of Jevic through a highly leveraged buyout—of each of these separate transactions in which the various parties were involved.  Assuming the veracity of the Committee's assertions and making all reasonable inferences in its favor, the Committee could establish that CIT had sufficient knowledge and notice of the Jevic LBO.  The Court also finds that the Committee has adequately alleged that the various transactions constituting the Jevic LBO would not have occurred independently of each other.  Given the short time span within which these transactions occurred and their asserted relatedness, the Court concludes that the Committee has provided enough facts from which the Court could reasonably infer the common aim of these transactions.

CIT attempts to shield itself from liability with respect to the Jevic LBO by maintaining that "[it] did not play any role in the leveraged buyout whatsoever."  Motion at 7.  While the Court acknowledges that the intervening role Bank of Montreal complicates the Committee's case and may ultimately prove fatal to the claims in the Complaint, the purpose of the integration

14

doctrine is to enable a plaintiff to overcome precisely the type of argument against liability

which CIT is now asserting.  Despite CIT's detachment from the Acquisition Facility pursuant to

which Sun initially acquired Jevic, the Court concludes that the Committee has sufficiently

alleged that CIT was nonetheless "fully engaged," "actively pursuing the transaction," and

intimately involved in the Jevic LBO.  Accordingly, the Committee is entitled to develop and

present evidence to corroborate its claims with respect to the propriety of collapsing the asserted

transactions  into Jevic LBO for the purpose of establishing CIT's fraudulent transfer liability.

      **2.**      **<u>Constructively Fraudulent Transfer Claims under § 548 (Claims III and IV)</u>**

Section § 548(a)(1) of the Bankruptcy Code grants a trustee the power to avoid any

transfer made or obligation incurred by a debtor of an interest in property, made no more than

two years before the debtor files for bankruptcy relief, if the transfer or obligation is deemed to

be actually or constructively fraudulent.  11 U.S.C. § 548(a)(1).  Here, the Committee has

alleged that the Refinancing Facility, and its attendant liens and loan payments by Jevic, are

voidable as constructively fraudulent transfers.  A transfer or an obligation is deemed

constructively fraudulent and thus voidable if the debtor received less than reasonably equivalent

value in exchange for such transfer or obligation, and (i) the debtor was insolvent when such

transfer was made or obligation was incurred, or became insolvent as a result thereof, (ii) the

debtor retained unreasonably small capital to operate its business when the transfer was made or

obligation was incurred, or (iii) the debtor made the transfer or incurred the obligation when it

was already unable to service its debts.  11 U.S.C. § 548(a)(1)(B).  Thus, to survive this Motion

with respect to § 548(a)(1), the Complaint must include facts sufficient to show that Jevic did not

receive reasonably equivalent value in exchange for the obligations it incurred and the attendant

transfers it made.  The Complaint must also include enough facts to show that Jevic was or

became insolvent when these transactions occurred, or that it retained unreasonably small capital

as a result thereof, or that it was unable to pay its debts when the transactions occurred.

<strong>a.        Reasonably Equivalent Value</strong>

A transfer or obligation is avoidable under § 548(a)(1)(B) only if the debtor "received

less than a reasonably equivalent value in exchange for such transfer or obligation."  11 U.S.C.

§ 548(a)(1)(B)(i).  The term "reasonably equivalent value" is not defined in the Bankruptcy Code

and "courts have rejected the application of any fixed mathematical formula to determine

reasonable equivalence." <u>Peltz v. Hatten</u>, 279 B.R. 710, 736 (D. Del. 2002).  The Third Circuit

has held that assessing whether a debtor received reasonably equivalent value in exchange for a

transfer or obligation requires a two-step approach. <u>Pension Transfer Corp. v. Beneficiaries</u>

<u>under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer</u>

<u>Corp.)</u>, 444 F.3d 203, 212 (3d Cir. 2006).  First, "a court must consider whether, 'based on the

circumstances that existed at the time' of the transfer, it was 'legitimate and reasonable' to

expect some value accruing to the debtor." <u>Id.</u> (quoting <u>Mellon Bank, N.A. v. Official Comm. of</u>

<u>Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)</u>, 92 F.3d 139, 144 (3d Cir. 1996).

Second, if the court finds that the debtor received any value, the court must engage in a

fact-driven comparison between such value and the transfer or obligation sought to be avoided to

determine "whether the debtor got roughly the value it gave." <u>Id.</u> at 212-13 (citations omitted).

To assess the reasonable equivalence of the transfer or obligation and the value received by the

debtor, a court should "look to the 'totality of the circumstances,' including (1) the 'fair market

value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length

16

relationship between the debtor and the transferee,' and (3) the transferee's good faith." <u>Id.</u> at 213 (quoting <u>Mellon Bank</u>, 92 F.3d at 148-49, 153).  Courts have previously upheld the reasonable equivalence of indirect value as well.  <u>See</u> <u>Fruehauf</u>, 444 F.3d at 212-13; <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc.</u>, 945 F.2d 635, 646 (3d Cir. 1996); <u>Rubin v. Mfrs. Hanover Trust Co.</u>, 661 F.2d 979, 991 (2d Cir. 1981).

In the LBO context, courts assess the value transferred to and from the debtor in the aggregate when the plaintiff in an avoidance action—typically the debtor or the trustee—has established that the various transactions which compose the LBO should be collapsed and assessed collectively.  <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)</u>, 344 B.R. 340, 347 (W.D. Pa. 2006) ("It is now widely accepted that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for purposes of applying fraudulent conveyance principles.") (citations omitted).  The debtor may be deemed to have received reasonably equivalent value in exchange for a transfer or obligation when one of a series of transactions is viewed in isolation and apart from the others.  However, when the collapsed transactions are analyzed in the aggregate, courts have often found that the total value accruing to the debtor is not reasonably equivalent to the total value of the transfers made or obligations incurred by the debtor.  <u>See, e.g.</u>, <u>Tabor</u>, 803 F.2d at 1302.  For instance, the <u>Tabor</u> court found that certain funds which were alleged to have provided the debtor with reasonably equivalent value in fact merely passed through the debtor when the relevant transactions were integrated and viewed in the aggregate, prompting the court to find that the debtor did not receive reasonably equivalent value after all. <u>Id.</u>

Here, the Committee alleges that Jevic did not receive reasonably equivalent value in exchange for its obligation with respect to the Refinancing Facility, the liens that secure it, and the various payments made on account thereof. Complaint ¶¶ 139, 148, 155, 161. CIT argues that in exchange for Jevic's obligation on the Refinancing Facility and the liens on Jevic's assets, CIT provided value to Jevic in the form of the loan proceeds. Motion at 10. CIT also asserts that in exchange for certain payments on account of the Refinancing Facility—specifically, to pay off the Term Loan using the proceeds from the sale of the Properties—CIT gave value via forbearance. Id. at 12. However, CIT's argument does not take into account the Committee's argument that when the transactions relating to the Jevic LBO are collapsed, the aggregate value of the obligation incurred and the transfers made by Jevic exceeds and is therefore not reasonably equivalent to the aggregate value that CIT provided to Jevic in return. The Committee alleges that the loan proceeds relating to the Refinancing Facility were used to pay off the Acquisition Facility, on which Sun's wholly owned affiliate was the obligor and Sun the guarantor. Considering all allegations and reasonable inferences in favor of the Committee, the Court concludes that the Complaint contains sufficient allegations that, if true, could support a finding that the loan proceeds received by Jevic merely passed through Jevic and thus failed to provide reasonably equivalent value to Jevic in exchange for the accumulated value Jevic transferred to CIT. While the Committee will still need to marshal evidence to refute CIT's charge that Jevic received reasonably equivalent value, the Court finds that the Committee has adequately alleged the absence of such value at this stage and is entitled to further pursue its claims.

      **b.**      **<u>Insolvency</u>**

The Bankruptcy Code defines insolvency as the "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property." 11 U.S.C. § 101(32)(A). When determining liability under § 548, a court measures a debtor's solvency "at the time the debtor transferred value, not at some later or earlier time." Mellon Bank, 92 F.3d at 154 (citation omitted). Here, the Committee alleges that Jevic was "insolvent or would be rendered insolvent by the transactions undertaken in connection with the [Jevic] LBO, the [Refinancing Facility], and Sale-Lease Back." Complaint ¶¶ 140, 149, 156, 162. The Court concludes that these allegations are sufficient to survive this motion. See Joseph v. Frank (In re Troll Commc'ns, LLC), 385 B.R. 110, 123-24 (Bankr. D. Del. 2008) (finding that insolvency was adequately pleaded where plaintiff alleged facts showing that debtors' liabilities exceeded their assets during the year before bankruptcy).

### c.   **Unreasonably Small Capital**

Like insolvency, the Bankruptcy Code does not define what constitutes unreasonably small capital. In the context of an LBO, the Third Circuit has held that "the test for unreasonably small capital is reasonable foreseeability." Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992). "The problem universal to all LBOs—transactions characterized by their high debt relative to equity interest—is that they are less able to weather temporary financial storms because debt demands are less flexible than equity interest." Metro Commc'ns, 945 F.2d at 647. When determining whether the LBO-related transactions sought to be collapsed and unwound left the target—now the debtor entity—with unreasonably small capital, the court should determine whether the projections for the LBO target, which forecast that the debtor would retain sufficient cash or credit to operate and sustain its business, were reasonable. In

other words, "[the court's] task in determining whether a company had sufficient working capital as evidenced by cash flow projections was not to examine what happened to the company but whether the projections employed prior to the LBO were prudent." Id. at 1072 (quoting Credit Managers Ass'n v. Fed. Co., 629 F. Supp. 175, 187 (C.D. Cal. 1985)).  Although the Moody court explained that "[i]f reasonable financial projections are made at the time of the LBO, defendants can make a strong argument that at least certain types of intervening events should be viewed as viable potential defenses," id. at 1071, the key is that any projections must in fact be reasonable.  The Third Circuit explained that "[b]ecause projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance." Id. at 1073.  To satisfy the standard for reasonableness, "parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin of error." Id. at 1073.  As the Seventh Circuit stated in a recent decision, "businesses need adequate capital to have a good chance of surviving in the Darwinian jungle that we call the market" to weather business mistakes and other problems. Boyer, 587 F.3d at 795.  An overly leveraged buyout that leaves the target company with unreasonably small capital—where it is reasonably foreseeable that the target will soon thereafter become insolvent—may provide the requisite factual predicate for an avoidance action grounded in fraudulent transfer law.

The Court finds it significant that the Third Circuit has stated that "leveraged buyouts present great potential for abuse." Moody, 971 F.2d at 1073.  In a typical LBO, the target company alone—not the buyer—becomes obligated on the LBO debt that is secured by the target company's assets.  The target company's capital structure is radically altered as a result of the

20

LBO because its equity is substituted for highly leveraged debt for the benefit of the parties who are driving the LBO deal and to the detriment of the target company and its creditors.  The risk of the LBO is thereby externalized to unsecured creditors and away from the parties to the LBO deal.  For this reason, "[a]n LBO may be attractive to the buyer, seller, and lender because the structure of the transaction could allow all parties to the buyout to shift most of the risk of loss to other creditors of the corporation if the provisions of section 548(a)(2) were not applied."  Metro Commc'ns, 945 F.2d at 646.

Here, the Committee alleges that the transactions related to the Jevic LBO left Jevic with unreasonably small capital.  In support of this allegation, the Committee asserts that following the Jevic LBO, Jevic's equity was reduced from $46 million to $1 million while its debt rose from $55 million to $101.2 million.  Complaint ¶ 80.  The Committee further alleges that the projections underlying which the Refinancing Facility, allegedly prepared by Sun and approved by CIT, were unrealistic and highly unreasonable, but were made for the purpose of maximizing the Refinancing Facility.  Assuming the truth of the Committee's allegations, the Court concludes that the Committee could establish that Jevic was left with unreasonably small capital within the meaning of § 548.

3.    **Fraudulent Transfer Claims under § 544 (Claims I and II)**

Under § 544(b), a debtor may avoid any transfer of an interest in the debtor's property that is voidable under applicable state law by a creditor holding an allowable unsecured claim. 11 U.S.C. § 544(b)(1).  Here, the Committee invokes the Uniform Fraudulent Transfer Act ("UFTA") but has failed to allege the state-specific UFTA law upon which such claim is grounded.  As a general matter, UFTA allows a debtor's creditors to recover property that was transferred by a debtor who did not receive reasonably equivalent value for it and who was insolvent when the transfer occurred or became insolvent as a result thereof.  Because UFTA generally tracks 11 U.S.C. § 548, the Committee's success on a § 544(b) action will likely mirror its success on a § 548 action that is based upon the same facts.  Here, however, the Committee's failure to identify the state-specific UFTA upon which its claims are based leads the Court to conclude that the Committee has failed to put CIT on sufficient notice of the grounds upon which the cause of action against it are based.  In light of Twombly and Iqbal especially, case law provides that such inadequate notice necessitates dismissal of the Committee's § 544 claim for failure to state a claim upon which relief can be granted.  Luster v. Greenhill Capital Partners II, L.L.P., (In re CLK Energy Partners, LLC), 2010 WL 1930065 at *4 (Bankr. W.D. La. May 12, 2010) (dismissing fraudulent transfer count with leave to amend for failure to identify non-bankruptcy law upon which the trustee's claim under § 544(b) was grounded).  See also Walker v. Sonafi Pasteur (In re Aphton Corp.), 423 B.R. 76 (Bankr. D. Del. 2010) (dismissing fraudulent transfer counts that recited only generally elements of UFTA and made "blanket assertions" unsupported by specific facts about the allegedly voidable transfers).  Accordingly, the Court will dismiss without prejudice and with leave to amend the Committee's claim under § 544(b).

**B.**     <u>Preferential Transfer Claims under § 547 (Claim V)</u>

In Claim V, the Committee alleges that Jevic made certain transfers to CIT on account of the Refinancing Facility that are voidable as preferential transfers under 11 U.S.C. § 547.  The Committee asserts that within 90 days of the Petition Date and while Jevic was insolvent, CIT received approximately $3.2 million from Jevic on account of its antecedent debt to CIT. Complaint ¶¶ 165-70.

Section 547 of the Bankruptcy Code provides that, subject to certain statutory exceptions, the trustee may avoid any transfer of an interest of the debtor in property (1) made to or for the benefit of a creditor, (2) for or on account of an antecedent debt owed by the debtor before such transfer was made, (3) made while the debtor was insolvent, (4) made on or within 90 days before the date of the bankruptcy petition is filed, and (5) which enabled the creditor to receive more than such creditor would have received under a hypothetical chapter 7 liquidation.  11 U.S.C. § 547(b).  A preference action can only succeed if it seeks the avoidance of "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate."  <u>Caliolo v. Saginaw Bay Plastics, Inc. (In re Cambridge Indus. Holdings, Inc.)</u>, No. 00-1919 (LK), C.A. 03-1009 (GMS), 2006 WL 516764, at *1-2 (D. Del. Mar. 2, 2006) (citing H.R. Rep. No. 95-595, at 177 (1978), <u>as reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6138).  This element of a preference claim is critical because "a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-à-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate."  <u>Hager v. Gibson</u>, 109

F.3d 201, 210 (4th Cir. 1997) (quoting Smith v. Creative Fin. Mgmt., Inc., (In re Virginia-Carolina Fin. Corp.), 954 F.2d 193, 199 (4th Cir. 1992)).

Here, the Committee lists in detail each of the allegedly preferential payments that Jevic made during the 90 days before the Petition Date.  Specifically, the Committee asserts that between February 29, 2008 and May 20, 2009, Jevic transferred to CIT approximately $3.2 million on account of the Refinancing Facility.  Complaint ¶¶ 165-69.  CIT disputes that the Committee can establish all elements of § 547(b).  Specifically, CIT argues that the Committee does not have a plausible preference claim against CIT on the ground that it will not be able to meet the requirement in § 547(b)(5) because CIT did not receive more from Jevic than it would have been entitled to receive under a hypothetical chapter 7 liquidation.  CIT argues that its claims against the Debtors have always been (and still remain) fully secured because it holds liens on all of Jevic's assets to secure its obligations under the Refinancing Facility.  Thus, CIT argues that any payments on account of the Refinancing Facility that CIT received from Jevic cannot be deemed preferential transfers because CIT received no more than it would have otherwise received and was therefore not actually "preferred" within the meaning of § 547.

However, CIT's argument does not take into account the potential effect of the Committee's claims against CIT to avoid the liens securing the Refinancing Facility.  As the Committee correctly argues, CIT will remain secured only if and to the extent that the Committee does not prevail on its fraudulent transfer claims against CIT.  For the reasons discussed above, the Court has found that at this stage, the Committee has adequately pleaded its fraudulent transfer claims against CIT.  To the extent that the Committee will be able to substantiate its allegations and avoid CIT's liens on Jevic's assets, the Committee may be able to

show that CIT is unsecured or undersecured with respect to the Refinancing Facility.  Under

these circumstances, the Committee may very well be able to establish that the allegedly

preferential payments did indeed enable CIT to receive more than it would otherwise have been

entitled to receive under the Bankruptcy Code's established priority scheme.  Accordingly, the

Court concludes that for the purpose of considering this Motion, the Committee has sufficiently

alleged a cause of action against CIT under § 547.  A contrary conclusion would be tantamount

to finding that the Committee has no chance of succeeding on the merits of its avoidance claims

under fraudulent transfer law, and this finding would necessarily contradict the Court's

aforementioned conclusions regarding these claims in the preceding paragraphs.

**C.**    **Recovery of Avoided Transfers under § 550 (Claims I through V)**

In Claims I through V, the Committee seeks recovery under 11 U.S.C. § 550 of the

allegedly fraudulent and preferential transfers that are asserted in each of these claims.  Section

550(a) of the Bankruptcy Code provides that, to the extent that a transfer is avoided under, inter

alia, §§ 544, 547, or 548, "the trustee may recover, for the benefit of the estate, the property

transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of

such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or

mediate transferee or such initial transferee."  11 U.S.C. § 550(a).

For the reasons discussed above, the Committee has adequately alleged its avoidance

actions under §§ 548 and 547.  The Complaint contains sufficient facts from which the Court can

infer that CIT was the initial transferee of the allegedly fraudulent and preferential transfers,

which include the obligation Jevic incurred under the Refinancing Facility, the liens on Jevic's

assets securing the Refinancing Facility, and the payments made by Jevic on account of these

obligations.  The Committee has sufficiently alleged § 550(a) claims for the recovery of voidable

transfers, if and to the extent that such transfers are avoided under §§ 548 or 547, or both.

**D.**     **Aiding and Abetting Breach of Fiduciary Duty (Claim VI)**

In Claim VI, the Committee alleges that CIT aided and abetted Jevic's officers and

directors in the breach of their fiduciary duties.  The Committee asserts that the officers and

directors of Jevic breached their fiduciary duties by supporting and approving the Acquisition,

the Refinancing Facility, the transfer of liens on Jevic's assets to CIT, the Sale-Leaseback, the

transfer of the proceeds from the sale of the Properties to CIT, and the payments made by Jevic

on account of the Refinancing Facility.  The Committee also contends that CIT knew the officers

and directors and knew that they breached their fiduciary duties by supporting and approving

these transactions.  The Committee maintains that notwithstanding this knowledge, "CIT

directed, encouraged, assisted, facilitated and/or participated" in the conduct that has given rise

to the directors' and officers' alleged breach of their fiduciary duties.  According to the

Committee, by aiding and abetting such conduct, CIT directly and proximately harmed Jevic by

diminishing its estate, reducing its ability to operate its business, and increasing the likelihood

that its creditors would not be paid in the event that Jevic declared bankruptcy.  Complaint ¶¶

171-77.

Under the internal affairs doctrine, only one state has the authority to regulate a

corporation's internal affairs, which include matters peculiar to relationships among or between

the corporation and its current officers, directors, and shareholders.  Edgar v. MITE Corp., 457

U.S. 624, 645 (1982).  The Supreme Court has held that the state under which the corporation is

chartered has this authority.  Id.  Courts have long recognized that few, if any, claims are more

26

central to a corporation's internal affairs than those relating to an alleged breach of a fiduciary duty by a corporation's directors and officers.  See, e.g., In re Topps Co. S'holders Litig., 924 A.2d 951, 960 (Del. Ch. 2007).

Here, because Jevic is a Delaware corporation, Delaware law governs the Committee's claim for aiding and abetting the breach of a fiduciary duty.  As with a claim for the breach of a fiduciary duty, the internal affairs doctrine compels the Court to also apply Delaware law to a claim for aiding and abetting the breach of a fiduciary duty asserted against CIT.  See Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038 (Del. Ch. 2006) (noting that aiding and abetting claims are essentially civil conspiracy claims brought in the context of matters relating to the internal affairs of corporations).  See also In re Am. Intern. Group, Inc., 965 A.2d 763, 822 (Del. Ch. 2009).

Delaware courts have articulated four elements that must be proven to establish a claim for aiding and abetting the breach of a fiduciary duty: (1) the existence of a fiduciary relationship; (2) the breach of a duty by the fiduciary; (3) the knowing participation in the breach by the defendant, who is not a fiduciary; and (4) damages to the plaintiff resulting from the concerted action of the fiduciary and the nonfiduciary.  Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096 (Del. Ch. 2008).  See also  Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001).  Proof of scienter is the crux of a successful claim.  Allied Capital, 910 A.2d at 1038.  "In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."  Bd. of Trs. of Teamsters v. Foodtown, Inc., 296 F.3d 164, 174 (3d Cir. 2002) (citing

Resolution Trust Corp. v. Spagnoli, 811 F. Supp. 1005, 1014 (D.N.J. 1993)).  See also Malpiede,

780 A.2d at 1097-98 (finding that "knowing participation" in a board's fiduciary breach requires

that the third party act with knowledge that the alleged conduct alleged constitutes a breach).  A

plaintiff must demonstrate the defendant's "knowing participation" with specific facts.

Foodtown, 296 F.3d at 174.

        Here, the Committees fails to plead specific facts in support of its allegation that CIT

knowingly participated in the breach of a fiduciary duty.  The Complaint merely states in general

terms that CIT knew the directors and officers of Jevic who breached their fiduciary duties, knew

that their conduct amounted to such breach, and directed, encouraged, and assisted such conduct.

Complaint ¶¶ 172-76.  However, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to support a claim under Iqbal.  129 S.

Ct. at 1949.  Additionally, the Committee fails to allege that it sustained damage that "resulted

from the concerted action of the fiduciary and the nonfiduciary," as it is required to do under

Delaware law.  Cargill, 959 A.2d at 1125.  Therefore, even when taking all factual allegations in

the Complaint as true and drawing all reasonable inferences in favor of the Committee, the Court

concludes that the Committee has failed to plead facts sufficient to establish a claim for aiding

and abetting the breach of a fiduciary duty.

**E.    Equitable Subordination under § 510(c) (Claim VII)**

        Finally, in Claim VII, the Committee alleges that there is a sufficient factual predicate in

support of its request for the equitable subordination under 11 U.S.C. § 510(c) of CIT's claims

against the estate in the amount of approximately $50.4 million.  The Committee asserts that

CIT's conduct resulted in injury to the Debtors, conferred an unfair advantage to CIT, or both. Complaint ¶¶ 179-81.

The Bankruptcy Code provides that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1). Proof of three elements is required to establish equitable subordination: (1) the defendant engaged in some type of inequitable conduct; (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (3) equitable subordination of the claim is consistent with bankruptcy law. Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-705 (5th Cir. 1977). See also United States v. Noland, 517 U.S. 535, 538-39 (1996) (adopting the Mobile Steel test for equitable subordination); Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 554 F.3d 382, 411 (3d Cir. 2009). Courts differentiate between insiders and outsiders when analyzing whether conduct was inequitable. "The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." In re Mid-Am. Waste Sys., Inc., 284 B.R. 53, 69 (Bankr. D. Del. 2002). If a defendant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." Schubert, 554 F.3d at 412 (internal quotation marks omitted).

Here, the Committee has alleged only that CIT's conduct, as it is described in the Committee's preceding claims, warrants the equitable subordination of CIT's claims against the Debtors. Complaint ¶¶ 180-81. Based on such sparse allegations, however, the Court cannot

conclude that the Committee has sufficiently alleged a claim for equitable subordination against CIT and will therefore dismiss this claim.

## V.  <u>CONCLUSION</u>

The Court concludes that CIT has not established that dismissal is warranted with respect to the  Committee's claims against it under 11 U.S.C. §§ 547, 548, and 550.  However, the Court concludes that the Committee's remaining claims against CIT under §§ 544 and 510, and for aiding and abetting the breach of a fiduciary duty will be dismissed without prejudice for failure to state claims upon which relief can be granted.  For the foregoing reasons, the Court will grant in part and deny in part the Motion.  An appropriate Order follows.


BY THE COURT:

Dated:       Wilmington, Delaware
             September 15, 2011            Brendan Linehan Shannon
                                           United States Bankruptcy Judge