IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JEVIC HOLDING CORP., *et al.*, | ) | Case No. 08-11006 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the bankruptcy estates of JEVIC HOLDING CORP., *et al.*, | ) ) ) | Adv. Pro. No. 08-51903 (BLS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| CIT GROUP/BUSINESS CREDIT, INC., in its capacity as Agent, and SUN CAPITAL PARTNERS IV, LP, SUN CAPITAL PARTNERS MANAGEMENT IV, LLC, and SUN CAPITAL PARTNERS, INC. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT AND OBJECTION TO CLAIMS

PACHULSKI STANG ZIEHL & JONES LLP
Bruce Grohsgal (Bar No. 3583)
Robert J. Feinstein
John A. Morris
Gabrielle A. Rohwer
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: brohsgal@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        grohwer@pszjlaw.com

Counsel to the Official Committee of
Unsecured Creditors

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 2

JURISDICTION AND VENUE ................................................................................................ 4

PARTIES ....................................................................................................................................... 4

STATEMENT OF FACTS ......................................................................................................... 6

    A.   Jevic's Business ................................................................................................................ 6

    B.   Jevic's Extended Pre-LBO Decline in Performance ............................................. 7

    C.   The Myriad Causes of Jevic's Decline That Led to Jevic's Sale ....................... 8

    D.   Sun Risks Nothing to Acquire Jevic .................................................................... 10

    E.   Sun's Overly Aggressive Projections and Revised Asset Appraisals Fuel the Increase of CIT's Re-Financing ........................................................... 12

    F.   CIT and Jevic Close on a $101.2 Million Financing ........................................ 17

    G.   Jevic Is in Immediate Default and Financial Distress ...................................... 20

    H.   The Sale-Leaseback Worsened Jevic's Plight ................................................... 22

    I.   Financing of Transaction Fees ............................................................................. 24

    J.   Jevic's Downward Spiral Continues .................................................................... 25

    K.   The Sun, Sun Management and Sun Partners Claims ...................................... 27

        1.   Sun's Claims ................................................................................................ 27

        2.   Sun Management's Claims ........................................................................ 27

        3.   Sun Partners' Claims ................................................................................. 28

FIRST CLAIM FOR RELIEF (Against CIT)  (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550) ........................................................................................................................................ 28

SECOND CLAIM FOR RELIEF (Against CIT)  (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations,  and Payments in Respect of Fraudulently Incurred Obligations  11 U.S.C. §§548 and 550) .................................................................... 29

THIRD CLAIM FOR RELIEF (Against CIT) (Avoidance of Liens, Fraudulently Incurred Obligations,  and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29) ...................................... 30

FOURTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Liens, Fraudulently Incurred Obligations,  and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27and 2-29) ........................................... 32

FIFTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29) ...................................................... 34

SIXTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)....................................................... 36

SEVENTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307) ....................................................... 37

EIGHTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305, and 1307).................................................................. 39

NINTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)......................................................... 41

TENTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307) ......................................................... 42

ELEVENTH CLAIM FOR RELIEF (Against CIT) (Equitable Subordination and Subordination - 11 U.S.C. §510)..................................................................................................................... 44

TWELFTH CLAIM FOR RELIEF (Against CIT) (Avoidance of Preferential Transfers - 11 U.S.C. §§547 and 550)................................................................................................................ 46

THIRTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550) ....................................................................................................... 48

FOURTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550).................................................................................... 49

FIFTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550) ....................................................................................................................... 50

SIXTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550).................................................................................... 51

SEVENTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550).................................................................................... 51

EIGHTEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29) ................................... 53

NINETEENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29) ...................................................... 55

TWENTIETH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)................. 56

TWENTY-FIRST CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29) ..................... 58

TWENTY-SECOND CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29) .................................................. 59

TWENTY-THIRD CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)........................................................ 61

TWENTY-FOURTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)................. 62

TWENTY-FIFTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29) ..................... 63

TWENTY-SIXTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)........................................................ 64

TWENTY-SEVENTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307)........................................................... 66

TWENTY EIGHTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307) ..................... 68

TWENTY-NINTH CLAIM FOR RELIEF (Against Sun) (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307)........................... 69

THIRTIETH CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware §§1304(a), and 1307)............................................................. 71

THIRTY-FIRST CLAIM FOR RELIEF (Against Sun) (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware §§1305, and 1307)........................................................ 72

THIRTY-SECOND CLAIM FOR RELIEF (Against Sun)  (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations  and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware §§1304(a) and 1307)............................... 73

THIRTY-THIRD CLAIM FOR RELIEF (Against Sun)  (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations  and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware §§1305 and 1307) ................................... 74

THIRTY-FOURTH CLAIM FOR RELIEF (Against Sun, Sun Management and Sun Partners) (Equitable Subordination and Subordination - 11 U.S.C. §510) ................................................ 75

OBJECTIONS TO SUN'S CLAIMS.......................................................................................... 76

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JEVIC HOLDING CORP., *et al.*, | Case No. 08-11006 (BLS) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the bankruptcy estates of JEVIC HOLDING CORP., *et al.*, | Adv. Pro. No. 08-51903 (BLS) |
| Plaintiff, | |
| -against- | |
| CIT GROUP/BUSINESS CREDIT, INC., in its capacity as Agent, and SUN CAPITAL PARTNERS IV, LP, SUN CAPITAL PARTNERS MANAGEMENT IV, LLC, and SUN CAPITAL PARTNERS, INC. | |
| Defendants. | |

## SECOND AMENDED COMPLAINT AND OBJECTION TO CLAIMS

Plaintiff, the Official Committee of Unsecured Creditors of Jevic Holding Corp. (the "Committee") appointed in the above-captioned cases, on behalf of the estates of Debtors Jevic Holding Corp. ("JHC"), Jevic Transportation Inc. ("Jevic" or the "Company"), and Creek Road Properties LLC ("Creek Road") (JHC, Jevic and Creek Road are collectively referred to as the "Debtors"), as and for its Second Amended Complaint and Objection to Claims against CIT Group/Business Credit, Inc., in its capacity as Agent, Sun Capital Partners IV, LP ("Sun Capital Partners IV"), Sun Capital Partners Management IV, LLC ("Sun Management"), and Sun Capital Partners, Inc. ("Sun Partners," and collectively with Sun Capital Partners IV, Sun Management and Sun Partners, "Sun"), by its undersigned counsel, alleges as follows:

## PRELIMINARY STATEMENT

1.     Like a borrower who put virtually no money down to acquire a house on the misguided belief that home values would only rise, Sun acquired Jevic with virtually none of its own money based on baseless projections of almost immediate growth and increasing profitability.  The only differences were that Sun believed that it would never be responsible to repay the debt used to acquire Jevic, and Sun knew that Jevic's value had already declined considerably over a prolonged period of time.

2.     With CIT's active assistance, Sun acquired Jevic on the backs of Jevic's creditors.  Sun orchestrated a leveraged buyout (the "LBO") whereby Jevic's assets were leveraged to enable a Sun affiliate to pay a total adjusted purchase price of $77.4 million, consisting of $41.3 million in cash and $36.1 million of assumed liabilities, with no money down.

3.     The acquisition costs were initially financed via a $90 million bridge loan. As planned, CIT, for itself and as agent for its syndication partners, re-financed those costs four weeks later in the form of $101.2 million of asset-based financing.  Sun took virtually no risk on this gamble, contributing only $1 million in equity, most of which it got back in "fees."  Sun's transaction costs for the LBO were funded through loan proceeds derived from liens on Jevic's assets.  Furthermore, CIT, who was purportedly fully secured, did not face any risk either.

4.     Sun was able to secure the financing, in part, due to its preparation of unreasonably aggressive projections, projections that were enhanced after CIT expressed concern that Sun's initial projections "would not support" the syndication of the loan because they were

too "conservative."

5.      With the enhanced projections in hand, CIT lent as much as the asset values would support, and Sun leveraged every single asset to the maximum extent possible, such that Jevic ultimately secured from CIT $101.2 million in financing that drastically increased Jevic's borrowing costs and put its assets beyond the reach of its unsecured creditors. Part of the asset base used to secure CIT's financing was Jevic's valuable real estate.

6.      Within seven months of its acquisition of Jevic, and consistent with its pre-acquisition plan, Sun caused Jevic to engage in the sale/lease back of certain of Jevic's real estate assets. Jevic received no benefit from the encumbrance of its real estate assets or from the sale-lease backs. The net proceeds of the sales went directly to CIT, as it required, to re-pay a portion of Sun's acquisition costs. Thus, after Jevic's real estate was encumbered to finance Sun's acquisition, and then sold to satisfy CIT, Jevic was left with onerous long-term obligations under 20-year leases and no real estate assets.

7.      Sun's riskless acquisition, and CIT's riskless financing, was a disaster. Notwithstanding Sun's unreasonably aggressive financial projections, Jevic was in default under its bank covenants almost immediately even though it drastically cut its capital expenditures to preserve liquidity. Jevic never met its budget in any fiscal quarter after Sun's acquisition and was forced to liquidate within two years of the LBO.

8.      Based on its conduct, Sun is liable to the Debtors' estates under fraudulent conveyance laws in an amount equal to the value of the property transferred in connection with the LBO to fund Sun's purchase of Jevic. Further, each of its proofs of claim should be

recharacterized as equity and/or equitably subordinated. Finally, the claims of Sun Management and Sun Partners should be disallowed and expunged or, in the alternative, recharacterized as equity or equitably subordinated.

9.     CIT is also liable under fraudulent conveyance laws and its purportedly secured debt should be equitably subordinated to unsecured creditors.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. § 157(a) and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. § 1408 and 1409.

## PARTIES

11.     The United States Trustee appointed the Committee on June 3, 2008. Pursuant to the Final Order (I) Authorizing Debtors-in-Possession to Obtain Senior Debtor in Possession Financing; (II) Granting Liens, Security Interests, and Superpriority Status; (III) Authorizing Use of Cash Collateral; and (IV) Affording Adequate Protection to Prepetition Lenders (the "Final DIP Financing Order") [Docket No. 118] entered in the above-captioned bankruptcy cases on June 20, 2008, the Committee has standing, on behalf of the Debtors' estates, to commence and challenge, in accordance with the Federal Rules of Bankruptcy Procedure, the validity, enforceability, or priority of the Debtors' obligations under the Prepetition Senior Credit Agreement and to assert any claims or causes of action against the Prepetition Agent and the Prepetition Lenders.[1] Further, on February 27, 2009, the Court entered

---

[1] Capitalized terms in this paragraph that are not otherwise defined herein shall have the meanings ascribed to them in the Final DIP Financing Order.

an Order approving the terms of a Stipulation between the Debtors and the Committee that, among other things, authorized the Committee to commence litigation against Sun and its affiliates.

12.    Upon information and belief, Defendant CIT is a New York corporation that, for itself and as agent for other participating lenders, provided $101.2 million in available debt to Jevic.

13.    Upon information and belief, CIT claimed to be owed approximately $51 million as of the petition date.

14.    Upon information and belief, Defendant Sun Capital Partners IV is a Delaware limited partnership with offices located at 5200 Town Center Circle, Suite 600, Boca Raton, Florida 33486.  Sun is the direct and/or indirect primary equity holder of the Debtors.

15.    Upon information and belief, Defendant Sun Management is a Delaware limited liability company with offices located at 5200 Town Center Circle, Suite 600, Boca Raton, Florida 33486.  Sun Management claims entitlement to unliquidated amounts purportedly due under a certain Management Services Agreement it allegedly entered into with Debtor Jevic Transportation, Inc.

16.    Upon information and belief, Defendant Sun Partners is a corporation existing under the laws of the State of Delaware with offices located at 5200 Town Center Circle, Suite 600, Boca Raton, Florida 33486.  Sun Partners asserts that it may have certain unliquidated "cross-claims or other claims against any of the Debtors."

17.    Upon information and belief, Sun Capital Partners IV, Sun Management

and Sun Partners are affiliated entities.

## STATEMENT OF FACTS

18.     Sun acquired Jevic through an LBO on June 30, 2006.  Four weeks later, on July 28, 2006, Sun caused Jevic to re-finance its debt by leveraging all its assets to the maximum extent possible, with the financing provided by a consortium of banks led by CIT (the "Re-Financing").  In January 2007, Sun caused Jevic to enter into the sale/lease back of certain real property owned by Jevic (the "Sale-Lease Back").

19.     The LBO, the Re-Financing and the Sale-Lease Back were all planned by Sun and CIT as part of the same integrated transaction.  Whether viewed together or separately, Jevic could not support the LBO and the cost of the Re-Financing, and each of these transactions, including the Sale-Lease Back, harmed the Company.

A.    **Jevic's Business**

20.     Jevic was a trucking business that was founded in 1981.  Jevic provided a broad line of less-than-truckload ("LTL") and truckload ("TL") services to its customers in the United States and portions of Canada.

21.     Jevic purportedly developed integrated solutions for customers designed to lower their overall supply chain costs, which included direct-to-customer deliveries, multi-shipper order consolidation for their inbound supplies, and express and time-definite deliveries.

22.     Upon information and belief, from approximately 2002 until June 30, 2006, Jevic was a wholly-owned operating subsidiary of SCS Transportation, Inc. ("SCS").

23.     The period from 2000-2003 was an impressive one for Jevic.  During that

time, revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA")

grew at a healthy pace, with EBITDA ranging from $28.5 million to $38.3 million per year and

EBITDA margins averaging 10.9%.

**B.    Jevic's Extended Pre-LBO Decline in Performance**

24.    However, for reasons more fully described below, beginning in 2004, and

continuing without interruption for two and a half years until Sun's acquisition of Jevic on

June 30, 2006, Jevic suffered a sustained and severe diminution of its business and earnings.

25.    Jevic's persistent decline was well-reflected in its financial performance:

|  | **2004** | **2005** | **TTM 2006** | **YTD 2005** | **YTD 2006**[2] |
|---|---|---|---|---|---|
| **Revenue (w/o FS)**[3] | $316,722 | 309,779 | 301,719 | 105,238 | 97,178 |
| **Operating Income** | 8,887 | 3,126 | (515) | 87 | (3,554) |
| **Net Income** | 3,345 | (506) | (2,674) | (752) | (2,920) |
| **Unadjusted EBITDA** | 28,957 | 22,481 | 18,579 | 6,645 | 2,743 |
| **EBITDA Margin** | 9.1% | 7.3% | 6.2% | 6.3% | 2.8% |

26.    Jevic's steady decline during the thirty months prior to Sun's acquisition is

even more dramatic when measured against Jevic's earlier performance.  For example, while

Jevic enjoyed double-digit EBITDA margins in each year from 2000-2003, Jevic's EBITDA

margin eroded each year from 2004 through June 2006; and in the first six months of 2006,

Jevic's EBITDA margin was just 2.8%.

27.    Annual expenses during period 2000-2003 never exceeded $297 million,

but annual expenses during the period 2004 through June 2006 were never less than $330

million, and hit a high of $344 million for the trailing twelve months ending May 2006.

---

[2] Whole numbers are reflected in thousands (000).

[3] "w/o FS" refers to "without fuel surcharge."

28.    Jevic's EBITDA eroded continuously from 2004 until Sun's acquisition in June 2006 such that Jevic's EBITDA for the trailing twelve months ending in May 2006 was (a) less than 50% of Jevic's EBITDA in 2000, and (b) more than $10 million off the lowest amount of EBITDA reported by Jevic in any year from 2000-2003.

29.    As reflected in Jevic's financial statements, Jevic did not suffer a bad quarter or even a bad year.  Rather, for the two and a half years prior to Sun's acquisition (the "Declining Years"), Jevic suffered a steady and significant decline in performance and profitability.  The causes for the Declining Years, as identified by Sun and CIT prior to the LBO, were several.

## C.    The Myriad Causes of Jevic's Decline That Led to Jevic's Sale

30.    In 2000, following his sale of the Company, Jevic's founder started a competing trucking company just miles from Jevic, called New Century.  New Century was staffed primarily with Jevic employees (Jevic lost approximately 300 employees, including drivers, operations personnel, sales staff and administrators to New Century), and as late as 2005, New Century hired a Jevic national account manager who had previously accounted for about $6 million of Jevic's annual revenue.  New Century overlapped Jevic's entire eastern market and, with thorough knowledge of Jevic's account base, actively and aggressively solicited business from Jevic's customers.

31.    More broadly, Jevic suffered during the Declining Years from a loss of customers resulting from increased competition.  As Sun and CIT knew prior to Sun's acquisition, the trucking industry is highly competitive and fragmented.  Jevic was competing

with local, regional, inter-regional and national LTL carriers, and even with truckload carriers, air freight carriers and railroads, some of which had greater financial resources, operated more revenue equipment and had larger freight capacity than Jevic. Competitors included Fedex, UPS, Yellow Corporation (another former owner of Jevic), Con-Way Transportation Services and other national and local players.

32.    Against this competitive backdrop, Jevic was beset by numerous internal "performance" problems, including (what Sun believed to be) a wayward change in strategic direction; inefficient operations; sub-standard information systems; "expensive" employment arrangements with the driver work force; and declining volume.

33.    Notably, prior to its acquisition of Jevic, Sun did a comparative analysis between Jevic and the trucking industry. Sun did not find any "statistically significant difference" between Jevic's declines (as measured by volume, tonnage and sales revenue) and the declines being felt throughout the trucking industry; thus, while Jevic suffered from various "performance" problems, Sun could not conclude that Jevic's challenges were qualitatively different from the broader trucking industry.

34.    Apparently, one of SCS's largest shareholders saw the writing on the wall: with Jevic facing declining profits resulting from stiff competition, a softening trucking market, and its own operational difficulties, the shareholder demanded a sale of Jevic under the threat of a proxy fight.

35.    Thus, in early 2006, Jevic retained Morgan Keegan, an investment banking firm, to explore strategic alternatives for the Company. As word reached the market-

place, according to Sun and CIT, Jevic's downward spiral continued as customers and employees

lost confidence in the long-term viability of Jevic.

**D.**    **Sun Risks Nothing to Acquire Jevic**

      36.    Sun is an investment firm focused on leveraged buyouts and other

investments.  With offices in the United States, London and China, Sun claims to have extensive

experience and success with "turnaround" opportunities.

      37.    Sometime in early 2006, Sun was contacted by Morgan Keegan, Jevic's

investment bank, to gauge Sun's interest in a possible acquisition of Jevic.  Morgan Keegan

provided Sun with a memorandum and other information concerning Jevic, including a

description of the business and financial data.

      38.    Thereafter, Sun provided an "indication of value" and, after the passage of

time, revised the proposal and proceeded to the due diligence stage.

      39.    Sun initially offered the opportunity to provide acquisition financing to

Wells Fargo Foothill ("WFF").  WFF, however, was not interested in providing financing for any

asset class other than accounts receivable.  Since Sun intended to leverage all of Jevic's assets to

complete its acquisition, Sun turned to CIT to provide a "comprehensive financing solution."

      40.    During June, Sun and CIT were fully engaged in the due diligence

process.  Sun engaged outside professionals including Crowe Chizek to review and analyze

Jevic's historical cash flows, balance sheets and statements of operation; Marsh to review Jevic's

insurance needs; and Mercer, an employee benefits company.

      41.    CIT retained Taylor and Martin to appraise Jevic's trucking assets; the

Durkin Group to perform field examinations; and Cushman & Wakefield to appraise Jevic's real

estate assets.  CIT also received projections of Jevic's future financial performance that were

prepared by Sun.

42.    As is more fully described below, Sun and CIT began this process in the

late Spring of 2006 with an eye towards a June 30, 2006 closing.

43.    Upon information and belief, SCS demanded the June 30 closing date and

threatened to liquidate Jevic if Sun did not complete the acquisition by that time.

44.    CIT, however, while actively pursuing the transaction, was not in a

position to close by the June 30 deadline.

45.    Consequently, Sun turned to its "warehouse facility," Harris Bank, an

affiliate of the Bank of Montreal, to assist in securing a bridge loan (the "Bridge Loan") until

CIT was prepared to move forward with what would then be permanent financing.

46.    On June 30, 2006, the Bank of Montreal provided JHC, an investment

vehicle wholly-owned by Sun, with a $90 million Bridge Loan that enabled JHC to complete the

acquisition of Jevic.

47.    The purchase price of the acquisition was $77.4 million, consisting of

$41.3 million in cash and $36.1 million of assumed liabilities, inclusive of  $2 million (the

"Bridge Loan Fees") of direct transaction costs.

48.    Thus, substantially all of the Bridge Loan was used for Sun's benefit to

acquire Jevic.  Most of the Bridge Loan was used to effectuate a change in ownership of the

Company, a change that was of no benefit to Jevic.

49.     The Bridge Loan was (i) evidenced by a demand note (i.e., there was no term; the Bank of Montreal could demand repayment at any time), (ii) guaranteed by Sun, and, (iii) upon information and belief, secured by all of the Debtors' assets.

50.     Upon information and belief, Sun would not have caused JHC to borrow $90 million under the demand note, and Sun would not have guaranteed JHC's repayment of the $90 million demand obligation, if Sun was not all but certain that CIT would successfully complete the re-financing in a short period of time.  Indeed, according to a Sun representative, Sun was "comfortable bridging the transaction given where CIT was in their diligence."

**E.     Sun's Overly Aggressive Projections and Revised Asset
Appraisals Fuel the Increase of CIT's Re-Financing**

51.     From the time work on the acquisition and related financing began in the late Spring, through CIT's July 28, 2006 re-financing of the Bridge Loan, Sun and CIT devoted considerable attention to two data points:  (a) Jevic's financial projections; and (b) the asset appraisals.

52.     Since CIT's financing was to be asset-based lending, the asset values took on primary importance because they would determine the amount of money that CIT and its syndication partners were prepared to lend.

53.     In general, and taking into account various reserves, CIT was prepared to lend as much money as the assets would support.  Not coincidentally, Sun was prepared to leverage Jevic's assets to the greatest extent possible because the more CIT was prepared to lend, the less equity Sun would have to put at risk.

54.     The projections were also important both because they were used to

determine the benchmarks upon which certain financial covenants would ultimately be based and because they were supposed to provide a picture of the likelihood that Sun and CIT would reap a return on their respective investments and that Jevic would be able to repay the CIT financing in accordance with its terms.

55.     Despite two and a half years of deteriorating financial performance in a highly competitive industry, from its initial drafts to its final version, Sun created ever more optimistic and aggressive iterations of its projections of Jevic's future financial performance, and CIT willingly embraced them.  Upon information and belief, Sun's projections became unreasonably optimistic throughout the period prior to the re-financing because such optimistic projections were needed to secure CIT's financing and would enable Sun to reduce its equity commitment.

56.     A review of the development of the projections over time shows that Sun unreasonably revised the projections upwards solely to support the acquisition and consequent refinancing, particularly when compared to Jevic's immediate prior performance.

57.     In an early draft of the projections, Sun forecast that Jevic would experience (a) revenue growth of -3.0% in 2006; 0% in 2007; 1% in 2008; and 2% in 2009; and (b) EBITDA growth of -32.0% in 2006; 30.3% in 2007; 25.1% in 2008; and 23.4% in 2009.

58.     These initial projections were wholly at odds with Jevic's recent historic performance.  Jevic had experienced actual EBITDA growth rates of 10.3% in 2003; 6.4% in 2004; and -30.6% in 2005.  In other words, even Sun's early projections forecasted EBITDA growth in 2007 and beyond at levels far in excess of anything actually achieved by Jevic in any

of the four years between 2003 and 2006.

59.     Significantly, these early projections also forecast total bank borrowings of $91.7 million, and an equity contribution by Sun of $5 million. Sun's equity contribution under these projections was itself a reduction from the $10 million equity contribution CIT had earlier discussed with Sun.

60.     By June, Sun had created new projections that drastically increased projected revenues, and adjusted other relevant metrics, all in a positive direction notwithstanding the Company's recent performance during the Declining Years.

61.     Sun's "Base Case" projection in June (i.e., the version of the projections which were thought most likely to be met) forecast (a) revenue (excluding fuel surcharge) growth of -5.0% in 2006; 3.0% in 2007; 4% in 2008; and 5% in 2009; and (b) EBITDA growth of -50.4% in 2006; 64.1% in 2007; 25% in 2008; and 21.2% in 2009.

62.     Significantly, even with June's stepped-up forecasts (as compared to the earlier version), Sun's June "Base Case" still failed to project sufficient EBITDA to meet the EBITDA and Fixed Charge covenants ultimately incorporated into CIT's financing agreement.

63.     And even under the June "Base Case" Jevic's "availability" (i.e., the amount of unused borrowing power under a revolving line of credit) under its contemplated financing would have been depleted by approximately 20% in the last six months of 2006, and by almost 20% more by the end of 2007.

64.     In June, Sun also prepared an "upside" set of projections that were unrealistically optimistic. Even though Jevic averaged less than 1% annual revenue growth from

2001 through 2005, Sun's "upside case" in June provided for revenue growth (excluding fuel surcharge) of 5% in 2007; 6.1% in 2008; and 7% in 2009. All of the forecasted metrics that flow from revenue growth were also significantly improved.

65.    Despite the unreasonably more optimistic projections (when compared to Jevic's actual performance and Sun's earlier projections), all was not well on the financing front.

66.    While Sun and CIT were conducting due diligence and Sun was preparing and revising the projections, CIT was marketing the financing package to potential syndication partners.

67.    In June, CIT prepared a Confidential Memorandum for potential investors. The memorandum described a total package of asset-based financing that included a $70 million senior secured revolving facility (the "Revolver"), secured by all non-real estate assets, and a separate $16.4 million real estate term loan. According to Sun, it was "ready, willing and able" to proceed with the acquisition of Jevic based on this loan package of $86.4 million.

68.    Upon information and belief, CIT knew that Sun was prepared to close on a $86.4 million loan package for the acquisition and financing of Jevic, and implicitly knew that Sun deemed $86.4 million to be sufficient to fund the acquisition and Jevic's operations.

69.    There were only two problems. First, some potential investors balked because, by this time, Sun's equity commitment had dwindled from $10 million (as discussed with CIT), to $5 million (as reflected in the early projections), to just $1 million.

70.    Second, and more significantly, CIT concluded that the projections would not support the syndication effort.

71.    Specifically, CIT believed that Sun "provided a model" that "did not support" CIT's "ability to syndicate the transaction" because "the turnaround was not early enough in the transaction based on where the capital structure was" and the EBITDA projections were insufficient.

72.    Sun's representative who was responsible for completing the acquisition and obtaining the related financing recalls being told by someone that the projections were "too conservative," he just could not recall who told him that.

73.    So instead of lowering the bridge, Sun tried to raise the water to close the gap. In July, Sun prepared revised projections that were used by CIT to syndicate the $101.2 million Re-Financing (the "Enhanced Projections"). The Enhanced Projections bore a striking resemblance to the June "upside" case and were similarly unrealistic. In fact, the Enhanced Projections now forecast that Jevic would substantially complete its "turnaround" within 18 months – as CIT indicated was required to complete the syndication -- and perform at a level that would finally enable it to exceed the benchmarks reflected in the financial covenants ultimately contained in the Financing Agreement.

74.    Meanwhile, CIT was receiving appraisals on Jevic's assets that exceeded expectations. CIT's "[u]nderwriting was focused on the asset values . . . because that was the deal" for CIT.

75.    Even though Sun was "ready, willing and able" to close on the acquisition with $86.4 million in financing, including a $70 million Revolver, the higher asset valuations enabled CIT to offer an even larger financing package of $101.2 million, including an $85

million Revolver, which Sun and Jevic readily accepted.

F.    **CIT and Jevic Close on a $101.2 Million Financing**

76.    On July 28, 2006, CIT, for itself and as agent for the lending group, and Jevic, as the borrower, closed on the financing pursuant to a written financing agreement (the "Financing Agreement"). CIT provided an $85 million Revolver (inclusive of $35 million in letters of credit), and a $16.2 million term loan for a total loan facility of $101.2 million, inclusive of the payment of $1.5 million of direct transaction costs (the "CIT Loan Fees"). Sun caused JHC to contribute $1 million in equity.

77.    Upon information and belief, CIT would not have funded the Re-Financing on its own, and CIT would not have been able to syndicate the Re-Financing without the Enhanced Projections.

78.    Upon information and belief, Jevic's officers and directors approved the Re-Financing in breach of their fiduciary duty. Jevic's officers and directors knew or should have known that the Re-Financing was based, in part, on specious projections and otherwise caused the Company to vastly increase its total debt and debt service obligations, and encumber all of its assets, all to the detriment of Jevic and its creditors.

79.    Jevic incurred expenses of approximately $1.4 million in connection with the CIT-led Re-Financing, including closing fees to CIT in the amount of $101,200.00 -- on top of approximately $1.7 million in transaction expenses associated with the acquisition and Bridge Loan.

80.    The change in Jevic's capital structure resulting from the Re-Financing

was stark.  Immediately prior to Sun's acquisition, Jevic had long-term debt of approximately

$55 million and shareholders' equity of approximately $46 million.  After Sun's acquisition and

the Re-Financing, Jevic had debt (or the ability to utilize debt facilities) in an amount up to

$101.2 million and equity of $1 million.

81.    The only thing accomplished by this recapitalization was a change in

ownership.  Sun acquired ownership of Jevic, using Jevic's assets to pay the purchase price.

82.    Thus, as of July 28, 2006, Sun -- with CIT's backing -- had (a) acquired a

company that Sun knew had experienced a prolonged downturn in financial performance and

which operated in a highly competitive market while beset by many operational problems; (b)

leveraged Jevic to the hilt, converting approximately $45 million of shareholders' equity into

debt bearing an interest rate of almost 9 percent; (c) leveraged every single asset owned by Jevic

to the maximum extent possible in order to finance the acquisition; (d) caused the incurrence of

over $3 million in direct transaction costs associated with the acquisition and Re-Financing; and

(e) avoided virtually all risk by contributing just $1 million in new equity, most of which was

repaid to Sun in the form of "fees."

83.    Those "fees" were paid at the time of the Re-Financing and immediately

prior to the bankruptcy filing.  Specifically, in July 2006, Jevic paid Sun $640,001 in financing

fees and $124,999.00 in management fees.  Then, in April 2008, it paid Sun an additional

$32,009.85 in management fees.  The total amount of "fees" paid to Sun as part of the LBO was

$797,009.85 (the "Direct Sun Fees").

84.    Tellingly, neither Sun nor CIT did any analysis to determine the impact of

Jevic's newly-found debt burden compared to Jevic's pre-acquisition cost of borrowing.

85.     For a company that had experienced a prolonged period of decline in terms of profitability, and which operated in a highly competitive market while enduring myriad operational problems, the impact of Jevic's newly-imposed debt burden was catastrophic, putting its constituents, including its unsecured creditors, contract counterparties and employees, at great risk.

86.     Collapsed together, the cost of Sun's acquisition of Jevic, and the Re-Financing, left Jevic with substantially increased borrowing costs and with unreasonably small capital; and Jevic was rendered insolvent.

87.     As would soon be apparent, Jevic could not perform at the level forecast by Sun. And since the financial covenants were predicated on Sun's overly-optimistic projections, Jevic had no margin for error.

88.     Specifically, Jevic agreed to several financial covenants in its Financing Agreement with CIT. The financial covenants were established by CIT at 80% of the relevant portions of the financial projections. Thus, if Jevic achieved just 80% of the relevant portions of the projections, it would be in compliance under the financial covenants. If Jevic could not achieve that seemingly modest goal, Jevic would be in default and considerable benefits and rights would inure to CIT's benefit and to Jevic's detriment.

89.     One relevant portion of Sun's projections was the EBITDA forecast. CIT used 80% of the projected EBITDA to establish minimum consolidated EBITDA benchmarks that Jevic had to meet each calendar quarter (the "EBITDA Covenant").

90.     Another relevant portion of the projections was the fixed charge ratio. Again, CIT used 80% of the projected fixed charge ratio to establish a benchmark that Jevic was required to meet under certain circumstances (the "Fixed Charge Covenant").

91.     Ironically, while Sun's unreasonably aggressive projections may have helped it secure the Re-Financing, and may have helped CIT syndicate that loan package, the same projections formed the basis of financial covenants that Jevic could not meet and would lead to its downfall and ultimate liquidation.

**G.     Jevic Is in Immediate Default and Financial Distress**

92.     Sun's projections notwithstanding, Jevic was not just on the road to ruin; it was on the fast track.

93.     Within days of the acquisition, Jevic began slashing its capital expenditure budget in an effort to maintain liquidity.

94.     The debt burden created by CIT's re-financing also had a material, adverse effect of Jevic's cash flow.

95.     And sales and EBITDA continued to erode at a precipitous pace.

96.     In the first three months of Sun's ownership, from July 1 through September 30, 2006, Jevic (a) missed its revenue target by more than 6%; (b) "achieved" EBITDA that was less than 25% of the EBITDA Sun had forecasted just weeks before (i.e., Jevic missed Sun's EBITDA projection in the very first quarter by more than 75%); and (c) cut capital expenditures by almost 50% from the budgeted amount.

97.     The only "external" event cited for Jevic's dismal performance was

Jevic's inability to immediately re-gain lost customers and sales revenue.

98.    Incredibly, on September 11, 2006, just six weeks after the closing of CIT's Re-Financing, Jevic and Sun knew that Jevic would default under the EBITDA Covenant as of September 30, 2006.

99.    On September 11, Jevic's Chief Financial Officer (the "CFO") reported to Sun that compliance with the EBITDA Covenant as of September 30, 2006 was "not feasible" and that the EBITDA Covenant would "continue to be a concern through calendar 2007. . ." The CFO ominously recommended that Jevic "start conversations with our lending group shortly to explore our options."

100.    The CFO's September 11 observations proved prescient.

101.    On October 11, 2006, Jevic informed CIT that it was in default under the EBITDA Covenant as of September 30, 2006, and CIT promptly declared a default under the Financing Agreement.

102.    Jevic faced liquidity problems for the balance of the year, and, as of December 31, 2006, was in default under both the EBITDA Covenant and the Fixed Charge Covenant.

103.    CIT, Jevic and Sun negotiated an amendment to the Financing Agreement that was executed on January 16, 2007 (the "Second Amendment"), less than six months after CIT provided the Re-Financing.

104.    The parties recognized the dire circumstances confronting Jevic and acted to protect their own interests.

105.    The unreasonableness of Sun's July 2006 projections -- including its forecast (incorporated into CIT's syndication marketing materials) of 2007 EBITDA growth of more than 75% -- became crystal clear.  Implicitly recognizing that Jevic would not generate meaningful earnings for the foreseeable future, the Second Amendment eliminated the EBITDA Covenant in its entirety.

106.    The Second Amendment also modified the formula for calculating the Fixed Charge Covenant, and lowered the Fixed Charge ratio by 90% for the January 1 through June 30, 2007 period, and by 55% for the period ending September 30, 2007 (the "Modified Fixed Charge Covenant"), all presumably to make it easier for Jevic to avoid further defaults.

107.    In exchange for the elimination and substantial loosening of Jevic's financial covenants, CIT extracted significant concessions including (a) a $250,000 fee; (b) a requirement that Jevic provide weekly certified borrowing base certificates (as opposed to monthly); (c) a doubling of the frequency in which CIT could perform Rolling Stock and Real Estate Appraisals, at Jevic's expense; (d) a requirement that all net proceeds from the contemplated sale/lease back of real property (discussed below) be used to pay off the Term Loan, and then to pay down the Revolver; and (e) a condition precedent requiring Jevic to deliver to CIT executed leases with respect to the properties being sold.

**H.    The Sale-Leaseback Worsened Jevic's Plight**

108.    Jevic owned three pieces of real property (and related improvements) located in Delanco, New Jersey, Markham, Illinois, and Oxford, Massachusetts (together, "Jevic's Real Estate"), and maintained operations at each site.

109.    In connection with its due diligence for the Re-Financing, CIT received new real estate appraisals and thereafter agreed to lend $16.2 million (or 70% of the stated market value of Jevic's Real Estate) in the form of a term loan (the "Term Loan") in exchange for security interests in Jevic's Real Estate.

110.    Jevic received no benefit from the $16.2 million lent by CIT against Jevic's Real Estate; as Sun and CIT knew and intended, the proceeds from the Term Loan were used to repay the Bridge Loan, which was obtained to finance Sun's acquisition, not to fund Jevic's operations.

111.    But borrowing against Jevic's Real Estate was just the first step in Sun's larger plan. Prior to its acquisition of Jevic, Sun mapped out a plan to leverage Jevic's Real Estate to help finance the acquisition, and later enter into sale/leaseback arrangements in order to repay the debt incurred under the Term Loan. But Sun needed time to orchestrate the sale/leaseback transactions. According to a Sun representative:

> We had looked at potentially performing a sale leaseback from our initial involvement in looking at the opportunity, and it took some time for us to go out, contact parties, and negotiate a sale leaseback transaction. But I can't say there was any magic behind the exact date, except for that was the time that we were able to come to the table with a party to finalise [sic] a sale leaseback.

112.    With CIT's active assistance, Sun began to put into motion its plan to sell and lease back Jevic's Real Estate promptly after the acquisition and Re-Financing.

113.    From in or around August 2006 through in or around January 2007, Sun executed its plan by causing Jevic to market Jevic's Real Estate, and to negotiate sale terms.

114.    Finally, on January 17, 2007, Sun caused Jevic to complete the Sale-Lease

Backs by selling the New Jersey and Illinois properties (the "SLB Properties"), and by simultaneously entering into 20-year leases with the new owners of the properties that contemplated enormous rent obligations for the properties formerly owned outright by Jevic.

115.    Jevic's officers and directors breached their fiduciary by authorizing the Sale-Lease Backs in which Jevic's valuable real estate was sold to satisfy Sun's acquisition debt and onerous leases were imposed on Jevic.

116.    The SLB Properties were sold for approximately $20 million.  In accordance with the Second Amendment, Jevic delivered to CIT all of the net proceeds to (a) pay off the $16.2 million Term Loan, (b) pay down the Revolver by $3 million, and (c) pay transaction fees in the amount of $700,000 (the "Sale-Lease Back Fee," and collectively with the Bridge Loan Fees, the CIT Loan Fees and the Direct Sun Fees, the "Transaction Fees").

117.    Following the Sale-Lease Backs and the paying off of the Term Loan, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was now saddled with 20-year lease commitments with respect to property Jevic had previously enjoyed the use of rent free.

118.    As Sun and CIT knew, the SLB Properties were encumbered solely to secure the Term Loan and thereby pay down the Bridge Loan used to finance Sun's acquisition of Jevic, and the Sale-Lease Backs were entered into solely to pay off CIT's Term Loan.

I.    **Financing of Transaction Fees**

119.    Upon information and belief, the Transaction Fees were funded with the loan proceeds of the Bridge Loan, the Re-Financing and the sale proceeds from the Sale-Lease

Backs. The total amount of the Transaction Fees plus the Direct Sun Fees was $4.9 million, none of which benefited Jevic.

**J.    Jevic's Downward Spiral Continues**

120.    The continued deterioration of the trucking industry -- the possibility of which was never incorporated into Sun's projections (the Committee is unaware of any iteration of Sun's projections that forecast a decrease in revenue at any time after 2006) -- was a hill that Jevic could not climb.

121.    Jevic was in default under the severely Modified Fixed Charge Covenant as of September 30, 2007, and Jevic remained in default for the rest of the year.

122.    With Jevic in continuing default under the Modified Fixed Charge Covenant and other provisions of the Financing Agreement (the "2007 Defaults"), Jevic, JHC, Creek Road and CIT entered into a Forbearance Agreement and Third Amendment to Financing Agreement on January 8, 2008 (the "Forbearance Agreement").

123.    In exchange for CIT's willingness to forebear from exercising its rights flowing from the 2007 Defaults until February 29, 2008 (about seven weeks), CIT extracted the following concessions, among others:  (a) Jevic was required to hire an investment advisor within two weeks to assist with the preparation of an offering memorandum in connection with a possible sale; (b) Jevic was required to pay the expenses of a restructuring consultant to be hired by CIT; (c) all LIBOR-based loans were eliminated during the forbearance period; (d) Sun was required to deliver a $2 million guaranty of Jevic's indebtedness; (e) the Line of Credit (as defined in the Financing Agreement) was reduced from $101.2 million to $70 million; and (f) the

Revolver was reduced from $85 million to $70 million (i.e., all forms of financing were eliminated except for the Revolver, which itself was reduced).

124.    The Forbearance Agreement was amended four times over the following ninety days.  In general, the amendments to the Forbearance Agreement further constricted the Revolver; required the retention (at Jevic's expense) of various consultants, appraisers and investment advisors; and ultimately required all Net Cash Proceeds (as defined in the Financing Agreement) to be paid to CIT.

125.    On May 20, 2008, less than two years after Sun's acquisition of Jevic, and CIT's Re-Financing, Jevic filed for bankruptcy.  Shortly before the bankruptcy filing, the company abruptly ceased all operations, and immediately after the bankruptcy it was liquidated in piece-meal fashion.

126.    Jevic was a complete failure under Sun's ownership.  Indeed, there was no fiscal quarter between Sun's acquisition of Jevic and Jevic's bankruptcy filing when Jevic met its budget on an EBITDA, revenue or net income basis.

127.    Sun and CIT risked nothing on the gamble that Sun's "experience" and "expertise" would revive Jevic's fortunes and generate big returns and fees for them; Jevic's unsecured creditors are now left to deal with the consequences of their failed gamble.

128.    Jevic's demise was not the result of some unforeseeable event.  Rather, it was the foreseeable end of a reckless course of action in which Sun and CIT bore no risk but all other constituents did.

**K.**    **The Sun, Sun Management and Sun Partners Claims**

**1.**    **Sun's Claims**

129.    On or about January 20, 2010, Sun filed Proof of Claim No. 1067 against Jevic; Proof of Claim No. 1068 against Creek Road; and Proof of Claim No. 1085 against JHC (these Proofs of Claim are collectively referred to as "Sun's Claims").

130.    As Sun acknowledged, the Debtors defaulted under their credit agreement with CIT in 2007 (and 2006).  In exchange for entering into the Forbearance Agreement (the term of which was approximately seven weeks), CIT received, among other things, Sun's guaranty of up to $2 million of the Debtors' obligations to CIT (the "Guaranty").  According to Sun's Claim, the Guaranty purports to subrogate Sun "to the Prepetition Lenders' position to the extent of the Guaranty."  Sun contends that it paid $2 million pursuant to the Guaranty; that the "Prepetition Facility has now been paid in full, with the exception of the $2 million" allegedly owed to Sun; and that Sun is therefore the holder of a first priority secured lien on the Debtors' assets (including cash), to the extent of any principal, "accrued interest, fees, expenses or costs in relation to such claim" ("Sun's Purported Liens").

131.    At the time Sun executed the Guaranty, and purportedly made the $2 million payment required thereunder, the Guaranty was on terms that no reasonable third-party lender would have lent money to the Debtors.

**2.**    **Sun Management's Claims**

132.    On or about January 20, 2010, Sun Management filed Proof of Claim No. 1087 against Jevic ("Sun Management's Claim").

133.    Sun Management alleges that it entered into a "Management Services

Agreement" with Jevic and its Claim is "for any amounts due and owing under the Management

Services Agreement, including the indemnification and expense reimbursement provisions

thereof."

### 3.    <u>Sun Partners' Claims</u>

134.    On or about January 20, 2010, Sun Partners filed Proof of Claim No. 1086

against JHC; Proof of Claim No. 1088 against Creek Road; and Proof of Claim No. 1089 against

Jevic (these Proofs of Claim are collectively referred to as "Sun Partners' Claims," and

collectively with Sun's Claims and Sun Management's Claim, the "Sun Group Claims").

135.    Sun Partners is purportedly a Defendant in Adversary Case No. 08-50662

(Bankr. D. Del.), and in an unidentified case pending in an unidentified New Jersey state court

(together, the "Proceedings").

136.    Each of Sun Partners' Claims is identical.  Sun Partners alleges in each of

its Proofs of Claim that "[t]o the extent that [Sun Partners] has any cross-claims or other claims

against any of the Debtors relating to the Proceedings . . . [Sun Partners] hereby preserves such

claims herein.

**FIRST CLAIM FOR RELIEF**
**(Against CIT)**
**(Avoidance of Liens, Fraudulently Incurred Obligations,**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§548 and 550)**

137.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though set forth fully herein.

138.    Since June 2006, the Debtors directly or indirectly, voluntarily or

involuntarily, made transfers and conveyances, and incurred obligations, in an amount to be

determined, to CIT for, including without limitation, the pledging to CIT of liens on the Debtors

assets, including without limitation, the Debtors' valuable real estate, and the debt obligations

that the Debtors incurred to finance the acquisition of Jevic by Sun.

139.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received

less than reasonably equivalent value from CIT in exchange for such transfers, conveyances, and

incurrences of obligations.

140.    At the time of each transfer and incurred obligation, the Debtors (i) were

insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii)

were engaged in business for which their remaining property was an unreasonably small capital,

or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to

repay as they matured.

141.    Pursuant to section 550 of the Bankruptcy Code such transfers are

voidable by the Debtor.

142.    Accordingly, Plaintiff is entitled to void such transfers and obligations and

to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

### SECOND CLAIM FOR RELIEF
#### (Against CIT)
#### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550)

143.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though set forth fully herein.

144.    In January, 2007, the Debtors directly or indirectly, voluntarily or involuntarily, made transfers and conveyances in connection with the Sale-Lease Back and the resulting repayment of the Term Loan.

145.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free.

146.    At the time of the Sale-Lease Back and the repayment of the Term Loan, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

147.    Pursuant to section 550 of the Bankruptcy Code such transfers and incurred obligations in the amount of approximately $16,200,000.00 are voidable by the Debtor.

148.    Accordingly, Plaintiff is entitled to void such transfers and obligations and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

### THIRD CLAIM FOR RELIEF
#### (Against CIT)
#### (Avoidance of Liens, Fraudulently Incurred Obligations,
#### and Payments in Respect of Fraudulently Incurred Obligations
#### 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)

149.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

150.    CIT and all of the other participants involved in the LBO, the Re-Financing, and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of liens on the Debtors' assets, including without limitation, its valuable real estate, in order to refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness, and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

151.    The Debtors did not receive reasonably equivalent value in exchange for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun.

152.    At the time that CIT obtained liens on the Debtors' assets and the Debtors incurred debt obligations to CIT, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to the business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 25:2-25(b) of the New Jersey Statutes.

153.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

154.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the Debtors should be avoided pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-25(b) and 2-29 of the New Jersey Statutes.

155.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt obligations under their fraudulently incurred obligations to CIT were transferred for the benefit of CIT.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of the liens from CIT and all amounts that the Debtors have repaid on fraudulently incurred obligations.

156.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-25(b) and 2-29 of the New Jersey Statutes, such transfers, conveyances and incurrences of obligations are voidable.

157.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of obligations and is entitled to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

### FOURTH CLAIM FOR RELIEF
### (Against CIT)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27and 2-29)

158.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

159.    CIT and all of the other participants involved in the LBO, the Re-

Financing, and the Sale-Lease Back intended and planned that all transactions related thereto –
including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of
liens on the Debtors' assets, including without limitation, its valuable real estate, in order to
refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT
indebtedness, and all other related transactions – would be interdependent related transactions.
All of those transactions should be collapsed into a single integrated transaction for purposes of
determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

160.   The Debtors (a) did not receive reasonably equivalent value in exchange
for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for
the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun,
and (b) were insolvent at that time or became insolvent as a result of the transfer within the
meaning of section 25:2-27 of the New Jersey Statutes.

161.   At all relevant times, the Debtors had actual creditors holding unsecured
claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and
section 25:2-21 of the New Jersey Statutes.

162.   The liens on the Debtors' assets and the proceeds thereof that were
pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the
Debtors should be avoided pursuant to sections 544(b) and 550 of the Bankruptcy Code and
sections 25:2-27 and 2-29 of the New Jersey Statutes.

163.   The liens on the Debtors' assets and the proceeds thereof that were
pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt

obligations under their fraudulently incurred obligations to CIT were transferred for the benefit

of CIT.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of the liens

from CIT and all amounts that the Debtors have repaid on fraudulently incurred obligations.

164.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

25:2-27 and 2-29 of the New Jersey Statutes, such transfers, conveyances and incurrences of

obligations are voidable.

165.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of

obligations and is entitled to a monetary judgment against CIT in an amount to be determined at

trial, plus interest.

**FIFTH CLAIM FOR RELIEF**
**(Against CIT)**
**(Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)**

166.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

167.    CIT and all of the other participants involved in the LBO, the Re-

Financing and the Sale-Lease Back intended and planned that all transactions related thereto –

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to

CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to

refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the

CIT indebtedness and all other related transactions – would be interdependent related

transactions.  All of those transactions should be collapsed into a single integrated transaction for

purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

168.    The Debtors did not receive reasonably equivalent value in connection with the Sale-Lease Back and the resulting repayment of the Term Loan because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free.

169.    At the time of the Sale-Lease Back and the repayment of the Term Loan, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to the business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond its ability to pay as they became due within the meaning of section 25:2-25(b) of the New Jersey Statutes.

170.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

171.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-25(b) and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

172.    Accordingly, Plaintiff is entitled to void such transfers and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

## SIXTH CLAIM FOR RELIEF
### (Against CIT)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)

173.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

174.    CIT and all of the other participants involved in the LBO, the Re-Financing and the Sale-Lease Back intended and planned that all transactions related thereto – including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness and all other related transactions – would be interdependent related transactions.  All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

175.    At the time of the Sale-Lease Back and the repayment of the Term Loan, the Debtors did not receive reasonably equivalent value in connection with the Sale-Lease Back and the resulting repayment of the Term Loan because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free, and the Debtors were insolvent or would be rendered insolvent by the transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of section 25:2-27 of the New Jersey Statutes.

176.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

177.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-27 and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

178.    Accordingly, Plaintiff is entitled to void such transfers and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

**SEVENTH CLAIM FOR RELIEF**
**(Against CIT)**
**(Avoidance of Liens, Fraudulently Incurred Obligations,**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)**

179.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

180.    CIT and all of the other participants involved in the LBO, the Re-Financing, and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of liens on the Debtors' assets, including without limitation, its valuable real estate, in order to refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness, and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of

determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

181.    The Debtors did not receive reasonably equivalent value in exchange for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun.

182.    At the time that CIT obtained liens on the Debtors' assets and the Debtors incurred debt obligations to CIT, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to the business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due; within the meaning of section 1304(a) of Title 6 of the Delaware Code.

183.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

184.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code.

185.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt obligations under their fraudulently incurred obligations to CIT were transferred for the benefit of CIT.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of the liens

from CIT and all amounts that the Debtors have repaid on fraudulently incurred obligations.

186.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code, conveyances and incurrences of obligations are voidable.

187.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of obligations and is entitled to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

### EIGHTH CLAIM FOR RELIEF
### (Against CIT)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305, and 1307)

188.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

189.    CIT and all of the other participants involved in the LBO, the Re-Financing, and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of liens on the Debtors' assets, including without limitation, its valuable real estate, in order to refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness, and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

190.    The Debtors (a) did not receive reasonably equivalent value in exchange

for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for

the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun,

and (b) were insolvent at that time or became insolvent as a result of the transfer within the

meaning of section 1305 of Title 6 of the Delaware Code.

191.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 1301 of Title 6 of the Delaware Code.

192.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the

Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the

Bankruptcy Code and sections 1305 and 1307 of Title 6 of the Delaware Code.

193.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt

obligations under their fraudulently incurred obligations to CIT were transferred for the benefit

of CIT.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of the liens

from CIT and all amounts that the Debtors have repaid on fraudulently incurred obligations.

194.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

1305 and 1307 of Title 6 of the Delaware Code, conveyances and incurrences of obligations are

voidable.

195.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of

obligations and is entitled to a monetary judgment against CIT in an amount to be determined at

trial, plus interest.

## NINTH CLAIM FOR RELIEF
### (Against CIT)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)

196.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

197.    CIT and all of the other participants involved in the LBO, the Re-

Financing and the Sale-Lease Back intended and planned that all transactions related thereto --

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to

CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to

refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the

CIT indebtedness and all other related transactions -- would be interdependent related

transactions.  All of those transactions should be collapsed into a single integrated transaction for

purposes of determining whether those transactions were fraudulent as to unsecured creditors of

the Debtors.

198.    The Debtors did not receive reasonably equivalent value in connection

with the Sale-Lease Back and the resulting repayment of the Term Loan because subsequent to

the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any

borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease

commitments on properties Jevic previously enjoyed rent free.

199.    At the time of the Sale-Lease Back and the repayment of the Term Loan,

the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to the business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 1304(a) of Title 6 of the Delaware Code.

200.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

201.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code sections 1304 and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

202.    Accordingly, Plaintiff is entitled to void such transfers and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

**TENTH CLAIM FOR RELIEF**
**(Against CIT)**
**(Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307)**

203.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

204.    CIT and all of the other participants involved in the LBO, the Re-Financing and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to

CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

205.    At the time of the Sale-Lease Back and the repayment of the Term Loan, the Debtors did not receive reasonably equivalent value in connection with the Sale-Lease Back and the resulting repayment of the Term Loan because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free, and the Debtors were insolvent or would be rendered insolvent by the transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of section 1305 of Title 6 of the Delaware Code.

206.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

207.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code sections 1305 and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

208.    Accordingly, Plaintiff is entitled to void such transfers and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

### ELEVENTH CLAIM FOR RELIEF
### (Against CIT)
### (Equitable Subordination and Subordination - 11 U.S.C. §510)

209.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

210.    CIT asserts a claim against each of the Debtors' estates in the amount of $50,417,204.27 (collectively, the "CIT Claims"). These claims were paid off pursuant to the final DIP financing order, subject to disgorgement.

211.    CIT was an active participant in the disastrous Jevic leveraged buyout and profited handsomely in the form of interest, fees and other charges in connection therewith. CIT also contributed in active ways and encouraged the transaction's highly leveraged structure which led to the failure of the business and millions of dollars of employee, vendor and governmental claims going unpaid. As alleged herein, CIT actively participated in the development of Jevic's financial projections used to support the transaction – an even more leveraged one than originally proposed – in order to enable its syndication of the loans. These projections turned out to be a recipe for Jevic's failure, as it was unable from the inception to meet any of these projections, or to sustain the overwhelming debt burden it took on and also meet its ordinary business obligations as they came due. Jevic's abrupt failure and consequent liquidation enabled CIT to recover on its senior secured loans but all other creditors were left holding the bag, creditors who had no involvement with the formulation of the LBO nor profited

from it but were victims of a scheme concocted by the architects of the LBO, including CIT, who did profit from it and bore little or no risk from the outset.

212.    Sun's initial forecasts to support the LBO projected that Jevic would experience (a) revenue growth of -3.0% in 2006; 0% in 2007; 1% in 2008; and 2% in 2009; and (b) EBITDA growth of -32.0% in 2006; 30.3% in 2007; 25.1% in 2008; and 23.4% in 2009. Thereafter, Sun developed a "Base Case" projection in June of 2006 which improved the forecast to (a) revenue (excluding fuel surcharge) growth of -5.0% in 2006; 3.0% in 2007; 4% in 2008; and 5% in 2009; and (b) EBITDA growth of -50.4% in 2006; 64.1% in 2007; 25% in 2008; and 21.2% in 2009.

213.    Significantly, even with June's stepped-up forecasts (as compared to the earlier version), Sun's June "Base Case" still failed to project sufficient EBITDA to meet the EBITDA and Fixed Charge covenants that were ultimately incorporated into CIT's financing agreement. Upon information and belief, using Sun's already rosy Base Case financial projections, CIT was not able to succeed in syndicating the LBO loans. Consequently, CIT pushed Sun to provide even more aggressive projections.

214.    In July, Sun prepared the Enhanced Projection that were used by CIT to syndicate the $101.2 million Re-Financing. The Enhanced Projections were even more unrealistic, but they were used to syndicate an even larger financing. Whereas before Sun and CIT were contemplating $86.4 million in financing, including a $70 million Revolver, reliance on the Enhanced Projection enabled CIT to offer an even larger financing package of $101.2 million. This increase (a) reduced the amount of capital Sun would put into the deal, and (b)

increased the size of the loans and thereby increasing CIT's fees on the deal and interest to be earned in the future.

215.    The direct result of CIT's role in encouraging Sun to prepare unrealistic financial projections in order to facilitate syndication of the LBO loans was the infliction of massive debt  on Jevic's creditors.

216.    But for CIT's conduct, Sun would not have revised its already overly-optimistic projections further upwards, and it did so in order to facilitate CIT's syndication of the LBO loans.  CIT profited in the form of substantial fees and charges, as well as interest and the recovery of its principal while all of Jevic's other creditor were left with nothing.  Jevic simply could not withstand even the slightest vicissitudes given how highly it became leveraged, and its inevitable failure was abrupt and catastrophic.  All employees were laid off without notice, trucks were left on the side of the road, and the business was sold in piecemeal fashion.  As a consequence of its willing participation in and encouragement of Jevic LBO, from which it profited handsomely and recovered its principal while others were left with nothing, CIT's claims should be equitably subordinated below the claims of prepetition general unsecured creditors.

217.    Consistent with section 510(c) of the Bankruptcy Code, the CIT Claims should be equitably subordinated to other claims against the Debtors.

### TWELFTH CLAIM FOR RELIEF
#### (Against CIT)
#### (Avoidance of Preferential Transfers - 11 U.S.C. §§547 and 550)

218.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though set forth fully herein.

219.    Upon information and belief within ninety days prior to the Petition Date, the Debtors made at least the following transfers to CIT:

| Check Date | Amount |
|---|---|
| 02/29/08 | 132,066.47 |
| 02/29/08 | 5,134.74 |
| 02/29/08 | - |
| 02/29/08 | 94,115.03 |
| 03/31/08 | 127,174.31 |
| 03/31/08 | 5,899.58 |
| 03/31/08 | - |
| 03/31/08 | 155,414.30 |
| 04/30/08 | 113,266.94 |
| 04/30/08 | 2,908.07 |
| 04/30/08 | 67,598.81 |
| 04/30/08 | 1,791,402.91 |
| 05/20/08 | 115,064.97 |
| 05/20/08 | 923.40 |
| 05/20/08 | 41,279.41 |
| 05/20/08 | 575,351.94 |

220.    The transfers were made on account of alleged antecedent debts owed by the Debtor to CIT.

221.    The transfers were made while the Debtors were insolvent.

222.    The transfers enabled CIT to receive more than it would have received if the Debtors' cases were cases under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and/or if it received payment on the debt to the extent provided by the Bankruptcy Code.

223.    Accordingly, Plaintiff is entitled to void such transfers and to a monetary judgment against CIT in an amount to be determined at trial, plus interest.

## THIRTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§548 and 550)

224.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

225.    Since June 2006, the Debtors directly or indirectly, voluntarily or involuntarily, made transfers and conveyances, and incurred obligations, in an amount to be determined, for the benefit of Sun, including without limitation, the pledging to CIT of liens on the Debtors assets, including without limitation, the Debtors' valuable real estate, and the debt obligations that the Debtors incurred to finance the acquisition of Jevic by Sun.

226.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value from Sun in exchange for such transfers, conveyances, and incurrences of obligations for Sun's benefit.

227.    At the time of each transfer and incurred obligation, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

228.    Pursuant to section 550 of the Bankruptcy Code, such transfers are voidable by the Debtor.

229.    Accordingly, Plaintiff is entitled to void such transfers and obligations and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

## FOURTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§548 and 550)

230.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

231.    In January 2007, the Debtors directly or indirectly, voluntarily or involuntarily, made transfers and conveyances in connection with the Sale-Lease Back and the resulting repayment of the Term Loan for the benefit of Sun.

232.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free.

233.    At the time of the Sale-Lease Back and the repayment of the Term Loan for Sun's benefit, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

234.    Pursuant to section 550 of the Bankruptcy Code, such transfers and incurred obligations in the amount of approximately $16,200,000.00 are voidable by the Debtor.

235.    Accordingly, Plaintiff is entitled to void such transfers and obligations and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

## FIFTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§548 and 550)

236.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

237.    Since June 2006, the Debtors directly or indirectly, voluntarily or involuntarily, made transfers and conveyances, and incurred obligations, in an amount to be determined, for the benefit of Sun, including without limitation, the pledges of assets that ultimately became subject to Sun's Purported Lien.

238.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value from Sun in exchange for such transfers, conveyances, and incurrences of obligations for Sun's benefit.

239.    At the time the Debtors pledged to CIT the assets that ultimately became subject to Sun's Purported Lien, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

240.    Pursuant to section 550 of the Bankruptcy Code, the pledges that ultimately became subject to Sun's Purported Lien are voidable by the Debtor.

241.    Accordingly, Plaintiff is entitled to void the pledge of assets that ultimately became subject to Sun's Purported Lien and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### SIXTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§548 and 550)

242.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

243.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value in connection with the pledge of assets to CIT that ultimately became subject to Sun's Purported Lien.

244.    At the time the Debtors pledged the assets to CIT that ultimately became subject to Sun's Purported Lien, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

245.    Pursuant to section 550 of the Bankruptcy Code, such transfers and incurred obligations are voidable by the Debtor.

246.    Accordingly, Plaintiff is entitled to void such transfers and obligations and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### SEVENTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§548 and 550)

247.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

248.    In July 2006 and April 2008, the Debtors directly or indirectly, voluntarily or involuntarily, made transfers and conveyances for the benefit of Sun in connection with the Sun Fees in the amount of $797,009.85.  In addition, the Debtors directly or indirectly, voluntarily or involuntarily made transfers and conveyances for the payment of the fees and expenses of the lenders and other third parties in connection with the Bridge Loan, the Re-Financing and the Sale-Lease Back that were part of the LBO for the benefit of Sun.

249.    Pursuant to section 548(a) of the Bankruptcy Code, the Debtors received less than reasonably equivalent value because the Transaction Fees and the Direct Sun Fees did not provide any benefit to the Debtors.

250.    At the time that the Transaction Fees and the Direct Sun Fees were paid, the Debtors (i) were insolvent or became insolvent as a result of such transfers and incurrences of obligations, (ii) were engaged in business for which their remaining property was an unreasonably small capital, or (iii) intended to incur, or believed they would incur, debts that were beyond their ability to repay as they matured.

251.    Pursuant to section 550 of the Bankruptcy Code, such transfers and incurred obligations in the amount of approximately $4.1 million for the Transaction Fees and $797,009.85 for the Sun Direct Fees are voidable by the Debtor.

252.    Accordingly, Plaintiff is entitled to void such transfers and obligations and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

## EIGHTEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)

253.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

254.    Sun and all of the other participants involved in the LBO, the Re-Financing, and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of liens on the Debtors' assets, including without limitation, its valuable real estate, in order to refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness, and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

255.    The Debtors did not receive reasonably equivalent value in exchange for the liens on Jevic's assets that were pledged to CIT for the benefit of Sun as security for the Re-Financing and for the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun.

256.    At the time that Sun caused the Debtors to incur the liens on their assets and incur debt obligations for the benefit of Sun, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur, believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the

meaning of section 25:2-25(b) of the New Jersey Statutes.

257.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

258.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the Bankruptcy Code and section 25:2-29 of the New Jersey Statutes.

259.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt obligations under their fraudulently incurred obligations to CIT were transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of those liens from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

260.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-25(b) and 2-29 of the New Jersey Statutes, such transfers, conveyances and incurrences of obligations are voidable.

261.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of obligations and is entitled to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

## NINETEENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)

262.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

263.    Sun and all of the other participants involved in the LBO, the Re-

Financing, and the Sale-Lease Back intended and planned that all transactions related thereto --

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of

liens on the Debtors' assets, including without limitation, its valuable real estate, in order to

refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT

indebtedness, and all other related transactions -- would be interdependent related transactions.

All of those transactions should be collapsed into a single integrated transaction for purposes of

determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

264.    The Debtors (a) did not receive reasonably equivalent value in exchange

for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for

the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun,

and (b) were insolvent at that time or became insolvent as a result of the transfer within the

meaning of section 25:2-27 of the New Jersey Statutes.

265.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 25:2-21 of the New Jersey Statutes.

266.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the

Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the

Bankruptcy Code and sections 25:2-27 and 2-29 of the New Jersey Statutes.

267.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt

obligations under their fraudulently incurred obligations to CIT were transferred for the benefit

of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of those

liens from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

268.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

25:2-27 and 2-29 of the New Jersey Statutes, such transfers, conveyances and incurrences of

obligations are voidable.

269.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of

obligations and is entitled to a monetary judgment against Sun in an amount to be determined at

trial, plus interest.

### TWENTIETH CLAIM FOR RELIEF
#### (Against Sun)
#### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)

270.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

271.    Sun and all of the other participants involved in the LBO, the Re-

Financing and the Sale-Lease Back intended and planned that all transactions related thereto --

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to

CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to

refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the

CIT indebtedness and all other related transactions -- would be interdependent related

transactions. All of those transactions should be collapsed into a single integrated transaction for

purposes of determining whether those transactions were fraudulent as to unsecured creditors of

the Debtors.

272.    The Debtors did not receive reasonably equivalent value in connection

with the Sale-Lease Back and the resulting repayment of the Term Loan incurred for Sun's

benefit because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB

Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and

(iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent

free.

273.    At the time of the Sale-Lease Back and the repayment of the Term Loan,

the Debtors (a) were engaged or about to engage in a business for which their remaining assets

and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur,

or reasonably should have believed that it would incur, debts beyond their ability to pay as they

became due within the meaning of section 25:2-25(b) of the New Jersey Statutes.

274.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 25:2-21 of the New Jersey Statutes.

275.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and section 25:2-25(b) and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

276.    Accordingly, Plaintiff is entitled to recover the value of such transfers and to monetary judgment against Sun in an amount to be determined at trial, plus interest.

**TWENTY-FIRST CLAIM FOR RELIEF**
**(Against Sun)**
**(Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)**

277.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

278.    Sun and all of the other participants involved in the LBO, the Re-Financing and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

279.    At the time of the Sale-Lease Back and the repayment of the Term Loan,

the Debtors (a) did not receive reasonably equivalent value in connection with the Sale-Lease Back and the resulting repayment of the Term Loan because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free, (b) incurred, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due, and (c) were insolvent or would be rendered insolvent by the transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of section 25:2-27 of the New Jersey Statutes.

280.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

281.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-27 and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

282.    Accordingly, Plaintiff is entitled to recover the value of such transfers and to monetary judgment against Sun in an amount to be determined at trial, plus interest.

### TWENTY-SECOND CLAIM FOR RELIEF
#### (Against Sun)
#### (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)

283.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

284.    Sun asserts that it is "subrogated to the Prepetition Lenders' first priority secured lien in the Debtors' assets," such that Sun "is now the holder of the first priority secured lien in the Debtors' assets," Sun's Purported Lien.

285.    The Debtors did not receive reasonably equivalent value in exchange for the pledge of assets that are subject to Sun's Purported Lien.

286.    At the time Sun caused the Debtors to pledge the assets that are subject to Sun's Purported Lien, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 25:2-25(b) of the New Jersey Statutes.

287.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

288.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing, including Sun's Purported Lien, were transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of Sun's Purported Lien from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

289.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

25:2-25(b) and 2-29 of the New Jersey Statutes, Sun's Purported Lien is voidable.

290.    Accordingly, Plaintiff is entitled to a judgment avoiding Sun's Purported

Liens.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Against Sun)
#### (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)

291.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

292.    Sun asserts that it is "subrogated to the Prepetition Lenders' first priority

secured lien in the Debtors' assets," such that Sun "is now the holder of the first priority secured

lien in the Debtors' assets," Sun's Purported Lien.

293.    At the time Sun caused the Debtors to pledge the assets that are subject to

Sun's Purported Lien, the Debtors (a) did not receive reasonably equivalent value in exchange

for the pledge of assets that are subject to Sun's Purported Lien; and (b) were insolvent or would

be rendered insolvent by the transactions undertaken in connection with the LBO, the Re-

Financing, and Sale-Lease Back within the meaning of section 25:2-27 of the New Jersey

Statutes.

294.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 25:2-21 of the New Jersey Statutes.

295.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing, including Sun's Purported Lien, were

transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may

recover the value of Sun's Purported Lien from Sun and all amounts that the Debtors have repaid

on fraudulently incurred obligations.

296.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

25:2-27 and 2-29 of the New Jersey Statutes, Sun's Purported Lien is voidable.

297.    Accordingly, Plaintiff is entitled to a judgment avoiding Sun's Purported

Liens.

## TWENTY-FOURTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-25(b) and 2-29)

298.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

299.    The Debtors did not receive reasonably equivalent value in connection

with the pledge of the assets that are the subject of Sun's Purported Lien.

300.    At the time the Debtors pledged the assets that are the subject of Sun's

Purported Lien, the Debtors (a) were engaged or about to engage in a business for which their

remaining assets and/or capital were unreasonably small in relation to the business, and/or (b)

intended to incur, or reasonably should have believed that they would incur, debts beyond their

ability to pay as they became due within the meaning of section 25:2-25(b) of the New Jersey

Statutes.

301.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 25:2-21 of the New Jersey Statutes.

302.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 25:2-25(b) and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with Sun's Purported Lien are voidable.

303.    Accordingly, Plaintiff is entitled to recover the value of Sun's Purported Lien and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### TWENTY-FIFTH CLAIM FOR RELIEF
#### (Against Sun)
#### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; New Jersey Statutes 25:2-27 and 2-29)

304.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

305.    The Debtors did not receive reasonably equivalent value in connection with the pledge of the assets that are the subject of Sun's Purported Lien.

306.    At the time the Debtors pledged the assets that are the subject of Sun's Purported Lien, the Debtors were insolvent or would be rendered insolvent by the transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of section 25:2-27 of the New Jersey Statutes.

307.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 25:2-21 of the New Jersey Statutes.

308.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

25:2-27 and 2-29 of the New Jersey Statutes, the transfers and conveyances associated with

Sun's Purported Lien are voidable.

309.    Accordingly, Plaintiff is entitled to recover the value of Sun's Purported

Lien and to a monetary judgment against Sun in an amount to be determined at trial, plus

interest.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**(Against Sun)**
**(Avoidance of Liens, Fraudulently Incurred Obligations,**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)**

310.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

311.    Sun and all of the other participants involved in the LBO, the Re-

Financing, and the Sale-Lease Back intended and planned that all transactions related thereto --

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of

liens on the Debtors' assets, including without limitation, its valuable real estate, in order to

refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT

indebtedness, and all other related transactions -- would be interdependent related transactions.

All of those transactions should be collapsed into a single integrated transaction for purposes of

determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

312.    The Debtors did not receive reasonably equivalent value in exchange for the liens on Jevic's assets that were pledged to CIT for the benefit of Sun as security for the Re-Financing and for the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun.

313.    At the time that Sun caused the Debtors to incur the liens on their assets and incur debt obligations for the benefit of Sun, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 1304(a) of Title 6 of the Delaware Code.

314.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

315.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code.

316.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt obligations under their fraudulently incurred obligations to CIT were transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of those

liens from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

317.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code, such transfers, conveyances and incurrences of obligations are voidable.

318.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of obligations and is entitled to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### TWENTY-SEVENTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307)

319.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

320.    Sun and all of the other participants involved in the LBO, the Re-Financing, and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging to CIT of liens on the Debtors' assets, including without limitation, its valuable real estate, in order to refinance the purchase, the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness, and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

321.    The Debtors (a) did not receive reasonably equivalent value in exchange

for the liens on Jevic's assets that were pledged to CIT as security for the Re-Financing and for

the debt obligations to CIT that they incurred in order to finance the acquisition of Jevic by Sun,

and/or (b) incurred, or believed or reasonably should have believed that they would incur, debts

beyond their ability to pay as they became due within the meaning of section 1305 of Title 6 of

the Delaware Code.

322.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 1301 of Title 6 of the Delaware Code.

323.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the

Debtors should be avoided pursuant to applicable provisions of sections 544(b) and 550 of the

Bankruptcy Code and sections 1305 and 1307 of Title 6 of the Delaware Code.

324.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing and all payments by the Debtors of debt

obligations under their fraudulently incurred obligations to CIT were transferred for the benefit

of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of those

liens from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

325.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

1305 and 1307 of Title 6 of the Delaware Code, such transfers, conveyances and incurrences of

obligations are voidable.

326.    Accordingly, Plaintiff is entitled to void such transfers and incurrences of

obligations and is entitled to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### TWENTY EIGHTH CLAIM FOR RELIEF
#### (Against Sun)
#### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1304(a) and 1307)

327.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

328.    Sun and all of the other participants involved in the LBO, the Re-Financing and the Sale-Lease Back intended and planned that all transactions related thereto -- including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the CIT indebtedness and all other related transactions -- would be interdependent related transactions. All of those transactions should be collapsed into a single integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of the Debtors.

329.    The Debtors did not receive reasonably equivalent value in connection with the Sale-Lease Back and the resulting repayment of the Term Loan incurred for Sun's benefit because subsequent to the Sale-Lease Back, Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties Jevic previously enjoyed rent free.

330.    At the time of the Sale-Lease Back and the repayment of the Term Loan, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 1304(a) of Title 6 of the Delaware Code.

331.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

332.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately $16,200,000.00 are voidable.

333.    Accordingly, Plaintiff is entitled to recover the value of such transfers and to monetary judgment against Sun in an amount to be determined at trial, plus interest.

### TWENTY-NINTH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware Code §§1305 and 1307)

334.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

335.    Sun and all of the other participants involved in the LBO, the Re-

Financing and the Sale-Lease Back intended and planned that all transactions related thereto --

including the purchase of Jevic by Sun, the borrowing of funds from CIT, the pledging of liens to

CIT on the Debtors' valuable assets, including, without limitation, its real estate, in order to

refinance the purchase, and the Sale-Lease Back of the SLB Properties in order to pay down the

CIT indebtedness and all other related transactions -- would be interdependent related

transactions. All of those transactions should be collapsed into a single integrated transaction for

purposes of determining whether those transactions were fraudulent as to unsecured creditors of

the Debtors.

336.    At the time of the Sale-Lease Back and the repayment of the Term Loan,

the Debtors (a) did not receive reasonably equivalent value in connection with the Sale-Lease

Back and the resulting repayment of the Term Loan because subsequent to the Sale-Lease Back,

Jevic (i) no longer owned the SLB Properties; (ii) no longer had any borrowing power associated

with the SLB Properties; and (iii) was saddled with 20-year lease commitments on properties

Jevic previously enjoyed rent free, and (b) were insolvent or would be rendered insolvent by the

transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of

section 1305 of Title 6 of the Delaware Code.

337.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 1301 of Title 6 of the Delaware Code.

338.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

1305 and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with

the Sale-Lease Back and the repayment of the Term Loan in the amount of approximately

$16,200,000.00 are voidable.

339.    Accordingly, Plaintiff is entitled to recover the value of such transfers and

to monetary judgment against Sun in an amount to be determined at trial, plus interest.

### THIRTIETH CLAIM FOR RELIEF
### (Against Sun)
### (Avoidance of Liens, Fraudulently Incurred Obligations,
### and Payments in Respect of Fraudulently Incurred Obligations
### 11 U.S.C. §§544(b) and 550; 6 Delaware §§1304(a), and 1307)

340.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

341.    Sun asserts that it is "subrogated to the Prepetition Lenders' first priority

secured lien in the Debtors' assets," such that Sun "is now the holder of the first priority secured

lien in the Debtors' assets," Sun's Purported Lien.

342.    The Debtors did not receive reasonably equivalent value in exchange for

the pledge of assets that are subject to Sun's Purported Lien.

343.    At the time Sun caused the Debtors to pledge the assets that are subject to

Sun's Purported Lien, the Debtors (a) were engaged or about to engage in a business for which

their remaining assets and/or capital were unreasonably small in relation to the business, and/or

(b) intended to incur, or believed or reasonably should have believed that they would incur, debts

beyond their ability to pay as they became due within the meaning of section 1304(a) of Title 6

of the Delaware Code.

344.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

345.    The liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing, including Sun's Purported Lien, were transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may recover the value of Sun's Purported Lien from Sun and all amounts that the Debtors have repaid on fraudulently incurred obligations.

346.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code, Sun's Purported Lien is voidable.

347.    Accordingly, Plaintiff is entitled to a judgment avoiding Sun's Purported Liens.

**THIRTY-FIRST CLAIM FOR RELIEF**
**(Against Sun)**
**(Avoidance of Liens, Fraudulently Incurred Obligations,**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; 6 Delaware §§1305, and 1307)**

348.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

349.    Sun asserts that it is "subrogated to the Prepetition Lenders' first priority secured lien in the Debtors' assets," such that Sun "is now the holder of the first priority secured lien in the Debtors' assets," Sun's Purported Lien.

350.    At the time Sun caused the Debtors to pledge the assets that are subject to Sun's Purported Lien, the Debtors (a) did not receive reasonably equivalent value in exchange

for the pledge of assets that are subject to Sun's Purported Lien; and (b) were insolvent or would

be rendered insolvent by the transactions undertaken in connection with the LBO, the Re-

Financing, and Sale-Lease Back within the meaning of section 1305 of Title 6 of the Delaware

Code.

351.    At all relevant times, the Debtors had actual creditors holding unsecured

claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and

section 1301 of Title 6 of the Delaware Code.

352.    The liens on the Debtors' assets and the proceeds thereof that were

pledged to CIT as security for the Re-Financing, including Sun's Purported Lien, were

transferred for the benefit of Sun.  Under section 550 of the Bankruptcy Code, Plaintiff may

recover the value of Sun's Purported Lien from Sun and all amounts that the Debtors have repaid

on fraudulently incurred obligations.

353.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections

1305 and 1307 of Title 6 of the Delaware Code, Sun's Purported Lien is voidable.

354.    Accordingly, Plaintiff is entitled to a judgment avoiding Sun's Purported

Liens.

**THIRTY-SECOND CLAIM FOR RELIEF**
**(Against Sun)**
**(Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations**
**and Payments in Respect of Fraudulently Incurred Obligations**
**11 U.S.C. §§544(b) and 550; 6 Delaware §§1304(a) and 1307)**

355.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

356.    The Debtors did not receive reasonably equivalent value in connection with the pledge of the assets that are the subject of Sun's Purported Lien.

357.    At the time the Debtors pledged the assets that are the subject of Sun's Purported Lien, the Debtors (a) were engaged or about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, and/or (b) intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of section 1304(a) of Title 6 of the Delaware Code.

358.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

359.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1304(a) and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with Sun's Purported Lien are voidable.

360.    Accordingly, Plaintiff is entitled to recover the value of Sun's Purported Lien and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### THIRTY-THIRD CLAIM FOR RELIEF
#### (Against Sun)
#### (Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations 11 U.S.C. §§544(b) and 550; 6 Delaware §§1305 and 1307)

361.    Plaintiff repeats and realleges the allegations contained in each preceding

paragraph of the Complaint as though fully set forth herein.

362.    The Debtors did not receive reasonably equivalent value in connection with the pledge of the assets that are the subject of Sun's Purported Lien.

363.    At the time the Debtors pledged the assets that are the subject of Sun's Purported Lien, the Debtors were insolvent or would be rendered insolvent by the transactions undertaken in connection with the LBO and Sale-Leaseback within the meaning of section 1305 of Title 6 of the Delaware Code.

364.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code.

365.    Pursuant to sections 544(b) and 550 of the Bankruptcy Code and sections 1305 and 1307 of Title 6 of the Delaware Code, the transfers and conveyances associated with Sun's Purported Lien are voidable.

366.    Accordingly, Plaintiff is entitled to recover the value of Sun's Purported Lien and to a monetary judgment against Sun in an amount to be determined at trial, plus interest.

### THIRTY-FOURTH CLAIM FOR RELIEF
#### (Against Sun, Sun Management and Sun Partners)
#### (Equitable Subordination and Subordination - 11 U.S.C. §510)

367.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

368.    Sun asserts that it paid CIT on its limited guaranty and thereby succeeded

to a portion of the CIT debt and liens securing same.    For all of the reasons supporting equitable subordination of CIT's claims, Sun's claims acquired from CIT by way of subrogation are subject to the same subordination.

369.    Additionally, in its own name and right, Sun engaged in conduct that warrants equitable subordination of the CIT claims it acquired by subrogation, including without limitation, Sun's conduct in formulating and executing upon the LBO and Sale-Leaseback transactions as alleged in the Complaint.    Sun acquired Jevic for virtually no money, investing only $1 million in equity which it recouped in the form of fees soon thereafter.    The LBO of Jevic left it so financially weakened that its failure was inevitable, and its failure harmed creditors of Jevic, including vendors and employees, who were left with no hard assets to satisfy their unpaid liabilities as all of Jevic's assets were liened up to CIT, and sold, with the proceeds being sufficient to satisfy the CIT debt but no others.

370.    Sun's conduct was inequitable and led to injury of Jevic's creditors.

371.    Consistent with 11 U.S.C. §510(c), the Sun Claims should be equitably subordinated to other claims against the Debtors.

## OBJECTIONS TO SUN'S CLAIMS

372.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein

373.    In addition to the substantive causes of action against the Guaranty, the Committee objects to Sun's Claims to the extent they are duplicative.

374.    The Committee objects to Sun Management's Claim on the grounds that

(a) it lacks any specificity upon which to asses the merits of the claim; (b) upon information and belief, the Management Services Agreement was not negotiated at arms' length and is otherwise unenforceable; (c) as an affiliate of Sun, Sun Management should be estopped from asserting any claim against, or deriving any benefit from, any of the Debtors; (d) upon information and belief, Sun Management's Claim is subject to off-set for preferential payments or fraudulent transfers made by any of the Debtors to Sun Management prior to the Petition Date; and (e) as an affiliate of Sun, Sun Management's Claim should be equitably subordinated to general unsecured claims.

375.    The Committee objects to Sun Partners' Claims on the grounds that (a) at least two of the claims are duplicative; (b) none of the Claims identifies the legal or factual basis upon which Sun Partners might have a "Cross-Claim" or "other Claim" against any of the Debtors; (c) they lack any specificity upon which to assess the merits of the Claims; (d) as an affiliate of Sun, Sun Partners should be estopped from asserting any claim against, or deriving any benefit from, any of the Debtors; and (e) as an affiliate of Sun, Sun Partners' Claims should be equitably subordinated to general unsecured claims.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.    On the First Claim for Relief, as against CIT, for a determination that the transfers made and the obligations incurred by the Debtors' pledging to CIT of liens on their assets are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

2.    On the Second Claim for Relief, as against CIT, for a determination that the transfers made and the obligations incurred by the Debtors in connection with the Sale-Lease

Back and resulting repayment of the Term Loan are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

3.    On the Third Claim for Relief, as against CIT, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

4.    On the Fourth Claim for Relief, as against CIT, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and the debt obligations to CIT incurred by the Debtors are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

5.    On the Fifth Claim for Relief, as against CIT, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

6.    On the Sixth Claim for Relief, as against CIT, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers

or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

7.    On the Seventh Claim for Relief, as against CIT, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

8.    On the Eighth Claim for Relief, as against CIT, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

9.    On the Ninth Claim for Relief, as against CIT, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

10.    On the Tenth Claim for Relief, as against CIT, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and

the avoidance of obligations incurred.

11.　On the Eleventh Claim for Relief, as against CIT, for equitable subordination and subordination of the claims asserted by CIT below the level of claims of general unsecured creditors of the Debtors.

12.　On the Twelfth Claim for Relief, as against CIT, for a determination that the transfers are avoidable and for recovery of the transfers or the value of the property transferred in an amount to be determined at trial, plus interest.

13.　On the Thirteenth Claim for Relief, as against Sun, for a determination that the transfers and conveyances made and the obligations incurred by the Debtors for the benefit of Sun including without limitation, the pledging to CIT of liens on the Debtors assets, including without limitation, the Debtors' valuable real estate, and the debt obligations that the Debtors incurred to finance the acquisition of Jevic by Sun are avoidable, for recovery of the transfers or the value of the property transferred for its benefit, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

14.　On the Fourteenth Claim for Relief, as against Sun, for a determination that the transfers and incurred obligations for the benefit of Sun in the approximate amount of $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred for its benefit, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

15.　On the Fifteenth Claim for Relief, as against Sun, for a determination that the transfers made and the obligations incurred in the putative creation of Sun's Purported Lien

are avoidable, and for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and avoidance of the obligations incurred.

16.    On the Sixteenth Claim for Relief, as against Sun, for a determination that the transfers made and the obligations incurred in the putative creation of Sun's Purported Lien are avoidable, and for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and avoidance of the obligations incurred.

17.    On the Seventeenth Claim for Relief, as against Sun, for a determination that the transfers made and the obligations incurred in the amount of approximately $4.1 million for the Transaction Fees and $797,009.85 for the Sun Direct Fees are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

18.    On the Eighteenth Claim for Relief, as against Sun, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

19.    On the Nineteenth Claim for Relief, as against Sun, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations

are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

20.    On the Twentieth Claim for Relief, as against Sun, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

21.    On the Twenty-First Claim for Relief, as against Sun, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

22.    On the Twenty-Second Claim for Relief, as against Sun, for a determination that the liens, including Sun's Purported Lien, on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing were transferred for the benefit of Sun and all amounts that the Debtors have repaid are fraudulently incurred obligations which are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

23.    On the Twenty-Third Claim for Relief, as against Sun, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security

for the Re-Financing, including Sun's Purported Lien, and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

24.     On the Twenty-Fourth Claim for Relief, as against Sun, for a determination that Sun's Purported Liens on the Debtors' assets and the proceeds thereof are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

25.     On the Twenty-Fifth Claim for Relief, as against Sun, for a determination that Sun's Purported Liens on the Debtors' assets and the proceeds thereof are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

26.     On the Twenty-Sixth Claim for Relief, as against Sun, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

27.     On the Twenty-Seventh Claim for Relief, as against Sun, for a determination that the liens on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing and all payments made by the Debtors on account of their debt obligations are avoidable, for recovery of the transfers or the value of the property

transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

28.    On the Twenty-Eighth Claim for Relief, as against Sun, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

29.    On the Twenty-Ninth Claim for Relief, for a determination that the transfers and conveyances associated with the Sale-Lease Back and the repayment of the Terms Loan in the amount of approximately $16,200,000.00 are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

30.    On the Thirtieth Claim for Relief, as against Sun, for a determination that the liens, including Sun's Purported Lien, on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing were transferred for the benefit of Sun and all amounts that the Debtors have repaid are fraudulently incurred obligations which are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

31.    On the Thirty-First Claim for Relief, as against Sun, for a determination that the liens, including Sun's Purported Lien, on the Debtors' assets and the proceeds thereof that were pledged to CIT as security for the Re-Financing were transferred for the benefit of Sun

and all amounts that the Debtors have repaid are fraudulently incurred obligations which are avoidable, for recovery of the transfers or the value of the property transferred, in an amount to be determined at trial, plus interest and the avoidance of obligations incurred.

32.     On the Thirty-Second Claim for Relief, as against Sun, for a determination that Sun's Purported Liens on the Debtors' assets and the proceeds thereof are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

33.     On the Thirty-Third Claim for Relief, as against Sun, for a determination that Sun's Purported Liens on the Debtors' assets and the proceeds thereof are avoidable, for recovery of the transfers or the value of the property transferred for its benefit in an amount to be determined at trial, plus interest, and the avoidance of obligations incurred.

34.     On the Thirty-Fourth Claim for Relief, as against Sun, the recharacterization of the Sun Claims as equity or, in the alternative, for equitable subordination and subordination of the Sun Claims below the level of claims of general unsecured creditors of the Debtors.

35.     On the objection to the Sun Claims, the expunging of the Sun Claims or equitably subordinating them to general unsecured claims.

36.    Such other and further relief as is just and proper.

Dated:    October 7, 2011    PACHULSKI STANG ZIEHL & JONES LLP

_____
Bruce Grohsgal (Bar No. 3583)
Robert J. Feinstein (NY Bar No. RF-2836)
John A. Morris (NY Bar No. JM-2239)
Gabrielle A. Rohwer (NY Bar No. GR-9399)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: brohsgal@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        grohwer@pszjlaw.com

Counsel to the Official Committee of Unsecured
Creditors