1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 08-11006-bls

4

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   JEVIC HOLDING CORP., ET AL.,

9           Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                   United States Bankruptcy Court

14                   824 North Market Street

15                   Wilmington, Delaware

16

17                   November 13, 2012

18                   1:39 p.m.

19

20

21   B E F O R E :

22   HON BRENDAN L. SHANNON

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  DANA MOORE

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 2 of 172
JEVIC HOLDING CORP., ET AL.

Page 2

1    Debtors' First Omnibus Objection (Non-Substantive) to Claims

2    Pursuant to 11 U.S.C. §§ 501(a) or 502(b), and Fed. R.

3    Bankr. P. 3003(c)(2) and 3007 and the Bar Date Order to

4    Certain Amended/Superseded Claims, Late Claims, Duplicate

5    Claims, and Insufficient Documentation Claims

6

7    Debtors' Second Omnibus Objection (Substantive) to Claims

8    Pursuant to 11 U.S.C. Sections 501(a) and 502(b) and Fed. R.

9    Bankr. P. 3003(c)(2) and 3007 to Certain No Amount Stated

10    Claims, No Liability Claims, Reclassified Claims, Reduced

11    Claims, Reduced/Reclassified Claims, Cross Case Duplicative

12    Claims, and Contingent No Liability Claims

13

14    Debtors' Third Omnibus Objection (Substantive) to Claims

15    Pursuant to 11 U.S.C. Sections 501(a) and 502(b), and Fed.

16    R. Bankr. P. 3003(c)(2) and 3007 to Certain No Liability

17    Claims, Contingent No Liability Claims, Employee Wage and

18    Benefit Claims, No Amount Stated Claims, and Cross Case

19    Duplicative Claims

20

21    Debtors' Fourth Omnibus Objection (Non-Substantive) to

22    Claims Pursuant to 11 U.S.C. Sections 501(a) and 502(b), and

23    Fed. R. Bankr. P. 3003(c)(2) and 3007 and the Bar Date Order

24    to Certain Amended/Suspended Claims and Insufficient

25    Documentation Claims

Page 3

1   Joint Motion of the Debtors, CIT, Sun Capital, and the

2   Official Committee of Unsecured Creditors Pursuant to 11

3   U.S.C. 105(a), 349 and 1112(b) and Fed. R. Bankr. P. 9019

4   for Entry of an Order: (I) Approving Settlement Agreement

5   and Releasing Claims; (II) Dismissing the Debtors' Cases

6   Upon Implementation of Settlement; and (III) Granting

7   Related Relief

8

9   Debtors' Motion for Order (A) Authorizing Extension of Use

10  Of Cash Collateral and (B) Granting Adequate Protection

11

12  Interim Fee Applications for Professionals

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sherri L. Breach, CERT*D-397

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 4 of 172
JEVIC HOLDING CORP., ET AL.

Page 4

```
 1   A P P E A R A N C E S :

 2   KLEHR, HARRISON, HARVEY, BRANZBURG, LLP

 3        Attorneys for the Debtors

 4        919 Market Street, Suite 1000

 5        Wilmington, Delaware 19801

 6

 7   BY:  DOMENIC E. PACITTI, ESQ.

 8        MICHAEL YURKEWICZ, ESQ.

 9

10   HUNTON & WILLIAMS, LLP

11        Attorneys for CIT

12        Riverfront Plaza, East Tower

13        951 East Byrd Street

14        Richmond, Virginia 23219

15

16   BY:  BENJAMIN C. ACKERLY, ESQ.

17        RICHARD NORTON, ESQ.

18

19   MORRIS JAMES, LLP

20        Attorneys for CIT

21        500 Delaware Avenue

22        Suite 1500

23        Wilmington, Delaware 19801

24

25   BY:  STEPHEN M. MILLER, ESQ.
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 5 of 172
JEVIC HOLDING CORP., ET AL.

Page 5

1   LOIZIDES & ASSOCIATES, PA

2        Attorneys for WARN Claimants

3        1225 North King Street

4        Wilmington, Delaware 19801

5

6   BY:  CHRISTOPHER LOIZIDES, ESQ.

7

8   OUTTEN & GOLDEN, LLP

9        Attorneys for WARN Claimants

10        3 Park Avenue, 29th Floor

11        New York, New York 10016

12

13   BY:  JACK A. RAISNER, ESQ.

14        RENE S. ROUPINIAN, ESQ.

15

16   KIRKLAND & ELLIS, LLP

17        Attorneys for Sun Capital

18        300 North LaSalle

19        Chicago, Illinois 60654

20

21   BY:  JAMES A. STEMPEL, ESQ.

22

23

24

25

Page 6

1    KIRKLAND & ELLIS, LLP

2          Attorneys for Sun Capital

3          655 Fifteenth Street, N.W.

4          Washington, D.C. 20005

5

6    BY:  JAMES P. GILLESPIE, ESQ.

7

8    MORRIS, NICHOLS, ARSHT & TUNNELL

9          Attorneys for Sun Capital

10         1201 North Market Street

11         18th Floor

12         Wilmington, Delaware 19899

13

14   BY:  CURTIS S. MILLER, ESQ.

15

16   PACHULSKI, STANG, ZIEHL & JONES

17         Attorneys for UCC

18         780 Third Avenue

19         36th Floor

20         New York, New York 10017

21

22   BY:  ROBERT FEINSTEIN, ESQ.

23

24

25

JEVIC HOLDING CORP., ET AL.

```
 1   PACHULSKI, STANG, ZIEHL & JONES

 2         Attorneys for UCC

 3         919 North Market Street

 4         17th Floor

 5         Wilmington, Delaware 19801

 6

 7   BY:  KATHLEEN MAKOWSKI, ESQ.

 8

 9   DILWORTH PAXSON, LLP

10         Attorneys for Naysha Berrios

11         1500 Market Street, 3500E

12         Philadelphia, Pennsylvania 19102

13

14   BY:  PETER C. HUGHES, ESQ.

15

16   GELLERT, SCALI, BUSENKELL & BROWN, LLC

17         Attorneys for Cabarrus County

18         913 North Market Street

19         10th Floor

20         Wilmington, Delaware 19801

21

22   BY:  RONALD S. GELLERT, ESQ.

23

24

25
```

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 8 of 172
JEVIC HOLDING CORP., ET AL.

Page 8

1    OFFICE OF THE UNITED STATES TRUSTEE

2         Attorneys for U.S. Trustee

3         844 King Street

4         Suite 2313

5         Wilmington, Delaware 19801

6

7    BY:  MARK KENNEY, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 9 of 172
JEVIC HOLDING CORP., ET AL.

Page 9

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Mr. Pacitti.

4              MR. PACITTI:  Good afternoon, Your Honor.  Domenic

5    Pacitti and Michael Yurkewicz of Klehr, Harrison, Harvey,

6    Branzburg on behalf of the debtors.

7              Your Honor, we're here on our amended notice of

8    agenda that was filed on November 9th.

9              THE COURT:  I have it.

10             MR. PACITTI:  There are many continued items, but

11   three remaining items that are going forward today:  Items

12   Number 5, which is our joint motion under 9019; Items Number

13   6, which is our motion for extension of cash collateral; and

14   Item 7, which are a host of quarterly fee applications --

15             THE COURT:  Right.

16             MR. PACITTI:  -- which have been pushed throughout

17   the case.

18             Your Honor, if it -- I think it may make sense to

19   leave the fee applications until the end.

20             THE COURT:  That's fine.

21             MR. PACITTI:  Perhaps address cash collateral and

22   then move onto sort of the main event --

23             THE COURT:  Okay.

24             MR. PACITTI:  -- after that.

25             With respect to our motion for cash collateral,

Page 10

1    Your Honor, there was only one objection and that was of the

2    WARN plaintiffs.  And that objection merely raised in their

3    minds the view that the structured -- what they view a

4    structured dismissal rather than a 9019 settlement should

5    not be approved and, therefore, the use of cash collateral

6    shouldn't be authorized to allow the debtors to implement

7    that settlement.

8              First of all, Your Honor, obviously, the WARN

9    plaintiffs don't have an interest in cash collateral.

10   They're not a secured creditor.  They are a plaintiff in a

11   cause of action before Your Honor that has not determined

12   liability or -- or damages yet, first of all.

13             And, secondly, the secured lenders have agreed and

14   the creditors' committee have consented to the entry of the

15   order.  So we don't believe that any rights are implicated

16   with respect to the WARN plaintiffs.

17             Secondly, Your Honor -- or, thirdly, rather, the

18   costs that are sought to be paid by use of cash collateral

19   include the professional fees of various professionals in

20   the case as well as sort of just the general cost to keep

21   the lights on, effectively, what very few lights are left.

22             And as Your Honor knows, throughout this case our

23   cash collateral extension orders have been lagging behind

24   the calendar.  So this cash collateral request actually is

25   for the last quarter of this year, which is half over at

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 11 of 172
AEMC HOLDING CORP., ET AL.

Page 11

1    this point.

2            So, effectively, costs have been incurred for

3    which the debtor needs authorization to use cash collateral

4    to pay, and many of those costs, Your Honor, have actually

5    benefited the WARN plaintiffs in that there was a tremendous

6    amount of discovery that was conducted, a lot of documents

7    produced and out of pocket costs incurred in order for the

8    WARN plaintiffs to have the requisite discovery that they

9    needed to prosecute their underlying adversary proceeding

10   against the debtors and the other defendants in that action.

11           So, Your Honor, we don't believe that there's a

12   basis to deny the use of cash collateral if the parties with

13   an interest in cash collateral have consented and the WARN

14   plaintiffs have no interest in the use of cash, but rather

15   are a beneficiary of the use of cash collateral that the

16   debtors have requested.

17           We would ask that Your Honor enter the order.

18           THE COURT:  Okay.  I understand.

19           Mr. Loizides.

20           MR. LOIZIDES:  Yes.  Good afternoon, Your Honor.

21   For the record, Chris Loizides for the WARN plaintiffs.  I'm

22   also joined here by my co-counsel --

23           THE COURT:  Welcome.

24           MR. LOIZIDES:  -- Rene Roupinian and Jack Raisner

25   of the Outten & Golden firm, both of whom have been admitted

1    pro hac vice.

2              THE COURT:  Uh-huh.

3              MR. LOIZIDES:  With respect to the issue of cash

4    collateral, I would simply -- you know, the motion says that

5    they want you to use about $300,000 in order to implement

6    the structured dismissal.  So that involves things that have

7    already occurred in the past since, presumably, they're not

8    working on the structured dismissal if it hasn't been

9    approved by the Court yet.  That's -- that's a separate

10   issue.

11             But to the extent that they're seeking to use cash

12   collateral to -- to do something that the Court hasn't yet

13   approved, I -- I just think we'll get -- we have the cart

14   before the horse.  So I -- I would simply respectfully

15   suggest that we -- we leave this one until the end of the

16   hearing and depending on what the Court's ruling is we could

17   decide at that point.  That -- that would be my suggestion

18   on this.

19             THE COURT:  Yeah.  Don't go far.

20             Mr. Pacitti, doesn't it seem like -- I mean, as

21   far as the issues, expenses that have already been incurred,

22   I understand that and I -- I don't think that that seems

23   controversial.  But doesn't it seem like if I grant this,

24   isn't this an in -- I don't want to sort of mix the two --

25             MR. PACITTI:  Well, I think we're mistaking the

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 13 of 172
SEMC HOLDING CORP., ET AL.

Page 13

1    cart before the horse argument.

2             THE COURT:  Give me a better metaphor.

3             MR. PACITTI:  And -- well, I don't have a good

4    one, but --

5             THE COURT:  All right.

6             MR. PACITTI:  -- I'm just going to talk fast.

7        (Laughter)

8             MR. PACITTI:  I feel like a politician.  I'm just

9    going to talk fast.

10            THE COURT:  Just bang on the podium.

11            MR. PACITTI:  Yes.

12            Your Honor -- if Your Honor, under the unlikely

13   event, doesn't approve our 9019 settlement in my view, then

14   there's no costs to incur going forward because there's not

15   going to be an implementation of that settlement.  So

16   whatever costs are going to be incurred will be for whatever

17   estate purposes are left to accomplish.  So I think they're

18   concern is -- you know, is really misguided in the extent

19   that there's no cart before the horse.  If it's not

20   approved, then there's nothing to spend, you know, the cash

21   collateral on --

22            THE COURT:  All right.

23            MR. PACITTI:  -- to -- to foster any --

24            THE COURT:  Okay.

25            MR. PACITTI:  -- implementation of a settlement.

```
 1            THE COURT:  I think I am going to hold this.  I

 2    don't think it's going to require anything at the conclusion

 3    of the hearing because I think that answers the question.

 4    And I sort of see this as sort of a -- as a corollary to

 5    what we often see in first days where the last motion that

 6    we hear is the financing motion and -- and -- but before

 7    that I'll hear six or seven motions about all this money

 8    that's going out the door and at some point the DIP lender

 9    stands up and says, I just want to be clear that if you

10    don't approve my DIP order, none of this money is getting

11    paid.  And -- and I guess that makes sense.

12            And in this, I'm being asked to approve financing

13    and funding and your point would be, just to be clear, none

14    of that actually happens unless you approve stage two.  I

15    think I can deal with the two issues --

16        MR. PACITTI:  Okay.

17            THE COURT:  -- collectively and, you know, again,

18    I don't -- I also think that that minimizes any issue that

19    one will color the other.  So I think it makes sense to turn

20    to the settlement.

21            MR. PACITTI:  Okay.  We'll do that then, Your

22    Honor.  Thank you.

23            THE COURT:  Okay.

24            MR. PACITTI:  Then, Your Honor, the item that

25    we're here for and the main event is the joint 9019 motion
```

1    of the debtors, the official committee of unsecured

2    creditors, Sun Capital Partners IV, LP, Sun Partners

3    Management IV, LLC, Sun Capital Partners, Inc., and the CIT

4    Group Business Credit, Inc. as agent for lenders under the

5    debtors' pre and post-petition loan facilities.

6             Your Honor, as I'm sure you're aware there were

7    objections filed to this joint 9019 motion by nine parties.

8    I'm happy to report that --

9             THE COURT:  Have you resolved --

10            MR. PACITTI:  -- seven of those --

11            THE COURT:  Have you resolved with the --

12            MR. PACITTI:  -- have been --

13            THE COURT:  -- IRS?

14            MR. PACITTI:  Yes, we have.

15            THE COURT:  Okay.

16            MR. PACITTI:  Seven of the nine have been resolved

17   either through the supplement that was filed to the motion

18   or pursuant to what -- what I will report to Your Honor

19   today.

20            The two remaining objections, as Your Honor could

21   well imagine, are those of the United States Trustee and the

22   WARN plaintiffs.

23            Your Honor, if I -- if I may, I would like to

24   report on the status of each of the resolved objections if

25   -- if that's --

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 16 of 172
HEWC HOLDING CORP., ET AL.

Page 16

1           THE COURT:  Sure.

2           MR. PACITTI:  The first one is that of Naysha

3    Berrios.  That matter has been resolved.  This was an

4    objection related to a state court personal injury action

5    for which there is available insurance to cover the claim.

6           The objection has been resolved and the parties

7    have agreed to add language in a proposed order that

8    essentially indicates that the withdrawal of the objection

9    by Berrios or any actions related to the claims in this

10   bankruptcy court proceeding or otherwise in the bankruptcy

11   court would not be used in any way to impair the rights that

12   they have in the state court action.  So that matter has

13   been resolved.

14           The next --

15           THE COURT:  Okay.

16           MR. PACITTI:  -- objection that was related to the

17   motion on the docket, but -- but really it was misdocketed,

18   I think, is that of JC Graphics Solution.  It's Docket

19   Number 1391.  Their pleading was basically in response to

20   the broad circulation of the 9019 motion and the claimant

21   has indicated to us that the pleading was not intended to be

22   in opposition to the settlement motion, but rather to put

23   folks on notice that their claim is out there and still

24   exists.  So that's not really applicable to the 9019 motion.

25           The next item is that of the -- objection is that

1    of the New York State Department of Taxation, and that

2    matter has been resolved.  This was an objection in the form

3    of a joinder to the United States Trustee's objection.

4            Your Honor, New York State Department of Taxation

5    has completed its evaluation of the taxes that they believe

6    were due by the debtors and have resolved certain

7    liabilities with respect to those taxes that are due from

8    third parties.  And those third parties would be the prior

9    owners of the Jevic entities that relate to activities prior

10   to the sale transaction.  New York State has determined that

11   all amounts that would otherwise be due from the debtors

12   have, in fact, been paid.  As a consequence, they have

13   agreed to withdraw the remaining claims and not pursue

14   opposition to the 9019 motion.

15           The next objection, Your Honor, is that of the

16   Ohio Department of Taxation and the Ohio Bureau of Workers'

17   Comp.  There were three -- we've reached three separate

18   agreements with the Ohio Department of Taxation relating to

19   three claims that they filed.

20           The first is a claim asserted in the priority

21   amount of $85,597.40.  The Ohio Department of Taxation has

22   agreed to reduce that by -- to 25 percent and be included in

23   the supplement to the motion that we filed, which would

24   provide for payments to priority tax creditors.  So the

25   agreed reduced amount is $21,399.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 18 of 172
PEMC HOLDING CORP., ET AL.

Page 18

1          The second claim relates to Claim Number 68 and

2     it's a priority claim in the amount of $31,511, and the same

3     agreement has been reached; a reduction to 25 percent of

4     that amount or $7,877.

5          Lastly, there's a Claim Number 1138 that was a

6     priority claim in the amount of $302,001.  The same

7     agreement has been reached to reduce that to 25 percent of

8     the priority amount or $75,500.  And they would be treated

9     pursuant to the supplement under the joint motion.  As a

10    result of those resolutions the Ohio Department of Taxation

11    has agreed to withdraw their objection to the motion today.

12          THE COURT:  Okay.

13          MR. PACITTI:  The next item is a objection by

14    Cabarrus County, Docket Number 1394.  This was a joinder in

15    the United States Trustee's motion.  They now have agreed to

16    support our motion.  It was -- claim number 959 originally

17    asserted a priority claim in the amount of $54,493.  It had

18    previously been reduced by agreement to $24,000, and there's

19    been a further agreement to reduce it to 25 percent of that

20    amount or $6,036, and that amount would be paid as well

21    pursuant to the supplement.  And that resolves the objection

22    of Cabarrus County.

23          The next objection is that of the State of

24    Michigan.  This was a joinder to the U.S. Trustee's

25    objection, and the State of Michigan has now agreed to not

1  press their objection.

2          There was a claim filed -- two claims filed:  1162

3  in the priority of $27,611 and claim number 1163 in the

4  priority amount of $104,987.  The claim -- State of Michigan

5  has agreed to accept no distribution as it relates to Claim

6  Number 1162, has agreed to a $98,806 amount with respect to

7  Claim Number 1163, and there's an agreement that they would

8  be treated similarly to the folks in the joint -- in the

9  supplement to the joint motion, although there's a little

10  wrinkle to this one.  Fifty percent of the amount would be

11  paid by the debtors and 50 percent would be paid by other

12  responsible parties --

13          THE COURT:  Okay.

14          MR. PACITTI:  -- that are not the debtors.  And

15  with that the State of Michigan's objection is resolved.

16          The last objection is that of the United States

17  on behalf of the Internal Revenue Service.  It was Docket

18  Number 1397.  Again, this was a joinder to the United States

19  Trustee's objection and the Internal Revenue Service and the

20  debtors have agreed that they would not press their

21  objection today based on ongoing discussions with the

22  debtors.  The IRS has filed a priority claim in the amount

23  of $17,853.

24          The IRS and the debtors have continued to

25  negotiate and discuss the resolution of that amount.  We

1   believe that it should be a much lower amount, but in an

2   effort to resolve matters with the Internal Revenue Service,

3   the debtors have agreed that it will pay the priority amount

4   as filed at the same time as the distribution of other

5   priority creditors pursuant to the supplement to the joint

6   motion or a lower amount to the extent that the United

7   States, on behalf of the Internal Revenue Service, agrees to

8   a different amount with the debtors in its ongoing

9   negotiations and discussions.

10          And I think, quite frankly, this is a consequence

11  of just needing additional time.

12          THE COURT:  Okay.  I understand.

13          MR. PACITTI:  So, Your Honor, that takes care of

14  all of the objections save the WARN --

15          THE COURT:  And the U.S.T.

16          MR. PACITTI:  -- and the U.S. -- and the trustee.

17          And with respect to those remaining objections,

18  Your Honor, so a little bit of a background I think might be

19  helpful and then I think we would like to move on to the

20  submission of evidence.  We have two witnesses today and

21  those are Mr. Dooley and Mr. Gavin.

22          Your Honor, as a preliminary matter we filed our

23  joint motion on June 27th at Docket Number 1346 and we

24  served the notice to the motion and the motion on the Rule

25  2002 list, and we served the notice on the entire matrix,

1    which set forth in -- in the notice instructions on how to

2    obtain copies of the underlying joint motion and exhibits.

3           We filed the supplement to the joint motion on

4    October 23rd at Docket Number 1465 and a separate notice of

5    the supplement that same day at Docket Number 1467.  Again,

6    Your Honor, we served the supplement and the notice on the

7    Rule 2002 list and we served the notice on the entire

8    matrix.  That notice, again, set forth instructions on how

9    to obtain copies of the joint motion and the supplement.

10   And more importantly, with respect to the notice of the

11   supplement, prior to the filing of the notice and the

12   supplement we provided the United States Trustee with drafts

13   several days prior to their filing and -- in an effort to

14   try to resolve one of the objections that Mr. Kenney raised

15   as it related to the form of the notice.

16          This notice was much different than the original

17   notice filed with the original motion in that it

18   specifically recited the relief that was being requested,

19   the proposed settlement terms, and it also indicated clearly

20   that there are potential creditors that would not receive

21   payment under the proposed joint motion.

22          So, Your Honor, I think what we have remaining is,

23   effectively, a disagreement over truly what we're seeking

24   today.  What the movants believe we're seeking is settlement

25   under Rule 9019.  And while the terms of the implementation

HEMC HOLDING CORP., ET AL.

Page 22

```
1    of this settlement might be a little bit more complicated
2    than a generic settlement of an adversary where defendant
3    pays X amount to plaintiff and then the plaintiff releases
4    the defendant, the essential character of what we're seeking
5    today and the standard of law that Your Honor needs to apply
6    are the same.
7             The United States Trustee and the WARN plaintiffs
8    have attempted to portray this joint motion as what folks,
9    at least on our side of the table have characterized as a
10   parade of horribles that -- that are being thrust upon folks
11   in this case and on this court.
12            Now, Your Honor, we're not going to devolve into a
13   who struck John portrayal of sort of where we are and -- and
14   what this motion is, but what we believe is that the
15   evidence that you'll hear, the arguments that we will put
16   forth today will demonstrate that this is truly an
17   appropriate 9019 settlement that was negotiated at arm's
18   length and we believe we'll be prepared to present the
19   testimony today in the form of proffer that --
20            THE COURT:  Can I ask you a broad -- a broader
21   question?  And it goes to what the appropriate or applicable
22   standard are -- is.  And I hear you and -- and obviously
23   I've seen the submission from the committee and the support
24   of the secured creditor as well; that the standard is 9019.
25   It's relatively low.  It's -- it's, you know, the lowest
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 23 of 172
DEMC HOLDING CORP., ET AL.

Page 23

1    point on the range of reasonableness I think is what

2    everybody cites to.

3              But is there a different context?  Do I need to

4    find that for what you're trying to do there's no meaningful

5    alternative?  What if I had an otherwise sort of a -- you

6    know, typical up and running, relatively healthy case that

7    everybody just decided, you know, we want to stick a fork in

8    this one and be done with it. I mean, this one, the case has

9    been around for a long time and at least as I've seen your

10   -- your arguments -- and, obviously, they will be subject to

11   challenge.

12             But your point is that there is no alternative to

13   this.  If we were to convert the result is what it is.  If

14   we were to dismiss, again, the result is what it is.

15   Without any meaningful distribution your point is, to be

16   blunt, Your Honor is faced with two options:  A return and

17   no return.  And I know that that's actually in dispute to

18   some extent.  But do I have to -- does it have to be at that

19   level or --

20             MR. PACITTI:  I don't think it does.  I think the

21   facts that you recite are true and I think they're

22   supportive of the factors considered for approving a 9019

23   settlement.  But I don't think that it's a required finding

24   on Your Honor's part.

25             And I think it's -- I think a lot of it gets

1   caught up with the fact that we've requested a dismissal as

2   well.  We -- we could have just filed a 9019 motion, but,

3   quite frankly -- and you'll hear some of the testimony -- we

4   didn't want to stick it to someone like a panel trustee

5   because there's nothing left to do.  It just seemed to be --

6   to -- to everyone a -- just an indication of reality that,

7   you know, if this case got converted there's really no

8   assets, but a lot of costs for a trustee.  And our view was

9   that a dismissal made more sense.  As a consequence, we

10  requested it rather than do it at some later date.

11         So I -- I don't think Your Honor should get hung

12  up on that aspect of it as somehow increasing your standard

13  of review of the proposed settlement.  I still think the

14  9019 standard applies notwithstanding the dismissal aspect

15  of it because that's really just an implementation and sort

16  of a cleanup mechanism as opposed to truly a settlement of

17  the economic terms that are before the Court.

18         THE COURT:  Okay.

19         MR. PACITTI:  Your Honor, what we have proposed is

20  -- what we would like to do is, by proffer, proffer the

21  testimony of Mr. Dooley and Mr. Feinstein would proffer the

22  testimony of Mr. Edward Gavin.  Obviously, both of these

23  gentlemen are in the courtroom and available for cross-

24  examination.  And if it's acceptable, Your Honor, we would

25  like to proceed that way.

1            THE COURT:  Okay.  Any objection to proceeding by

2    proffer?  There will obviously be a full opportunity for --

3    for cross.

4            Okay.  All right.  You may proceed.

5            MR. PACITTI:  Thank you, Your Honor.

6            It's not that long, but I should take a sip of

7    water, Your Honor.  I promise it's --

8            THE COURT:  It's always --

9            MR. PACITTI:  -- really not that long.

10           THE COURT:  It's always ominous when somebody --

11       (Laughter)

12           MR. PACITTI:  It's just cold and flu season, Your

13    Honor, and too many young daughters at home that are sick.

14           Your Honor, we would call to the stand Daniel

15    Dooley.  Mr. Dooley would testify that he is a principal of

16    Morris, Anderson & Associated, Ltd and is the chief

17    restructuring officer of the debtors and has been since

18    early May of 2008.

19           Mr. Dooley would testify that the debtors filed

20    their bankruptcy petitions on May 20th, 2008 and that as of

21    the petition date the debtors were borrowers under a secured

22    credit agreement with CIT and the lender group, and that as

23    of December 31, 2007 the debtors had $25.4 million of

24    outstanding borrowings and $27.8 million of outstanding

25    letters of credit for a total balance outstanding of $53.2

1    million under the pre-petition facility.

2              Mr. Dooley would also testify that in connection

3    with the forbearance agreement entered into between the

4    debtors and the lender group on January 8, 2008, a Sun

5    Capital entity provided a $2 million limited guarantee of

6    the pre-petition facility.  He would also testify that prior

7    to the petition date the Sun entity paid CIT in respect of

8    that guarantee and, therefore, acquired a last out portion

9    of the senior secured lenders claims against the debtors

10   secured by substantially all of the debtors' assets.

11             Mr. Dooley would testify that immediately prior to

12   the petition date the debtors commenced a wind down process

13   pursuant to which they ceased substantially all of their

14   operations and terminated substantially all of their

15   employees.

16             Mr. Dooley would testify that the debtors paid all

17   accrued and unpaid wages and benefits to the employees

18   through the respective termination dates.

19             Mr. Dooley would testify that post-petition all of

20   the debtors' tangible assets were liquidated and that the

21   proceeds were used to repay outstanding obligations owed to

22   the lender group under the pre-petition facility which had

23   been rolled up in the debtor-in-possession financing

24   facility approved by the Court.

25             Mr. Dooley would also testify that the DIP

1    facility included the debtors' waiver of any rights to

2    challenge the liens and claims of the senior secured

3    lenders.

4            He would also testify that after paying the civil

5    lender group were made, there remained outstanding $2

6    million of principle amount plus continuing accruing

7    interest, attorney's fees and costs to CIT, Sun as lender

8    and the lender group.

9            He would testify that currently the total amount

10   outstanding to the senior secured lenders inclusive of

11   interest, fees and costs is approximately $4 million.  The

12   senior -- he would also testify that the senior secured

13   lenders have a first priority security interest in all the

14   assets of the debtors, including avoidance actions and their

15   proceeds.  And, therefore, but for the carve-out of their

16   lien positions, there would be no assets available to any

17   creditors in these cases.

18           Mr. Dooley would testify that on May 23rd, 2008,

19   certain former employees of the debtors initiated a class

20   action suit against the debtors, Sun Capital Partners, Inc.,

21   and various John Doe's in the United States Bankruptcy Court

22   in the District of Delaware under adversary number 08-50662,

23   alleging violations of both the New Jersey and federal

24   statutes concern -- concerning employee terminations.

25           He would also testify that on May 27th, 2008,

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 28 of 172
JEVIC HOLDING CORP., ET AL.

Page 28

1    certain alleged former employees of the debtors initiated a

2    class action suit against the debtors, Sun Capital Partners,

3    Inc. and other named parties in the Superior Court of New

4    Jersey, Burlington County Law Division, under case number

5    08-3341, also alleging violations of New Jersey statutes

6    concerning employee terminations.

7             He would testify that the New Jersey class action

8    has been resolved and terminated.

9             Mr. Dooley would testify that pursuant to the

10   final DIP financing order, the committee was granted

11   standing to assert claims against the lender group and that

12   pursuant to that order, on December 31, 2008, the committee

13   commenced an adversary proceeding by filing a complaint

14   against CIT, docket number 08-51903 asserting claims arising

15   from Sun's acquisition of Jevic pursuant to a leveraged

16   buyout.

17            The complaint was later amended on June 30, 2010

18   to add Sun parties as defendants.  He would also testify

19   that on September 15th, 2011, the committee filed a second

20   amended complaint against CIT and Sun and -- and to which

21   Sun has filed responsive pleadings and CIT has filed

22   responsive pleadings, including counterclaims against the

23   committee.

24            He would testify that all assets of the estates,

25   including the avoidance actions, have been monetized

1    consisting of approximately $100 -- $1.7 million of senior

2    secured lenders collateral proceeds and that there's no

3    further work to be performed other than to defend the

4    pending adversary by the WARN plaintiffs and to prosecute

5    the committee adversary proceeding by the committee.

6            He would also testify that rather than litigate

7    the claims in the committee's adversary proceedings, the

8    parties commenced discussions in March 2012 regarding the

9    terms under which the committee's adversary proceeding would

10    be settled and the Chapter 11 cases disposed of.  He would

11    testify to this end that the parties have reached a

12    settlement, which is the subject of the joint 9019 motion

13    today.

14            Mr. Dooley would testify that the material

15    provisions of the settlement agreement are as follows:

16            Number one, a release of claims against each of

17    the parties to the settlement agreement estimated to be

18    approximately $4 million with respect to the claims and

19    liens of CIT, the lender group, and Sun;

20            Number two, the payment of $2 million by CIT to

21    the debtors which should be used to satisfy unpaid Chapter

22    11 allowed administrative claims;

23            Number three, the dismissal with prejudice of the

24    committee's adversary proceeding;

25            Number four, the assignment by Sun of its liens on

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 30 of 172
AMC HOLDING CORP., ET AL.

Page 30

1    the estate's remaining assets of approximately $1.7 million

2    in cash proceeds of collateral liquidations to a liquidating

3    trust to be established by the debtors as grantor for the

4    benefit of the debtors' general unsecured creditors and

5    priority tax claims;

6              Number five, the reconciliation of administrative

7    and general unsecured claims during a 60 day period

8    following the effective date of the settlement agreement;

9    and lastly, thereafter, the dismissal of the Chapter 11

10   cases.

11             Mr. Dooley would testify that the total general

12   unsecured claims filed in this case currently total

13   approximately $24 million.  He would also testify that the

14   debtors believe that all valid post-petition administrative

15   expenses incurred in the ordinary course of the debtors'

16   business have been paid, except for unpaid professional fees

17   and expenses of professionals of the debtors and committee

18   totaling approximately $1.7 million.

19             He would testify that the debtors believe that the

20   only other valid unpaid administrative expense claims are

21   timely submitted 503(b)(9) claims in the amount of $213,200,

22   post-petition date administrative taxes in the amount of

23   $78,297; and miscellaneous administrative claims in the

24   amount of $79,259.

25             He would testify that the debtors have resolved

1    certain priority claims substantially comprised of the

2    taxing authority claims as recited previously in my

3    presentation, Your Honor, and that these claims have agreed

4    -- these claimants have agreed to a reduction of their

5    claims and a percentage payment pursuant to the settlement

6    as supplemented and will be paid an aggregate amount of

7    approximately $250,000.

8              Mr. Dooley would testify that under the

9    settlement, effectively, all creditors will be paid in full

10   or a compromised agreed amount other than the WARN

11   plaintiffs.  Additionally, the general unsecured creditors

12   would receive a pro rata distribution from the trust.

13             Mr. Dooley would testify that the WARN plaintiffs

14   have not filed a proof of claim on behalf of their WARN

15   plaintiff clients; that the debtors are contesting the WARN

16   Act liability asserted in the adversary proceeding filed by

17   the WARN plaintiffs based on various potential affirmative

18   defenses; and that despite numerous efforts by the debtors

19   to include the WARN plaintiffs in this settlement, the

20   debtors were unable to reach a resolution with the WARN

21   plaintiffs.

22             Mr. Dooley would also testify that the recoveries

23   to creditors contemplated by the settlement would come from

24   a  sharing in the senior secured lenders' property which are

25   proceeds of a liquidation of their collateral.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 32 of 172
PEMC HOLDING CORP., ET AL.

Page 32

1          Mr. Dooley would also testify that nothing in the

2     proposed settlement would impact the rights of non-settling

3     parties and that the WARN plaintiffs' adversary proceeding

4     is not effected or intended to be effected by the proposed

5     settlement.

6          Mr. Dooley would further testify that the request

7     for dismissal of these cases was meant to acknowledge the

8     realities of the situation of these cases; that is, namely,

9     that a plan is not possible and that a conversion to a

10    Chapter 7 would leave a trustee with the burden of the cost

11    of the remaining litigation with no assets available and no

12    prospect of assets since the assets of the estate have been

13    fully monetized are -- and are fully encumbered.

14          And, lastly, it is Mr. Dooley's testimony that in

15    his view, given the circumstances of these cases, the

16    settlement is the best possible and achievable results for

17    the debtors.

18          Your Honor, that concludes the proffer of Mr.

19    Dooley's testimony and -- and he, of course, is available

20    for cross-examination.

21          THE COURT:  Okay.  I assume we'll cross.

22          All right.  Mr. Dooley.  We'll swear the witness,

23    please.

24          Please remain standing.

25          THE CLERK:  Please raise your right hand.

```
 1            (Witness sworn)

 2            THE CLERK:  Please state and spell your name for

 3   the record.

 4            THE WITNESS:  Sure.  Daniel F. Dooley,

 5   D-O-O-L-E-Y.

 6            THE COURT:  Mr. Kenney, good afternoon.

 7            MR. KENNEY:  Good afternoon, Your Honor.  For the

 8   record, Mark Kenney for the United States Trustee.

 9   CROSS-EXAMINATION

10   BY MR. KENNEY:

11   Q    Good afternoon, Mr. Dooley.  Besides your work for

12   Jevic, have you served as a consultant or chief

13   restructuring officer for any other subsidiaries or

14   affiliates of Sun Capital?

15   A    I have.

16   Q    And which ones would those be?

17   A    One other case called -- a company called Drysol (ph).

18   Q    Is that the only one?

19   A    It is.

20   Q    Okay.  And when were you engaged in that matter?

21   A    Somewhere around late 2008, early 2009.

22   Q    Was that engagement terminated?

23   A    No.  It's ongoing.

24   Q    So you have a continuing relationship -- do you have

25   any relationship with Sun Capital or is your relationship
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 34 of 172
JEVIC HOLDING CORP., ET AL.

Page 34

1    strictly with the affiliates of Sun?

2              MR. PACITTI:  Objection as to the characterization

3    of relationship, Your Honor.

4              THE COURT:  Overruled.  As best he can answer.

5              THE WITNESS:  I know people at Sun Capital.  Sun

6    Capital has provided referrals and opportunities in the

7    past.  I haven't had a referral from Sun Capital for four

8    years.  Ironically, the Jevic situation was a referral from

9    CIT, not from Sun Capital.  But, nevertheless --

10   BY MR. KENNEY:

11   Q    Did you participate in the negotiations among the

12   debtors, the committee, CIT and Sun for the settlement that

13   is before the Court now?

14   A    Mr. Pacitti and I essentially mediated the settlement.

15   By that I mean, we asked all parties together.  We held

16   meetings.  We tried to include all parties.  We were looking

17   for a global settlement of the case.  So, yes, I was

18   actively involved in this.

19   Q    Okay.  Did you have discussions with any of the people

20   from Sun directly?

21   A    No.

22   Q    Okay.  Who engaged in the discussions with Sun Capital?

23   A    Counsel for Sun, I suspect, their folks at Kirkland &

24   Ellis.

25   Q    Okay.  And did you engage in discussions directly with

1    them?

2    A    From time to time I talked to Kirkland & Ellis, yes.

3    Q    Okay.  And what about negotiations with CIT?  Did you

4    have direct contact with people from CIT?

5    A    Only once, once during one of the mediation meetings we

6    had at Pachulski's office in March of 2012 with all parties

7    present.  CIT, I believe, had two representatives at that

8    meeting.  Otherwise, all of the conversations have been

9    through counsel.

10   Q    Okay.  In any of those discussions that you had --

11   let's start with CIT, the representative from CIT and CIT's

12   counsel -- did any of them ever tell you why the funds that

13   CIT was paying in were specifically earmarked for the

14   payment of administrative expenses?

15   A    No.

16   Q    And are you aware of -- at -- did they say nothing at

17   all about it?

18   A    It was part of a global settlement to resolve the

19   lawsuit.

20   Q    Do you know who -- who was the author of that

21   particular term that the money -- the payment from CIT would

22   be specifically earmarked for the payment of administrative

23   expenses?

24   A    I don't think anyone was the author of the term.  It

25   was the subject of negotiation between three or four

1   parties.

2   Q    Do you know who first brought up the subject?

3   A    No, I -- no, I don't, Mr. Kenney.

4   Q    Okay.  Let's turn to the Sun Capital side of it where

5   Sun will release its lien on collateral and allow the paying

6   of proceeds of its collateral to be paid to the general

7   unsecured creditors.  Was there any discussion with Sun

8   Capital's counsel or anyone from Sun about why it was being

9   earmarked for general unsecured creditors instead of being

10  paid directly to the estate?

11  A    I'm not sure of Sun's motivation that specifically.

12  So, no.  I -- I don't have any knowledge of that.

13  Q    The proffer of evidence, I believe, that Mr. Pacitti

14  said that all of the other priority claimants are being

15  paid?

16  A    The question is?

17  Q    Is that your -- is that your understanding that all of

18  the other priority claimants except the WARN Act claimants

19  are receiving payments under this settlement?

20  A    I believe so.  Yes.

21  Q    Okay.  And is that based on the chart that was filed

22  with the supplement?

23  A    And my knowledge of -- yes, and my knowledge of the

24  case, I believe.

25  Q    Mr. Dooley, have you ever looked at the claims

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 37 of 172
NMC HOLDING CORP., ET AL.

Page 37

1   register in this case?

2   A    I have.

3   Q    Okay.  Did you ever look at Claim Number 601 filed by

4   Melvin L. Myers (ph) as a priority claim for $4,025.61?

5   A    I would have to see the claim.  Is he part of the WARN

6   class?

7   Q    I'm looking at Mr. Myers' claim, sir, and on the face

8   of the claim it says it is for "unpaid vacation and personal

9   time."

10  A    Uh-huh.

11  Q    Okay.  $4,025.61 and it does have attached some earning

12  statements from ADP showing year to date vacation hours

13  earned -- accrued.

14           MR. KENNEY:  Your Honor, I don't have any exhibit

15  tabs.  May I present this to the court recorder for marking?

16           THE COURT:  Sure.  Or you can just mark it as UST-

17  1.

18       (Mr. Myers' claim marked as UST-1 for identification)

19           MR. KENNEY:  Your Honor, should I give a copy to

20  the recorder?

21           THE COURT:  No.  I'll just take it.

22           MR. KENNEY:  May I approach, Your Honor?

23           THE COURT:  Sure.

24           MR. KENNEY:  May I approach the witness?

25           THE COURT:  Absolutely.  Thanks.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 38 of 172
JEVIC HOLDING CORP., ET AL.

Page 38

```
 1              MR. KENNEY:  Thank you.

 2    BY MR. KENNEY:

 3    Q    Mr. Dooley, I will represent to you that I looked at

 4    the claims register less than an hour before coming to court

 5    and this claim was still listed as -- did not have any

 6    listings of further activity such as the claim having been -

 7    had an objection to it granted.  I don't know if an

 8    objection has been filed.

 9    A    There's been no objection filed to the best of my

10    knowledge.

11    Q    Okay.  And --

12    A    As -- do you know if there was one?

13    Q    I don't know how -- how epic marks the docket that they

14    maintain, if they -- I believe that they list as soon as

15    objections are filed.  I know that --

16    A    That's my understanding as well.

17    Q    -- when an order has been entered, the docket does

18    reflect a reduced amount.

19              And is Mr. Myers listed on the supplement of

20    claims that are being paid --

21    A    No, he is not.

22    Q    -- the priority claims?

23    A    Counsel, just so I'm reading this right, is he alleging

24    this claim is for $4,025?

25    Q    That is correct, sir.
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 39 of 172
PEMIC HOLDING CORP., ET AL.

Page 39

1    A    Thank you.

2              MR. KENNEY:  Your Honor, may I approach the bench

3    and the witness again?

4              THE COURT:  Sure.   Thanks.

5              THE WITNESS:  Thanks, Mark.

6    BY MR. KENNEY:

7    Q    Now, Mr. Dooley, what I've just handed you is -- is a

8    priority proof of claim on behalf of Jeffrey Ohlers (ph).

9              MR. KENNEY:  I'll note for the record that Mr.

10   Myers and Mr. Ohlers are also members of the WARN class.

11             THE COURT:  Okay.

12             MR. KENNEY:  But these are separate claims apart

13   from -- these are, you know, vacation pay.  These are not

14   WARN Act claims.

15             THE COURT:  Sure.

16   BY MR. KENNEY:

17   Q    Now, Mr. Dooley, to your knowledge is Mr. Ohlers listed

18   in the supplement of priority claims who are being paid?

19   A    He's not -- not.

20   Q    Okay.  And, again, I'll represent to you that when I

21   checked the docket before today's hearing Mr. Ohlers was

22   listed having a pending claim of -- claim number 540 for

23   $3,633.04.

24        Did you make any comparison of the claims register of

25   priority -- of the priority claims listed in the claims

1    register against the supplement that was filed by the

2    debtors today -- filed by the debtors as part of their

3    supplement?

4    A    We did.

5    Q    Okay.  Is it still your testimony that all of the

6    priority claimants are being paid?

7    A    I would have to verify these two.  So you've created

8    some doubt in my mind whether or not there's been these two

9    missed.  And I will say that, for whatever it's worth,

10   Counsel, that the debtor paid $900,000 of accrued vacation

11   with the court's leave as well as insurance run off, so I

12   would find these claims to be unlikely to be valid.  But I

13   do not know for sure.

14   Q    But no claims -- no objections have been filed to -- to

15   your knowledge?

16   A    That is correct.

17   Q    Okay.

18         MR. KENNEY:  I have no further questions, Your

19   Honor.

20         THE COURT:  Hang on.  I -- I want to make sure

21   that I followed the point of this.

22         What you've identified are claims that appear on

23   the register that are marked, at least under box 5 of Form

24   10, that they're marked off as a 50784 priority claims for

25   vacation, et cetera, right?

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 41 of 172
HEMC HOLDING CORP., ET AL.

Page 41

```
 1              MR. KENNEY:  That's correct, Your Honor.  These
 2      are -- remain as allowed priority claims.
 3              THE COURT:  And there's no indication anywhere on
 4      the record that they've been paid or otherwise objected to
 5      or otherwise disposed of, and the witness has testified that
 6      to his knowledge they are not included in -- in priority
 7      claims to be paid under proceeds from the settlement?
 8              MR. KENNEY:  That's correct, Your Honor.  They --
 9      they have not been paid and there is no indication that they
10      will be paid.  And, you know, again, in terms of, you know,
11      canvassing the record to make sure this is a reasonable
12      settlement, okay, I only checked two of the claims on the
13      docket.  There are hundreds, if not thousands of claims.
14      Okay.  And obviously you have a number of objections from
15      taxing authorities, but those are not the sole priority
16      claimants.
17              THE COURT:  Some -- okay.
18              MR. KENNEY:  Okay.  And I have no further
19      questions of Mr. Dooley.
20              THE COURT:  Very good.
21              Mr. Loizides.
22      CROSS-EXAMINATION
23      BY MR. LOIZIDES:
24      Q    Good afternoon, Mr. Dooley.  For the record, Chris
25      Loizides for the WARN claimants.
```

JEMIC HOLDING CORP., ET AL.

Page 42

1              MR. LOIZIDES:  Your Honor, I do have a couple of

2      exhibits that I would like to --

3              THE COURT:  Sure.

4              MR. LOIZIDES:  -- hand up -- I mean, most -- all

5      of these are -- except for one which is a demonstrative is a

6      matter of the public record.

7              THE COURT:  Okay.

8              MR. LOIZIDES:  And the first one is simply the

9      settlement agreement itself.

10              THE COURT:  Sure.

11              MR. LOIZIDES:  If I could approach.

12              THE COURT:   Thanks.

13              THE WITNESS:  Thank you.

14              MR. LOIZIDES:  I do have copies if anybody would

15      like one, but I assume you have the settlement agreement.

16              THE COURT:  Actually, you know something, just in

17      terms of housekeeping --

18              MR. LOIZIDES:  I --

19              THE COURT:  Hang on.  Is there any objection to

20      the admission of two U.S. Trustee proofs of claims, UST-1

21      and UST-2?

22              Okay.  They're admitted.

23          (UST-1 & UST-2 were received in evidence)

24              MR. LOIZIDES:  Okay.

25      BY MR. LOIZIDES:

1    Q    Mr. Dooley, if you could -- looking at what's been

2    marked as Exhibit W-1 for WARN-1, could you identify what

3    Sun is paying under the settlement?

4    A    What Sun is paying?

5    Q    Correct.

6    A    My understanding of the settlement agreement is that

7    Sun is leaving behind or paying its claim -- its secured

8    claim for secured claim to the cash in the estate, which

9    right now sits at approximately $1.7 million and they're

10   leaving behind their claim to avoidance action -- avoidance

11   actions.  They're leaving behind their claim to accrued

12   interest, which is somewhere in the neighborhood of a

13   quarter of a million dollars.  They're leaving behind their

14   accrued attorney's fees as it relates to their role as

15   lender in the case, not as their role of defending WARN

16   litigation, which I believe is another four or $500,000.  So

17   somewhere in excess of $2 million.

18   Q    Okay.  The first thing you mentioned was a -- was a --

19   I believe a -- leaving behind collateral.  I don't want to

20   --

21   A    The cash in the estate, the --

22   Q    The cash in the estate.  Can you --

23   A    -- $1.7 million.

24   Q    If I could direct you to paragraph -- paragraph 7,

25   which is on page 9.  And if -- if I could just have you read

Page 44

1    -- well, first of all, if you could look at paragraph 7 and

2    if you could just read that, and if you could tell me, is

3    that the 1.7 million that you're referring to.  Is that in

4    that section?

5    A    You would like me to read paragraph 7?

6    Q    Yes, please.

7    A    Paragraph 7 says, "Upon reconciliation of the

8    administrative claims as set forth in paragraph 6 hereof,

9    the debtors shall pay in full the allowed administrative

10   claims.  Upon payment in full of the allowed administrative

11   claims as provided herein, Sun shall infeasibly (sic)

12   transfer to a liquid trading trust established by the

13   debtors as grantor for the exclusive benefit of the debtors'

14   general unsecured creditors (the trust) as a collateral

15   carve-out from this allowed secured claim and any super

16   priority liens on the assets of the debtors' estate, a sum

17   equal to all of the remaining funds in the estate (the carve

18   out).  The trust shall be responsible for paying the allowed

19   general unsecured claims their pro rata share of the carve

20   out."

21   Q    Okay.

22   A    End paragraph.

23   Q    And the amount of funds you've testified is about $1.7

24   million?

25   A    Today it is.  Yes.

1   Q    And -- and that -- those funds are not going to the

2   estate under the settlement; is that correct?

3   A    That's correct.  Yes.

4   Q    They are instead going to a trust, correct?  I'm simply

5   asking about your understanding of the settlement that you

6   testified about.

7   A    Yes.  They're going into a trust.  Yes.  That's

8   correct.

9   Q    Okay.  And -- and the beneficiaries of that trust are

10  all general unsecured creditors; is that correct?

11  A    That is correct.  Yes.

12  Q    Priority creditors are not to share in that trust; is

13  that correct?

14  A    Agreed.  Yes.  That is correct.

15  Q    Okay.  If you can now turn back to paragraph 2.

16  A    What page?

17  Q    This is -- I'm sorry.  This is -- it begins on page 3

18  and carries over to page 4.

19  A    Right.

20  Q    I'm specifically referring to the release of Sun.

21  A    Uh-huh.

22  Q    I wouldn't ask you to read that all into the record,

23  but maybe if I could just read the first part of that.  It

24  says, "The debtors, their estates, the committee and each of

25  their past, present and future agents, representatives,

1    administrators, successors, and assigns, including any

2    Chapter 7 trustee or Chapter 11 trustee subsequently

3    appointed and any entity acting on his or her behalf,

4    collectively, the estate releasing parties hereby grant a

5    full, complete and unconditional release and forever

6    discharge Sun and" -- is your understanding of that

7    paragraph that that involves a release of the -- by the

8    estates of Sun; that is, is the -- are the Jevic estates

9    releasing Sun under this provision?

10   A    I would have to read the first section, so if you give

11   me a second I could try to be responsive to you.

12   Q    All right.

13   A    I haven't memorized the agreement.  I'm sorry, Counsel.

14   Q    Okay.  If -- if you could take a look at that.

15   A    Sure.  Of course.

16   Q    And let me know what your understanding of that is.

17   A    Yes.  I think you correctly stated it.  It appears to

18   me this --

19   Q    All right.

20   A    -- this provision is a consideration for Sun to give

21   them a full release on this litigation and any other claims

22   that might -- that someone may assert from the debtor

23   estates or any successors to the debtors' estate.

24   Q    Okay.  The -- now you had also mentioned that they are

25   releasing a claim for interest and a claim for attorney's

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 47 of 172
BEMC HOLDING CORP., ET AL.

Page 47

1    fees; is that correct?

2    A    Correct.

3    Q    Assume that's -- that this committee was not successful

4    in the pending -- well, let me take a step back.  You have

5    referred in your testimony to an adversary proceeding that

6    was filed by the committee against CIT and Sun; is that

7    correct?

8    A    Yes.

9    Q    All right.  If -- if the committee was not successful

10   in that adversary proceeding, would there be any assets in

11   this estate available for anyone other than the secured

12   creditors?

13   A    No.  In fact, it's pretty hard to contemplate under any

14   scenario there would be any assets that won't --

15   Q    And even as --

16   A    -- be for the secured creditor claim.

17   Q    I apologize.  And even as things stand now, without

18   assuming future legal fees and interest, Sun's claim,

19   assuming it is valid, greatly exceeds the $1.7 million of

20   cash that's in the estate, correct?

21   A    Correct.  Yes.

22   Q    Now you've also testified that Sun -- Sun's claim

23   arised (sic) by way of subrogation to the rights of CIT

24   under a pre-petition financing agreement; is that correct?

25   A    That is correct.

1  Q    And the adversary proceeding that was filed by the

2  committee attacked the validity of that financing agreement

3  and related transactions.  Is that your understanding?

4  A    It did.  Yes.

5  Q    So to the extent that the adversary proceeding against

6  CIT and Sun was -- was successful, then Sun -- Sun's and

7  CIT's liens and claims would be deemed invalid; is that

8  correct?

9            MR. PACITTI:  Objection.

10            THE WITNESS:  I'm not sure --

11            MR. PACITTI:  Objection, Your Honor.

12            THE WITNESS:  I'm not sure how --

13            MR. PACITTI:  Calls for a legal --

14            THE WITNESS:  -- the Court would rule on that.

15            THE COURT:  Can you ask that question again?  I

16  want to make sure that I understood the question before I --

17            MR. LOIZIDES:  All right.  I'll try to rephrase.

18  BY MR. LOIZIDES:

19  Q    If you assume that the committee succeeded in what --

20  well, maybe what I should do is get the complaint.  I have a

21  copy of the complaint.  This is the second -- this is the

22  second amended complaint, which I believe is the last

23  iteration of this.  And I'll mark this as W-2

24       (Second amended complaint marked as W-2 for

25  identification)

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 49 of 172
JEVIC HOLDING CORP., ET AL.

Page 49

1          MR. LOIZIDES:  I have copies if anybody needs it.

2          THE COURT:  Bring it up.  Thank you.

3          THE WITNESS:  Thanks.

4    BY MR. LOIZIDES:

5    Q    Do you -- can I ask you to identify what has been

6    marked as W -- Exhibit W-2?

7    A    It's captioned, second amended complaint and objection

8    to claims filed by committee counsel in this case -- in the

9    Jevic Holding Case, et al.

10   Q    All right.  If I can take you to the -- it's a long --

11   long document.  If I can take you to page 77.  It is double-

12   sided.

13   A    I'm there.

14   Q    Well, actually, let's -- let's talk specifically about

15   Sun, so let's -- if we can skip ahead to -- paragraph 13 on

16   page 80 and thereafter, if I could direct your attention to

17   that.

18   A    Okay.

19   Q    And does it appear upon reviewing that that the

20   committee is seeking a determination that transfers and

21   conveyances and obligations incurred by the debtors for the

22   benefit of Sun would be essentially unwound or undone as a

23   result of this, if -- again, assuming the committee

24   succeeded in its efforts?

25          MR. PACITTI:  Well, let's object, Your Honor.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 50 of 172
HEMC HOLDING CORP., ET AL.

Page 50

1           THE COURT:  I'll bet it's the same one.  Go on.

2           UNIDENTIFIED SPEAKER:  The document speaks for

3    itself.  I -- at this point for a legal conclusion of an

4    allegation in a complaint that we're not a party to.

5           MR. PACITTI:  Same objections, Your Honor, plus

6    speculation to the extent that he is asking the witness what

7    success in the litigation might mean and -- and he is not a

8    lawyer, so I don't know that he's capable of doing that.

9           THE COURT:  I don't need a response.

10          I'm going to overrule the objections.  I would

11   note that I'm aware that the witness is not a -- an attorney

12   and is not testifying for purposes of a legal conclusion.

13   He has testified, though, with respect to the nature of the

14   settlement, the contours of the settlement, where the

15   settlement came from and at bottom the settlement is, among

16   other things, a settlement of the issues that are raised in

17   this.

18          And as I understand, the question goes to in the

19   absence of settlement what happens with a win on a

20   particular count.  I'll allow him to answer that to the

21   extent he can.

22          THE WITNESS:  I think there's no doubt that the

23   unsecured creditors' committee has asked that -- that the

24   loan transaction be totally unwound with all the hosts of --

25   of adverse findings.  At least in my experience that's

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 51 of 172
JEMC HOLDING CORP., ET AL.

Page 51

1    pretty common in litigation.  You ask for everything under

2    the sun.  Whether or not you get that's a question of fact

3    and -- and trial.  So, yeah.  I guess it is conceivable that

4    there would be all these hosts of uglies (sic) posed upon

5    the lenders.  I suspect it's fairly unlikely, but it is

6    possible.

7              MR. LOIZIDES:  Okay.

8    BY MR. LOIZIDES:

9    Q    Is Sun -- is Sun owed anything other than by virtue of

10   its subrogation rights to CIT?  And when I say that I would

11   include any adequate protection claims associated with that.

12   A    Sun is -- in its role as last out lender in this case.

13   Is that what you mean?

14   Q    Well, they -- do they have -- do they have -- are they

15   owed any other money?  I mean, do they -- did they loan --

16   is there some other transaction out there, some loan

17   transaction on which the debtors are indebted to someone?

18   A    I think Sun is -- as a entity probably has some claims

19   against the estate, which they waived, but Sun as the

20   lender, no.  I've tried to list what I understand to be

21   Sun's claims as a secured lender against the estate, which

22   is the principal amount, which is a subrogated last out for

23   participation, accrued interest, which is unpaid, and

24   attorney's fees that relates to the loan.

25   Q    But just again to be clear.  The interest and

1    attorney's fees still relate to that same subrogation claim;

2    is that correct?

3    A    Yes.  Of course.

4    Q    Okay.  All right.

5    A    Of course.

6    Q    All right.  All right.  Do you know how the decision --

7    under the proposed settlement the WARN claimants are

8    receiving nothing, correct?

9    A    Under the 9019 that's -- that's before the Court today,

10   the WARN claimants are receiving nothing.  We've tried --

11   we've tried to involve them in the negotiations and it

12   didn't work.

13          MR. LOIZIDES:  I move to strike the last portion

14   of that testimony about --

15          THE COURT:  Stricken.

16          MR. LOIZIDES:  All right.  We'll continue.

17   BY MR. LOIZIDES:

18   Q    Do you know how the decision was reached not to pay the

19   WARN claimants anything?  How did that come about, if you

20   know?

21   A    There was no decision not to pay the WARN claimants.

22   There was a decision to settle certain proceedings amongst

23   parties.  The WARN claimants were part of that group of

24   people that decided to create a settlement.  So there was no

25   decision not to pay the WARN claimants.  There was a

1   decision --

2   Q    But --

3   A    -- to settle amongst parties that negotiated.

4   Q    All right.  Did you conduct negotiations with each of

5   the beneficiaries of the trust?  I guess you -- well,

6   withdraw -- I withdraw the question.

7          THE COURT:  Okay.

8   BY MR. LOIZIDES:

9   Q    What -- why are the debtors creating a trust for the

10  benefit of general unsecured creditors only?

11         UNIDENTIFIED SPEAKER:  Objection, Your Honor.

12         MR. PACITTI:  Again, this has happened a couple of

13  times.  This actually misstates the agreement because under

14  the supplement priority tax claimants are beneficiaries of

15  the trust.  As a --

16         MR. LOIZIDES:  I -- I apologize, Your Honor.  I

17  was thinking of the original settlement.

18         THE COURT:  Okay.

19  BY MR. LOIZIDES:

20  Q    Why are the -- why are the debtors creating a trust for

21  the benefit of certain priority creditors, not WARN

22  claimants, and general unsecured creditors, but not all --

23  A    I think it's --

24  Q    -- creditors?

25  A    -- the nature of any 9019 settlement.  Those parties

Page 54

1    that have agreed to a settlement have a mechanism for

2    exchanging funds, consideration, waiver of claims.  So that

3    -- that's simply all it is.  It's simply an exchange by the

4    parties involved where the secured creditors are putting

5    either new cash into -- into a pot or leaving substantial

6    claims behind and those claims are going to satisfy

7    administrative claims, priority claims, and a pro rata share

8    of the unsecured creditors.

9    Q    All right.  Well --

10   A    I don't think it's any more complicated than that,

11   Counsel.  I'm sorry.

12   Q    Do -- do you know -- let me ask you this.  Have you

13   ever been involved in a case -- a bankruptcy case that --

14   well, have you ever been involved in any bankruptcy cases

15   other than this one?

16   A    Yeah, a few.

17   Q    Are you aware of what occurs when a case converts to a

18   Chapter 7, in general?

19   A    Sure.

20   Q    Is a Chapter 7 trustee appointed?

21   A    Sure.

22   Q    So if these cases were converted, would a Chapter 7

23   trustee be appointed?

24   A    I would imagine so.  Yes.

25   Q    And would the Chapter 7 trustee, in your understanding,

1    succeed to the claims that were asserted in the committee's

2    adversary proceeding?

3    A    They would succeed any assets the estate had left.

4    Yes.  That claim is one of those assets.

5    Q    Okay.  And is there anything that would prevent the

6    trustee from retaining counsel on a contingency fee basis,

7    for example?

8    A    Only the practicality of the trustee would come into a

9    case with no assets, with a lawsuit against it by WARN

10   claimants and all the cash would go to the secured creditors

11   because it's their lien.  So I don't -- you -- you would

12   saddle a Chapter 11 trustee with a cost for sure, no assets

13   to fight, and a multi-million dollar piece of litigation

14   that's -- you've got to convince people on the cone to fight

15   with you, and then you've got to hire expert witnesses.  Who

16   is going to pay for those?

17   Q    Well, let me -- let me ask you this question.  If the

18   trust -- do you have any reason to believe that CIT and Sun

19   would be unwilling to take a virtually identical deal

20   presented by a Chapter 7 trustee?

21   A    You would have to ask them.

22   Q    You don't know?

23   A    You would have to ask them.  I don't represent CIT or

24   Sun, so, yes, I do not know.

25   Q    All right.  Okay.  Do -- well, I may have already asked

1    you this, but do you know -- do you know whether CIT --

2    whether it was an essential deal point for CIT that Sun get

3    a general release from the estate?

4    A    I don't know, but common logic tells you that only one

5    party cares about themself (sic) and that's the party that

6    gets the benefit of the deal.  So I could imagine that CIT

7    could care less what Sun's terms were.  They just cared what

8    was in it for CIT, as Sun probably felt the same way for

9    themself (sic).  It's human nature, Counsel.

10   Q    Okay.  Fair enough.

11        MR. LOIZIDES:  Can you hold on for one second,

12   Your Honor?  I'm sorry.

13        THE COURT:  Take your time.

14        MR. LOIZIDES:  No further questions, Your Honor.

15        THE COURT:  Any other cross?

16        All right.  Redirect.

17   REDIRECT EXAMINATION

18   BY MR. PACITTI:

19   Q    Mr. Dooley, you testified that on direct, I think, and

20   on -- on cross that it was your understanding that the

21   debtors paid all accrued vacation wages to employee pursuant

22   to first day orders entered by the Court; is that your

23   testimony?

24   A    It is.

25   Q    Okay.  Can you explain the process under which you and

1    the company undertook to determine the amount of those

2    claims and come up with the number that was requested for

3    approval by this Court?

4    A    Certainly.  As part of the negotiation with the secured

5    lender, which at that time was agented by CIT, to create a

6    debtor-in-possession budget or a DIP budget, myself and my

7    team negotiated with the CIT people extensively over a

8    couple of week period of time on a budget.  One of the

9    points, probably the most contentious point on that budget

10   negotiation was given the fact that it was likely that we

11   were going to have to quickly wind down operations, how to

12   treat the employees relative to expenses other than accrued

13   payroll.

14           And it was my position that for a variety of

15   reasons we should -- and, frankly, some of these were self-

16   serving from the estate and lenders' point of view

17   protection of collateral that my belief was that we should

18   make sure we paid all the accrued vacations and we should

19   pay as much as we could of the health benefits.  This was a

20   self-insured company, so there was a health insurance run

21   off issue involved.

22           And we had had some incredibly contentious debates

23   with CIT over this issue of which we prevailed.  But we went

24   through, with the help of the HR people of Jevic, all the

25   paper -- people's time records and convinced ourselves to a

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 58 of 172
HEMC HOLDING CORP., ET AL.

Page 58

1    reasonable point that we had the correct vacation amounts

2    with people.  And it is possible, as counsel asserts, that

3    there was one missed.  It's -- it's not outside of the realm

4    of possibility.  I find it highly unlikely.

5              But the point that I would like to make, Counsel,

6    is that the lenders at the request or to some degree a

7    request of debtor, myself, was they paid $900,000 of accrued

8    vacation and $2.1 million of accrued health insurance

9    benefits that I will tell you in many cases are left

10   stranded in wind down 11's like this.  $3 million got paid

11   to the employees.  So when people tell me that the employees

12   were treated poorly here, frankly, that -- I -- that is just

13   factually untrue.

14             MR. PACITTI:  Okay.

15   BY MR. PACITTI:

16   Q    Now as part of the settlement, there's also a claims

17   reconciliation process that will continue if the settlement

18   is approved. isn't that correct?

19   A    It is.

20   Q    Okay.  And part of that would be a review of the claims

21   of the nature that are marked as UST-1 and UST-2?

22   A    We would review all claims again to make sure that we

23   had them all right.  Yes, sir.

24   Q    Now there are a lot of claims objections that have been

25   filed in this case that you're aware of, right?

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 59 of 172
HEMC HOLDING CORP., ET AL.

Page 59

1    A    There -- there's a number.  Yes.

2    Q    Okay.  But you're not aware of every single claim

3    number that appears on every single one of those omnibus

4    claims objections?

5    A    Of course not.  As counsel pointed out, we're talking

6    thousands.

7    Q    Okay.  Can I just draw your attention to UST-1?

8    A    Which one -- which one is that, Counsel?  These are not

9    --

10   Q    It is --

11   A    Oh, it's on the bottom.  I'm sorry.

12   Q    -- I believe, Myers.  Yeah.

13   A    I see it.  Sorry.

14   Q    The third page reflects vacation -- this is what Mr.

15   Kenney pointed your attention to -- vacation earned and

16   vacation hours.  And then below that it has an indication,

17   personal hours left, vacation hours left, zero.  Do you see

18   that?

19   A    I do.

20   Q    Is it possible that there truly is just an accounting

21   of what could potentially be earned by this employee, but

22   not actually what has been earned by this employee as

23   reflected on this ADP statement?

24   A    Certainly possible.  It's probably likely.  Most

25   employees don't quite understand their paystubs very well.

HEMC HOLDING CORP., ET AL.

1    They're not exactly written in employee-friendly language

2    usually.

3    Q    Okay.

4            MR. PACITTI:  May I have one moment, Your Honor?

5            THE COURT:  Yeah.

6        (Pause)

7            MR. PACITTI:  Nothing further, Your Honor.

8            THE COURT:  Okay.

9            Any recross?

10           MR. KENNEY:  Thank you.

11   RECROSS-EXAMINATION

12   BY MR. KENNEY:

13   Q    Mr. Dooley, you said that the claims review process was

14   an ongoing one and that the priority claims would be

15   accounted for in the reconciliation of claims?

16   A    I did.

17   Q    Would the priority claims be paid as part of that trust

18   in the same proportion as the priority claims of let's say

19   the taxing authorities who have agreed to take fractional

20   payments in this case?

21   A    Could you repeat the question, please?

22   Q    Would the priority claimants receive the same

23   percentage on their claims as the taxing authorities, other

24   than the IRS, are receiving on their priority claims?

25   A    Specifically, what priority claimants are you referring

1    to?

2    Q    Well, let's say that there are -- the debtor doesn't

3    proceed with objections to claims like Myers and Ohlers?

4    A    Oh, so if there is employee claims, employee priority

5    claims?

6    Q    Employee priority claims.

7    A    Would they receive the same percentage?

8    Q    Would they --

9    A    Is that your question?

10   Q    Would they receive the same percentage as the taxing

11   authorities or would they receive the same percentage as the

12   people who, according to the supplement, are being paid in

13   full?

14   A    I -- I think that if we had a couple of de minimis

15   employee claims that were small amounts that we probably,

16   for the sake of administrative efficiency, pay them in full

17   because the cost of disputing, objecting, negotiating a

18   $3,000 claim, the cost benefit would be so out of whack that

19   we're better off giving him $3,000.

20   Q    Is that regardless --

21   A    We --

22   Q    -- regardless of number?

23   A    I'm sorry.

24   Q    Regardless of the number of such claims?

25   A    No, not regardless of the number.  If there was

1   hundreds of them or hundreds of thousands that would not be

2   the case.  There is not hundreds and hundreds of thousands.

3   There may be one or two.

4   Q    All right.

5           MR. KENNEY:  No further questions, Your Honor.

6           Thank you, Mr. Dooley.

7           THE WITNESS:  You're welcome, Mr. Kenney.

8           THE COURT:  Anything further?

9           Very well.  Mr. Dooley, you may step down.  Thank

10  you, sir.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. PACITTI:  I'm sorry, Your Honor.

13          The next witness will be presented by Mr.

14  Feinstein.

15          THE COURT:  Very good.

16          Let me ask, do the WARN claimants or the U.S.

17  Trustee have witnesses today?

18          MR. KENNEY:  No, Your Honor.

19          THE COURT:  Okay.

20          MR. LOIZIDES:  We do not have any witnesses, Your

21  Honor, depending on what is asked.  I would just reserve the

22  right to call this -- this coming witness as of cross.

23  That's it.

24          THE COURT:  Okay.  Here's what I want to do, then.

25          Mr. Feinstein, we'll proceed by proffer with Mr.

```
 1    Gavin.

 2              MR. FEINSTEIN:  Yes, sir.

 3              THE COURT:  Is that acceptable?  All right.

 4              MR. LOIZIDES:  Yeah.

 5              THE COURT:  I'll take the proffer and then we'll

 6    just take a five-minute break, and then we'll reconvene.

 7              MR. FEINSTEIN:  Very well, Your Honor.

 8              THE COURT:  Okay.

 9              MR. FEINSTEIN:  My proffer is a little longer, but

10    I'll --

11        (Laughter)

12              THE COURT:  Get him some water.

13              MR. FEINSTEIN:  For the record, Robert Feinstein,

14    Pachulski, Stang, Ziehl & Jones, counsel to the official

15    creditors' committee.

16              Your -- Your Honor, the committee's lone witness

17    is Edward Gavin who is the managing director and founding

18    partner of Gavin Solmonese.  They're in the process of

19    acquiring NHB Advisors, which was the initial entity

20    retained by the committee.  So with that, Your Honor, I

21    would like to proceed with a proffer of Mr. Gavin's

22    testimony.

23              If Mr. Gavin were called to the stand he would

24    testify that he is the managing director and founding

25    partner of Gavin Solmonese, and that the predecessor entity,
```

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 64 of 172
JEVIC HOLDING CORP., ET AL.

Page 64

1    NHB, was engaged as the financial advisor to the official

2    creditors' committee, appointed in the Jevic Chapter 11

3    cases, and that he was the principal of NHB;

4           That as the leader of the firm's corporate

5    restructuring practice he is responsible for the firm's

6    development, selling and oversight of engagements to, among

7    other things, advisory engagements to official creditors'

8    committee, such as Jevic, and that he has led the firm's

9    engagement in Jevic since its inception in June of 2008.

10          Mr. Gavin would testify as to his educational and

11    professional background.  In the interest of time, Your

12    Honor, I will move on since he's here as a fact witness and

13    not as an expert, and that he has served as an advisor to

14    many, many creditors' committees in this and other

15    jurisdictions;

16          That as advisor to the Jevic creditors' committee,

17    a significant part of his work and his firm's work related

18    to the investigation, development and assertion of claims

19    arising out of the June 2006 leverage buyout of Jevic

20    sponsored by Sun Capital, which was financed with debt from

21    Bank of Montreal that was then refinanced with debt extended

22    by a syndicate led by CIT, and that Mr. Gavin worked closely

23    with the committee's counsel to determine whether the Jevic

24    LBO formed the basis for viable causes of action based on

25    fraudulent transfer and other theories, focusing in

1    particular on the projections utilized by the parties to the

2    transaction at the time of the LBO as well as the subsequent

3    sale leaseback of Jevic's real estate to determine whether

4    those transactions rendered Jevic legally or equitably

5    insolvent undercapitalized or unable to pay its debts as

6    they matured.

7            Thus, he, in the course of this engagement, he and

8    his firm assessed the fair value of the debtors' assets in

9    comparison to the debtors' total liabilities or the balance

10   sheet test of insolvency.  He assessed whether the debtors

11   were able to pay their obligations as they became due or the

12   ability to pay test of insolvency, and whether the debtors'

13   operations had adequate capital immediately before and after

14   the LBO and the sale leaseback.

15           He would testify that the committee was granted

16   standing pursuant to the challenge provision in the Court's

17   final DIP financing order to assert any defenses to the

18   secured claims of CIT as well as any affirmative claims, and

19   that he and his firm assisted counsel between the time of

20   the engagement and the end of the year 2008 in investigating

21   such claims and formulating and drafting a complaint that

22   asserted principally that the June 2006 leverage buyout and

23   the subsequent sale leaseback transactions were fraudulent

24   conveyances.

25           At year-end, he would testify year-end of 2008 the

1   committee filed a complaint asserting such claims against

2   CIT pursuant to their standing granted in the final DIP

3   financing order, and that the factual analysis developed by

4   his firm and included in the complaint were to the effect

5   that Jevic incurred obligations and granted liens to CIT

6   without receiving reasonably equivalent value, and that

7   Jevic was left insolvent under -- and undercapitalized.

8           Mr. Gavin would further testify that after the

9   complaint was filed, CIT filed a motion to dismiss on

10  January 3rd -- 30th, 2009, and that this Court, on September

11  15th, 2011, rendered a decision denying the motion to

12  dismiss in substantial part.

13          He would further testify that in the interim the

14  committee added Sun Capital as a party on the basis that

15  they had received a subordinated lien by virtue of having

16  paid a guarantee, a limited guarantee pre-petition.

17          Mr. Gavin would further testify that in October

18  2011, following the Court's ruling, the committee filed an

19  amended complaint and that on November 4th both CIT and Sun

20  filed answers to the complaint; further that those answers

21  denied many of the factual allegations in the complaint,

22  including, most importantly, that the debtors were left

23  insolvent.  And that in Mr. Gavin's professional experience

24  he would testify that a contested litigation over insolvency

25  is a very protracted and expensive exercise that often turns

1    into a battle of the experts, and that that's -- that is

2    what is -- what would have ensued here.

3              He would further testify that CIT engaged the

4    Protivity (sic) firm to render expert testimony on their

5    behalf and that, of course, the two expert opinions were

6    diametrically opposed.

7              Mr. Gavin would further testify that since last

8    November that the committee pursued a dual path.  It

9    prepared for discovery and trial of the case and it also

10   explored settlement options.

11             With regard for -- to trial preparation, Mr. Gavin

12   would testify that he did undertake preparing an expert

13   report to be provided to the defendants with regard to the

14   insolvency and related issues; that this was, in fact, a

15   complex undertaking that required many judgment calls as to

16   which reasonable minds could differ.

17             Mr. Gavin would further testify that -- that CIT's

18   expert was prepared to testify at trial that the Jevic LBO,

19   which occurred in or about June of 2006, was not the cause

20   of the company's failure two years later in 2008, but that

21   intervening events, such as the declining economy and the

22   shrinking demand for the trucking kind of business that

23   Jevic was in were the predicates for the company's failure

24   such that there would be serious challenges to the

25   committee's claims based on insolvency and causation.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 68 of 172
EMC HOLDING CORP., ET AL.

Page 68

1          Mr. Gavin would further testify that aside from

2     preparing for trial, that he and the committee explored

3     settlement and -- and that this was not the first time that

4     settlement was explored.  And, in fact, that there were --

5     before the decision on the motion to dismiss, there were

6     meetings among all the parties, and that would include CIT,

7     Sun, the debtors, the committee and the WARN class action

8     claimants, but that no settlement was reached, and that

9     there were renewed efforts in the past year to bring about a

10    global settlement.

11         Mr. Gavin would further testify that

12    notwithstanding a statement in the WARN claimants' objection

13    before the Court that the WARN claimants were never asked to

14    participate in the settlement process, that Mr. Gavin

15    attended an all hands meeting of the parties and their

16    counsel in March, March 13th of 2012; that WARN counsel who

17    are in the courtroom were present as were all the other

18    parties in the courtroom and their counsel, and that no

19    settlement could be reached because the WARN claimants

20    essentially were insistent that their claim against Sun -- a

21    litigation between two non-debtor parties -- had to be

22    resolved as part of a global settlement.

23         Mr. Gavin would further testify that the committee

24    thereafter made a determination to settle on the terms set

25    forth in the settlement agreement based on the committee's

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 69 of 172
HELIC HOLDING CORP., ET AL.

Page 69

1    good faith judgment that given the risk and the wards of

2    litigation, including the prospect of waiting for perhaps

3    many years before a litigation against Sun and CIT could be

4    resolved at significant expense for which there is no means

5    of funding in the estate, that obtaining the certainty of a

6    modest distribution to unsecured creditors now is in the

7    committee's -- the constituencies' best interest.

8              Mr. Gavin would further testify as to the

9    considerations that the committee and its advisors took into

10   account in negotiating the settlement agreement and

11   ultimately in agreeing to the terms set forth therein.

12             Mr. Gavin would testify that while the bankruptcy

13   case and the adversary proceeding have been pending for over

14   four years, that nonetheless the litigation is in a very

15   early stage; that there's been a complaint and an answer,

16   but there has been no pretrial discovery under Bankruptcy

17   Rule 20 -- 7026 et seq., and further that significant

18   obstacles were presented to the committee by virtue of the

19   answers and affirmative defenses interposed by Sun, and the

20   answers and affirmative defenses and counterclaims asserted

21   by CIT.

22             The -- Mr. Gavin would further testify that in

23   order to bring this litigation to conclusion, including

24   after all appeals that the process could conceivably take

25   many years in addition to the four years that have

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 70 of 172
PEMC HOLDING CORP., ET AL.

Page 70

1   transpired since the case began, and further that it would

2   cost millions of dollars aside from the professional fee

3   associated with bringing that litigation in order to press

4   the litigation to trial.  And that those expenses, aside

5   from attorney's fees, would include expert costs and

6   disbursements associated with a trial and the inevitable

7   appeals that would ensue insofar as CIT and Sun expressed to

8   the committee during the course of settlement discussions

9   that if the matter didn't settle, that they would vigorously

10   defend the case, and if they lost at trial, they would take

11   the matter up to the highest appellate court available to

12   them.

13         Mr. Gavin would further testify that putting aside

14   the hurdles to the success in a litigation and the time

15   delay, that the committee was presented with an alternative

16   of an early settlement that would provide for satisfaction

17   of administrative claims, some priority claims, and a five

18   to ten percent recovery for general unsecured creditors who

19   have already been waiting many years for any recovery in

20   these cases, and that the committee, as advised in

21   conjunction with its advisors, determined that accepting the

22   bird in hand of this settlement was far more beneficial to

23   creditors of this bankruptcy estate than rolling the dice in

24   the hopes of securing a large amount of money many years

25   from now and possibly losing the litigation many years from

                                                    Page 71

1    now if -- if that course could be pursued.

2           Now Mr. Gavin would further testify that there is

3    substantial uncertainty in the further prosecution of the

4    lawsuit because of the financial condition of the estate and

5    because of the inability of the estate to secure trial

6    counsel who would not only take a very complex litigation

7    that would take many years in the face of very well-financed

8    and aggressive adversaries through the trial and appellate

9    process, considering that such counsel would have to advance

10   costs because the estate has no assets with which to pay for

11   anything associated with taking a case of this complexity to

12   trial;

13          That Mr. Gavin would further testify that among

14   the substantive obstacles to the committee's success in such

15   a litigation, assuming an attorney could be found to bring

16   the case and to fund expenses would be overcoming a -- a

17   long litany of affirmative defenses that were interposed in

18   Sun and CIT's answers and also in Sun's counterclaim.

19          Moreover, Mr. Gavin would testify that even if the

20   committee could prevail on the merits of its causes of

21   action, there is uncertainty as to how damages would be

22   measured and as to whether or not, under certain outcomes,

23   there would be any benefit to anybody other than

24   administrative creditors insofar as there was a roll up of

25   the bank debt in this case and Sun and CIT have super

1    priority administrative claims such that even if liens were

2    avoided, there would still be an overhang of tens of

3    millions of dollars' claims before any priority or unsecured

4    creditors could see any -- any recovery.

5              Mr. Gavin would also testify that in terms of

6    considering the potential benefits to the estate of

7    continued litigation, aside from CIT's claims which could be

8    reasserted under 502(h) and that they may be $40 million of

9    super priority claims, that there were also substantial

10   unpaid administrative claims in the estate, professional

11   fees of approximately $1.5 million, as Mr. Dooley testified,

12   approximately 300,000 of 503(b)(9) and other priority claims

13   such that in many scenarios where the committee might find a

14   victory on the merits, the outcome would still result in no

15   recovery for non-administrative creditors.

16             Mr. Gavin would further testify that given the

17   prospect of years of litigation to establish its case and

18   overcome CIT's and Sun's affirmative defenses and CIT's

19   counterclaims, that the committee would face a monumental

20   task and an uphill battle at monumental expense while the

21   estate has no unencumbered assets and is already in the hole

22   for professional fees to date, that -- incurred in

23   connection with litigation, that the estate has no visible

24   means to pay for the expenses already incurred, let alone

25   the substantial disbursements that would have to be funded

HEMC HOLDING CORP., ET AL.

Page 73

1    to prosecute the case going forward.

2              Mr. Gavin would testify that from the committee's

3    perspective the only alternative to -- Mr. Gavin would

4    further testify that if the objectors had their way and the

5    case were converted to Chapter 7, that the -- a Chapter 7

6    trustee presiding over the estate with no cash and over a

7    million dollars in unpaid administrative claims would be

8    left to his own devices to advance the litigation, and that

9    based on his knowledge of the case and the financial

10   condition of the estate that conversion would decimate any

11   value associated with this litigation that the committee has

12   been able to generate for the estate for administrative

13   claims for certain priority claimants for unsecured

14   creditors, and that it is at best highly speculative that a

15   Chapter 7 trustee could secure counsel who would bring this

16   kind of litigation and advance costs and secure a victory,

17   including after all -- including after appeals many years

18   from now that could produce as -- as good or better a result

19   than is presented to creditors and to the estate under the

20   settlement agreement.

21             Mr. Gavin would testify that in light of all of

22   these factors, the -- that the creditors will have more

23   certainty of recovery and will enjoy a recovery in the near

24   term, after having waited for over four years without any

25   payment on their claims, and that the risk associated with

1    an uphill litigation battle that could take years to pursue

2    support the decision made by the committee to settle on the

3    terms set forth in the settlement agreement.

4              Mr. Gavin would further testify that the

5    settlement agreement was heavily negotiated by the parties

6    in good faith and provides an advantageous outcome for the

7    vast majority of creditors in the case, and that in his

8    view, based on his knowledge of the case and his experience

9    in bankruptcy cases generally that no better result could

10   have been obtained, and further that neither Sun nor CIT

11   would pay anymore to settle the case than they expressed and

12   is set forth in the settlement agreement.

13             Mr. Gavin would further testify that particularly

14   with respect to Sun, given that Sun is not getting a

15   complete release, but remains exposed to direct claims from

16   the WARN claimants that it was unsurprising to him that Sun

17   was not prepared to do any more than what they are doing

18   under the settlement agreement, which is to assign their

19   collateral of approximately $1.7 million and to relinquish

20   any and all claims to that money as well as any other claims

21   against the estate to bring about a settlement.

22             Finally, Mr. Gavin would testify that CIT's

23   willingness to pay more in the context of the settlement was

24   tested and that CIT held steadfast that they were not

25   willing to pay anymore to the settlement as they would

1    otherwise devote the same funds to litigating the case

2    through all appeals rather than to pay anymore to resolve

3    the litigation.

4            I believe that concludes the proffer, Your Honor.

5            THE COURT:  Okay.  We'll take a five-minute break

6    and then we'll reconvene for cross, okay?  Thanks.

7            Stand in recess.  Thanks.

8            (Recess taken at 3:06 p.m.)

9            (Proceedings resume at 3:21 p.m.)

10           THE COURT:  Please be seated.

11           Mr. Gavin, I think you're up.  All right.  We'll

12   swear the witness, please.

13           Please remain standing.

14           THE CLERK:  Would you please raise your right

15   hand?

16           (Witness sworn)

17           THE CLERK:  Please state your name and spell it

18   for the record.

19           THE WITNESS:  Edward T. Gavin, G-A-V-I-N.

20           THE CLERK:  Thank you.

21           THE COURT:  Let me make just a housekeeping

22   comment.  I have just scheduled a -- what will be a call of

23   no more than ten minutes at 4:30.  I have a high level of

24   hope and confidence that there won't be a need for a call

25   because the parties will reach an appropriate accommodation

1    prior to 4:30, but if there is, I will be on the call at

2    4:30.  We'll take a break.  It's just a phone call.  You can

3    leave all your stuff depending on where we are.  All right.

4    But I just wanted to let you know.

5         (Laughter)

6              MR. PACITTI:  I -- I'm texting.

7              THE COURT:  The reason for -- the reason for the

8    editorial comment is that debtors' counsel will likely be on

9    that call and I think he's hopefully conveying a message.

10             MR. PACITTI:  I am, Your Honor.

11             MR. KENNEY:  For the record, Mark Kenney for the

12   United States Trustee.

13   CROSS-EXAMINATION

14   BY MR. KENNEY:

15   Q    Good afternoon, Mr. Gavin.

16   A    Good afternoon.

17   Q    Mr. Gavin, the proffer said that you worked on the

18   investigation, development and assertion of the committee's

19   claims.

20   A    I don't know if it said the assertion, but certainly

21   the investigation and the development, I and others in my

22   firm.

23   Q    And were you aware of the capacity in which the

24   committee brought the adversary proceeding?

25   A    I believe the committee brought it in a derivative

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 77 of 172
JEVIC HOLDING CORP., ET AL.

Page 77

1  standing for the estate.

2  Q    On behalf of the bankruptcy estate of Jevic Holding, et

3  al?

4  A    That's my understanding.  Yes.

5  Q    In your capacity as financial advisor to the committee,

6  did you understand that in pursuing a claim derivatively on

7  behalf of the estate, the committee was acting for more than

8  just the benefit of the general unsecured creditors?

9            MR. PACITTI:  Objection.  Calls for legal

10  conclusion, and I'll just stop there.

11            MR. KENNEY:  Your Honor, I'm only asking for --

12            THE COURT:  I'll -- I'll allow it.

13            MR. KENNEY:  -- his understanding.

14            THE COURT:  I'll allow it.  Mr. Gavin's

15  experienced.  He understands the capacity in which he

16  served, and to the extent he can comment, he can respond.

17            THE WITNESS:  My understanding is that, yes, in

18  pursuing a derivative standing the committee is pursuing

19  that action for the benefit of the entirety of the estate.

20  BY MR. KENNEY:

21  Q    Okay.  Did you at any time in the process of assisting

22  the estate in pursuing these claims interact with members of

23  the committee?

24  A    Yes.

25  Q    Okay.  Do you -- do you have any reason to believe that

1    they under -- the members of the committee, or at least the

2    members of the committee that you interacted with understood

3    their capacity?

4    A    That seems to be a very multi-faceted question.  I

5    believe that the committee understood its role as a

6    fiduciary to all general non-priority unsecured claimholders

7    as a committee.  I also believe, I have no reason not to

8    believe, that the committee understood that in pursuing the

9    derivative -- or the action derivatively for the estate that

10   it was pursuing an action on behalf of the entire estate.

11   Q    Okay.  Now, Mr. Gavin, I understand there's been no

12   discovery taken in the adversary proceeding?

13   A    That's correct.

14   Q    Okay.  And yet you've made an assessment of the merits

15   of litigation?

16   A    We've -- we have made an assessment of what the claims

17   and causes of action appear to be, and done an expert report

18   with respect to the same.

19   Q    Okay.  And you've also made an assessment of the wisdom

20   of the settlement?

21   A    Yes.

22   Q    Now I want to make sure I understood your -- your --

23   the proffer; that basically since, is it approximately

24   November of last year, the committee was preparing for trial

25   while simultaneously also prepare -- pursuing settlement?

1    A    I don't know when the discussions of settlement first

2    started, but I believe it was after preparation of at least

3    the committee's expert report which was delivered to CIT,

4    and probably during the preparation of CIT's expert report

5    which the committee got in late February or early March.

6          So while -- while those two things happened within

7    the same space of time, one certainly happened for much

8    longer.  The preparation for litigation happened, in terms

9    of creating -- creation of the expert report started earlier

10   than the discussions of settlement, at least in the current

11   iteration of the discussions of settlement.  There had been

12   discussions of settlement before that had not gone anywhere.

13   Q    Okay.  Did you personally participate in any of the neg

14   with Sun and CIT?

15   A    I don't know if what I participated in would be

16   characterized as negotiations.  I did participate in the

17   meeting in March at Pachulski's office in New York that

18   ultimately led to this proposed settlement.

19   Q    Did you provide any -- did you have any discussions

20   with members of the committee regarding the settlement or

21   the terms of the settlement?

22          MR. PACITTI:  Objection, Your Honor.  I'm just

23   going to raise the attorney/client privilege at this point

24   and if there were communications to which counsel was privy,

25   that they would be protected by the privilege.

1              MR. KENNEY:  And, Your Honor, Mr. Gavin's not an

2     attorney.  He's a financial advisor.  There is no federal

3     accountant privilege, which is probably the closest thing

4     you're going to find for financial advisor.

5              THE COURT:  Let me ask you, if the committee and

6     the debtor are meeting with the financial advisor there and

7     the committee members are communicating with their counsel

8     for purposes of developing a strategy, would you take the

9     position that the presence of the court-appointed and

10    retained financial advisor is an outside agent to disrupt or

11    otherwise impair the privilege?

12             MR. KENNEY:  I don't think I would go that far,

13    Your Honor, but I'm not sure that that's been put on the

14    table.  And if a privilege is being asserted, what's the

15    basis of it?  You know, were the only meetings -- were his

16    only contacts with members of the committee through the

17    agency of counsel?

18             THE COURT:  Fair point.  I don't think I need to

19    answer now whether or not there's a financial advisor or --

20    or whether there's a heightened -- I don't think there's a

21    recognized federal privilege for financial advisors in that

22    capacity, but why don't you do me a favor, ask the question

23    again.

24             MR. KENNEY:  Okay.

25    BY MR. KENNEY:

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 81 of 172
JEVIC HOLDING CORP., ET AL.

Page 81

1    Q    Did you have any discussions with members of the

2    committee about the proposed settlement of the adversary

3    proceeding?

4    A    I'm sure I was involved in discussions with the

5    committee as a whole along with counsel regarding --

6    regarding the proposed settlement.

7    Q    Did you have any discussions that counsel was not a

8    part of?

9    A    Not to my knowledge.

10           MR. KENNEY:  If I can just have one second, Your

11   Honor.

12           THE COURT:  Sure.  Take your time.

13           MR. KENNEY:  Do this without getting an objection

14   to it.

15   BY MR. KENNEY:

16   Q    You were in the courtroom when Mr. Dooley testified --

17   A    Yes, I was.

18   Q    -- earlier today?  And do you remember Mr. -- someone,

19   I think it was Mr. Loizides had asked about Sun's motivation

20   -- CIT's motivation and Mr. Dooley said, well, he thinks

21   people act for themselves?

22   A    I do recall that exchange.  Yes.

23   Q    Are you aware of any discussions between debtors and --

24   the debtors or -- between the committee and CIT and Sun

25   specifically discussing how the fund -- the various buckets

Page 82

1    of funds in the settlement would be allocated?

2    A    I am not aware of any discussions.  If there were such

3    discussions, I wasn't a party to them.

4    Q    Whose idea was it for the Sun collateral to be

5    transferred to a trust for the benefit of the general

6    unsecured creditors?

7    A    I don't know.

8    Q    Did you ever hear anything from anybody on behalf of

9    Sun that led you to believe that Sun would care where that

10   money went as long as Sun got its release?

11   A    No.  I -- I never had -- I never heard anything from

12   Sun.  I -- this may make it easier for you.  I never had any

13   communications directly with Sun period.

14   Q    And you were never involved in any -- any of the

15   discussions -- or you said that you were -- participated in

16   a meeting, so that meeting was just with committee counsel

17   or other counsel?

18   A    The March meeting that I think you're referring to was

19   myself and -- and Mr. Feinstein and Mr. Groskahl (ph) for

20   the committee, CIT's counsel, Mr. Stempel and Sun's counsel,

21   Mr. Pacitti, Mr. Dooley and the counsel presently in the

22   courtroom today for the WARN Act plaintiffs.  So everybody

23   was there.

24            Now I will tell you that as the day went on and it

25   looked like at least the notion of a settlement was reached,

Page 83

1   I left simply because I had to be some -- I had to be in

2   Washington, D.C. that night and it was a long train ride

3   from New York to Washington, D.C.  So Mr. Feinstein and Mr.

4   Groskahl stayed on long after I left.

5   Q    Do you know whether there were any discussions of

6   entering into separate settlements with CIT and Sun?

7   A    I don't know if there were.

8   Q    Your proffer indicated that there wouldn't be anything

9   for a trustee to do if the case were converted to a Chapter

10  7?

11  A    Well, I think my proffer indicated that if the case

12  were -- were converted to a Chapter 7, absent meeting a

13  number of very difficult hurdles to meet, there would be no

14  assets for a trustee to pursue this litigation.  There would

15  be no means by which to pay costs and expenses going forward

16  in the litigation.  There are no assets to administer since

17  they're all covered by liens by creditors.  So it -- it's

18  highly speculative that a trustee would find contingency via

19  counsel who would also be willing to write checks out of

20  pocket to fund expert's fees, expert's costs, court costs

21  and the general costs of litigation all while sitting behind

22  secured creditors who have liens on all of the assets in the

23  estate.

24  Q    Okay.  If a settlement were completed with Sun and CIT

25  with the same economic terms from their perspective, and all

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 84 of 172
JEVIC HOLDING CORP., ET AL.

Page 84

1   of the money remained in the estate rather than being

2   distributed to administrative claimants and general

3   unsecured creditors as provided in the settlement agreement,

4   would a Chapter 7 trustee be able to administer those funds?

5   A     So just so I understand what you're asking, if Sun and

6   CIT reached the settlement, the funds went into the estate,

7   would a party responsible for the estate, be it a debtor-in-

8   possession or a Chapter 7 trustee be able to simply continue

9   on and administer the estate with -- with those funds being

10  in the estate?  That's what you're asking?

11  Q     Well, I asked specifically about a Chapter 7 trustee.

12  A     Okay.  I -- I imagine so, although I imagine it would

13  also come at -- at cost to the estate compared to where we

14  are today.

15  Q     Have you ever represented or worked with a Chapter 7

16  trustee, Mr. Gavin?

17  A     We are engaged by a few Chapter 7 trustees now.  Yes.

18  Q     Okay.  And have you ever worked with a trustee, a

19  Chapter 7 trustee in assessing -- in determining how funds

20  -- funds in the estate are distributed?

21  A     I believe so.  Yes.

22  Q     Okay.  And are you aware that the trustee is required

23  to distribute them in accordance with the priorities set

24  forth in the Bankruptcy Code?

25  A     I am aware that the priorities apply to a Chapter 7

1    trustee.  I'm also unfortunately aware that that -- there's

2    rarely, in Chapter 7 cases, funds available after the

3    Chapter 7 trustee's fees and costs and expenses of the

4    administration of the Chapter 7 portion of the estate.

5    Q    Okay.  And is that because the Chapter 7 trustee is

6    incurring those expenses and fees and costs for the purpose

7    of gathering assets, pursuing claims, litigating claim

8    objections and the like?

9    A    Yes.  I mean, administering a Chapter 7 estate costs

10   money.

11   Q    Hasn't a lot of that administrative cost already been

12   incurred in this case?

13   A    I would assume that the claimants -- the claims issues

14   that -- that you and Mr. Dooley were discussing earlier,

15   absent those questions that the estate has been marginally

16   administered, the only thing that's left is the litigation.

17   Q    So that if the litigation settled on terms that were

18   satisfactory to CIT and Sun, the trustee could then

19   administer those funds; is that correct?

20   A    Presumably.

21   Q    Pardon me.

22   A    Presumably.

23   Q    Okay.  Thank you.

24        MR. KENNEY:  No further questions, Your Honor.

25        Thank you, Mr. Gavin.

1   CROSS-EXAMINATION

2   BY MR. LOIZIDES:

3   Q    Good afternoon, Mr. Gavin.  For the record, again,

4   Chris Loizides for the WARN claimants.  I believe you

5   testified that there were some discussions, some settlement

6   discussions among the parties back in March of this year; is

7   that right?

8   A    Yes.

9   Q    And I think it was your testimony that it was the

10  position of the WARN claimants that there had to be a global

11  settlement that included a release of claims against Sun; is

12  that correct?

13  A    That is my understanding.

14  Q    Okay.  Were -- I mean, when you say that's your

15  understanding, did you -- did you actually hear that

16  yourself or is -- were you told that by somebody else?

17  A    I remember the discussion, both in the large meeting as

18  well as in a break out.  There may have been other

19  discussions that happened that -- that are not consistent

20  with that that I wasn't a party to

21  Q    All right.  Were you ever aware that Sun conveyed to

22  the WARN claimants that they had to release Sun in order to

23  get anything out of the estate at all?

24          MR. FEINSTEIN:  Objection.

25          MR. LOIZIDES:  I'm asking if he knew.

JEVIC HOLDING CORP., ET AL.

Page 87

1          MR. FEINSTEIN:  Assumes facts not in evidence.

2          THE COURT:  Overruled.

3          THE WITNESS:  No.  I was unaware of any

4     conversations between Sun and the WARN -- the WARN

5     plaintiffs directly.

6     BY MR. LOIZIDES:

7     Q    Well, then that probably -- that probably would moot my

8     next couple of questions, then.  All right.  So then -- the

9     -- referring back -- I don't know if you have it up there.

10    If you would refer back to the complaint which is, I

11    believe, Exhibit W-2.

12    A    I have it.

13    Q    Yeah.  Is that a document that you -- I may have gotten

14    the chronology wrong.  Is that a document that you assisted

15    in preparing?

16    A    Yes.

17    Q    Do you believe that is a -- that represents a frivolous

18    complaint?

19    A    No, not at all.

20    Q    Okay.  And you've been involved in many bankruptcy-

21    related litigations before; is that correct?

22    A    Yes.

23    Q    Okay.  And -- including against large sophisticated

24    parties, such as Sun and CIT?

25    A    Yes.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 88 of 172
PEMC HOLDING CORP., ET AL.

Page 88

1    Q    Is it typical in these situations that they roll over

2    or do they usually put up a good fight?

3    A    I will tell you that it is -- in my experience it would

4    be rare to see a case like this litigated out to conclusion,

5    mostly because of the time and complexity, also because of

6    the extreme lack of certainty as to the outcome.  And

7    looking at this, it's a -- the committee believes that this

8    complaint is strong and valid, and CIT believes that it's

9    terrible and they have all sorts of defenses.  And we can be

10   as confident in this complaint and the litigation ahead as

11   we wish, but we don't make that determination in the end.

12   Q    Do you have any understanding of why Sun is

13   effectively surrendering $1.7 million under the settlement?

14   Do you know why they're doing that?

15   A    I -- I believe that the dollar amount simply represents

16   the cash that's in the estate and for Sun this is just a

17   walk away.  They're surrendering -- they're -- they're

18   giving over their liens.

19   Q    Why are they doing that, though?  Are they doing that

20   because -- out of durative intent?

21   A    I'm sorry.  Could you repeat that?

22   Q    I'm sorry.  Are they doing that because they want to

23   make essentially a gift to unsecured creditors?

24   A    No.  I -- I think they're doing it because they simply

25   want finality.  I don't -- I don't know what discussions

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 89 of 172
HEVIC HOLDING CORP., ET AL.

Page 89

1    happened with respect to Sun or CIT or the other parties as

2    to what funds would go where, and to me in some respect it's

3    form over substance, although I recognize that the form is

4    important to people to whom the form is important to.

5            But my perception, and this is simply looking at

6    it, for CIT this is money in and CIT got money.  Sun didn't

7    get money.  So they have nothing to pay it back.  They're

8    simply walking away from their liens.

9    Q    All right.  But they're walking away in exchange for a

10   broad release from the estate; is that correct?

11   A    Well, that -- that would be the consideration going

12   back and forth for settlement of the litigation.  One side

13   releases Sun, although it's only the parties to the

14   settlement that are releasing Sun, and Sun's releasing its

15   liens.

16   Q    Okay.  But Sun is certainly not making a gift to

17   anybody in walking away from the $1.7 million, are they?

18   A    I don't really know how to -- how to answer that.  I

19   mean, they may view it as a gift.  You may not.

20   Q    You had -- I believe in your -- in your direct

21   testimony you mentioned something about 502(h).  Can you

22   explain what 502(h) claims would arise -- or how 502(h)

23   claims could arise in the context of the CIT and Sun

24   litigation?

25   A    Well, there are a few ways.  You know, there are a

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 90 of 172
DEVC HOLDING CORP., ET AL.

Page 90

1    number of challenges that have to be met for the CIT

2    litigation to ultimately be deemed a grand slam.  So, first,

3    you have the coin toss of do you win or not, and it's

4    fifty/fifty.

5          Second, you have to strip the liens as to the pre-

6    petition debt, and if you strip the lien as to the pre-

7    petition debt, then in theory you've just created an

8    unsecured claim, a 502(h) claim in the total amount of the

9    pre-petition debt.

10         Third, that does you no good because they have a

11   post-petition roll up in the DIP order, so you've got to

12   undo the roll up.  And if you don't undo the roll up, then

13   you simply have the same claim post-petition that the debtor

14   gave whatever releases it gave to.  So you've got to get

15   past that as well.

16         So in order to even get to the point where a $50

17   million 502(h) claim comes into being, you have to have won

18   three times in a row and not only won the litigation, but

19   you have to have won in stripping the lien pre-petition, you

20   have to win in undoing the roll up, and -- and then what you

21   end up with, before you even get to equitable subordination,

22   which is probably the big -- one of the biggest hurdles is

23   you're now left with an incredibly diluted unsecured

24   creditor class because of the 502(h) claim.

25   Q    Okay.  Now you -- so what you're saying is if the liens

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 91 of 172
DEMC HOLDING CORP., ET AL.

Page 91

```
 1    -- putting the roll up aside for just a minute.  If the
 2    liens were stripped off, but the claims were not avoided,
 3    those claims would still be there as unsecured claims,
 4    correct?
 5    A    That's my understanding.
 6    Q    Okay.  But the -- but the complaint seeks to avoid the
 7    claims as well under 548 or 544; is that correct?
 8    A    Yes, it does.
 9    Q    Okay.  I mean, is -- is it your understanding that the
10    roll up essentially bootstraps CIT's and Sun's position so
11    that it doesn't matter what the result of the litigation
12    would be?
13    A    It's my understanding, having had the conversations
14    with counsel, and this really does get into the realm of
15    counsel more than -- more than kind of in the realm of
16    financial advisory work.  But my understanding is that is a
17    possibility because you can win as to the pre-petition, but
18    not win as to the post-petition.
19    Q    You're talk -- well, you're talking about the post --
20    well, what -- you're talking about the fact that CIT
21    extended DIP financing, correct?
22    A    And got a roll up of its pre-petition debt in the post-
23    petition.  So, essentially, their post-petition lien is for
24    the same amount as the DIP financing and the pre-petition
25    debt as well.
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 92 of 172
JEVIC HOLDING CORP., ET AL.

Page 92

1    Q    Do you -- do you -- were they paid back on the DIP?

2    A    I believe they were paid back.

3    Q    Okay.

4    A    In fact, I'm certain that they were paid back because

5    that's why the only cash in the estate is subject to Sun's

6    liens due to their subrogation claim.

7    Q    Okay.  Thank you.

8         Did -- did the committee ever consider doing a --

9    simply a stand-alone deal with CIT to get the two million

10   from CIT and leave Sun out of the picture until they were

11   willing to put money into the estate?

12   A    You know, I don't recall.  I -- I recall the -- the

13   context of the March meeting was the debtors' desire to see

14   if there could be a global settlement.  So having -- having

15   the committee cut a side deal with CIT and leave Sun in

16   would present a number of complications to the notion of a

17   global settlement.

18        MR. LOIZIDES:  If you could give me one second,

19   Your Honor.  I'm sorry.

20        THE COURT:  Take your time.

21        (Pause)

22   BY MR. LOIZIDES:

23   Q    Were you ever aware -- putting aside Sun's

24   communications with the WARN claimants, specifically, were

25   you ever aware that it was conveyed to the WARN claimants

1   that there had to be a -- a global settlement involving a

2   release of Sun or else there would be a 9019 motion in which

3   WARN could get nothing?

4              MR. FEINSTEIN:  Objection, Your Honor.  I -- I'm

5   not sure I understand the question.

6              THE COURT:  Yeah.  I didn't understand that

7   question.  Try --

8              MR. FEINSTEIN:  And --

9              THE COURT:  -- it again.

10             MR. FEINSTEIN:  -- and I think it assumes facts

11  not in evidence as well.

12  BY MR. LOIZIDES:

13  Q   Were you ever aware that -- I'll try to rephrase.  I'm

14  sorry.

15             Were you ever aware that it was conveyed to the

16  WARN claimants that the WARN claimants had two choices,

17  essentially:  One was to do a global deal that involved a

18  release of Sun, or there would be a 9019 motion such as the

19  one before the Court today in which WARN claimants would get

20  nothing?

21             MR. FEINSTEIN:  Your Honor, I am going to object

22  that this assumes facts not in evidence.  WARN brought no

23  witnesses here and counsel's question implies that there's a

24  set of facts that exist that may not exist.

25             THE COURT:  I'll overrule it.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 94 of 172
NEMC HOLDING CORP., ET AL.

Page 94

1              THE WITNESS:  As best as I can answer that

2     question, I know that I never communicated that to -- to

3     counsel for the WARN plaintiffs.  I can't answer as to

4     whether anybody else did without my knowledge or outside of

5     my presence.

6              MR. LOIZIDES:  Nothing further, Your Honor.

7              THE COURT:  Okay.

8              MR. LOIZIDES:  Oh, I'm sorry.  Can I --

9              THE COURT:  Sure.

10    BY MR. LOIZIDES:

11    Q    I may have already asked this, and if so, I apologize.

12    But do you -- do you understand why, for whatever reason,

13    why the $1.7 million is going into a trust rather than to

14    the estate?  I'm sorry if I already asked you that question.

15    A    I don't think you did ask me that specific question.

16    No, I don't understand it, only because I wasn't involved in

17    structuring the mechanics of the deal.

18    Q    Okay.

19    A    It wasn't something that I needed to be involved in.

20    Q    Okay.

21             MR. LOIZIDES:  No further questions, Your Honor.

22             THE COURT:  Okay.

23             MR. LOIZIDES:  Thank you very much.

24             THE COURT:  Redirect.

25             MR. FEINSTEIN:  Just -- just a couple of

1    questions, Your Honor.

2    REDIRECT EXAMINATION

3    BY MR. FEINSTEIN:

4    Q    Mr. Gavin, you were asked on cross whether or not there

5    had been any pretrial discovery.  Do you recall that?

6    A    Yes.

7    Q    Do you recall whether or not the committee had any pre-

8    complaint discovery?

9    A    I think there may have been pre-complaint discovery.  I

10   recall, and this is going back about four years, but I

11   recall depositions.  I don't know who took them, but I know

12   that there were deposition transcripts.

13   Q    Mr. Gavin, you were asked to speculate whether, if Sun

14   and CIT would agree to settle with a Chapter 7 trustee on

15   the same terms, a Chapter 7 trustee could administer those

16   funds.  Do you recall that?

17   A    I do.

18   Q    Okay.  Now I'm going to ask you to speculate whether

19   Sun and CIT would settle with a Chapter 7 trustee who has no

20   counsel and no means of prosecuting the lawsuit for the same

21   financial terms?

22   A    Probably not.  They chose the settlement that they

23   chose.

24   Q    Thank you.

25           MR. FEINSTEIN:  I have no further questions.

1          MR. LOIZIDES:  I have just one very brief

2     question.

3          THE COURT:  Sure.

4     RECROSS-EXAMINATION

5     BY MR. LOIZIDES:

6     Q    As things stand now with respect to the estate, is it

7     also true that the estate effectively has no money to

8     prosecute the pending litigation?

9     A    Absent some release of the $1.7 million or some portion

10    thereof, the estate has no funds to do anything right now.

11    Q    And what was the last time that the estate did have

12    funds to pursue this CIT litigation?

13    A    I don't know.

14    Q    Okay.  All right.

15         MR. LOIZIDES:  Nothing further.

16         THE COURT:  Okay.  Anyone else?

17         Mr. Gavin, you may step down.  Thank you, sir.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  All right.  No other witnesses?

20         MR. PACITTI:  That's all the witnesses, Your

21    Honor.

22         THE COURT:  Very good.  And no witnesses?

23         MR. LOIZIDES:  Can you hold on for one second?

24    I'm sorry.

25         THE COURT:  Sure.

1          (Pause)

2               MR. LOIZIDES:  Your Honor, I'm sorry.  We're --

3     we're ready to proceed.

4               THE COURT:  Very good.  Okay.

5               Then we turn to argument, correct?  Okay.

6     Argument.

7               MR. FEINSTEIN:  Thank you, Your Honor.  I guess

8     I'll take the first crack at this.

9               For the record, Robert Feinstein, counsel for the

10    official creditors' committee.

11              Your Honor, we have a situation where this case

12    has been pending for years.  The committee, as well as the

13    other parties, have been dealing with this litigation for

14    years and tried in earnest to come up with a global

15    settlement.  We have the support or non-objection of every

16    creditor in the case.

17              What we have is opposition from the Office of the

18    United States Trustee and a punitive claimant, a punitive

19    claimant that hasn't filed a proof of claim; that admittedly

20    didn't file a proof of claim before the bar date; has never

21    sought from this Court to have the failure to file a proof

22    of claim addressed by way of a late claim; and a

23    constituency that has been litigating their WARN Act claims

24    for four years.

25              And I think the record is clear in -- and it's on

1    the docket that there have been plenty of delays in that

2    litigation and lots of last minute requests by the WARN Act

3    claimants for more time and more time because there just

4    hasn't been any activity in that lawsuit, which was never

5    stayed, which was never the subject of a motion to dismiss

6    that stayed the proceeding, that's been a live litigation

7    for four years where there was very little done.

8                THE COURT:  Speaking of that litigation, what is

9    your understanding, just because I want to make sure, what's

10   being settled here is the committee's litigation against Sun

11   and CIT --

12               MR. FEINSTEIN:  Yes.  The--

13               THE COURT:  -- right?  The WARN Act litigation

14   that is pending in this Court is not affected by this

15   settlement.  Is that accurate -- is that an accurate

16   statement?

17               MR. FEINSTEIN:  That's correct, Your Honor, and

18   it's the WARN Act claimants' claims or punitive claims or

19   causes of action against the estate which are not being

20   affected and their claims against the non-debtor, Sun, which

21   are not being affected.  The reality is that there are no

22   unencumbered funds in the estate to satisfy their claim

23   against the estate if it were to prevail.  But, certainly,

24   Your Honor, neither their claims against the debtors nor Sun

25   are being affected by this settlement.

1            Now, Your Honor, it was remarkable to me to read

2    in the WARN claimants' objection at page 4 that they were

3    "never invited to participate in the settlement process."

4    You have heard testimony today from at least two people who

5    were at a meeting with them in March of this year, that

6    there were efforts to bring about a global settlement and

7    that Mr. Raisner and Ms. Roupinian were -- were invited to

8    and did attend that meeting.

9            So there's a credibility issue, Your Honor, when

10   they come before the Court and profess to be barred from the

11   process because it's simply untrue.  Every effort was made

12   to try to bring about a settlement with them.  And as Mr.

13   Gavin testified, their position was absent a global

14   settlement that included settlement of litigation between

15   two non-debtors, they were not prepared to settle their

16   claim against the estate.

17           THE COURT:  Let's talk for a second -- we'll come

18   back to the WARN claimants' issues.  But let's talk about

19   the U.S. Trustee's objections and questions of sort of

20   institutional concern.

21           MR. FEINSTEIN:  Understood.

22           THE COURT:  The code contemplates liquidation.

23   The code contemplates reorganization.  The code contemplates

24   dismissal.  And the concern, I think, is -- is a straight up

25   one expressed by the U.S. Trustee, with standing to raise

1    it, that, you know, this is something that is not

2    contemplated within the code.  It's not consistent with the

3    distribution scheme under the code, and -- and I think you

4    get the gist of it.

5              MR. FEINSTEIN:  Yes.

6              THE COURT:  And I acknowledge that -- that Court's

7    have approved this in one form or another.  I think the U.S.

8    Trustee has -- has been, I think, pretty steadfast in

9    expressing their concern --

10             MR. FEINSTEIN:  Yes, they have.

11             THE COURT:  -- about this as -- you know, as an

12   end around -- around procedural protections and -- and a

13   statutory scheme and structure.

14             Other than acknowledging that it's been done

15   before, how do I deal with that?  I mean, do I have a

16   responsibility?  Don't I have a responsibility to say, you

17   know, you came to the Bankruptcy Court.  You need something

18   that ends with a discharge or a dismissal, and you -- I'm

19   not in the business of just brokering settlements.

20             MR. FEINSTEIN:  Let me address it this way, Your

21   Honor.  I -- I think the right way to look at the settling

22   parties' motion is as a 9019 motion.  And I would encourage

23   Your Honor to not disregard the request for dismissal, but

24   view that really as a secondary matter.

25             Looking at this as a 9019 motion, which is what it

JEVIC HOLDING CORP., ET AL.

1   is, you have a fact pattern where a committee under a final

2   DIP financing order has the right to bring a challenge, and

3   as part of compromising that challenge enters into an

4   agreement with the secured lenders that's embodied in the

5   settlement agreement put before the Court in a Rule 9019

6   motion whereby the secured creditors agreed to cede or

7   transfer or gift or assign some of their collateral to the

8   discreet group of people, general unsecured creditors, even

9   though there are intermediate creditors, priority

10  administrative creditors that may not be the beneficiaries

11  of that transfer.

12          It's not a gift.  It's an assignment.  It's a

13  settlement of litigation and we candidly admit, Your Honor,

14  it's a settlement of a litigation against them brought on

15  behalf of the estate.  But this is hardly the first case

16  where such an arrangement has been approved by the Court.

17  It's not the first case where this Court has approved such

18  an arrangement, and it's not the first case this month where

19  this Court has approved an arrangement of this kind.

20          So we didn't think that we were breaking new

21  ground just looking at this as a Rule 9019 settlement to

22  have CIT and Sun as secured creditors assign some of their

23  collateral to creditors who otherwise would be out of the

24  money and have no ability to be paid whatsoever because

25  there are no unencumbered assets in the estate as part of a

1    compromise of a lien challenge.

2              Now we can only rely on a fairly long list of

3    precedents to accomplish this and on precedents in this

4    jurisdiction that distinguish Armstrong, in particular,

5    which requires adherence to the absent priority rule if this

6    sort of thing -- settlement of litigation, what have you --

7    is being done pursuant to a plan of reorganization.  And,

8    yes, we candidly admit that where a plan of reorganization

9    is pursued, there are protections in the form of a

10   disclosure statements --

11             THE COURT:  Yeah.  I mean, I read --

12             MR. FEINSTEIN:  -- and the like.

13             THE COURT:  -- I read Armstrong to mean that the

14   details matter; that it has to be a carve out.  It can't be

15   within a plan because a plan imposes or -- or requires all

16   of those statutory provisions.  And this was an issue that

17   came up at different times before Armstrong and other

18   circumstances, and for whatever reason a secured creditor

19   who is more of a fiction of the taking of the collateral and

20   then distributing it to other parties, and here they said

21   it's just more convenient -- in Armstrong they said it was

22   more convenient to do it through the plan.  And I think the

23   Circuit said, if you have a plan, you're bound by 1129 and

24   this doesn't comply.  I don't think -- frankly, to me,

25   that's not remarkable.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 103 of 172
LEVIC HOLDING CORP., ET AL.

Page 103

```
 1              What do I do, then -- let me ask one of the

 2     questions I asked at the outset of Mr. Pacitti, which was is

 3     there a standard or a context -- and this is more an

 4     academic question because we're four years in in a case that

 5     has nothing left going on.  Okay.  But the U.S. Trustee's

 6     concern, I think, is a -- is a significant one about, do we

 7     allow the development of a -- basically a parallel

 8     bankruptcy procedure if people can reach a deal.

 9              And this case, I think, is more -- is less

10     alarming because, you know, it's -- it's certainly gone a

11     long way.  But, you know, it's -- again, in -- in an earlier

12     stage of a case or a case that has -- that is sort of less

13     in its final stages as one litigation -- three litigations,

14     really, two, that we're looking to wind up.  Do I have a

15     responsibility to say that this is something that you can do

16     in extremist almost by analogy to the -- is it the Lyondell

17     standard for sales that it's got to be -- things have to be

18     bad?  Is that fair or -- or do I embrace settlements as a

19     general proposition wherever I can find them?

20              MR. FEINSTEIN:  Well, certainly, the law

21     encourages settlements and 90 -- there's a long line of

22     cases under Rule 9019 that urge courts to approve

23     settlements because the bankruptcy process encourages

24     settlements.  And I think that policy was pursued by the

25     parties with great diligence in this case and great effort
```

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 104 of 172
LEVIC HOLDING CORP., ET AL.

Page 104

1    was made to try to bring about a global settlement that

2    failed.

3            So we did the best that we could in a -- in a

4    situation that could have resulted in a total meltdown and

5    no recovery for anybody.  Instead, nearly every creditor in

6    the case will receive a distribution.  The only punitive

7    creditor that won't will be WARN claimants who never filed a

8    proof of claim and are acting on behalf of employees who,

9    with the exception of two claims that Mr. Dooley suspected

10   may not be valid claims, who were paid all of their wages,

11   who were paid all of their PTO, and are now, through a class

12   action, are asserting punitive claims that are disputed for

13   WARN Act damages, but they were paid for their work.

14           So we have a scenario where, yes, Your Honor is

15   being asked to choose between approving a settlement that

16   provides for a distribution to hundreds if not thousands of

17   creditors in this case who have been waiting years to be

18   paid or converting the case to Chapter 7.  And I believe

19   undisputed testimony, Your Honor, is that it's going to

20   decimate the settlement.  It's going to mean no recovery on

21   the lawsuit, and that the only people who are going to walk

22   home with money in their pockets will be Sun and CIT.

23           And if Your Honor wishes to limit the ruling to an

24   extremist case, and this is an extremist case.  I mean, this

25   case has run in Chapter 11 through human capital, meaning

1    myself and Mr. Gavin, who have run out over the edge of the

2    cliff for two years incurring fees with no means of payment

3    because we believed in the lawsuit.  This is not -- the

4    Chapter 7 trustee couldn't find people as crazy as me and

5    Mr. Gavin to do that.  We got to where we are and we've got

6    a -- a position where we're getting millions of dollars from

7    the secured creditors because of our perseverance and

8    endurance, and that's going to benefit hundreds if not

9    thousands of creditors;

10           Or we can flush all that and let them go home with

11   their money.  We would be very disappointed.  I think lots

12   of -- the vast majority of -- of creditors in this case,

13   maybe all of them, would be disappointed as well.

14           But there is a long line of cases that we and the

15   debtors have cited as CFM, Kanos (ph) Partners, which I

16   believe is this Court, Digital Domain last week, Distributed

17   Energy Systems, TSIC, G.I. Joe, there are many, many cases

18   that approved settlements where committees acting

19   derivatively on behalf of the estate negotiate a settlement

20   where secured creditors are going to -- are -- are giving

21   money, transferring money to unsecured creditors out of

22   priority, if you will, as part of a settlement.

23           So we didn't think that we were breaking new

24   ground here.  And, in fact, we thought we were bringing

25   about something that was as beneficial to the creditors of

Page 106

1    this estate as -- as one could muster given the dynamics of

2    the different parties, the pending litigation between non-

3    debtors, and the unfortunate factual circumstances where

4    this estate has got no cash and a deep, deep hole at an

5    administrative level.

6              In terms of the settlement itself, Your Honor, we

7    believe that the outcome is above the lowest range of

8    reasonableness as well as a point on the range of

9    reasonableness.  Mr. Gavin's testimony bears out that the

10   likelihood of success was uncertain.  There were many

11   possible outcomes, some of which would result in recoveries

12   to the estate, others which may leave with -- CIT with a $40

13   plus million super priority claim.

14             So the potential for upside in the case was

15   speculative, hotly disputed by the defendants, and what --

16   so there is great uncertainty of outcome.  But there was a

17   certainty of significant expense, millions of dollars, Your

18   Honor, to take this case to trial.  And the defendants, CIT

19   and Sun, put in a pleading which confirms what we know to be

20   the case, which is that if they lost at trial they would

21   take an appeal to the District Court, to the Third Circuit

22   such that the earliest possible time that we might see a

23   definitive outcome of the case could be many years from now.

24   And after incurring expense that the estate simply does not

25   have the ability to bear.

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 107 of 172
JEVIC HOLDING CORP., ET AL.

Page 107

1          So on this basis, Your Honor, the recovery in the

2     aggregate of roughly speaking $4 million of value from

3     defendants who would otherwise walk home with that in their

4     pockets, we believe and submit to the Court is above the

5     lowest range of reasonableness and satisfies the TMT Trailer

6     Ferry standards.

7          And I note, Your Honor, that the TMT standards are

8     four:  One was probability of success, which I've addressed;

9     second is collection, which is not an issue; third is

10    inconvenienced delay and expense, which we've addressed; and

11    finally, Your Honor, is the paramount interest of creditors.

12    And the paramount interest of creditors in this case would

13    be to have the settlement approved because it's going to

14    mean that they get a distribution.  It's not the traditional

15    way.  It's not pursuant to a confirmed plan, but it is

16    distributions.

17         And Chapter 11 is about getting recovery to

18    creditors and we succeeded in doing that after four plus

19    years of trying, and we would hate to see that go down the

20    tubes, Your Honor, because a punitive claimant who didn't

21    see fit to file a proof of claim and may have an agenda of

22    litigation against another non-debtor is the only punitively

23    economically interested party standing in the way.

24         In terms of whether or not this is a sub rosa

25    plan, Your Honor, let me address that.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 108 of 172
JEVIC HOLDING CORP., ET AL.

Page 108

1           The -- as I said, the Sun's -- the WARN's claims

2      against the debtor are not being discharged.  There is no

3      discharge of claims against the debtor.  There is no release

4      of preference actions.  And I know Judge Walrath had a

5      problem with the AFA settlement a couple of weeks ago

6      because part of the bargain struck between the committee and

7      the secured lenders was a complete preference waiver.

8           Here, there was no preference waiver.  In fact,

9      all the preferences have been brought and concluded.  We

10     managed to accomplish a lot over the course of four years,

11     preference claims, claims resolution, disposing of all the

12     assets that might have the appearance that a plan happened

13     here.  No.  Four years of bankruptcy happened here where we

14     managed to complete all that work while we were trying to

15     deal with the much larger issues in the case.

16          But to be clear, there's no preference waiver.

17     There's no discharge.  There -- there are no releases except

18     releases that were contemplated by the DIP financing order,

19     and in that respect this is very similar to Digital Domain

20     where the release of the lenders in the DIP order was

21     validated in the context of a sharing arrangement where the

22     lenders gave some money to unsecured creditors.  And in that

23     case priority creditors, but not all the priority creditors,

24     just certain priority creditors.

25          So the argument here, Your Honor, that there's

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 109 of 172
JEVIC HOLDING CORP., ET AL.

Page 109

1    some discrimination going on, we addressed this in our

2    papers so I won't repeat it, it kind of rings hollow because

3    the Court has approved in another context a gifting or class

4    gifting arrangement where some priority creditors benefited

5    and other priority creditors did not.  So we don't think

6    that this is, again, breaking new ground.

7              Lastly, Your Honor, let me address the breach of

8    fiduciary duty issue.  Yes, the committee was acting on

9    behalf of the estate.  The committee brought about a

10   settlement that will result, if approved, in recoveries by

11   every creditor in the case.  The only punitive creditor

12   that's not getting a recovery didn't file a proof of claim.

13             And the -- and an objection was made in Digital

14   Domain and I believe in other cases by the U.S. Trustee in -

15   - in virtually identical words that the committee is

16   reaching its fiduciary duty in negotiating a settlement of

17   this year, and Your Honor overruled that objection.  And we

18   believe the same result should be obtained here.

19             So for all those reasons, Your Honor, we would ask

20   that Your Honor approve the motion and allow us to

21   consummate the settlement.

22             THE COURT:  Okay.

23             MR. FEINSTEIN:  Thank you.

24             THE COURT:  Thank you.

25             Mr. Kenney.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 110 of 172
JEVIC HOLDING CORP., ET AL.

Page 110

1           MR. KENNEY:  Well, Your Honor, I'll apologize for

2    this because we're reaching dinner time and I wasn't aware

3    that the Bankruptcy Code --

4           THE COURT:  Do we need to take a break?

5           MR. KENNEY:  -- and rules were salad bar or buffet

6    where you can pick versions you want to live with and -- and

7    leave out whatever you don't like.  Okay.  I'll take a

8    little bit of automatic stay, oh, and let me put on some DIP

9    financing, let me add some 363 sales, but, yeah.  I don't

10   like the distribution priorities built into the code, so I'm

11   going to leave those off my tray and, you know, the

12   provision to say how and where we distribute the assets, let

13   me leave those off, too.

14          Bankruptcy isn't a salad bar or a buffet, Your

15   Honor.  Each chapter of the code is little bit more like a

16   combination platter.  No substitutions allowed.  You want to

17   liquidate assets in a Chapter 7 case, we appoint a trustee

18   and the trustee is a fiduciary.  He liquidates the assets,

19   distributes the money in accordance with the priority

20   scheme.  You want a Chapter 11, you comply with Section

21   1106; that is, you file a plan or you explain why a plan

22   won't be filed or you recommend conversion of the case to

23   another chapter.  Okay.  Nothing in Chapter 11 allows you to

24   piece together an alternative plan that lets you take a

25   little bit from this chapter and a little bit from that

Case 08-51903-BLS    Doc 75   Filed 11/27/12    Page 111 of 172
LEVIC HOLDING CORP., ET AL.

Page 111

1    chapter.

2            And as far as I can see, Your Honor, the only

3    provision that allows for settlements for dictate how assets

4    are going to be distributed is Section 1123, which says you

5    can work a settlement into a plan, okay, and 1123(c) is

6    optional provisions and that can include a settlement.

7            Now the code presumes in a Chapter 11 case

8    payments on account of prepetition claims are going to be

9    made either pursuant to a confirmed plan, okay, that

10   provides certain safeguards like the filing of a plan and

11   disclosure statement, okay, and the holding of a

12   confirmation hearing or, okay -- well, in 11 it's probably

13   Section 3021.  Rule 3021 talks about distributions being

14   made after a plan is confirmed.

15           I'll point out that in Conro Ford, a 1988 case,

16   Judge Fitzgerald looked at someone requesting pre-

17   confirmation distribution and she said that if distribution

18   can be made before confirmation of a plan, parties aren't

19   going to have any incentive to perform the work required to

20   issue and get approval of a disclosure statement and plan.

21   She cited Brandiff (ph) Airways.

22           I also point out the Swallens (ph) case, Your

23   Honor.  It's a Fourth Circuit -- a Sixth Circuit bankruptcy

24   appellate panel case from 2001 where the Court did say that

25   -- you know, it called what the debtors were trying to do a

1   hybrid creature not recognized by the Bankruptcy Code,

2   Chapter 7 without the protection of a trustee, or a Chapter

3   11 without the protections of a plan.

4           The Court held that "we simply cannot find a basis

5   in the Bankruptcy Code for permitting over objections by

6   interested parties a distribution to creditors of all the

7   assets in a Chapter 11 case without a confirmed plan, a

8   Chapter 11 plan."

9           THE COURT:  Let's -- let me ask you.  I understand

10  that analysis.  I guess I -- I would ask, for one thing, the

11  buffet analogy, people try those analogies all the time and

12  they almost never work.  That one actually held together.

13  That was a good analogy.

14      (Laughter)

15          MR. KENNEY:  Thank you, Your Honor.

16          THE COURT:  But -- but I do have a question.  You

17  know, to be blunt, I think Mr. Feinstein's argument and the

18  debtors' argument is going to be, look, the code is not a

19  suicide pact.  Okay.  We have a case that has run its -- I

20  think that's their argument.  We've got a case that has run

21  its course.  One of two things is going to happen.  We can

22  either convert, and there's been I think pretty coherent

23  testimony about what is likely to occur, and I've seen my

24  share of conversions, or a dismissal.  And the -- while --

25  while there is -- the principals stand, I think Mr.

1    Feinstein's closing points were that if this craters, then

2    this whole exercise dies with a whimper at some point, and

3    that contributing creditors will likely walk away, maybe not

4    immediately, but ultimately with the consideration that

5    otherwise would have been available.

6             How do I respond to that?

7             MR. KENNEY:  Well, Your Honor, the first thing is

8    you're starting with the assumption that the money has to be

9    distributed that way.  I mean, first of all, let's -- let's

10   start out with you saying, well, this has been done in a lot

11   of other cases.  This is the only one that I am aware of,

12   Your Honor, where the committee did more than just rattle

13   its sabers and make a lot of threats to do things and

14   threaten to disrupt sales, threaten to disrupt payments.

15   Here, the committee filed an adversary proceeding on behalf

16   of the estate.  So they acted as a fiduciary for all of the

17   creditors.  Okay.

18            Now I'm sure, and we haven't heard from them, and

19   I think we probably would have.  I'm sure Sun Capital and

20   CIT don't care at all who actually winds up with the

21   consideration, the money that CIT is putting in, the money

22   that Sun Capital is going to leave behind as long as they

23   walk away with their releases.  I really think that they

24   don't care.  And as a fiduciary for the entire estate, the

25   committee should have been negotiating for the money to

1    simply come into the estate, get rid of Sun and CIT, and

2    then determine how to distribute those proceeds in

3    accordance with the code.

4              And I think, you know, the fact that they actually

5    filed a suit, you know, does make a really big difference.

6    You said it was more alarming in this case because of the

7    point we're at.  I think it's -- it's more alarming because

8    of the fact that they actually filed that lawsuit on behalf

9    of all the estate.  Okay.  And --

10             THE COURT:  What's the --

11             MR. KENNEY:  -- I know that in their response --

12             THE COURT:  What's the -- what is the significance

13   of that?  I mean, because -- I mean, I guess it's -- it's --

14   it's more ammunition.  It's more legwork, but it's not that

15   different than if, you know, three months into a case a

16   committee looking at an expiree of a challenge deadline

17   files its complaint and then -- and then cuts a deal.

18             MR. KENNEY:  But, Your Honor --

19             THE COURT:  How does it --

20             MR. KENNEY:  -- if they do --

21             THE COURT:  -- how does it heighten their -- their

22   duties?

23             THE COURT:  When they file that complaint, they're

24   filing it under a -- they're filing it derivatively on

25   behalf of the estate, and that's --

1          THE COURT:  Okay.

2          MR. KENNEY:  -- what they did here.  This is the

3     estate's cause of action that they're asserting.  And I --

4     you know, I can analogize and I -- and I think when a

5     committee becomes a fiduciary for all the creditors rather

6     than just the unsecureds, when it brings that derivative

7     action, okay, you know, it's standing in the shoes of a

8     trustee or the debtor-in-possession and it becomes what I --

9     I think a familiar term for the Court would be it becomes a

10    guardian ad litem.  And I know that that's a term familiar

11    to a lot of people in this room because a lot of people do

12    pro bono work as guardians ad litem.

13          Well, imagine if a guardian ad litem files a

14    lawsuit for damages on behalf of his ward.  After the

15    defendant files an answer and threatens to litigate it to

16    death, the guardian ad litem approaches the debtor and says,

17    hey, you know what?  Don't worry about the kid.  You know,

18    just give me money for myself and I've got to make this

19    lawsuit disappear.

20          The guardian ad litem who presented that to the

21    Court, Your Honor, would walk out of the courtroom in

22    handcuffs and leg irons.  Okay.  And, you know, I think

23    that's essentially what they're doing here.

24          THE COURT:  That's not as good an analogy as the

25    buffet.

```
 1          (Laughter)

 2              MR. KENNEY:  Your Honor, I'll accept that

 3     criticism.  The fact is the committee came in.  It's -- it's

 4     asserting the estate's rights against Sun and CIT, okay.

 5     Sun and CIT --

 6              THE COURT:  All right.  And so let's --

 7              MR. KENNEY:  -- are getting releases from the

 8     estate.

 9              THE COURT:  Hang on.  So it's asserted those

10     rights and -- and let's just assume -- I mean, it's been

11     years.  Let's assume that they've been prosecuted

12     vigorously, negotiated aggressively, and ultimately, you

13     know, compromised.

14              Where's the violation?

15              MR. KENNEY:  Where's the violation?

16              THE COURT:  Yeah.

17              MR. KENNEY:  The fiduciary is taking an asset that

18     belongs to the entire estate and putting it in its own

19     pocket.  Okay.  Since I objected, I know they've gotten some

20     of the priority creditors on board by basically offering

21     them partial payment.  One, it's not all of the priority

22     creditors.  And I heard Mr. Feinstein say, we're going to

23     pay them all.  But that's not what's in the settlement

24     agreement.  That's not what's in the motion.  Okay.

25              And to the extent he says, well, it's not objected
```

JEVIC HOLDING CORP., ET AL.

Page 117

1    to by anybody else, Your Honor, they didn't serve every

2    single creditor in this case with the actual motion.  They

3    might have served people with a one-page notice of the

4    motion that doesn't really tell them anything.  You've got a

5    lot of creditors out here who -- who are very

6    unsophisticated people who may have -- you know, employees

7    holding priority claims.

8              So the absence of objection by people whose ox is

9    getting bored isn't really meaningful in a case like this,

10   especially when they know that, well, the committee is out

11   there.  They brought a suit on behalf of everybody and now

12   the committee's not -- they're saying, well, we didn't

13   really bring it on behalf of everybody.  We -- we want the

14   money for ourselves first.

15             And the committee is saying it's exercising sound

16   business judgment, but, Your Honor, if there is any

17   possibility that Sun and CIT would, in exchange for the

18   releases they're getting from the estate, you know, CIT puts

19   in the money.  It doesn't care who gets it.  And I'm sure

20   Sun doesn't really care who gets the $1.7 million that it's

21   going to leave behind as long as it gets its release.

22             And as a matter of fact, it's not just the

23   committee that's giving Sun a release.  It's the entire

24   estate.  Okay.  So the committee is basically grabbing a

25   proffer for the general unsecured creditors using somebody

1    else's assets and, you know, pocketing the proceeds,

2    essentially, for the benefit of the general unsecured

3    creditors with a little carve out for the priority claimants

4    that they made a deal with.

5           But it's not in the best interest of all

6    creditors, and the best interest of all creditors is the

7    last factor under the Martin standard.

8           THE COURT:  Well --

9           MR. KENNEY:  And then --

10          THE COURT:  -- let's go back to this.  So when we

11   talk about what the best interests are, if I deny the

12   settlement, I guess your point is they'll go back and cut a

13   deal that wraps everybody in.

14          MR. KENNEY:  Well, I think Sun and CIT certainly

15   would.  The debt -- the creditors' committee may not be

16   happy with it, but they would be complying with their

17   fiduciary duty to the estate to all of the creditors that

18   when they filed that lawsuit, Your Honor, it's -- they put

19   it on a different mantle.  You know, they became a fiduciary

20   for everybody, not just for the general unsecured creditors.

21          And, you know, I have to say that if committees

22   are going to do this, then we're going to have to --

23   everybody's going to have to revisit the concept of letting

24   a committee have derivative standing for the purpose of

25   having DIP financing in the first place because if the

Case 08-51903-BLS    Doc 75   Filed 11/27/12    Page 119 of 172
ZEVIC HOLDING CORP., ET AL.

Page 119

1    committee is basically going to acquire for itself a right

2    to do things derivatively and then turns around and

3    basically does it -- you know, holds itself out as a

4    fiduciary for everybody and then turns around and basically

5    disclaims that fiduciary obligation and says, well, we're

6    really doing this for us and the rest of you can go fend for

7    yourselves.

8            And one of the last things, Your Honor, is the

9    concept of a sub rosa plan.  You know, when you come up with

10   something that dictates how all the assets in the estate are

11   going to get disposed of, okay, how the claims of the

12   creditors are going to get dealt with, okay, what's going to

13   happen to the case itself if the case is going to be

14   dismissed, okay, I can't -- that, to me, is the very model

15   of a sub rosa plan.

16           You -- you're coming to court with something that

17   we're going to make this whole case going away.  Here's how

18   we're going to distribute the money.  Here's who we're going

19   to give it to.  And, oh, by the way, we're not going to

20   distribute it in accordance with the way a Chapter 7 trustee

21   would be required to distribute it.  We're not going to

22   distribute it in accordance with the priorities that Chapter

23   11 establishes.  We're instead going to invent our own

24   hybrid plan, okay, you know, cobbling together little bits

25   and pieces of this chapter and little bits and pieces of

1   that chapter, and we're even going to invent a few things on

2   our own.

3         And I -- and I think what you wind up with is

4   something that doesn't fit any chapter of the code.  It's --

5   it's a really unprecedented Rue Goldberg (ph) device, but

6   it's nothing that complies with any provisions of the code,

7   and what it actually does, it undermines the code and it

8   perverts the provisions of the code, Your Honor.  And it

9   basically -- it -- it ignores the sanctity of the statute

10   that Congress wrote, the policies that Congress established

11   and told all of us that this is what you have to work with,

12   like it or not.  This is what we've put in place.

13         THE COURT:  Let me ask you.  Accept for a moment

14   Mr. Feinstein's and the witnesses' testimony that they don't

15   believe that this deal is there absent the structure that's

16   been proposed, and that the likely next step for this case

17   would be conversion, although I think the witnesses have

18   each testified really without meaningful rebuttal that

19   conversion would make any sense because you would be dumping

20   an asset-less estate or a fund-less estate onto a 7 trustee.

21         What I'm being presented with is -- if that is the

22   consequence, what do I do?

23         MR. KENNEY:  Well, Your Honor, they're trying to

24   back you into a corner that way by saying, look at the

25   horrible things that are going to happen.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 121 of 172
JEVIC HOLDING CORP., ET AL.

Page 121

1          First of all, maybe a trustee acquires or masses

2     some funds by surcharging the professionals who have been

3     pursuing this litigation all this time and apparently not

4     getting anywhere with it.  You know, I don't understand

5     where all the administrative expenses in this case came

6     from.

7          Second, we have to accept the fact that there are

8     times when, for the purpose of upholding the sanctity of the

9     code, we have to accept the fact that we are sometimes going

10    to get a really ugly result, an economically ugly result,

11    but it's an economically ugly result that is dictated by

12    provisions of the code.  And we have to ask ourselves is

13    that economically ugly result something that is actually

14    better than allowing a perversion of the code, allowing

15    money to be distributed not in accordance with the way that

16    Congress said it should be disposed of.

17         And I know they've also said, well, you know, the

18    courts have already had discretion to allow this.  And, Your

19    Honor, aside from the approvals of -- of these sub rosa

20    plans, the structured dismissals under the guise of

21    settlements in this district, the only other thing I'm aware

22    of where money goes out of an estate other than through a

23    trustee or through a plan are under the necessity of payment

24    doctrine, which typically applies on the first day of a

25    case.

Page 122

```
 1              THE COURT:  Different --

 2              MR. KENNEY:  This isn't the first day.  This is

 3    the last day when they've run out the clock.  They've run

 4    out the money and now they're saying, well, judge, you've

 5    got to give us what we want now because we backed you into a

 6    corner.  And I think sometimes you have to push back.

 7    First, you know, I'm not even sure that the deal would not

 8    be on the table.  I'm sure Sun Capital and CIT would love to

 9    get out of this case because, yeah, they can fight it

10    forever.  It's going to cost them money to do it.  I'm sure

11    they would rather just wash their hands of it.  And if they

12    can wash their hands of it for the same money that they've

13    put on the table now, maybe the proper thing to do is to say

14    to the debtors, no, I'm not going to approve this

15    settlement.  Go back and cut a kosher deal; you know, one

16    that -- one that benefits the estate --

17              THE COURT:  What is a --

18              MR. KENNEY:  -- and all of the creditors.

19              THE COURT:  -- kosher deal?

20              MR. KENNEY:  Well, Your Honor --

21              THE COURT:  Is it that all secured claims get paid

22    in full and then all admin claims get paid in full --

23              MR. KENNEY:  Well, to the --

24              THE COURT:  -- and then all 507 priority claims

25    get paid in full and then there may be some distribution due
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 123 of 172
JEVIC HOLDING CORP., ET AL.

Page 123

1    unsecure creditors?

2              MR. KENNEY:  Except to the extent that people

3    agree to take less.  That -- that is what the code calls for

4    --

5              THE COURT:  How do we determine --

6              MR. KENNEY:  -- and that's what Chapter 7 --

7              THE COURT:  -- whether they agree to take less?

8              MR. KENNEY:  -- trustee would distribute.  Pardon

9    me?

10             THE COURT:  How do we determine whether they agree

11   to take less?  So what you're saying is --

12             MR. KENNEY:  Well, you have people --

13             THE COURT:  -- their choice is a plan?

14             MR. KENNEY:  You have the people that after I

15   objected and they joined in my objection, the debtors

16   reached out to those people and made deals with them to give

17   them fractional payments.  So those people agreed they would

18   take less.  There's a lot of other people out there.  Okay.

19             Now I don't know what else is out there for

20   secured claims.  Presumably, Sun is walking away from the

21   balance of its secured, its punitive secured claim, okay,

22   which right now is just a punitive claim because it is a

23   contested claim.

24             And if they had -- if they hadn't choreographed

25   this, and that's -- if they hadn't choreographed this

Page 124

1    settlement to provide specifically for Sun to receive a

2    release, but to retain its interest long enough that it can

3    then pay that interest over to the general unsecured

4    creditors, there might not be a problem.  But they -- it's

5    -- it was a very cynical arrangement, Your Honor, that --

6    okay.  We're going to grant Sun a release by the estate and

7    Sun is going to retain its claims against the estate long

8    enough for it to grant those claims, the benefit of those

9    claims to the general unsecured creditors and exclude

10   everybody else.  And the only way they can do that is for

11   Sun to get its release first so that the dispute against --

12   the dispute about its claim and the dispute about its

13   security interest goes away.

14           THE COURT:  Well, they wouldn't settle without a

15   -- without an effective release.  I mean, what you're

16   describing is a release that would be like kissing your

17   sister, right?

18           MR. KENNEY:  I'm not sure I understand that.

19           THE COURT:  Well, I think you're saying that --

20   that what they're doing is they're structuring it in a way

21   that gets them a release from the entity and the folks that

22   sued them.  And --

23           MR. KENNEY:  They get that first.  They retain

24   their rights, the right to their collateral, which all of a

25   sudden becomes an uncontested -- it's an undisputed claim

JEVIC HOLDING CORP., ET AL.

Page 125

1  and an undisputed security interest.  They then turn around,

2  as the next step in the settlement, and they give that --

3              THE COURT:  Okay.

4              MR. KENNEY:  -- their collateral interest away.

5  So it's not kissing your sister, Your Honor.  It's -- it's

6  arranging -- it's arranging the order of the releases so

7  that the funds can go where Sun dictates they go, and I

8  don't think it's Sun dictating where they go.  I think it's

9  the creditors' committee demanding where they go and Sun

10 basically saying, we want out.  We don't care where it goes,

11 but if it gets us out -- you know, if it gets us out, I'll

12 put the money on a rocket to Mars.  Okay.  I don't think

13 they really care where the money goes.

14              I think -- but -- but the way that its structured,

15 instead of simultaneous complete releases, Sun is -- the

16 estate is letting Sun have an undisputed claim, which Sun

17 can then surrender to the general unsecured creditors.

18 Okay.  And that's really more sub rosa because it's an -- if

19 Sun doesn't have a claim, those assets become assets -- you

20 know, they're unencumbered assets of the estate that should

21 be distributed in accordance with the code.  Okay.

22              And I'll point out that the general unsecured

23 creditors may not benefit from that, or they may, depending

24 on what kind of a deal everybody makes if it's a deal that

25 all of the creditors are involved in making.  But that

1    should have been one of the considerations of the committee

2    and I'm not even sure the committee was involved in this.

3    It was really the committee's professionals.  And they

4    should have been serving the interest of all of the

5    creditors, not just the interest of the general unsecured

6    creditors if -- you know, once they put on that fiduciary

7    mantle.

8                    THE COURT:  Okay.

9                    MR. KENNEY:  If Your Honor has any further

10   questions.

11                   THE COURT:  No, I don't.

12                   MR. KENNEY:  Thank you, Your Honor.

13                   THE COURT:  Here's what I would suggest we do. I

14   think I'm going to have my call.  Obviously, Mr. Pacitti,

15   you can remain in the courtroom for that.

16                   I would ask that we'll take a break.  We'll start

17   up again -- this won't be more than ten minutes.  So -- and

18   then we'll -- we'll reconvene hopefully by 4:20, don't go

19   far, or 4:40 for -- to finish -- to wrap up closings.  Okay.

20                   We'll stand in recess.

21                   MR. KENNEY:  Thank you, Your Honor.

22                   (Recess taken at 4:26 p.m.)

23                   (Proceedings resume at 4:55 p.m.)

24                   THE CLERK:  All rise.

25                   THE COURT:  Please be seated.

Page 127

```
1              I believe Mr. Loizides.

2              MR. PACITTI:  I think the objectors were going, so

3         --

4              THE COURT:  Yeah.  Okay.  Mr. Loizides.

5              MR. LOIZIDES:  Good afternoon, again, Your Honor.

6    Chris Loizides for the WARN claimants.  Before turning to

7    argument, if I could just -- just a couple of sort of

8    housekeeping things I would like to address, if I could

9    quickly.

10             I don't think I ever formally moved for the

11   admission of the two exhibits.  I don't think there were any

12   objections to those.

13             THE COURT:  no.

14             MR. LOIZIDES:  That was W-1 and W-2.  There were

15   also three documents that were referred to in testimony and

16   in argument, one being the final cash collateral order which

17   granted standing to the committee.  Secondly, the class

18   certification order, and the WARN docket was referred to, I

19   believe, in the proffer from Mr. Dooley.  And, finally,

20   there was the reference and argument to the actual docket in

21   the WARN action and -- and I have copies of all of these

22   documents, but I assume everybody else does and I --

23             THE COURT:  Yeah.  I do.

24             MR. LOIZIDES:  -- would also like to move to admit

25   those into the record.  I don't believe that, you know,
```

1    they're matters of public record.

2             THE COURT:  Okay.

3             MR. LOIZIDES:  I don't know if there's any

4    objections or -- or if we can just move on, Your Honor.

5             Your Honor, I -- I'm not sure where to start.  I

6    mean, if -- if you look at the settlement agreement, the --

7    what's happening -- and I just want to focus specifically on

8    the Sun part of it.  Sun is essentially giving $1.7 million

9    to this trust.

10            Now just hypothetically, let's say that the trust

11   was not a trust for the benefit of unsecured creditors.  It

12   was a trust for something out of -- out of the Herman Cane

13   2016 campaign or something like that, okay, who knows.

14   Could anybody argue seriously -- I'm not suggesting anybody

15   would do that, Your Honor.  I'm just picking something out

16   of thin air, okay?  But the -- would anybody seriously argue

17   that they should get a release from the state in exchange

18   for that?  I think the answer has got to be obviously no.

19            I suppose the response would be, well, of course,

20   that's not for the beneficiaries of the trust.  The

21   beneficiaries of the trust are creditors in this case.  It's

22   essentially everybody but -- excluding administrative

23   creditors, essentially everybody but the WARN claimants.

24   And they would say that -- that's a pretty close subset.

25   That's almost all.

1           From our perspective, Your Honor -- and, again, I

2     echo Mr. Kenney's comments on this.  From our perspective it

3     is as if they granted this money to some third party because

4     we're getting nothing.  And it was structured --

5           THE COURT:  You still have your lawsuit.

6           MR. LOIZIDES:  We have a lawsuit against a third

7     party, Your Honor, okay, against a third party.  We're

8     getting -- we have claims against the estate, against the

9     debtors, essentially.  And as to those claims we are getting

10    nothing.  The fact that we -- I mean, I don't think this

11    case should turn on whether we happen to have claims against

12    a third party or not.  And those aren't exactly the same

13    claims for whatever it's worth because there are additional

14    hurdles, as the Court is aware, that you have to overcome.

15          THE COURT:  I am.

16          MR. LOIZIDES:  Yeah.  All right.  I don't have to

17    discuss that.

18          Early in the case and in this -- today's hearing,

19    the Court said something to the effect, you know, is there

20    -- is  there a higher standard than 9019 that the debtors

21    might have to meet, something like than an extremist

22    standard or something like that.  And I -- I would

23    respectfully argue that I -- I don't think they can do it

24    even under that kind of argument.

25          And the reason I would argue it, Your Honor, is

Page 130

1    that pragmatics can only take you so far.  I mean, the code

2    has a certain structure.  And I think they're coming to this

3    Court and saying, Your Honor, you have to do this or you get

4    nothing.  It's -- it's almost like -- you know, it's this or

5    nothing at all.

6            Well, I don't think that's a legal argument, Your

7    Honor.  I understand the pragmatics of it, but it doesn't

8    justify granting a general release to Sun in exchange for

9    payment that is not being made to the estate.

10           The other thing is I think Your Honor had said

11   there's uncontroverted uncontradicted testimony.

12           THE COURT:  Well, I mean, if they're estate

13   claims, do I have to find that every -- I mean, do I -- to

14   approve a settlement are you suggesting that I need to find

15   that every estate claimant, if the estate settles with --

16   with somebody, that everybody sees a benefit from that?

17           MR. LOIZIDES:  No, not at all, Your Honor.  I'm

18   saying that the estate must benefit, and then whoever -- and

19   then -- and then at that point 507 -- that's when that comes

20   into play.  I -- I mean, there -- they said in their brief,

21   I haven't cited any authority that say that distributions

22   need to be made in accordance with 507.  Well, that's right

23   if you're talking about something that's not an estate

24   asset.  But that's sort of the whole point.

25           So, no.  Your court doesn't have to find that

1    every creditor will -- will benefit.  It's just that the

2    estate has to benefit.  And at that point, it's the

3    priorities ordered by Congress that govern.

4              THE COURT:  How is this different from other

5    circumstances?  Leave aside from a moment Mr. Kenney's

6    argument with respect to how the code should work.  The fact

7    that -- the fact is that courts have approved structured

8    dismissals, whatever you want to call them and it may be in

9    a spirit of pragmatism, faced with Hobson's choice of this

10   or nothing.  How do I deal with that?  Does this -- do -- is

11   the point that those are simply bad decisions or, in fact,

12   this case is different?

13             MR. LOIZIDES:  Your Honor, well, a couple of

14   things on that.  First of all, for -- for general purposes

15   we're joining with the U.S. Trustee's argument that you

16   can't do it, period.  However, there is still a distinction.

17   I -- in the -- in all of the Delaware cases that they --

18   well, that they have cited concerning structured dismissals,

19   I believe these cases were essentially consensual in the

20   sense that there were no objections.

21             And I understand the U.S. Trustee objected and of

22   course the U.S. Trustee has standing to objection. T he U.S.

23   Trustee is the guardian of the integrity of the system.  But

24   I would submit it's a very different situation if you have

25   parties coming together and saying we've cut what amounts to

JEVIC HOLDING CORP., et al.

Page 132

1    a deal, for the Court to say, oh, no.  I don't care.  I'm

2    going to prevent the parties who know the case and the facts

3    better than anyone else could, I think it's a good instinct

4    that the courts have not to unwind that.  And -- and I think

5    this court would normally not want to interfere with that

6    kind of consensual deal because it's sort of a no harm, no

7    foul situation.

8            So I think there is a distinction when there is no

9    -- when there is no objection by an economically interested

10   party as you have here.

11           I would also -- also just note --

12           THE COURT:  Mr. Kenney's head is about to start

13   spinning around.

14       (Laughter)

15           MR. LOIZIDES:  I'm sorry.

16           THE COURT:  Mr. Kenney's head is about to start

17   spinning around.

18           MR. LOIZIDES:  And, again, that's not to say

19   anything.  Again, we've joined their position.

20           THE COURT:  Well, I -- I mean, I guess I'm --

21   again, I'm trying to figure out whether consent is

22   sufficient.  I think that's your point is other cases may

23   have had creditors being on board.  You know, what's the

24   nature of that consent?  If your -- if your constituents,

25   the WARN constituents were participating as unsecured

1    creditors, would -- consensually or not, would that -- would

2    that resolve some of the concerns?

3              MR. LOIZIDES:  Well, no.  I --

4              THE COURT:  Your concerns are -- I mean, your

5    concerns -- you adopt the U.S. Trustee's position, but your

6    concerns aren't necessarily institutional in nature.  They

7    are --

8              MR. LOIZIDES:  No.

9              THE COURT:  -- this is a deal and we've been

10   frozen out.

11             MR. LOIZIDES:  I mean, we represent -- Your Honor,

12   we represent private individuals and that's where our duty

13   is to.  You know, there's been this discussion that they

14   took a different position in -- in Digital Media.  Different

15   case, different parties, different clients, so there's no

16   equitable estoppel.  I'm not even sure what -- what the

17   point of that is.  And that, again, was a consensual case

18   in which I understand -- I'm not involved in that case

19   myself.  There was no walk out of any creditors in that

20   case.  There may have been some, essentially, consensual

21   classes.

22             THE COURT:  I thought it was a lock out of

23   everybody but the priority -- of everybody but general

24   unsecureds.

25             MR. LOIZIDES:  You know what, Your Honor?  I --

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 134 of 172
JEVIC HOLDING CORP., ET AL.

Page 134

```
 1              THE COURT:  Yeah.  You're not in the case.

 2              MR. LOIZIDES:  I'm not in the case, so I --

 3              THE COURT:  You're about to step in it.

 4              MR. LOIZIDES:  -- I better watch what I say.  I'm

 5    only --

 6              THE COURT:  Fair enough.

 7              MR. LOIZIDES:  And I said --

 8              THE COURT:  No.  I'll let you out.

 9              MR. LOIZIDES:  Let me -- let me -- let me move --

10    well, actually, I -- I'm sorry.  I think I interrupted Your

11    Honor.  Your Honor had a question.

12              THE COURT:  I -- well, I -- again, I'm trying to

13    figure out in -- in this case is it fair that you're asking

14    me to call their bluff?  I mean, the debtors stood up and

15    said we don't think -- we think that this is the deal, and

16    in the absence of this we're not going to get -- we're not

17    going to get funding from CIT and we're not going to get a

18    waiver -- or we're not going to get the carve out from Sun.

19    And they're secured creditors and everybody's traced me

20    through the DIP orders and the secured creditor

21    documentation.  So their point is that if there's no deal,

22    then they're just going to -- they'll ultimately take all of

23    this value.

24              MR. LOIZIDES:  Your Honor, I -- I hear -- there's

25    a couple things about that.
```

Page 135

```
 1              First of all, I understand there was -- what the
 2     Court characterized as unrebutted testimony about the
 3     prospects of a 7, but that testimony I would also
 4     respectfully submit is somewhat speculative.  And -- and I
 5     think --
 6              THE COURT:  Yeah, but I mean, I've been around the
 7     block.
 8              MR. LOIZIDES:  Oh, I know Your --
 9              THE COURT:  I mean, I've been -- I mean, I -- I --
10     at -- you know, at -- at bar events, you know, the guys on
11     the panel --
12              MR. LOIZIDES:  No.  No.  Your Honor --
13              THE COURT:  -- come over and go what is this case
14     you dumped on me.
15              MR. LOIZIDES:  Yeah.  Your Honor understands this
16     better than I do.  And I'm not -- but I'm simply saying you
17     can say hypothetically that if Mr. Miller or Mr. Burgess or
18     someone were to go to Sun or CIT and offer them the same
19     deal or maybe even a slightly better deal for them, would
20     they say no?  I don't know.  They might say no.  But, you
21     know, as I believe Mr. Dooley said, well, people act on
22     their economic interest.  Why do they care so much where the
23     money goes?
24              And I would note that the one key thing that is
25     absent from the testimony here is there was no explanation
```

1   from either Mr. Gavin or Mr. Dooley about why the money is

2   going to a trust instead of to the estate.  I guess we could

3   speculate about why, but there was no testimony.  And,

4   really, that's sort of the -- that's the lynch pin of our

5   whole objection.  I mean, that's -- that's -- and there was

6   no testimony about that because they said they didn't know.

7           I -- sort of along the same lines, Your Honor,

8   again, if this Court were to go in this direction, and if

9   you look at the myriad of cases approving structured

10  dismissals, they're not reasoned opinions, again, because --

11  not to -- not to denigrate them, but simply that there was

12  no objection by a party in interest and so the Courts

13  essentially, just, well, that's what the parties had agreed

14  to.  This is a different situation.

15          And given the number of cases these days, Your

16  Honor knows better than I do, that wind up where you've got

17  a blanket lien on everything, an under secured creditor,

18  where's the limitation on this in terms of how you can pick

19  and choose.  I mean, there's always this incentive, as I

20  mentioned in some of our papers, that the secured and the --

21  and the unsecured creditors' committee have to cut out the

22  middle man, which is essentially what they're doing here,

23  except -- except that they fixed -- that they fixed it as to

24  everybody but us in the supplement, okay.

25          But -- but that's -- but there's that incentive

Page 137

1    there and, of course, Congress has provided --

2            THE COURT:  But let me compare this, though.  And,

3    again, I'm not going to -- I'm not going to try to stick you

4    with -- with Digital Domain because I'm not the only one

5    that's considered this or approved it.

6            MR. LOIZIDES:  Not at all.

7            THE COURT:  As a practical matter, isn't this

8    actually a more favorable economic structure than we usually

9    see?  Normally, what we see is a committee that says, I

10   don't care if there are tax claimants.  I don't care if

11   there are unpaid lawyers.  I don't care if there's, you

12   know, intervening 507 priority claimants.  We've cut a deal

13   and the secured creditor will fund for us --

14           MR. LOIZIDES:  Right.

15           THE COURT:  -- and, you know, and courts have

16   blessed that.

17           MR. LOIZIDES:  Yes.  As a -- well, I'm not sure

18   it's, as you say better, because some priority claimants are

19   getting paid.

20           THE COURT:  Yeah.

21           MR. LOIZIDES:  I -- I mean, Your Honor, again, I

22   -- I guess it's better for them, but for us it's not.  I

23   don't know what else to say about it.  I mean, I don't think

24   you can count it that way.  I mean, first of all, our

25   claims, I believe, are facially in the order of $10 million.

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 138 of 172
JEVIC HOLDING CORP., et al.

Page 138

1    So if you're going to count dollars -- now, of course, they

2    can test the claims.  But if you count dollars instead of

3    claims, then -- then we obviously dominate that.  And -- and

4    --

5              THE COURT:  But if you accept the proposition that

6    class skipping can occur, okay, and there are cases that

7    have -- that have said that, that we can just flat out

8    freeze out intervening classes, isn't that what we're doing

9    here?

10             MR. LOIZIDES:  Yeah.  But as I said, Your Honor,

11   the -- those cases are -- are generally consensual cases.

12             And there's another point I would like -- like to

13   make if you look at one of the few reasoned decisions in

14   this area of which has been cited in the -- I believe the

15   committee's and debtors' papers, the World Health

16   Alternatives case that the Court is familiar with.  I

17   believe the U.S. Trustee touched on this as well.

18             And that is, you know, the U.S. Trustee again was

19   the only objecting party there, and one of the arguments

20   they made is -- is you're doing essentially what they're

21   doing here and that is they're surrendering an estate asset

22   that is going into the hands of just the unsecured

23   creditors.  And if I can just read from a portion of that

24   decision.  It says:  "The U.S. Trustee focuses on the

25   letters of agreement release causes of action against Cap

Page 139

1    Source, which if pursued and succeeded in recoveries, those

2    recoveries would be for the benefit of the estate and

3    distributed first to priority creditors prior to any

4    possible distribution to the general unsecured creditors."

5              Then Judge Walsh writes, "However, it is important

6    to note that giving up estate causes of action against Cap

7    Source is not the only consideration that Cap Source

8    received under the letter of agreement.  The committee gave

9    up its right to pursue the objection to the sale motion.

10   This right belonged exclusively to the committee."

11             And I would note that's also similar to what

12   happened in the Sharper Image case, which I -- which I was

13   involved in.  Essentially, they -- they got a set aside from

14   a -- from a -- essentially from a 363 sale in exchange for

15   withdrawing their objection.

16             Now I -- I'm not sure I even agree with this

17   reasoning, Your Honor, but, I mean, the -- at least insofar

18   as it goes that the World Health Alternatives case is

19   distinguishable both because there were no objections of

20   private parties there and because there was this other thing

21   that was being given up.

22             And I would also note -- and, again, Mr. Kenney

23   touched on this as well -- was that in this case there was a

24   filed complaint.  I understand they didn't take discovery,

25   but it was a pretty significant complain that was filed.

 1    There was motion practice.  There -- I guess there was some

 2    expert reports or these initial expert reports prepared.

 3            In this case there was only a draft complaint that

 4    had been prepared.  No lawsuit had ever been filed.  And

 5    later in the opinion the Court seems to essentially say that

 6    it's a very weak cause of action.  I -- I think that the

 7    testimony on this cause of action was that it is, you know,

 8    I think -- I believe Mr. Gavin said something like 50/50,

 9    but, of course, there's a huge cost in getting to the end,

10    which I understand.  But that's -- I think that's -- again,

11    another distinguishing factor from World Health Alternatives

12    where the committee was giving up something that, at least

13    on its face, belonged to the committee.

14            And I -- I would also echo exactly what Mr. Kenney

15    said and that is if we're -- in a situation where -- you

16    know, a standard situation where there's a deadline and a

17    DIP financing or cash collateral order that says the -- you

18    know, often the committee or private party in interest can

19    get cybernetic standing by filing a motion in so many days,

20    I mean, normally a creditor can -- an unsecured creditor, a

21    priority creditor can sort of rely on the -- on the thought

22    that, well, the committee gets that standing, it's no

23    different than if I did it.

24            But -- but if -- it's now sort of treated as if

25    it's the committee's asset to bargain away.  It seems to me

1    that people are going to have to object or try to get their

2    own standing or force the debtors to do it or something.  I

3    -- it just -- it raises some serious concerns.

4            And, you know, as I -- the other thing if -- I do

5    believe, Your Honor, that if we were to go to expand this

6    doctrine in this way, because I think you can search far and

7    wide.  You don't see this done in a non-consensual basis.

8    It really opens up the door to a situation where there's

9    almost no limit.  I mean, I -- I realize Courts have --

10   don't like slippery slope arguments, but in this context it

11   seems that this is a slippery slope and there's no wall at

12   the end of it -- to take another bad metaphor -- there's no

13   -- well, there's no wall at the end of the cliff here.

14           So --

15           THE COURT:  Until you get to the buffet.

16           MR. LOIZIDES:  I'm sorry.

17      (Laughter)

18           THE COURT:  Until you get to the buffet.

19           MR. LOIZIDES:  I just -- I don't know if I need to

20   go through -- I mean, there's been arguments made about

21   being a sub rosa plan.  We obviously join with the

22   committee's -- with the -- excuse me -- with the U.S.

23   Trustee's objection on that and I would note briefly that in

24   some of the papers that were filed there was a suggestion

25   that the sub rosa plan doctrine is limited to cases where

Page 142

1   there is going to be a plan.  I think if -- you know, I -- I

2   have a stack of cases that I'm not going to spend time going

3   through because I think if you actually look at the

4   doctrine, it isn't limited to that situation.  There are

5   lots of cases that say the sub rosa plan doctrine applies

6   where you're trying to evade the requirements of

7   confirmation, not merely where there is going to be a plan.

8            And to me it would be a strange -- strange

9   doctrine to say that the sub rosa plan doctrine is limited

10  to cases where you're going to eventually have a plan.  I

11  mean, that -- that doesn't make a lot of sense to me, Your

12  Honor.  And as the U.S. Trustee has ably argued, this

13  settlement and the structured dismissal that are part of it,

14  you know, they fix all of the claims.  They say exactly who

15  is going to get what.  They essentially do everything that

16  the courts say you're not supposed to do as part of a sub

17  rosa plan.

18           Another point that I would like to stress briefly

19  in connection with that is that, yes, there's no technical

20  discharge.  There's no technical injunction.  But what they

21  are doing, Your Honor, is they're setting up this trust and

22  they're asking the Court to put its imprimatur on it.  And

23  if some -- if, for example, the WARN claimants or some other

24  creditors were later to sue that trustee and said, well, we

25  should participate in this, they would have a federal court

1    order that says, no, you don't.

2              And -- and that federal court order might not have

3    the word injunction in it.  It might not have the word

4    discharge in it, but for all intents and purposes it does

5    the same thing, which, again, is something that you would

6    normally have in connection with a plan of reorganization.

7              And, you know, again, they -- they keep coming

8    back to the fact, well, this is -- this is Sun's money.

9    But, again, Sun is paying money to a non-estate set of

10   parties in exchange for a release from the estate.  And I

11   would also point out, as we pointed out extensively in the

12   papers, that the lien that they're giving up is exactly the

13   lien that is being challenged in the adversary.  In a sense,

14   you know, CIT is actually putting some money in where --

15             THE COURT:  Well, no.  No.  No.

16             MR. LOIZIDES:  -- Sun is keeping it.

17             THE COURT:  Hang on.  The lien that they're giving

18   up is on some relative -- well, I mean, not small, but it's

19   on a slug of money.

20             MR. LOIZIDES:  Yes.

21             THE COURT:  The purpose of the adversary

22   proceeding is to -- is to persuade a much, much larger sum.

23   And the adversary proceeding is not just against this rump

24   amount that remains.  The adversary proceeding is to unwind

25   loans as to tens of millions of dollars.  So, I mean, I --

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 144 of 172
JEVIC HOLDING CORP., ET AL.

Page 144

1          MR. LOIZIDES:  Oh, I understand that, Your Honor.

2          THE COURT:  Okay.

3          MR. LOIZIDES:  And I didn't mean to -- I didn't

4    mean to say -- if I said something to suggest otherwise, I

5    didn't mean to.  I mean, I'm simply pointing out that Sun --

6    remember, Sun's rights come by -- the testimony from Mr.

7    Dooley, and I think the record is clear on this anyway,

8    Sun's rights are by way of subrogation.  It's all a part of

9    the same lien transaction.

10          There -- again, it evidences that this deal was

11    set up, essentially, to pay WARN zero because CIT is giving

12    up, whether they're -- I guess they're paying back $2

13    million based on the challenge to what is ultimately the

14    same loan document.  That's my point.  And where Sun is --

15    where Sun is -- exactly the opposite is happening with Sun.

16    They're keeping what's being challenged in the adversary

17    proceeding.

18          And, again, it's being done that way -- you --

19    there's only one conclusion you can reach.  It's being done

20    that way so that they can set up this trust and not pay the

21    WARN claimants anything.

22          I know -- a couple of last points, Your Honor.

23    There's been a lot of talk about the proof of claim issue.

24    I don't know how much weight the Court gives that.  I mean,

25    the WARN adversary proceeding has been pending since, I

JEVIC HOLDING CORP., et al.

Page 145

1   believe, a couple of days after the case was filed.  There's

2   been substantial discovery.  There's been, you know, more

3   than substantial notice.  You know, the Third Circuit

4   obviously recognizes the informal proof of claim doctrine.

5   But I don't know that the Court even has to go there.  I

6   mean, we -- we choose a procedure to liquidate these claims

7   that no one has ever said, this is wrong.  There's no motion

8   to dismiss that says you have to do this as part of claims

9   administration.

10          So for them to come here now saying, well, you

11  know, you should have filed a proof of claim, well, to what

12  end, to create difficult proceedings.  So I -- you know,

13  I've been in cases before where there weren't actions filed

14  and trustees or debtors have filed motions to dismiss that

15  say you can't do this.  You have to file a proof of claim.

16  This has to be done as part of a claims administration.  But

17  nobody's taken that position in this case.

18          I'm not also sure particularly how relevant this

19  is, but there is a discussion about the whole history of the

20  settlement negotiations or whatever and I -- I'm not -- it

21  may be of limited relevance.  But we didn't say that we

22  never participated in -- in settlement discussions.  We said

23  that to date WARN claimants have yet to receive a settlement

24  offer despite several reported settlement meetings, most of

25  which -- the most recent of which were part -- blah, blah,

1    blah.  So we actually admit that there was a settlement

2    meeting.

3              So, you know, in conclusion, Your Honor, I would

4    -- I would say that to approve a structured dismissal such

5    as this over the objection of a substantially interested

6    party, I would respectfully submit is going to open the door

7    to a lot of potential abuse and a lot of potential problems,

8    especially given in a case where what is being compromised

9    is clearly an estate asset and not an asset of the unsecured

10   creditors' committee.

11             Unless the Court has any questions, that's all I

12   have.

13             THE COURT:  I have no questions.

14             MR. LOIZIDES:  Thank you, Your Honor.

15             UNIDENTIFIED PARTY:  Your Honor, may I be heard?

16             THE COURT:  Sure.  Briefly.

17             MR. FEINSTEIN:  Your Honor, the same counsel for

18   the same --

19             THE COURT:  That's okay.

20             UNIDENTIFIED PARTY:  I believe though I had

21   stepped out.

22             The statement was made that in the Digital Domain

23   Media settlement there was some lockout and only some

24   creditors were included.  Your Honor, that is completely

25   contrary to my understanding.  There was no lock out of any

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 147 of 172
DIGIC HOLDING CORP., ET AL.

Page 147

1    creditor whatsoever in Digital Domain.  The Digital Domain

2    settlement is for a stream of income, of proceeds to go to

3    the creditors' committee to be used and any creditor is

4    eligible to place a claim and to be a -- to receive a

5    distribution.  There is no lock out.

6          Here there is a clear lock out.  It is completely

7    different.  The lock out here is being used unfairly and

8    abusively.  And that's why this is an unfair settlement to

9    an objecting creditor and a -- and in Digital Domain there

10   is no lock out and there is no objecting creditor.  Thank

11   you.

12         THE COURT:  Okay.  Thank you.

13         MR. FEINSTEIN:  Robert Feinstein, Pachulski,

14   Stang, Ziehl & Jones, counsel for the committee.

15         Your Honor, let me deal with the last part first.

16   As Your Honor knows, my firm is debtors' counsel in Digital

17   Domain.  The night before the settlement hearing last

18   Tuesday, the debtor filed schedules which included six-

19   figure tax priority claims with tax priority under

20   507(a)(8).

21         The County of West Palm Beach, the City of Port

22   St. Lucie, Florida, the Canadian tax priority claims, there

23   are several large priority claims that I don't foresee will

24   ever receive any recovery because the settlement that Mr.

25   Raisner stood up and endorsed in this courtroom last Tuesday

Case 08-51903-BLS    Doc 75   Filed 11/27/12    Page 148 of 172
JEVIC HOLDING CORP., ET AL.

Page 148

1   validated the secured lenders' liens -- blanket liens on

2   everything, including avoidance actions and provided for a

3   stream of payments to go to so-called distribution creditors

4   who were general unsecured creditors and 507(a)(4) priority

5   creditors.  507(a)(8) creditors will not share in that pot

6   and there are no other unencumbered assets in the estate to

7   pay them.  So they are locked out.

8            In addition, there are -- I don't think there are

9   many, but I think there are some 503(b)(9) claims which are

10  administrative claims in the case that are not provided for

11  in the budget on file with the Court and there are no

12  unencumbered assets left for them because the committee,

13  with WARN sitting as a member represented by Mr. Raisner

14  validated the lien and ensured that all proceeds of every

15  asset of the estate, which is now the lender's collateral,

16  will be targeted to 507(a)(4) claimants and general

17  unsecured creditors.

18           Second, Mr. Kenney said that the committee did not

19  act consistently with its fiduciary duty on behalf of the

20  estate.

21           THE COURT:  Yeah.  Let's talk about that because I

22  -- I guess the distinction that he's drawing -- and I've

23  thought about it during the break, but I want to make sure

24  that I understand it.  I think the distinction that he drew

25  is that a committee that comes in and objects is exercising

1    a committee right or a committee asset, which is standing to

2    complain about a sale or a bid procedure or a transaction,

3    et cetera.

4              But -- and that if it chooses to compromise that

5    for the benefit of its constituents, then that may be fine.

6    But if it -- if the committee assumes standing to prosecute

7    an estate asset, then it stands in the shoes of the debtor

8    with an obligation of, I guess, utmost good faith and fair

9    dealing to all waivers of creditors.  Is that an accurate?

10             MR. KENNEY:  Yes, it is, Your Honor.

11             THE COURT:  Okay.  How do you respond to that

12   because I hadn't really thought through that and I was

13   trying to understand the significance when he kept saying,

14   but here they filed a complaint, and then it finally got

15   through.  So I think I understand the argument.

16             MR. FEINSTEIN:  Sure.  When the committee is

17   dealing with its own objection to a sale motion, it's acting

18   for its own account.

19             THE COURT:  Uh-huh.

20             MR. FEINSTEIN:  But when a committee is deputized

21   under a DIP order to bring lien challenges, we all agree

22   it's acting for the estate.  The -- I don't think there's

23   any meaningful difference, Your Honor, whether that -- a

24   challenge comes in the form of informal saber rattling in a

25   draft complaint or as here, an actual complaint that was

1    filed.  I don't think there's any difference whatsoever.

2              In either case the committee is bringing forth a

3    challenge to the lenders and there are plenty of cases,

4    including many that we've cited where courts have approved a

5    transfer of collateral by the lenders to settle that

6    challenge to a subset of creditors in -- and with no sale

7    objection or anything else pending.  So that's -- that row

8    has been hoed already and courts have approved those

9    settlements.

10             There are one or two cases where it also involved

11   a sale objection, but on a stand-alone basis the committee's

12   role within the DIP order has formed the predicate in many

13   cases where that kind of transfer has been approved.

14             Now let me address head on, though, the notion of

15   whether this conduct is a breach of fiduciary or a

16   fulfillment of one.

17             In this case, Your Honor, I would submit that it

18   is a fulfillment of the fiduciary duty of the committee not

19   only to the unsecured creditors, but to the estate because

20   in this case we managed, through years of effort without any

21   funding, to get secured creditors to see millions of dollars

22   that are going to go to pay every creditor in this case

23   that's filed a proof of claim.  Every creditor will get a

24   distribution.

25             So we think that we have advanced the interest of

Page 151

1   not just the general unsecured creditors who will get a very

2   modest recovery, but the interest of the estate in seeing

3   that as many creditors get a recovery as possible.  And we

4   reached out to the WARN claimants, and I don't want to get

5   into the settlement negotiations.  We would have preferred

6   that it included claimants who didn't file a proof of claim,

7   too.  We just couldn't get there.

8             But we did substantial justice and created

9   substantial benefit for the estate.  We could have

10  negotiated a deal that said, no payments to administrative

11  creditors, but we -- the recovery that's taking place here

12  is going to pay several hundred thousand dollars to

13  503(b)(9) claimants, to the IRS, and priority claimants now

14  are going to get a share as well.  There's not a creditor in

15  this case who -- who is not going to see a recovery.

16            The only party who is complaining about this is

17  WARN.  They don't have a claim.  Moreover, the -- it's

18  telling, Your Honor, that if their -- if they get their way

19  and the case is converted, they're not going to see any

20  recovery that way either.  It's a spoiler argument; that if

21  they can't a recovery, nobody should get a recovery.

22            But the TNT trailer and the Martin test considers

23  the paramount interest of creditors.  And if you look at the

24  greater good here and -- and the benefit to the vast

25  majority, if not all of the creditors, the approval of the

Page 152

```
 1    settlement is in their interest and we think that that is in

 2    fulfillment of our fiduciary duty and it was the best that

 3    we could have accomplished given the practicalities of the

 4    situation where we have no cash in the estate.  We managed

 5    to get secured creditors to succumb to the pressure, if you

 6    will, of years of litigation to try to get them to see

 7    recovery.

 8              And you can ask them for yourself, Your Honor, ask

 9    Sun, ask CIT whether they would do the same settlement with

10    a Chapter 7 trustee, ask them whether they care who gets the

11    money in a settlement, whether Sun wants to pay money into

12    the estate that would go to people who are suing them

13    because I think the answer is they care.

14              Now a couple of other points that -- that Mr.

15    Loizides raised.  He says there's no discharge.  That's

16    right.  That's why this is a plan outside of a plan or a sub

17    rosa plan.  The cold hard reality is that the WARN claimants

18    still have their punitive lawsuit against the estate.  I

19    won't dignify it by calling it a claim.  But they have a

20    lawsuit against an estate that has no unencumbered assets.

21    That's not a discharge.  That's just unfortunate.

22              And he also argued that structured dismissals are

23    okay if nobody objects, but they're not okay if somebody

24    stands up and objects.  I don't know that that's a

25    meaningful difference.  Your Honor either approves matters
```

Page 153

1    or doesn't approve matters based on objections that are

2    filed, and if the U.S. Trustee objects, Your Honor obviously

3    would entertain an objection.  So the fact that, you know,

4    some of these cases were -- were not objected to really is

5    not a meaningful difference.

6              Why is money being transferred to a trust?  Your

7    Honor, it's a matter of convenience.  If you look at what

8    happens in other cases where secured creditors cede some of

9    their collateral, some of them cede them to a -- an

10   administrator or --

11             THE COURT:  A law firm.

12             MR. FEINSTEIN:  -- or a law firm, right, an escrow

13   account.  To me, that's -- it's a distinction without a

14   difference.  We created a trust because it's -- it's just --

15   it was a matter of administrative convenience.

16             Lastly, Your Honor, the slippery slope argument,

17   the flood gates argument, and this also addresses Mr.

18   Kenney's argument.  This is not a case where the committee

19   comes along and brings an estate claim and has the money go

20   to Herman Cane or to my daughter or a lot of other places

21   where the money could go.  It's going to creditors.  So we

22   don't think that that -- those analogies of, you know,

23   stealing money from a -- as a guardian ad litem really

24   apply.  We produced value and recoveries for all the

25   creditors in the estate.

Case 08-51903-BLS    Doc 75    Filed 11/27/12    Page 154 of 172
JEVIC HOLDING CORP., ET AL.

Page 154

1           So we're -- we're proud of the result.  We don't

2     think we've breached the duty.  As I said, I think we

3     fulfilled it.

4           THE COURT:  Okay.

5           MR. FEINSTEIN:  The last thing I'll address is Mr.

6     Loizides' argument that Sun's lien is being validated so

7     they're really not settling.  Sun is walking away from this

8     case with nothing.  They have -- today they have a lien on

9     nearly $2 million of cash in the estate.  I think they

10    perceive that they're giving up something of substantial

11    value to settle claims asserted against them for much, much

12    more as Your Honor noted.  We were suing them not just for

13    lien avoidance, but for damages because --

14          THE COURT:  Affirmative recoveries.  I'm aware of

15    that.

16          MR. FEINSTEIN:  -- the transfers conferred a

17    benefit.  It's a -- it's an aggressive argument, but one

18    that got their attention and that's how we got to the

19    settlement.

20          So I'll -- I'll stop there, Your Honor.  The hour

21    is late.  But --

22          THE COURT:  Okay.

23          Mr. Pacitti.

24          MR. PACITTI:  Your Honor, I -- I didn't want to go

25    without speaking at all, but Mr. -- Mr. Feinstein made all

1    of my arguments for me.  So I would adopt his -- his

2    arguments on behalf of the debtor.

3            I just wanted to raise a couple of points, Your

4    Honor, that we shouldn't lose sight of.

5            Number one, I don't think it's true that in all

6    cases in this district where so-called structured dismissals

7    are approved that they're only done where all economic

8    parties consented.  I think in the Wicks' case, priority

9    creditors including WARN objected vehemently and it was

10   approved over their objection.

11           And I also take offense on behalf of Mr. Kenney,

12   and we did it in our papers.  Mr. Kenney is very capable

13   counsel and he's raised all of the objections that any

14   economically interested party would raise in any type of

15   motion such as this.  So I -- I don't think that this Court

16   has lost the opportunity or the benefit of those arguments

17   by virtue of the fact that there's no economically

18   interested parties here before Your Honor.

19           Lastly, Your Honor, I -- I'm glad we had a break

20   because I was a little incensed by a couple of things I

21   heard.

22           But we're losing sight of the fact that what's

23   happened here -- everyone's trying to paint this as, well,

24   the committee is doing this for the committee's benefit, and

25   they're the only one benefiting.  Sun is only benefiting.

1   Your Honor, Mr. Dooley and I worked for a couple of years to

2   get everyone in this room to try to resolve this case.  Some

3   people were willing to participate.  Some people were not

4   willing to participate.  And that's fine.

5          But what we've presented to Your Honor is what we

6   believe is the best possible resolution to this four-plus-

7   year-old Chapter 11 proceeding that benefits more than just

8   unsecured creditors.  It benefits admin claimants, 503(b)(9)

9   included administrative tax claimants, other administrative

10  claimants.  It -- it also benefits priority tax claimants.

11  So it's not just one constituency.  It's everyone that we

12  could get to -- to try to structure a deal with except the

13  folks that chose not to settle.  So, Your Honor, I think we

14  have to keep that in mind.

15         I think Mr. Ackerly and Mr. Stempel would like to

16  speak as well.

17         THE COURT:  Okay.

18         Mr. Stempel, good to see you again, sir.

19         MR. STEMPEL:  Good to see you, Your Honor, since I

20  think the last time was Acuride (ph) --

21         THE COURT:  Oh.

22         MR. STEMPEL:  -- where I got accused of getting

23  sympathy from you for coughing a lot as you may recall.

24      (Laughter)

25         MR. STEMPEL:  Now I don't have that problem.

1              THE COURT:  I'm glad to see that.

2              MR. STEMPEL:  The -- a few points, Your Honor, and

3      I'll try to make it quick.

4              First, to the extent there's been any argument or

5      testimony that's confused Sun's claims and liens, they

6      result from $2 million of funding.  They don't just arise --

7      when somebody says subrogation, it means we put in $2

8      million.  That's how we got subrogated.  So they're walking

9      away from a $2 million plus claim.

10             Second, to the extent there's any confusion about

11     when the release that Sun gets happens in connection with

12     when the collateral or lien transfer occurs, they're

13     contemporaneous like any other settlement that you

14     securities.

15             Second (sic) point that I have to address is --

16     relates a lot to Mr. Kenney's speculation that there's no

17     reason why Sun or CIT wouldn't do this deal with a Chapter 7

18     trustee or -- or maybe more importantly, care where the

19     money goes.  Well, it's not -- it doesn't take testimony for

20     Your Honor to -- to figure out, Sun probably does care where

21     the money goes because you can take judicial notice that

22     there's a pending WARN action against Sun by the WARN

23     plaintiffs.  And if the money goes to the WARN plaintiffs,

24     then you're funding somebody who is suing you who otherwise

25     doesn't have funds and is doing it on a contingent fee

1    basis.

2            In that sense, the settlement is quite

3    unremarkable.  Your Honor, I know you throughout your entire

4    bankruptcy life have watched secured lenders who might have

5    challenged -- who might be open to investigation and

6    challenged by creditors, cut deals with them, and as part of

7    it I -- I would venture to say you've never seen those

8    lenders cut a deal that gives a sharing of their collateral

9    to the very creditor who's still got the right to sue them.

10   That's what we're doing here.  So you don't need testimony

11   to know that Sun does care where this money goes.

12           And the third -- another point, Your Honor, is

13   everybody seems to be -- the objecting parties seem to be

14   losing the vantage point that this is a package deal.  There

15   isn't a separate CIT settlement and a separate Sun

16   settlement, and although I'm not in the habit of -- of

17   backing Mr. Feinstein who challenges the Sun Capitals of the

18   world from time to time, the reality is it's a package deal.

19           Sun and CIT were in the room.  It was -- it was a

20   collective dollar figure that needed to be freed up by

21   virtue of the unfortunate circumstance of lots of admin

22   claims and liens covering very last dollar.  And the

23   collective deal was -- Mr. Feinstein successfully got CIT to

24   reluctantly say I can get you 2 million.  They agreed to

25   that.  Sun reluctantly agreed, notwithstanding the

1    aggressive theory, he would call it, on damages above the $2

2    million.  And Mr. Feinstein's complaint asserts reluctantly

3    walked away from the full amount of the dollars that were in

4    the estate.

5             The details of where you're earmarking the dollars

6    to go loses sight of the fact that the estate is benefiting

7    by this collective settlement.  It's paying lots of admin

8    claims.  It's paying some other creditors.  But it is not

9    paying, in part because Sun wouldn't let its collateral be

10   used to pay the very plaintiffs who are suing Sun to pay

11   that specific party who didn't join in the settlement on a

12   basis that was the -- where the parties were willing to cut

13   them in in this package deal.

14            The last point, Your Honor, is really the flood

15   gates argument.  I have a little bit different take on the

16   flood gates here.  And that is because of the facts -- these

17   are not the facts that you get presented with all the time

18   in these structured dismissal type matters, which I agree

19   with Mr. Pacitti and Mr. Feinstein on.

20            The dismissal was really a -- a convenience for us

21   to get it done and solve the case efficiently.  It very well

22   could have followed the settlement, but we thought to solve

23   a four-year case collectively, the efficient way to keep

24   down dollar -- costs and dollars was to serve it all out on

25   the same time and bake it into the settlement.

1            But -- but the flood gates are not opening here,

2    Your Honor, because, one, you've got testimony that supports

3    the reasonableness of the settlement to solve your 9019

4    requirements.

5            Two, you've got unrefutted testimony that here's a

6    case, as you noted at the very outset, that there's really

7    only two alternatives left.  There isn't a third.  It's

8    dismissal or conversion, and the unrefutted testimony says

9    dismissal is better than conversion. It just -- it gets more

10   money to the admin creditors and gives some recovery to some

11   additional creditors.  In the 7 I can tell you we will not

12   duplicate this settlement because Sun I cannot foresee the

13   fact pattern where they agree to hand money over to a party

14   who is suing them out of their collateral voluntarily.  It's

15   not duplicated in that Chapter 7 case.

16           And -- and so you've got the testimony that says

17   of the two alternatives this one is in the best interest of

18   the creditors.  That doesn't open up the flood gates.

19   You've got -- you've got standard -- two different standards

20   satisfied and the end of a four-year case in an efficient

21   fashion that -- that counsel has worked hard to get done.  I

22   can echo that -- that they have tried hard to get us all to

23   the table to settle.

24           I'll cede the podium to Mr. Ackerly.

25           THE COURT:  All right.

Page 161

1           Mr. Ackerly, good evening.

2           MR. ACKERLY:  May it please the Court, my name is

3    Ben Ackerly and I'm here on behalf of CIT.

4           I think one of the hardest lessons a lawyer has to

5    learn is that sometimes you just don't need to say anything

6    more.  I think everything has been said this side of the

7    room as to why the Court should approve this settlement.

8    CIT wants this settlement to be approved, and it's a mistake

9    and assumption to think that the same settlement could be

10   made with a Chapter 7 trustee.

11          Thank you.

12          THE COURT:  Okay.

13          Briefly.

14          MR. KENNEY:  Yes, Your Honor.  I would just like

15   to get a couple of clarifications for the record.  Mr.

16   Stempel said that there's a contemporaneous exchange of

17   releases, but if you read the settlement agreement, the

18   estate is -- is granting exchanges simultaneous -- the

19   estate and Sun are granting exchanges simultaneously, but

20   the release that Sun is giving to the estate specifically

21   carves out and allows Sun to retain its claim against the

22   estate.

23          So the order that things occur in is very

24   specifically choreographed to keep the estate from getting

25   the Sun collateral.

Page 162

1          The second thing, Your Honor, I heard every

2    creditor gets a distribution.  I heard that from a couple of

3    people here.  The problem is that's not what the motion

4    says.  That's not what the settlement agreement says.

5    That's not what the proposed forms of order say.

6          And I think it's important for everybody to know

7    what is every creditor going to be receiving on account of

8    their claims.  Are priority creditors going to -- it doesn't

9    look to me like any of the priority creditors are going to

10   get paid in full, but if they are, let's get that into the

11   record.  Let's -- let's be clear just what they're actually

12   accomplishing here because that is part of the best interest

13   test.

14          THE COURT:  All right.  Here's what I want to do.

15   I really do appreciate the argument and I have encountered

16   these issues.  I'm not -- I do not expect, because I don't

17   believe that I have time -- I do not expect that I will

18   write a formal opinion on this.  What I expect that I will

19   do is take the matter under advisement and within the next

20   probably week or so I will get the parties on the phone and

21   I will deliver a ruling.

22          But the parties have raised a number of issues.

23   These are always -- despite the fact that -- that sometimes

24   they're not contested, they're usually contested.

25          So, Mr. Hughes, did you have something to add,

Page 163

1      sir?

2                MR. HUGHES:  Yes, Your Honor.

3                THE COURT:  Good afternoon.

4                MR. HUGHES:  Good afternoon, Your Honor.  Peter

5      Hughes, Dilworth Paxson, LLP.  I represent Naysha Berrios,

6      both individually and as the administratix of the Cassandra

7      Berrios estate.

8                THE COURT:  Uh-huh.

9                MR. HUGHES:  We did file a motion to the

10     objection.  I just wanted to note for the record that we

11     have resolved that -- that objection on --

12               THE COURT:  Right. And I think I --

13               MR. HUGHES:  -- on the grounds --

14               THE COURT:  On the terms.

15               MR. HUGHES:  -- of a -- three paragraphs that are

16     included in the blackline form of order.  I just wanted to

17     note that that does resolve it, but we are counting on those

18     paragraphs being included in any order that would approve

19     this.

20               THE COURT:  I understand.

21               MR. HUGHES:  Thank you, Your Honor.

22               THE COURT:  All right.  So I wanted to be clear

23     what my expectations are.  Again, these are interesting

24     issues and I want the opportunity to make sure that I

25     understand the parties' positions.  This is a little bit

1    different from the typical fact pattern that I get, but I

2    want the opportunity to review it.

3              Mr. Pacitti, did you have something to add, sir?

4              MR. PACITTI:  Your Honor, I just wanted to --

5              THE COURT:  We're going to kick the fee --

6              MR. PACITTI:  -- remind you of --

7              THE COURT:  -- apps.

8              MR. PACITTI:  -- the fee apps and the cash

9    collateral.  I didn't know what you wanted to do with

10   respect --

11             THE COURT:  Oh --

12             MR. PACITTI:  -- to that, Your Honor.

13             THE COURT:  -- well, let me do this.  My point on

14   holding off on cash collateral was that I didn't want it to

15   be construed to prejudge.  If it's necessary or appropriate

16   that I approve cash collateral, that has no bearing.  But if

17   the debtor needs to make payments or needs some sort of

18   documentation, particularly because payments have been made

19   or -- I mean, I expect to rule within a week.

20             MR. PACITTI:  Your Honor, we -- we've incurred

21   costs over the last month and a half and will incur costs

22   that aren't funded yet.  And although we've -- we've --

23             THE COURT:  Here's what I would ask --

24             MR. PACITTI:  -- sort of lived on the edge

25   throughout this case --

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 165 of 172
JEVIC HOLDING CORP., ET AL.

Page 165

 1            THE COURT:  Here's what I would ask you to do.

 2    Confer with these folks.  There ought to be a way to get you

 3    a cash collateral order that will deal with the issues that

 4    you need without me answering the question, and I will get

 5    to it promptly on -- on the merits of this question.  But I

 6    have no issue with approving a -- a cash collateral order,

 7    and if we can articulate it in a way that -- that, you know,

 8    the powder is dry as to the settlement, then that will allow

 9    the debtor to -- and you folks to administer the case.

10            Mr. Feinstein.

11            MR. FEINSTEIN:  Yes.  Just one observation, Your

12    Honor.  As I understand the objection that was made, it

13    really goes to the allowability of the fees incurred in

14    developing this settlement.  The cash collateral order

15    simply provides a means for payment of allowed fees.  If the

16    WARN claimants have a problem with the committee's or the

17    debtors' fees, they always have the right to object to fee

18    applications, and isn't that their remedy?

19            THE COURT:  All right.  Here's what I think.  I

20    think we can get -- I think you guys can wordsmith an order,

21    and then I would be happy to entertain it.  I have no issue

22    with -- with cash collateral.  Obviously, the merits of the

23    settlement -- you know, I think you answered it, I think

24    accurately; that if the settlement's not approved, then the

25    cash collateral relief is in some part mooted.  And -- and

1    maybe we deal with that that way.

2              I'm happy to give you an order promptly on that

3    issue.  It seems to me that that makes sense.  And, again, I

4    think parties on the merits of the issue that's before me

5    can keep their powder dry.  I don't have a problem with

6    that.  So I'll look for you folks to wordsmith it.  If -- if

7    it becomes an issue, then you can get me on the phone, but I

8    expect to get you folks on the phone hopefully within the

9    week.

10             All right.

11             MR. PACITTI:  Thank you, Your Honor.

12             THE COURT:  All right.  We'll stand in recess.

13   Thank you very much for your patience.

14             (A chorus of thank you)

15        (Whereupon these proceedings were concluded at 5:43

16   p.m.)

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                      RULINGS

4   DESCRIPTION                           PAGE    LINE

5

6   Debtors' First Omnibus Objection

7   (Non-Substantive) to Claims Pursuant to

8   11 U.S.C. §§ 501(a) or 502(b), and Fed. R.

9   Bankr. P. 3003(c)(2) and 3007 and the Bar

10  Date Order to Certain Amended/Superseded

11  Claims, Late Claims, Duplicate Claims,

12  and Insufficient Documentation Claims       --      --

13

14  Debtors' Second Omnibus Objection

15  (Substantive) to Claims Pursuant to 11

16  U.S.C. Sections 501(a) and 502(b) and Fed.

17  R. Bankr. P. 3003(c)(2) and 3007 to Certain

18  No Amount Stated Claims, No Liability Claims,

19  Reclassified Claims, Reduced Claims,

20  Reduced/Reclassified Claims, Cross Case

21  Duplicative Claims, and Contingent No Liability

22  Claims                                       --      --

23

24

25

SEVIC HOLDING CORP., ET AL.

Page 168

```
 1                          I N D E X

 2

 3                           RULINGS

 4   DESCRIPTION                              PAGE   LINE

 5

 6   Debtors' Third Omnibus Objection

 7   (Substantive) to Claims Pursuant to

 8   11 U.S.C. Sections 501(a) and 502(b),

 9   and Fed. R. Bankr. P. 3003(c)(2) and

10   3007 to Certain No Liability Claims,

11   Contingent No Liability Claims, Employee

12   Wage and Benefit Claims, No Amount Stated

13   Claims, and Cross Case Duplicative Claims    --      --

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 08-51903-BLS   Doc 75   Filed 11/27/12   Page 169 of 172
JEVIC HOLDING CORP., ET AL.

Page 169

```
 1                    I N D E X

 2

 3                    RULINGS

 4   DESCRIPTION                          PAGE   LINE

 5

 6   Debtors' Fourth Omnibus Objection

 7   (Non-Substantive) to Claims Pursuant to

 8   11 U.S.C. Sections 501(a) and 502(b), and

 9   Fed. R. Bankr. P. 3003(c)(2) and 3007 and

10   the Bar Date Order to Certain Amended/Suspended

11   Claims and Insufficient Documentation Claims

12   Joint Motion of the Debtors, CIT, Sun Capital,

13   and the Official Committee of Unsecured

14   Creditors Pursuant to 11 U.S.C. 105(a), 349 and

15   1112(b) and Fed. R. Bankr. P. 9019 for Entry of

16   an Order: (I) Approving Settlement Agreement and

17   Releasing Claims; (II) Dismissing the Debtors'

18   Cases Upon Implementation of Settlement; and

19   (III) Granting Related Relief              --     --

20

21   Debtors' Motion for Order (A) Authorizing

22   Extension of Use Of Cash Collateral and

23   (B) Granting Adequate Protection           --     --

24

25   Interim Fee Applications for Professionals  --     --
```

JEVIC HOLDING CORP., ET AL.

Page 170

```
 1                  I N D E X

 2              T E S T I M O N Y

 3

 4    WITNESSES         EXAM BY              PAGE      LINE

 5

 6    Daniel Dooley     By Mr. Kenney        33        9

 7                      By Mr. Loizides      41        22

 8                      By Mr. Pacitti       56        16

 9                      By Mr. Kenney        60        10

10

11    Edward Gavin      By Mr. Kenney        76        12

12                      By Mr. Loizides      86        1

13                      By Mr. Feinstein     95        1

14                      By Mr. Loizides      96        3

15

16

17

18

19

20

21

22

23

24

25
```

JEVIC HOLDING CORP., ET AL.

Page 171

1                        I N D E X

2                     E X H I B I T S

3

4    EXHIBIT        DESCRIPTION            ID.        EVID.

5    UST-1          Mr. Myers' claim       37          42

6    UST-2          Mr. Ohlers' claim      --          42

7

8    W-2            2nd amended complaint  48          --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JEVIC HOLDING CORP., ET AL.

1                C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12

13

     Veritext

14

     200 Old Country Road

15

     Suite 580

16

     Mineola, NY 11501

17

18

     Date:  November 26, 2012

19

20

21

22

23

24

25