## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| JEVIC HOLDING CORP., *et al.*,[1] | Case No. 08-11006 (BLS) (Jointly Administered) |
| Debtors. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the bankruptcy estates of JEVIC HOLDING CORP., *et al*., Plaintiff, v. | Adv. No. 08-51903 (BLS) |
| | Re: Adv. Dkt. Nos. 43, 121 and 122 |
| THE CIT GROUP/BUSINESS CREDIT, INC., in its capacity as Agent, *et al*., Defendant. | |

**OPENING BRIEF OF THE CIT GROUP/BUSINESS CREDIT, INC., AS AGENT, IN (I) OPPOSITION TO THE MOTION TO SUBSTITUTE CHAPTER 7 TRUSTEE AS REAL PARTY IN INTEREST AND (II) SUPPORT OF THE MOTION OF THE CIT GROUP/BUSINESS CREDIT, INC., AS AGENT, FOR JUDGMENT ON THE PLEADINGS**

Kurt F. Gwynne (No. 3951)
Katelin A. Morales (No. 6683)
**REED SMITH LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 778-7500
Facsimile:  (302) 778-7575
Email: kgwynne@reedsmith.com
kmorales@reedsmith.com

Counsel for Defendant,
The CIT Group/Business Credit, Inc., as agent
for itself and the other prepetition lenders

---

[1] The Debtors in this Chapter 7 case, along with the last four digits of the Debtors' federal tax identification numbers are: Jevic Holding Corp. (8738); Creek Road Properties, LLC (9874); and Jevic Transportation, Inc. (3402).

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     NATURE OF THE PROCEEDINGS..............................................................2

      A.     The Committee's Adversary Proceeding Against CIT and Sun ............................3

      B.     The Settlement Agreement and Vacatur of the Approval Order ...........................6

      C.     Conversion to Chapter 7 and the Motion to Substitute..........................................7

III.    STATEMENT OF THE FACTS .........................................................................7

      A.     The Acquisition, the Acquisition Facility, and the Refinancing Facility ..............8

      B.     Default under the Financing Agreement and the Sale-Leaseback ..........................9

      C.     The Forbearance Agreement...............................................................................10

IV.     ARGUMENT ....................................................................................................10

      A.     Standard for Judgment on the Pleadings.............................................................10

      B.     The Trustee Steps Into the Debtors' Shoes, and Is Bound by the Debtors' Stipulations and Waivers in the Financing Order.  Accordingly, the Court Should Enter Judgment in CIT's Favor and Dismiss the Complaint in its Entirety..............................................................................................................11

      C.     The Trustee Cannot Continue the Adversary Proceeding Against CIT Unless the Trustee Repays the $2.0 Million that CIT Paid Under the Settlement Agreement............................................................................................19

      D.     The Court Should Enter Judgment in CIT's Favor With Respect to Counts 1-10 and Count 12 of the Complaint.....................................................................20

              i.      The Section 546(e) "Safe Harbor" Requires the Dismissal of All Avoidance Claims (Counts 1-10 and 12)...................................................20

              ii.     The Refinancing Facility and the Sale-Leaseback Cannot Be Collapsed into a Single Transaction with the Acquisition and the Acquisition Facility...............................................................................25

      E.     The Committee Cannot Prove a *Prima Facie* Case for Avoidance of Constructively Fraudulent Transfers Because the Complaint Evidences Reasonably Equivalent Value in the Cancellation of a $53.259 Million Debt.....................................................................................................................31

      F.     The Court Should Enter Judgment in CIT's Favor With Respect to Count 11 (Equitable Subordination). ...............................................................................33

V.      CONCLUSION.................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms, Inc. of Elizabeth City)*,
2013 WL 1829910 (Bankr. E.D.N.C. May 1, 2013)............................................................12, 17

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*,
249 U.S. 134 (1919)..................................................................................................19

*Armstrong v. Norwest Bank, Minneapolis, N.A.*,
964 F.2d 797 (8th Cir. 1992), *aff'd*, 2013 WL 1124064 (D. Del. Mar. 18, 2013) ...............................................................................................................12, 13

*Bank of New York v. Epic Resorts-Palm Spring Marquis Villas, LLC (In re Epic Capital Corp.)*,
307 B.R. 767 (D. Del. 2004)........................................................................................34

*Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Del., Inc.)*,
541 B.R. 219 (Bankr. D. Del. 2015) ..............................................................................11

*Bethesda Health, Inc. v. Azar*,
389 F. Supp. 3d 32 (D.D.C. 2019) ................................................................................21

*Brandt v. B.A. Capital Co. (In re Plassein Intl. Corp.)*,
590 F. 3d 252 (3d Cir. 2009)......................................................................................21

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
366 B.R. 318 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009)................................................................................20

*CitiCorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
160 F.3d 982 (3d Cir. 1998)......................................................................................33

*Claridge Assocs. v. Schepis (In re Pursuit Capital Mgmt., LLC)*,
595 B.R. 631 (Bankr. D. Del. 2018) .............................................................................18

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017)................................................................................................7

*Davis v. Home Depot U.S.A., Inc.*,
2018 WL 638998 (D. Conn. Jan. 31, 2018)....................................................................20

*DiCarlo v. St. Mary Hosp.*,
530 F.3d 255 (3d Cir. 2008)................................................................................10, 30

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
    421 B.R. 700 (Bankr. D. Del. 2010) ...................................................32

*Forrest Gen. Hosp. v. Azar*,
    926 F.3d 221 (5th Cir. 2019) ..........................................................21

*Galacia v. Louisiana Citizens Prop. Ins. Corp.*,
    88 So. 3d 656 (La. App. 4th Cir. 2012) .............................................19

*Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*,
    263 F.3d 296 (3d Cir. 2001)............................................................30

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)...........................................................11

*Hill v. Akamai Techs., Inc. (In re MS55, Inc.)*,
    477 F.3d 1131 (10th Cir. 2007) ............................................... *passim*

*In re Aeropostale, Inc.*,
    555 B.R. 369 (Bankr. S.D.N.Y. 2016) ..............................................34

*In re Allegheny Health, Educ. & Research Found.*,
    253 B.R. 157 (Bankr. W.D. Pa. 2000) ..............................................32

*In re BX Acquisitions, Inc.*,
    2019 WL 1768144 (B.A.P. 6th Cir. Apr. 19, 2019) ............................13

*In re Carolina Fluid Handling Intermediate Holding Corp.*,
    467 B.R. 743 (Bankr. D. Del. 2012) .................................................12

*In re Jevic Holding Corp.*,
    2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ....................... *passim*

*In re Madoff Investment Securities, LLC*,
    773 F. 3d 411 (2d Cir. 2014)...........................................................22

*In re Mid-Am. Waste Sys., Inc.*,
    284 B.R. 53 (Bankr. D. Del. 2002) ..................................................34

*In re Quebecor World (USA) Inc.*,
    453 B.R. 201 (Bankr. S.D.N.Y 2011)...............................................20

*In re Rachles, Inc.*,
    131 B.R. 782 (Bankr. D.N.J. 1991) .................................................18

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2007) .................................................33

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y. 2016) ............................................................28, 29

*In re Student Fin. Corp.*,
   335 B.R. 539 (D. Del. 2005) ...................................................................................11

*In re SubMicron Sys. Corp.*,
   432 F.3d 448 (3d Cir. 2006)....................................................................................33

*In re Tribune Co. Fraudulent Conveyance Litigation*,
   2019 WL 1771786 (S.D.N.Y. April 23, 2019) ............................................. *passim*

*In re World Health Alternatives*,
   344 B.R. 291 (Bankr. D. Del. 2006) .......................................................................17

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.*
   *Holdings Inc.)*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012)....................................................................22

*Leslie v. Conseco Life Ins. Co.*,
   2014 WL 12479931 (S.D. Fla. July 25, 2014)........................................................19

*Liquidation Trust of Hechinger Inv. Co. of Delaware v. Fleet Retail Finance*
   *Group (In re Hechinger Inv. Co. of Delaware)*,
   327 B.R. 537 (D. Del. 2005)...................................................................................29

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
   181 F.3d 505 (3d Cir. 1999), *abrogated in part on other grounds, Merit Mgmt.*
   *Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) ........................................21

*Lucille v. City of Chicago*,
   31 F.3d 546 (7th Cir. 1994) ....................................................................................20

*Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v.*
   *Dennis J. Fitzsimmons (In re Tribune Co. Fraudulent Conveyance Litigation)*,
   2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied*, 2019
   WL 549380 (Feb. 12, 2019).........................................................................26, 27, 28

*Matter of Fabricators*,
   926 F.2d 1458 (5th Cir. 1991) ................................................................................34

*McCormick v. City of Chicago*,
   230 F.3d 319 (7th Cir. 2000) ..................................................................................33

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991)....................................................................................32

*Nance v. NYPD*,
   31 Fed. Appx. 30 (2d Cir. 2002) ..........................................................................................19

*Note Holders v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent*
   *Conveyance Litig.)*,
   946 F.3d 66 (2d Cir. 2019)..................................................................................................24

*Nw. Fuel Co. v. Brock*,
   139 U.S. 216 (1891)..............................................................................................................19

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co.of Del. v. Fleet*
   *Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*,
   274 B.R. 71 (D. Del. 2002).............................................................................................21, 22

*Official Comm. of Unsecured Creditors v. Belgravia Paper Co. (In re Great*
   *Northern Paper, Inc.)*,
   299 B.R. 1 (D. Me. 2003) ................................................................................................12, 17

*Official Comm. Of Unsecured Creditors v. Constellation Enters. LLC (In re*
   *Constellation Enters. LLC)*,
   587 B.R. 275 (D. Del. 2018).................................................................................................17

*Paul v. Monts*,
   906 F.2d 1468 (10th Cir. 1990) .......................................................................................11, 12

*Perez-Ruiz v. Crespo-Guillen*,
   25 F.3d 40 (1st Cir. 1994)....................................................................................................31

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*,
   554 F.3d 382 (3d Cir. 2009)................................................................................................34

*Terlecky v. Peoples Bank, N.A. (In re Amerigraph, LLC)*,
   456 B.R. 349 (Bankr. S.D. Ohio 2011)................................................................................12

*U.S. v. Tabor Court Realty Corp.*,
   803 F.2d 1288 (3d Cir. 1986).....................................................................................28, 29, 30

*United States ex rel. Petratos v. Genentech, Inc.*,
   855 F.3d 481 (3d Cir. 2017)................................................................................................31

*United States v. White*,
   2012 WL 4513489 (S.D.N.Y. Oct. 2, 2012) .........................................................................21

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007)................................................................................................31

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
   919 F.2d 206 (3d Cir. 1990)................................................................................................29

*Williams v. Runyon*,
   130 F.3d 568 (3d Cir. 1997)...........................................................................31

*Wolfington v. Reconstructive Orthopaedic Assocs. II PC*,
   935 F.3d 187 (3d Cir. 2019)...........................................................................11

*Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*,
   477 B.R. 504 (Bankr. D. Del. 2012) ..............................................................20

*Zimmerman v. Corbett*,
   873 F.3d 414 (3d Cir. 2017)...........................................................................10

**Statutes**

11 U.S.C. § 101(22)(A).................................................................21, 22, 23, 24

11 U.S.C. § 101(31)(B).................................................................................34

11 U.S.C. § 101(54)(A).................................................................................21

11 U.S.C. § 101(54)(d)(i)..............................................................................21

11 U.S.C. § 363............................................................................................10

11 U.S.C. § 510(c)(1)....................................................................................33

11 U.S.C. § 741(7)(A)(i)................................................................................22

11 U.S.C. § 741(7)(A)(v)...............................................................................22

11 U.S.C. § 741(7)(A)(viii)............................................................................22

11 U.S.C. § 741(7)(A)(xi)..............................................................................22

11 U.S.C. § 1107(a) ......................................................................................13

**Rules**

Fed. R. Civ. P. 12(c) .....................................................................................10

Fed. R. Civ. P. 25(c) .....................................................................................17

**Other Authorities**

BLACK'S LAW DICTIONARY..............................................................................21

BLACK'S LAW DICTIONARY (10th ed. 2014) ....................................................21

BLACK'S LAW DICTIONARY (11th ed. 2019) ....................................................21

OXFORD ENGLISH DICTIONARY (3d ed.)........................................................................................21

I.    **INTRODUCTION**[2]

The Trustee steps into the Debtors' shoes, not the Committee's shoes.  The Trustee cannot be substituted as plaintiff in the Adversary Proceeding because the Debtors waived their right to assert claims against CIT in the post-petition Financing Order, and the Committee was disbanded automatically upon conversion of the Debtors' chapter 11 cases to chapter 7 cases.

The Trustee (even if he could step into the Committee's shoes) cannot proceed with the Complaint because he has not repaid the $2.0 million CIT contributed to the Settlement Agreement, the approval of which has been vacated.

Each of the Counts in the Complaint alleging fraudulent and preferential transfer claims against CIT (Counts 1-10 and Count 12) is barred by the "safe harbor" under section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e).  Even though the section 546(e) "safe harbor" requires judgment in CIT's favor in the LBO context, the Refinancing Facility and the Sale-Leaseback *cannot* be "collapsed" into a single transaction—the LBO—with the Acquisition and Acquisition Facility.  The LBO was complete upon the closing of the Acquisition and the Acquisition Facility, which were *not conditioned upon* the Refinancing Facility or the Sale-Leaseback.  The Acquisition and the Acquisition Facility closed without any promise of the Refinancing Facility. The Committee does not (and cannot) allege otherwise.

In addition, *the Complaint itself* evidences that Jevic received reasonably equivalent value for the $41.3 million paid to Seller in the LBO because Parent and Seller waived $53.259 million in intercompany claims against Jevic in the LBO.

---

[2] Capitalized terms not defined in this Introduction have the meaning ascribed to such terms *infra.*

For the foregoing reasons (each of which alone is sufficient for judgment in CIT's favor), the Court should enter judgment in CIT's favor with respect to Counts 1-10 and Count 12 of the Complaint.

With respect to Count 11 (Equitable Subordination), the Complaint fails for the same reason the Court previously concluded. The Committee's allegations (which have just been reshuffled in the Complaint) fail to allege sufficient conduct to equitably subordinate the claims of CIT—a non-insider.

## II.  NATURE OF THE PROCEEDINGS

On May 20, 2008 (the "Petition Date"), Jevic Holding Corp. ("JHC"), Creek Road Properties, LLC, ("Creek Road") and Jevic Transportation, Inc. ("Jevic") (collectively, the "Debtors") commenced their respective bankruptcy cases by filing voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "Court"), thereby commencing their bankruptcy cases (the "Cases") jointly-administered under bankruptcy case #08-11006(BLS). The Official Committee of Unsecured Creditors (the "Committee") was appointed on June 3, 2008. *See* Complaint (as defined below), ¶ 11.

On June 20, 2008, the Court granted final approval of the Debtors' post-petition financing pursuant to the *Final Order (I) Authorizing Debtor-in-Possession to Obtain Senior Debtor in Possession Financing; (II) Granting Liens, Security Interests, and Superpriority Status; (III) Authorizing Use of Cash Collateral; and (IV) Affording Adequate Protection to Prepetition Lenders* (the "DIP Order") [Dkt. No. 118]. The CIT Group/Business Credit, Inc., as agent for itself and other lenders ("CIT"), is the senior DIP financing agent. Pursuant to the DIP Order, the Debtors waived their right to assert claims against CIT. Specifically, the Debtors (subject to the rights of other parties in interest to assert timely claims on behalf of the

bankruptcy estate) agreed to the validity, enforceability and non-avoidability of the lenders' liens and "waived any and all claims and causes of action against the Senior DIP Agent, the Senior DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the other Secured Parties, and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, related to the Prepetition Senior Credit Agreement . . . ." *See* DIP Order, ¶ 61; *see also* DIP Order, ¶¶ 38-39. The Debtors' "stipulations and admissions" are "binding upon the Debtors and any successor thereto (*including without limitation any Chapter 7 . . . trustee appointed or elected for any of the Debtors*) in all circumstances." *See* DIP Order, ¶ 60 (emphasis added).

Notwithstanding the Debtors' stipulations and admissions, the DIP Order provides for the Committee or any other party in interest to challenge CIT's claims and liens. Specifically, "the Committee or any party-in-interest, including a Chapter 7 . . . trustee appointed or elected during the Investigation Period (defined below), shall be permitted to . . . challenge . . . the validity, enforceability, priority, perfection, or amount of the Prepetition Indebtedness or Prepetition Lenders' liens . . . or otherwise assert any claims or causes of action against the Prepetition Agent and/or a Prepetition Lender on behalf of the Debtors' estates, which shall be filed no later than 75 days from the Petition Date or with respect to the Committee not later than 75 days after the date of the appointment of the Committee (the 'Investigation Period')." *See* DIP Order, ¶ 39. The Committee was granted standing to commence and challenge the validity, enforceability, or priority of the Debtors' obligations under the Financing Agreement (as defined below) and to assert any claims or causes of action against CIT and the Lender Group. *See* Complaint, ¶ 11.

A.      **The Committee's Adversary Proceeding Against CIT and Sun**

Pursuant to the DIP Order, on December 31, 2008, the Committee timely commenced an adversary proceeding #08-51903(BLS) (the "Adversary Proceeding") by filing a complaint against CIT, as agent for itself and BMO Capital Markets Financing, LaSalle Bank Midwest

National Association, PNC Bank, N.A., and Wachovia Bank, National Association (together with CIT in its capacity as lender, the "Lender Group").  *See Complaint and Objection to Claims* (the "Original Complaint") [Adv. Dkt. No. 1].  In the Original Complaint, the Committee alleged claims against CIT relating to Sun's acquisition of the Debtors pursuant to a "leveraged buyout" or "LBO" and the subsequent refinancing of the debt incurred in relation to the LBO.

On January 30, 2009, CIT filed its *Motion to Dismiss the Complaint* (the "Motion to Dismiss") [Adv. Dkt. No. 5].  On June 30, 2010, the Committee amended the Original Complaint to join Sun Capital Partners IV, LP, Sun Capital Partners Management IV, LLC, and Sun Capital Partners, Inc. (collectively, "Sun") as defendants and to assert claims against such entities.  [Adv. Dkt. No. 17].

On September 15, 2011, the Bankruptcy Court granted in part and denied in part the Motion to Dismiss.  *See Opinion* [Adv. Dkt. No. 40] reported at *In re Jevic Holding Corp.,* 2011 WL 4345204, *1 (Bankr. D. Del. Sept. 15, 2011), and an accompanying *Order* (the "Dismissal Order") [Dkt. No. 41].  In the Opinion, the Court denied the Motion to Dismiss with respect to the constructive fraudulent transfer and preference claims under sections 547, 548 and 550 of the Bankruptcy Code and granted the Motion to Dismiss with respect to the Committee's remaining claims.  *Id.* at *14.

After entry of the Dismissal Order, on October 7, 2011, the Committee filed the *Second Amended Complaint and Objection to Claims* (the "Complaint") [Adv. Dkt. No. 43]. The Complaint asserts thirty-four (34) causes of action against CIT and Sun, primarily seeking avoidance of alleged constructively-fraudulent and preferential transfers (pursuant to sections 544(b), 547, 548, and 550 of the Bankruptcy Code and state law) and equitable subordination of

claims (under Section 510 of the Bankruptcy Code). In the Complaint, the Committee asserts the

following twelve (12) counts against CIT:

- Count One – Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations – 11 U.S.C. §§ 548 and 550

- Count Two – Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations - 11 U.S.C. §§548 and 550

- Count Three – Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations – 11 U.S.C. §§ 544(b) and 550; New Jersey Statutes §§ 25:2-25(b) and 2-29

- Count Four – Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations – 11 U.S.C. § 544(b) and 550; New Jersey Statutes §§ 25:2-27 and 2-29

- Count Five – Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations - 11 U.S.C. §§ 544(b) and 550; New Jersey Statutes §§ 25:2-25(b) and 2-29

- Count Six – Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations - 11 U.S.C. §§ 544(b) and 550; New Jersey Statutes §§ 25:2-27 and 2-29

- Count Seven – Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations – 11 U.S.C. §§ 544 (b) and 550; 6 Del. C. §§ 1304(a) and 1307

- Count Eight – Avoidance of Liens, Fraudulently Incurred Obligations, and Payments in Respect of Fraudulently Incurred Obligations – 11 U.S.C. §§ 544(b) and 550; 6 Del. C. §§ 1305 and 1307

- Count Nine – Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently Incurred Obligations - 11 U.S.C. §§ 544(b) and 550; 6 Del. C. §§ 1304(a) and 1307

- Count Ten – Avoidance of Fraudulent Transfers, Fraudulently Incurred Obligations and Payments in Respect of Fraudulently

Incurred Obligations - 11 U.S.C. §§ 544(b) and 550; 6 Del. C. §§ 1305 and 1307

- Count Eleven – Equitable Subordination and Subordination – 11 U.S.C. § 510

- Count Twelve – Avoidance of Preferential Transfers – 11 U.S.C. §§ 547 and 550

*See* Complaint, pp. i-ii.  On November 4, 2011, CIT filed its *Answer to the Complaint and Counterclaim* (the "<u>Answer</u>") [Adv. Dkt. No. 45].

### B.  The Settlement Agreement and Vacatur of the Approval Order

Subject to Court approval, the Debtors, the Committee, Sun, and CIT entered into a Settlement Agreement and Release dated as of June 22, 2012 (the "<u>Settlement Agreement</u>").  On December 4, 2012, over the objection of certain former employees of the Debtors (the "<u>WARN Plaintiffs</u>"), the Bankruptcy Court entered an *Order Granting Joint Motion of the Debtors, CIT, Sun Capital and the Official Committee of Unsecured Creditors for Entry of an Order: (I) Approving Settlement Agreement and Releasing Claims; (II) Dismissing the Debtors' Cases Upon Implementation of Settlement; and (III) Granting Related Relief* (the "<u>Approval Order</u>") [Dkt. No. 1520], which approved a settlement of the claims set forth in the Complaint.  The WARN Plaintiffs appealed the Approval Order.  After their request for a stay pending appeal was denied, the parties consummated the Settlement Agreement.  *See* Dkt. No. 1741.  CIT paid $2.0 million to the Debtors as part of that settlement, and the funds were distributed to the Debtors' creditors.  *See Certification of Counsel Regarding Satisfaction of Conditions in Order Approving Joint Motion of the Debtors, CIT, Sun Capital and the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. Section 105(a), 349 and 1112(b) and Fed. R. Bankr. P. 9019 for Entry of an Order: (I) Approving Settlement Agreement and Releasing Claims;*

*(II) Dismissing the Debtors' Cases Upon Implementation of Settlement; and (III) Granting Related Relief* [Dkt. No. 1741].

After multiple affirmances in the appellate courts, the United States Supreme Court vacated the Third Circuit's affirmance of the Approval Order. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 987 (2017) ("The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.").

### C.    Conversion to Chapter 7 and the Motion to Substitute

On May 23, 2018, the Bankruptcy Court entered an order converting JHC's bankruptcy case, as of June 5, 2018, to a chapter 7 case. *See* Dkt. No. 1805. The Trustee was appointed on June 5, 2018. *See* Dkt No. 1807. On October 10, 2018, the Court reopened the remaining Debtors' bankruptcy cases and converted them to chapter 7 cases. *See, e.g., In re Jevic Transportation, Inc.*, Case #08-11008(BLS), Dkt. No. 17. The Trustee was appointed on October 15, 2018. *See id.*, Dkt. No. 18.

On April 12, 2019, the Trustee filed the *Motion to Substitute Chapter 7 Trustee as Real Party in Interest* (the "Motion to Substitute") [Adv. Dkt. No. 121] seeking to substitute himself as "plaintiff" in the Adversary Proceeding. *See Opening Brief in Support of Motion to Substitute Chapter 7 Trustee as Real Party in Interest* (the "Brief in Support of Motion to Substitute") [Adv. Dkt. No. 122].

## III.    STATEMENT OF THE FACTS

Prior to the Petition Date, the Debtors operated a hybrid less-than-truckload and truckload carrier that provided regional and inter-regional time definite delivery across the United States and parts of Canada. The Debtors began operations in 1981 and from 2002 until 2006, Jevic was a wholly-owned operating subsidiary of SCS Transportation, Inc. ("Parent").

Complaint, ¶¶ 20-22.  In early 2006, Jevic hired an investment banking firm to explore strategic options for the company.  Complaint, ¶ 35.

## A.    The Acquisition, the Acquisition Facility, and the Refinancing Facility

On June 30, 2006, pursuant to the Stock Purchase Agreement among Jevic, JHC ("Buyer"), Saia Motor Freight Line, Inc. ("Seller"), and Parent, dated as of June 30, 2006 (the "Stock Purchase Agreement"), Sun Transportation, LLC, which is owned by Sun Capital Partners, IV, purchased the Debtors from Seller for $77.4 million (the "Acquisition"), consisting of $41.3 million in cash and $36.1 million of assumed liabilities.  *See* Complaint, ¶¶ 18 and 47.

To finance the Acquisition, Sun obtained a $90 million loan (the "Acquisition Facility") from Bank of Montreal to cover the purchase price and transaction costs.  The Acquisition Facility was evidenced by a demand note, secured by all of the Debtors' assets, and guaranteed by Sun.  Complaint, ¶¶ 46 and 49.  The Committee does not (and cannot) allege that the Acquisition Facility was conditioned upon any subsequent refinancing, whether by CIT or any other lender.

As part of the Acquisition, Parent and Seller waived, released, and discharged $53.259 million in intercompany claims against Jevic.  *See* Stock Purchase Agreement, § 8.4(d) ("Effective upon the Closing, each of the Parent and Seller hereby irrevocably waives, releases and discharges the Target [Jevic Transportation, Inc.[3]] and its Subsidiaries from any and all liabilities and obligations to it of any kind or nature whatsoever . . . whether absolute or contingent, liquidated or unliquidated, known or unknown, and whether arising under any agreement or understanding (other than this Agreement and any of the other agreements executed and delivered in connection herewith) or otherwise at law or equity").

---

[3] *See* Stock Purchase Agreement, p. 1.

Within a month of the Acquisition, Jevic, as borrower; JHC and Creek Road, as guarantors; CIT, as agent and lender; LaSalle Bank Midwest National Association, as syndication agent and lender; Wachovia Bank, National Association, as documentation agent and lender; and PNC Bank, N.A. and BMO Capital Markets Financing, Inc., as additional lenders, entered into that certain Financing Agreement dated as of July 28, 2006 (the "Financing Agreement"), to refinance the Acquisition Facility (the "Refinancing Facility"). *See* Complaint, ¶ 76 ("On July 28, 2006, CIT, for itself and as agent for the lending group, and Jevic, as the borrower, closed on the financing pursuant to a written financing agreement ('the Financing Agreement').").

The Refinancing Facility provided Jevic with a $101.2 million credit facility, consisting of an $85 million revolving line of credit (the "Revolver") and a $16.2 million term loan (the "Term Loan"). Complaint, ¶ 76. The Refinancing Facility was secured by a first lien on all of Jevic's assets, including its accounts receivable and stock, but the Term Loan also was secured by real estate properties owned by Jevic (the "Properties"). *See* Financing Agreement, § 17(d).

### B.    Default under the Financing Agreement and the Sale-Leaseback

Jevic defaulted on its obligations under the Financing Agreement. Complaint, ¶ 101. In exchange for relaxing certain covenants, CIT obtained from Jevic various concessions and required Jevic to market the Properties (CIT's collateral) and, upon their sale, to utilize the sale proceeds to repay the Term Loan and reduce the balance of the Revolver. Complaint, ¶ 107. Jevic simultaneously entered into 20-year leases with the new owners of the Properties in order to continue to use the Properties for its ongoing business operations. Complaint, ¶ 114. The Complaint refers to the sale of the Properties, the turnover of the sale proceeds to CIT, and the execution of the leases in the aggregate as the "Sale Leaseback." Complaint, ¶ 18.

### C.      The Forbearance Agreement

Jevic's financial condition continued to deteriorate.    A year and a half after the Acquisition, Jevic, JHC, Creek Road and CIT entered into a Forbearance Agreement and Third Amendment to the Financing Agreement on January 8, 2008 (the "<u>Forbearance Agreement</u>"), which was amended several times to extend the expiration date.  Complaint, ¶¶ 122-24.

On May 20, 2008, almost two years after the Acquisition, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.  Complaint, ¶ 125.  Since the Petition Date, the Debtors ceased all operations and liquidated their assets through a sale under 11 U.S.C. § 363.

## IV.    <u>ARGUMENT</u>

### A.      Standard for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion.  A motion for judgment on the pleadings should be granted if the movant establishes that there are no material issues of fact, and he is entitled to judgment as a matter of law.  In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party."  *Zimmerman v. Corbett*, 873 F.3d 414, 417-18 (3d Cir. 2017) (internal quotation marks omitted).    A "court will accept the complaint's well-pleaded allegations as true, and construe the complaint in the light most favorable to the nonmoving party, *but* will not accept unsupported conclusory statements."  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262-63 (3d Cir. 2008) (emphasis added).  In deciding a motion for judgment on the pleadings, a court may consider "the complaint, exhibits attached to the complaint, matters of

public record", as well as documents "integral to or explicitly relied upon in the complaint." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (internal quotation marks omitted).

>    **B.    The Trustee Steps Into the Debtors' Shoes, and Is Bound by the Debtors' Stipulations and Waivers in the Financing Order.  Accordingly, the Court Should Enter Judgment in CIT's Favor and Dismiss the Complaint in its Entirety.**

The Trustee claims, pursuant to Federal Rule 25(c), as made applicable by Federal Rule of Bankruptcy Procedure 7025, he should be substituted for the Committee as the real party in interest to assert and prosecute the claims and causes of action in the Complaint.  *See* Motion to Substitute, p. 3.  For the following reasons, the Trustee is incorrect as a matter of law.

As the Trustee concedes, it is well established that a chapter 7 "'trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.' Collier on Bankruptcy, ¶ 323.02[4]." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989) (brackets in original); *see also, e.g., In re Student Fin. Corp.*, 335 B.R. 539, 553 (D. Del. 2005) (trustee had standing to bring a claim for fraudulent conveyance under section 541 of the Bankruptcy Code because the trustee "step[s] into the shoes of the debtor"); *Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Del., Inc.)*, 541 B.R. 219, 235 (Bankr. D. Del. 2015) ("As the bankruptcy trustee steps in the shoes of the debtor, it is subject to the same defenses that could have been asserted against the debtor[.]"); Brief in Support of Motion to Substitute, p. 4.

Standing in the debtor-in-possession's shoes, a "bankruptcy trustee has no greater rights than the debtor has." *Paul v. Monts*, 906 F.2d 1468, 1473 (10th Cir. 1990).  Thus, it is equally

well-established that a chapter 7 trustee is "bound by prior actions of the debtor-in-possession to the extent approved by court." *Hill v. Akamai Techs., Inc. (In re MS55, Inc.)*, 477 F.3d 1131, 1135 (10th Cir. 2007) (citing *Paul*, 906 F.2d at 1473); *Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms, Inc. of Elizabeth City)*, 2013 WL 1829910, at *6 (Bankr. E.D.N.C. May 1, 2013) (chapter 7 trustee is "bound by the prior acts of a debtor-in-possession").

"Any other result would be unfair to creditors, . . . who relied on the acts of the debtor-in-possession." *Tanglewood*, 2013 WL 1829910, at *10.  Allowing a trustee to evade a debtor-in-possession's prior agreements also would have a chilling effect on the ability of a debtor-in-possession to negotiate compromises in chapter 11. *See Official Comm. of Unsecured Creditors v. Belgravia Paper Co. (In re Great Northern Paper, Inc.)*, 299 B.R. 1, 7 (D. Me. 2003) ("The effect of allowing such an attack would ... have a chilling effect on the ability of debtors-in-possession to proceed in normal-course arrangements and compromises in Chapter 11 cases.") (internal quotation marks and citation omitted).  Worse yet, failing to enforce a debtor-in-possession's agreement would result in "chaos." *See In re Carolina Fluid Handling Intermediate Holding Corp.*, 467 B.R. 743, 756 n.67 (Bankr. D. Del. 2012) (quoting *Armstrong v. Norwest Bank, Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir. 1992) ("We cannot entertain any suggestion to the contrary, as the result would be chaos among debtors-in-possession and their creditors.  Creditors must be able to deal freely with debtors-in-possession, within the confines of the bankruptcy laws, without fear of retribution or reversal at the hands of a later appointed trustee."), *aff'd*, 2013 WL 1124064 (D. Del. Mar. 18, 2013)).

"Section 1107(a) of the Bankruptcy Code grants the debtor-in-possession the powers of a chapter 11 trustee, including 'the authority to bring—and waive the right to bring avoidance actions.'" *Tanglewood*, 2013 WL 1829910, at *8 (citing *Terlecky v. Peoples Bank, N.A. (In re*

*Amerigraph, LLC*), 456 B.R. 349, 356 (Bankr. S.D. Ohio 2011) (citations omitted)). Accordingly, a debtor-in-possession's agreement to waive or otherwise limit the terms upon which fraudulent transfers can be asserted against lenders is binding on a chapter 7 trustee. *See In re BX Acquisitions, Inc.*, 2019 WL 1768144, at *6 (B.A.P. 6th Cir. Apr. 19, 2019) ("Pursuant to 11 U.S.C. § 1107(a), a debtor-in-possession is granted the powers of a trustee. It follows that an agreement made by a debtor-in-possession that is set forth in an agreed cash collateral order generally will—unless the order expressly states otherwise—be binding on a subsequently appointed trustee.") (internal quotation marks omitted). Indeed, "it is axiomatic that the Trustee is bound by the acts of the debtor-in-possession." *Armstrong*, 964 F.2d at 801 (chapter 7 trustee is bound by cash collateral stipulations).

Here, the Trustee is attempting to assert claims that the Debtors waived their own right to assert in the DIP Order. Specifically, the Debtors (subject to the rights of other parties in interest to assert timely claims on behalf of the bankruptcy estate) agreed to the validity, enforceability and non-avoidability of the lenders' liens and "waived any and all claims and causes of action against the Senior DIP Agent, the Senior DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the other Secured Parties, and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, related to the Prepetition Senior Credit Agreement . . . ." *See* DIP Order, ¶ 61; *see also* DIP Order, ¶¶ 38-39. Those "stipulations and admissions" are "binding upon the Debtors and any successor thereto (including without limitation any Chapter 7 . . . trustee appointed or elected for any of the Debtors) *in all circumstances*." *See* DIP Order, ¶ 60 (emphasis added). Notwithstanding the Debtors' stipulations and admissions, the DIP Order provides for the Committee or any other party in interest to challenge the lenders' claims and liens. Specifically, "the Committee or any party-in-

interest, including a Chapter 7 . . . trustee appointed or elected during the Investigation Period (defined below), shall be permitted to . . . challenge . . . the validity, enforceability, priority, perfection, or amount of the Prepetition Indebtedness or Prepetition Lenders' liens . . . or otherwise assert any claims or causes of action against the Prepetition Agent and/or a Prepetition Lender on behalf of the Debtors' estates, which shall be filed no later than 75 days from the Petition Date or with respect to the Committee not later than 75 days after the date of the appointment of the Committee (the 'Investigation Period')." *See* DIP Order, ¶ 39.

Although the Committee timely filed the Adversary Proceeding against CIT, the Cases subsequently were converted to chapter 7 bankruptcy cases. Upon conversion, the Committee was disbanded, and the Trustee was appointed. The Trustee, however, as the successor to the Debtor, is bound by the Debtors' admissions and waivers and cannot step into the Committee's shoes as plaintiff in the Adversary Proceeding.

In *In re MS55, Inc.*, 477 F. 3d 1131 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit specifically addressed whether a chapter 7 trustee could assert an avoidance action when a debtor-in-possession waived its right to do so in a post-petition financing order entered prior to conversion. In that case, the bankruptcy court entered a post-petition financing order that protected the secured creditors, including Akamai, from "any and all claims" except those that could be brought by the unsecured creditors' committee. *Id.* at 1133. The financing order provided that "Debtor's estate, creditors, holders of claims against or equity interest in, debtor, any official or unofficial committee of holders of claims or equity interests and all such and other persons and entities shall be forever barred from asserting any and all claims on any basis or theory against the secured creditors" provided that "[t]he Committee shall have until the first date set by the Court for objections to confirmation of a reorganization plan in the

Bankruptcy Case to deliver to Secured Creditors . . . [its] written notice of intent . . . to commence an action against any Secured Creditor asserting any claim, liability, or cause of action, based on any grounds or theory whatsoever . . . but including, without limitation, any claim, liability or cause of action seeking to avoid, [etc.].” *Id.* The financing order also contained provisions confirming that it bound parties other than the debtor and was intended to survive conversion to chapter 7 and bind any chapter 7 trustee. *Id.* at 1133-34.

Over a year-and-a-half later, the case was converted to chapter 7. *Id.* at 1134. One of the stated purposes of converting the case to chapter 7 was “to initiate avoidance and other types of litigation. . . . by an independent Chapter 7 trustee.” *Id.*

The chapter 7 trustee subsequently filed an avoidance action against Akamai. *Id.* Akamai sought judgment in its favor on the grounds that the claim was barred by the terms of the financing order. *Id.* The bankruptcy court denied this motion, and Akamai appealed to the district court, which reversed on the grounds that the post-petition financing order barred the trustee’s claims. *Id.* The trustee appealed to the Tenth Circuit. *Id.*

The Tenth Circuit first determined whether the debtor-in-possession “waived its right along with the right of the Chapter 7 trustee to bring an avoidance action against Akamai.” *Id.* at 1135. The Court declared that such issue was “readily resolved by the financing order,” which provided that the debtor “shall be forever barred from asserting any and all claims on any basis or theory against the secured creditors.” *Id.*

Notwithstanding the clear language of the financing order, the trustee argued, *inter alia,* that (i) a “full release did not occur because the creditors’ committee retained a right of action” and (ii) “it is unreasonable to conclude the agreement intended conversion to act as an unstated limitation on the creditors’ committee right of action.” *Id.* Turning to the trustee’s first

argument, the Court declared that "the real question is not whether a full release exists, but rather who retained any existing right to bring an avoidance action.  It is well established that a Chapter 7 trustee succeeds to the rights of the debtor-in-possession and is bound by prior actions of the debtor-in-possession to the extent approved by the court." *Id*.  Thus, the Court held that "[t]he *creditors' committee may have retained a right of action, but that does not remove the existing bar against the debtor-in-possession or, post-conversion, the trustee enforcing those rights*. [The debtor] and, post-conversion, the trustee are barred from bringing an avoidance action regardless of whether the right to an avoidance action exists." *Id*. at 1136 (emphasis added). The Court noted that "[b]oth the bankruptcy court and district court agreed the financing order barred [the debtor] from bringing an avoidance action and that the trustee was similarly barred. The only reason the bankruptcy court denied summary judgment was its conclusion that the trustee succeeded to the creditors' committee right of action." *Id*. at 1137.

Addressing the trustee's argument that enforcing the financing order would operate as an "unstated limitation" on the creditors' committee's right to bring an avoidance action, the Tenth Circuit declared that "the fact that Chapter 7 conversion could dissolve the committee immediately after the order became effective demonstrates only that [the debtor] failed to retain a meaningful right to enforce avoidance actions for the creditors' committee.  It does not mean that [the debtor's] waiver of its own rights (and those of the Chapter 7 trustee) to enforce the agreement were so unreasonable as to be unenforceable." *Id*.  As the Court recognized, it is reasonable for a debtor-in-possession to waive certain rights of the estate in exchange for additional financing. *Id*.  The Court further recognized that the creditors' committee could have objected to the financing order or sought to forestall conversion until the avoidance actions had

been resolved.  *Id.*  Thus, the Trustee is bound by the Debtors' stipulations in the DIP Order and cannot be "substituted" as the plaintiff in the Adversary Proceeding.

The Trustee's reliance upon Rule 25(c) is erroneous for two other reasons.  Rule 25 applies when an "interest is transferred."  Fed. R. Civ. P. 25(c).  Upon conversion, (i) the Committee dissolved, and (ii) the Committee had no independent rights to assign.  *See MS55*, 477 F.3d at 1137-38 ("Once the Chapter 11 case was converted to a Chapter 7 case, the Creditors Committee ceased to exist; the Creditors Committee's attorney therefore had no authority to make an assignment, nor did the Creditors Committee have any rights to assign.") (quoting *Great Northern Paper*, 299 B.R. at 5); *see also Official Comm. Of Unsecured Creditors v. Constellation Enters. LLC (In re Constellation Enters. LLC)*, 587 B.R. 275, 286 (D. Del. 2018) ("There is no provision in the Bankruptcy Code that permits the Committee to hold or transfer rights or interests, nor is there any provision that permits the Committee to transfer its statutory duties to another entity."); *In re World Health Alternatives*, 344 B.R. 291, 295 (Bankr. D. Del. 2006) ("Of course, upon conversion of the cases to chapter 7, the Committee will cease to exist").

In conclusion, the Court in *MS55* reiterated that "the only rights a trustee inherits from a creditors' committee to bring an avoidance action are derivative of the debtor's rights", and the financing order extinguished the debtor's rights, and therefore, the trustee's rights.  *MS55*, 477 F.3d at 1140.  "The derivative rights exist like a sword in a stone, but there is no Arthur to claim them."  *Id.*; *Tanglewood*, 2013 WL 1829910, at *10 (dismissing trustee's adversary proceeding to avoid and recover fraudulent and preferential transfers "because he, stepping into the shoes of the debtor-in-possession, cannot attack or take a position inconsistent with those actions previously taken by the debtor-in-possession").

The Trustee does not cite to, let alone discuss, *MS55* (or similar cases). However, in an attempt to remove the sword from the stone, the Trustee cites one case, *In re Rachles, Inc.,* 131 B.R. 782 (Bankr. D.N.J. 1991), allegedly supporting its proposition that he can step into the shoes of the Committee. *See* Brief in Support of Motion to Substitute, p. 4. The Trustee's reliance on *Rachles* is misplaced. Although the court in *Rachles* does state that "it is entirely appropriate for the Chapter 7 Trustee to be substituted as plaintiff in the instant adversary proceeding in the place of the Committee which initially filed the adversary complaint on behalf of the Debtor and this estate," *Rachles,* 131 B.R. at 785, the case does not advance the Trustee's position. First, the court provides no reasoning or support for its conclusion. *Id.* at 785. Second, and more importantly, in *MS55,* the Tenth Circuit effectively distinguished *Rachles*. As the Tenth Circuit recognized, "*Rachles* should not be read to stand for a proposition that the creditors' committee has independent avoidance claims of its own to which the trustee inevitably succeeds. The trustee in *Rachles* was not succeeding to the independent rights of the creditors' committee, but rather joining the committee's already initiated derivative claim of the debtor's rights ***in a case where the trustee was not otherwise barred by previous arrangements made by the debtor-in-possession.***" 477 F.3d at 1139 (emphasis added).[4]

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

---

[4] The Trustee also erroneously relies upon *Claridge Assocs. v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 656 (Bankr. D. Del. 2018). First, the *Pursuit Capital* decision does not address the issue before the Court, *i.e.,* whether a chapter 7 trustee can assert a claim when the debtor—into whose shoes the trustee steps—has waived the right to bring such claim. Instead, *Pursuit Capital* dealt with the standing of an entity that purchased the claims from the debtor. *Pursuit Capital*, 595 B.R. at 652.

C.     **The Trustee Cannot Continue the Adversary Proceeding Against CIT Unless the Trustee Repays the $2.0 Million that CIT Paid Under the Settlement Agreement.**

The United States Supreme Court long ago recognized that parties to a settlement agreement that has been vacated on appeal should be restored to their original economic position, prior to entering into that settlement agreement. *See Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919) ("a party against whom an erroneous judgement or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby"); *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219 (1891) ("[T]he power is inherent in every court, while the subject of controversy is in its custody, and the parties are before it, to undo what it had no authority to do originally, and which it, therefore, acted erroneously, and to restore, so far as possible, the parties to their former position."). Many courts have since required disgorgement of monetary benefits upon vacatur or reversal of a judgment. *See, e.g., Nance v. NYPD*, 31 Fed. Appx. 30, 33 (2d Cir. 2002) ("[T]his Court has held that litigants seeking to vacate settlement agreements must disgorge any monetary benefits gained as a result of the agreement."); *Leslie v. Conseco Life Ins. Co.*, 2014 WL 12479931, *2 (S.D. Fla. July 25, 2014) ("If this Court's approval of the Settlement Agreement is reversed, vacated, or modified in any material respect by any court, the Settlement Agreement will be void, [and] Plaintiffs and Conseco will be restored to their respective positions as of the date the Settlement Agreement was signed."); *Galacia v. Louisiana Citizens Prop. Ins. Corp.*, 88 So. 3d 656 (La. App. 4th Cir. 2012) (after vacating a settlement agreement, court compelled plaintiff to return immediately the settlement funds to the defendant because plaintiff could not keep those funds and pursue litigation against defendant at the same time); *Conseco Life Ins.*, 2014 WL 12479931 at *2 ("[P]laintiffs and Conseco will be restored to their respective positions as of the date the Settlement Agreement was signed . . . and the Lawsuit will proceed as though the

- 19 -

Settlement [] had never been certified."); *Davis v. Home Depot U.S.A., Inc.*, 2018 WL 638998, at

*2 (D. Conn. Jan. 31, 2018) (a party must disgorge any benefit he received from the defendant

prior to setting aside the settlement agreement); *Lucille v. City of Chicago*, 31 F.3d 546, 548 (7th

Cir. 1994) (noting that a litigant did not seek to vacate a contested settlement agreement because

"rescission would require him to tender at least the [monetary settlement award], which he had

not offered to do")).

Here, however, the Trustee—who wants to step into the Committee's shoes—has not

disgorged the $2.0 million in funds paid by CIT under the vacated Approval Order that settled

the Committee's Adversary Proceeding.  The Trustee's failure to return CIT's funds to restore

the Lender Group to their pre-Approval Order position is yet another reason that the Trustee

cannot proceed with the Adversary Proceeding.

> **D.  The Court Should Enter Judgment in CIT's Favor With Respect to Counts 1-10 and Count 12 of the Complaint.**

>> **i.  The Section 546(e) "Safe Harbor" Requires the Dismissal of All Avoidance Claims (Counts 1-10 and 12).**

Even if the Trustee is able to step into the shoes of the Committee (which he cannot), the

"safe harbor" of Section 546(e) of the Bankruptcy Code bars the Trustee's fraudulent and

preferential transfer claims in Counts 1-10 and Count 12 of the Complaint.[5]

---

[5] "The application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings."  *In re Tribune Co. Fraudulent Conveyance Litigation,* 2019 WL 1771786, at *7 (S.D.N.Y. April 23, 2019); *In re Quebecor World (USA) Inc.*, 453 B.R. 201, 211 (Bankr. S.D.N.Y 2011) ("It is appropriate to resolve a dispute over the legal application of a safe harbor provision in the context of a dispositive motion . . . ."); *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 515 (Bankr. D. Del. 2012) ("Courts in this district have considered the 546(e) defense at the motion to dismiss stage where the defense is clearly established on the face of the complaint.") (citing *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 323-25 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009)).

Section 546(e) applies to transfers in connection with an LBO.  *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999), *abrogated in part on other grounds, Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018); *Brandt v. B.A. Capital Co. (In re Plassein Intl. Corp.)*, 590 F. 3d 252, 256 (3d Cir. 2009); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co.of Del. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 83-89 (D. Del. 2002) (applying Section 546(e) to "collapsible" LBO transaction).

Section 546(e) of the Bankruptcy Code provides, in relevant part, that a trustee may not avoid "a transfer"[6] made "by or to (or for the benefit of)"[7] a "financial institution[8] [or] financial participant[9]" "in connection with"[10] a "securities contract."[11]    11 U.S.C. § 546(e).    As

---

[6] *See* 11 U.S.C. § 101(54)(d)(i) ("transfer" includes "each mode . . . of disposing of or parting with . . . property").  A "transfer" also includes "the creation of a lien."  11 U.S.C. § 101(54)(A).

[7] A "benefit" is "the helpful or useful effect something has."  Black's Law Dictionary (11th ed. 2019); Bethesda Health, Inc. v. Azar, 389 F. Supp. 3d 32, 47 (D.D.C. 2019) (quoting Black's Law Dictionary); see Forrest Gen. Hosp. v. Azar, 926 F.3d 221, 229 & n.46 (5th Cir. 2019) (defining "benefit" as the "advantage or privilege something gives; the helpful or useful effect something has.") (quoting Black's Law Dictionary (10th ed. 2014)); United States v. White, 2012 WL 4513489, at *4 (S.D.N.Y. Oct. 2, 2012) ("Non-legal dictionaries define 'benefit' to mean a '[p]ecuniary advantage, profit [or] gain'") (quoting Oxford English Dictionary (3d ed.)).

[8] The term "financial institution" is defined, in relevant part, as "a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a 'customer', as defined in section 741) in connection with a securities contract (as defined in section 741) such customer[.]"  11 U.S.C. § 101(22)(A).

[9] The term "financial participant" is defined, in relevant part, as "an entity that, at the time it enters into a securities contract . . . or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on

Continued on following page

"collapsed" into a single LBO transaction, the transfers to CIT are unavoidable under section 546(e) as transfers to or for the benefit of a financial institution or financial participant in connection with Sun's agreement to purchase the equity in Jevic (which constitutes a "securities contract" under 11 U.S.C. § 741(7)(A)(i)), and the Financing Agreement (which constitutes a "securities contract" under 11 U.S.C. § 741(7)(A)(v), (viii) and (xi))).

For several reasons, all payments to, and liens granted in favor of, CIT are transfers "to" or "for the benefit of" a "financial institution" or "financial participant." **First**, CIT (the agent for the Lender Group) is a financial institution. *See Hechinger*, 274 B.R. 71, 87-88 (D. Del. 2002) (holding that Chase Mellon Financial Services, L.L.C., was a financial institution and noting that "a financial institution need not include the words 'bank' or 'savings and loan' in its name to be a financial institution). CIT (and the other lenders) made "revolving loans, term loans and other financial accommodations" to Jevic. *See* Financing Agreement, Preamble. Accordingly, transfers to CIT are transfers "to" a "financial institution."

---

Continued from previous page

any day during the 15-month period preceding the date of the filing of the petition." 11 U.S.C. §101(22)(A).

[10] "A transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *Picard v. Ida Fishman Revocable Trust (In re Madoff Investment Securities, LLC,* 773 F. 3d 411, 421 (2d Cir. 2014); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.),* 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

[11] The term "securities contract" includes any "contract for the purchase, sale, or loan of a security . . . including an option to purchase or sell any such security." 11 U.S.C. § 741(7)(A)(i). The term "securities contract" also includes "any extension of credit for the clearance or settlement of securities transaction," "any combination of the agreements or transactions referred to in this subparagraph," and "any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph." *See* 11 U.S.C. § 741(7)(A)(v), (viii), and (xi). Notably, Congress expanded the definition of "securities contract" to include the text in section 741(7)(A)(v), (viii) and (xi) when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 907(a)(2), Pub. L. 109-8, 119 Stat. 173 (2005).

**Second**, the Lender Group members (each of which signed the Financing Agreement) for which CIT served as agent include (in addition to CIT) LaSalle Bank Midwest National Association ("LaSalle Bank"), PNC Bank, N.A., and Wachovia Bank, National Association ("Wachovia Bank"), and BMO Capital Markets Financing, Inc.. Thus, the payments to, and liens granted in favor of, CIT, as agent, were "for the benefit of" each of those "financial institutions." Each of the Lender Group members' respective loan commitments was set forth on the signature pages of the Financing Agreement. *See* Financing Agreement, signature pages.

**Third**, Sun is a "financial participant," as defined under section 101 (22)(A). During the years 2008-2009, the time of the transactions at issue – the LBO, Refinancing Facility, and the Sale-Leaseback – Sun was party to one or more agreements listed in section 561(a)(1)–(6) totaling more than $100,000,000. *See* 11 U.S.C. §101(22)(A); *Combined Response of Sun Capital to Motion to Substitute Chapter 7 Trustee as Real Party in interest and Memorandum of Law in Support of Sun Capital's Motion for Judgment on the Pleadings* [Dkt. No. 126], ¶ 61. ("During the years 2006-2008 – the time of the transaction at issue through the Petition Date – Sun Capital Partners IV held market-to-market positions in its investment of between $152 million and $1.3 billion."). Thus, the transfers to CIT were also "for the benefit of" Sun, as a "financial participant." *See* Complaint, ¶ 225 ("Since June 2006, the Debtors directly or indirectly . . . made transfers and conveyances, and incurred obligations . . . for the benefit of Sun, including without limitation, the pledging to CIT of liens on the Debtors assets . . . and the debt obligations that the Debtors incurred to finance the acquisition of Jevic by Sun."); ¶ 231 ("In January 2007, the Debtors directly or indirectly, . . . made transfers and conveyances in connection with the Sale-Lease Back and the resulting repayment of the Term Loan for the benefit of Sun.").

**Fourth**, $90 million of the Refinancing Facility proceeds were used to pay off the Acquisition Facility provided by Bank of Montreal. *See* Complaint, ¶¶ 45-47, 49, 80. Thus, the transfers to CIT were also "for the benefit of" Bank of Montreal, which also qualifies as a "financial institution."

**Fifth**, the definition of "financial institution" also includes a "customer" [12] where "any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent[13] or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). As the Financing Agreement plainly states, LaSalle Bank served as the syndication agent for the Lender Group, and Wachovia Bank served as the documentation agent for the Lender Group, in connection with the LBO and under the Financing Agreement (which, like the Stock Purchase Agreement, is a "securities contract"). *See* Financing Agreement, cover page. Therefore, the Lender Group members (including, without limitation, CIT) were "financial institutions" in that they were "customers" of other financial institutions (LaSalle Bank and Wachovia Bank), which served as the "agent" for the Lender Group "in connection with" (*i.e.*, "relating to") the Financing Agreement. Thus, all transfers to CIT were "to" or "for the benefit of" "customers," which are financial institutions under section 101(22)(A) of the Bankruptcy Code.

Notably, even if the Debtors are considered the "customers" of LaSalle Bank, as syndication agent, and Wachovia Bank, as documentation agent, section 546(e) still precludes avoidance of the transfers to CIT because the transfers would be made "by" the "customers,"

---

[12] The Bankruptcy Code does not define "customer." Accordingly, the Court should employ the ordinary meaning of the term, which is "someone who buys goods or services." *Note Holders v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 79 (2d Cir. 2019); *Tribune*, 2019 WL 1771786, at *7 (same).

[13] *Tribune*, 946 F.3d at 79 (employing common law definition of "agent" and declaring that the issue can be decided as a matter of law).

which are financial institutions under section 101(22)(A). *See Tribune,* 2019 WL 1771786, at

*8-12 (transfers were not avoidable where debtor was a "customer" of a financial institution and,

therefore, was itself a "financial institution").

For the foregoing reasons, 546(e) bars the Trustee's constructive fraudulent transfer

counts (Counts 1-10) and the preference count (Count 12) of the Complaint. As the Committee

does not (and cannot) challenge the Refinancing Facility and the Sale-Leaseback other than in

the "collapsed" LBO context, the Court should enter judgment in CIT's favor with respect to

those claims.

ii.     **The Refinancing Facility and the Sale-Leaseback Cannot Be Collapsed into a Single Transaction with the Acquisition and the Acquisition Facility.**

Even though the section 546(e) "safe harbor" requires judgment in CIT's favor in the

LBO context, the Refinancing Facility and the Sale-Leaseback *cannot* be "collapsed" into a

single transaction—the LBO—with the Acquisition and Acquisition Facility. *See* Complaint,

¶ 86. The LBO was complete upon the closing of the Acquisition and the Acquisition Facility,

which were *never* conditioned upon the Refinancing Facility or the Sale-Leaseback. The

Committee does not allege otherwise. Accordingly, the Court should enter judgment in CIT's

favor with respect to Counts 1-10 and Count 12 of the Complaint.

According to the Complaint, Sun "turned to CIT to provide a 'comprehensive financing

solution'" to facilitate its acquisition of Jevic. Complaint, ¶ 39. Furthermore, the Complaint

alleges that Sun and CIT negotiated for a June closing date months before the Acquisition

occurred, but CIT was unable to close at that time. Complaint, ¶ 44. To avoid delaying the

closing, the Committee alleged that Sun obtained the Acquisition Facility from Bank of Montreal

to serve as a "bridge facility" for the purpose of effectuating the Acquisition "until CIT was

prepared to move forward with what would then be permanent financing." Complaint, ¶ 45. By

the end of July, CIT had refinanced the Acquisition Facility through the Refinancing Facility. The Committee contends—in a conclusory manner unsupported by facts—that "Sun would not have caused [its subsidiary] to borrow $90 million under [the Acquisition Facility], and Sun would not have guaranteed . . . repayment of the [Acquisition Facility], if Sun was not *all but certain* that CIT would successfully complete the re-financing in a short period of time." Complaint, ¶ 50 (emphasis added).

Concerning the collapsing of all transactions, the Court previously concluded as follows: "Based on the Committee's allegations, the Court could conclude that CIT, Sun, Bank of Montreal, and Jevic were all apprised of the overall goal—Sun's acquisition of Jevic through a highly leveraged buyout—of each of these separate transactions in which the various parties were involved." *Jevic Holding Corp.,* 2011 WL 4345204 at *7. The Court held that the Committee could establish that CIT had sufficient knowledge and notice of the LBO and that the Committee adequately alleged that the various transactions constituting the LBO "*would not have occurred independently of each other*." *Id.* (emphasis added). Just knowing about, and expecting, another transaction to occur, are insufficient bases to collapse transactions. Based on recent case law, CIT respectfully submits the Court's prior conclusion in 2011 is incorrect and unsupported by any non-conclusory, factual allegation.

A recent decision of a Second Circuit Judge,[14] sitting by designation, in *Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Dennis J. Fitzsimmons (In re Tribune Co. Fraudulent Conveyance Litigation),* 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied,* 2019 WL 549380 (Feb. 12, 2019), is instructive. In *Tribune,* the District Court granted five motions to dismiss fraudulent transfer and other claims asserted by Tribune's

---

[14] Richard J. Sullivan, United States Circuit Judge.

litigation trustee against several individuals or entities that were involved in or received payments after Tribune's 2007 LBO. *Id.* at *1. The District Court also denied the Trustee's request to amend its complaint. *Tribune*, 2018 WL 6329139, at *2-3.

In January 2007, private-equity investor Sam Zell emerged as a bidder for Tribune. *Id.* at *2. Ultimately, Zell proposed to acquire Tribune in a "two-step LBO transaction." *Id.* In the first step, Tribune would borrow approximately $7 billion and execute a tender offer, repurchasing about 50% of Tribune's outstanding shares at $34 a share. *Id.* In the second step, Tribune would borrow another $3.7 billion, repurchase its remaining shares, and merge with the newly-formed Tribune Employee Stock Ownership Plan ("ESOP"). *Id.* At the conclusion of the second step, Tribune would become a private company, wholly-owned by the ESOP. *Id.* After completion of step one, but in advance of step two, Tribune increased its projections for its financial performance for 2008-2012, which projections were used to obtain the solvency opinion required for step two. *Id.* at *3. On or about December 20, 2007, the LBO was consummated and, at the close of step two, Tribune carried a debt burden of $13.7 billion. *Id.* Thereafter, Tribune experienced financial difficulties that led it to file for Chapter 11 bankruptcy on December 8, 2008. *Id.* at *4.

The trustee in *Tribune* urged the District Court to collapse step one and step two of the LBO so as to consider them a unitary transaction. The trustee alleged that steps one and two should be collapsed and deemed a single unitary transaction because, among other things, Tribune's board of directors approved both steps at the same time, the parties and public markets viewed the transactions as a "two-step transaction," and step two was "***highly likely***" (*i.e.,* "all but certain" in the Committee's jargon) to occur at the time of step one. *Id.* at *9 (emphasis added).

The District Court began its analysis by recognizing that the "paradigmatic" scenario where courts collapse transactions—where "one transferee gives fair value to the debtor in exchange for the debtor's property [*i.e.*, transfer one], and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee [*i.e.*, transfer two]" bore "little resemblance to the complex, two-step LBO transaction at issue." *Id.* (citing *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) (treating "two exchanges" as "part of one integrated transaction" where "[t]he $4,085,000 in ... loan proceeds which were lent immediately by the borrowing companies to [the holding company] were merely passed through the borrowers to [the holding company] and ultimately to the selling stockholders")).

The District Court (like this Court in *Jevic Holding Corp.*, 2011 WL 4345204) then turned to the following factors in determining whether to apply the collapsing doctrine: (1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions. *Tribune*, 2018 WL 6329139, at *9 (citing *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 541 (Bankr. S.D.N.Y. 2016)).  Applying those factors, the District Court declared, as follows:

> Here, the relevant parties ***clearly knew about both steps*** of the LBO, and, in fact, ***anticipated*** that ***both steps would be consummated***.  **However**, the FitzSimons Complaint makes clear that, even after the Board voted in favor of the LBO, and even after Step One closed, ***it was never certain that Step Two would occur***. (*See, e.g.*, FitzSimons Compl. ¶¶ 242 ("[A]t the time of Step One, Step Two was, ***at a minimum, highly likely to occur***."); 302 (describing three scenarios pursuant to which Step Two would not close.)

*Tribune*, 2018 WL 6329139, at *9 (emphasis added).  The District Court then concluded that "Step One and Step Two of the LBO were independent transactions" because step two was not certain to occur.  *Id.*

The *Tribune* decision is consistent with Third Circuit law.  The *Tribune* court cited to Third Circuit precedent, and this Court recognized the exact same test as the District Court applied in the *Tribune* decision for "collapsing" transactions.  *See id.* at *9 (citing *Tabor.*, 803 F.2d at 1288); *Jevic Holding Corp.,* 2011 WL 4345204, at *5 (reciting same test as applied in *Tribune*).

In *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990), the Third Circuit upheld collapsing of transactions into a single transaction where the bankruptcy court found that "*[e]ach portion of the transaction* [of August 8, 1986] *was dependent upon the occurrence of the other.*"  *Id.* at 212 (emphasis added).  In other words, *neither* transaction would have occurred without the occurrence of the other.  *See Liquidation Trust of Hechinger Inv. Co. of Delaware v. Fleet Retail Finance Group (In re Hechinger Inv. Co. of Delaware)*, 327 B.R. 537, 547 (D. Del. 2005) (collapsing LBO elements into a single transaction where "*[e]ach step of the Transaction would not have occurred on its own*, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger.  Therefore, in evaluating the validity of the Transaction, the court considers it as one transaction.") (emphasis added).  In *Hechinger,* each element of the collapsed transaction was a "condition" of the other element of the transaction.  *See id.* at 547 n.16.  Other courts also focus on whether a "second step" was certain or inevitable when considering whether to collapse transactions.  *See, e.g., Sabine*, 547 B.R. at 542 (applying the "collapsing doctrine" in light of the fact that the second transaction "could [not] have been stopped or have been reversed" after the first transaction occurred).

Here, the *LBO was completed* upon the closing of the Acquisition Facility.  Upon the closing of the Bank of Montreal loan, Sun had acquired the equity in Jevic, the Jevic shareholders had received $41.3 million for their stock, and the liens and security interests were

granted to Bank of Montreal. That transaction effectuated all the elements of an LBO. Each of those transactions, while a simultaneous two-part process, was dependent upon the occurrence of the other transactions at closing. *See Tabor*, 803 F.2d at 1302 ("The loan arrangement was a two-part process: the loan proceeds went from IIT to the borrowing Raymond Group companies, which immediately turned the funds over to Great American, which used the funds for the buy-out").

The subsequent refinancing of the Bank of Montreal facility is a separate transaction—regardless of whether it was contemplated (or even "highly likely" or "all but certain") at the time of the Bank of Montreal facility. The Committee does not (and cannot allege) that, when the Bank of Montreal Acquisition Facility was closed, it was dependent upon the Refinancing Facility. The Committee's *conclusory* allegation that "Sun would not have caused [its subsidiary] to borrow $90 million under the [Acquisition Facility], and Sun would not have guaranteed . . . repayment of the [Acquisition Facility], if Sun was not *all but* certain that CIT would successfully complete the re-financing in a short period of time" (Complaint, ¶ 50) is both conclusory and insufficient. As a conclusory allegation, it is entitled to no deference. *See DiCarlo*, 530 F.3d at 262-63; *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("conclusory allegations . . . masquerading as factual conclusions will not suffice") (quoting 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 12.34[1][b], at 12-61 to 12-63 (3d ed. 2001)). It is also insufficient to establish a plausible claim. The Acquisition and the Acquisition Facility closed without any promise—let alone certainty—that there would be any refinancing (whether from CIT or any other lenders). The Acquisition Facility simply was *not* conditioned or dependent upon the Refinancing Facility, and the Committee does not (and

cannot) allege otherwise.[15]  The Acquisition and the Acquisition Facility, therefore, did occur independent of the Refinancing Facility.  Accordingly, as a matter of law, the Acquisition and the Acquisition Facility (which constituted the LBO) should not be considered as a single transaction with the Refinancing Facility.  For similar reasons, it is even more outlandish to collapse the Sale-Leaseback into a single transaction with the Acquisition or the Acquisition Facility.  The Committee does not (and cannot) allege that the Sale-Leaseback was even contemplated at the time of the Acquisition and the Acquisition Facility.

As the Committee did not (and cannot) challenge the Refinancing Facility or the Sale-Leaseback other than as part of the LBO (which they were not), the Court should enter judgment on the pleadings in CIT's favor with respect to Counts 1-10 and Count 12 of the Complaint.

### E.    The Committee Cannot Prove a *Prima Facie* Case for Avoidance of Constructively Fraudulent Transfers Because the Complaint Evidences Reasonably Equivalent Value in the Cancellation of a $53.259 Million Debt.

The Bankruptcy Code and the New Jersey Uniform Fraudulent Transfer Act (N.J.S.A. §§ 25:2-20-34), upon which the Committee relies, do not define "reasonably equivalent value." The Third Circuit has declared that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"  *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 631 (3d Cir. 2007).  "In analyzing constructive fraudulent transfer claims under both § 548 and [the] UFTA, the 'touchstone is whether the transaction conferred realizable commercial value on

---

[15] Although this Court declared that "the intervening role Bank of Montreal complicates the Committee's case and *may ultimately prove fatal* to the claims in the Complaint," *Jevic Holding Corp.,* 2011 WL 4345204, at *7 (emphasis added), the fatality should happen now.  The Court is free to, and should, revisit that issue.  *See United States ex rel. Petratos v. Genentech, Inc.,* 855 F.3d 481, 493 (3d Cir. 2017) ("law of the case doctrine . . . 'does not limit the power of trial judges to reconsider their [own] prior decisions.' *Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir. 1997).  Therefore, '[i]nterlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case.' *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994).").

the debtor reasonably equivalent to the realizable commercial value of the assets transferred.'" *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 713 (Bankr. D. Del. 2010) (quoting *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991)).

Debt forgiveness is relevant when determining "reasonably equivalent value." *In re Allegheny Health, Educ. & Research Found.*, 253 B.R. 157, 171–72 (Bankr. W.D. Pa. 2000) ("AHERF") (mutual release of intercompany debt was reasonably equivalent value). In AHERF, the bankruptcy court held (in the context of a motion to dismiss) that the release of intercompany debt that was $3.4 million in excess of the debt released by the debtor was reasonably equivalent as a matter of law. *Id.*

In the Complaint, the Committee effectively pled itself out of court. Specifically, even assuming that the Acquisition, the Acquisition Facility, and the Refinancing Facility are collapsed into a single transaction, the Complaint establishes, as a matter of law, that the Committee cannot prove lack of reasonably equivalent value because the Complaint indirectly, but indisputably, acknowledges that Jevic received the cancellation of $53.259 million in debt owed to Parent and Seller in exchange for the $41.3 million paid to Seller in the LBO. *See* Complaint, ¶¶ 2 and 47-48 (regarding $41.3 million equity cash purchase price).

The Committee specifically asserts, based on the Debtors' balance sheet, that "[i]mmediately prior to Sun's acquisition, Jevic had . . . shareholders' equity of approximately $46 million." *See* Complaint, ¶ 80. The approximately $46 million ($45.627 million to be exact) in shareholders' equity is the amount set forth in Schedule 4.7(a) to the Stock Purchase Agreement and Schedule 7.1(h) to the Financing Agreement and is *net of* Jevic's $53.259 million in intercompany debt owed as of May 31, 2006. *See* Balance Sheet, Schedule 4.7(a) to the Stock

Purchase Agreement; Balance Sheet attached as Schedule 7.1(h) to the Financing Agreement, a

true and correct copy of each of the Balance Sheets is attached as **Exhibit A**.

Pursuant to the Stock Purchase Agreement, Parent and Seller waived, released, and

discharged their $53.259 million intercompany claims against Jevic.  *See* Stock Purchase

Agreement, § 8.4(d).  Therefore, the Committee's *own allegations* and the documents relied

upon by the Committee in the Complaint evidence that Jevic received reasonably equivalent

value for the $42 million paid to Seller in the LBO.  Accordingly, the Committee has pled itself

out of court, and the Court should enter judgment in CIT's favor on Counts 1-10 of the

Complaint.  *See McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000) (plaintiff may

plead herself out of court by pleading facts undermining allegations set forth in her complaint).

F.    **The Court Should Enter Judgment in CIT's Favor With Respect to Count 11 (Equitable Subordination).**

Section 510(c) of the Bankruptcy Code provides that a court may "under principles of

equitable subordination, subordinate for purposes of distribution all or part of an allowed claim

to all or part of another allowed claim."  11 U.S.C. § 510(c)(1).  Equitable subordination is a

"drastic" and "unusual" remedy.  *In re Radnor Holdings Corp.*, 353 B.R. 820, 840 (Bankr. D.

Del. 2007).  Courts have required proof of the following three elements to establish equitable

subordination: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the

misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the

defendant; and (3) equitable subordination of the claim is consistent with bankruptcy law."  *In re*

*SubMicron Sys. Corp.*, 432 F.3d 448, 462 (3d Cir. 2006) (citing *CitiCorp Venture Capital, Ltd. v.*

*Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998)).

"The most important factor in determining if a claimant has engaged in inequitable

conduct for the purposes of equitable subordination is whether the claimant was an insider or

- 33 -

outsider in relation to the debtor at the time of the act." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002); *Jevic Holding Corp.,* 2011 WL 4345204, at *14 (quoting *Mid-Am. Waste*).[16]   "If the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary."   *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (citing *Matter of Fabricators*, 926 F.2d 1458, 1465 (5th Cir. 1991)); *see also Jevic Holding Corp.,* 2011 WL 4345204, at *14 (quoting *Schubert*); *Bank of New York v. Epic Resorts-Palm Spring Marquis Villas, LLC (In re Epic Capital Corp.)*, 307 B.R. 767, 772 (D. Del. 2004).   In fact, "the circumstances warranting equitable subordination of a non-insider's claim arise less frequently" and "[u]nless the non-insider has dominated or controlled the debtor to gain an unfair advantage, the type of inequitable conduct that justifies subordination of a non-insider's claim is breach of an existing, legally recognized duty arising under contract, tort or other area of law." *In re Aeropostale, Inc.*, 555 B.R. 369, 398 (Bankr. S.D.N.Y. 2016) (internal quotation marks omitted) (Absent a contractual breach, "the proponent must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity.").

Here, the Committee does not (and cannot) alleged that CIT is an "insider" of the Debtors.  Thus, the Committee must plead "more egregious conduct such as fraud, spoliation or overreaching." *Schubert*, 554 F.3d at 412.  The Committee fails to allege such in the Complaint. The Committee merely states that CIT "contributed" and "participated" in the LBO that, the Committee alleges, led to the Debtors' bankruptcies.  Complaint, ¶ 211.  The Committee also

---

[16] The Code defines an "insider" of a corporate debtor as including "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).

does not (and cannot) allege that CIT dominated or controlled the Debtors. Accordingly, the Committee's allegations fall far short of the egregious conduct necessary to plead equitable subordination of a non-insider's claim. For similar reasons, the Court previously dismissed the Committee's equitable subordination claim. *See Jevic Holding Corp.,* 2011 WL 4345204, at *14. The Court noted that "the Committee has alleged only that CIT's conduct, as it is described in the Committee's preceding claims, warrants the equitable subordination of CIT's claims against the Debtors. Based on such sparse allegations, however, the Court cannot conclude that the Committee has sufficiently alleged a claim for equitable subordination against CIT and will therefore dismiss the claim." *Id.* (internal citations omitted). The Committee's description of CIT's alleged conduct does not differ now from when the Court originally dismissed the equitable subordination claim. *See In re Jevic,* 2011 WL 4345204, at *14. The Complaint merely reshuffles and restates the allegations from the "Statement of Facts," which are essentially the same as in the Original Complaint, in the "Eleventh Claim for Relief."[17]

Nothing new, different, or meaningful has been alleged concerning the Committee's equitable subordination claim since this Court dismissed the claim. Extending financing that is "riskless" is not a basis for equitable subordination. *See* Complaint, ¶ 7. Therefore, the Court should enter judgment in CIT's favor with respect to Count 11 of the Complaint.

---

[17] *Compare* Original Complaint, ¶ 77 ("Upon information and belief, CIT would not have funded the Re-Financing on its own, and CIT would not have been able to syndicate the Re-Financing without the Enhanced Projections."), ¶ 56 ("A review of the development of the projections over time shows that Sun unreasonably revised the projections upwards solely to support the acquisition and consequent refinancing, particularly when compared to Jevic's immediate prior performance."), and ¶ 55 ("Upon information and belief, Sun's projections became unreasonably optimistic throughout the period prior to the re-financing because such optimistic projections were needed to secure CIT's financing and would enable Sun to reduce its equity commitment."); with *Complaint,* ¶ 216 ("But for CIT . . . , Sun would not have revised its already overly-optimistic projections, and it did so in order to facilitate CIT's syndication so the LBO loans."), ¶ 11 ("CIT actively participated in the development of Jevic's financial projection used to support the transaction.").

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should (i) deny the Motion to Substitute, (ii) enter

judgment in CIT's favor with respect to all Counts of the Complaint and (iii) grant such further

relief to CIT as is appropriate.

Dated:  April 6, 2020
Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

*/s/ Kurt F. Gwynne*
Kurt F. Gwynne (No. 3951)
Katelin A. Morales (No. 6683)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 778-7500
Facsimile:  (302) 778-7575
Email: kgwynne@reedsmith.com
          kmorales@reedsmith.com

Counsel for Defendant,
The CIT Group/Business Credit, Inc., as Agent
for itself and the other prepetition lenders