## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| JEVIC HOLDING CORP., *et al.*,[1] | Case No. 08-11006 (BLS) |
| Debtors. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the bankruptcy estates of JEVIC HOLDING CORP., *et al.*, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 08-51903 (BLS) |
| THE CIT GROUP/BUSINESS CREDIT, INC., in its capacity as Agent, *et al.*, | Related Docket Nos.: 121, 122, 123, 125, 126, 130, 131, 132 |
| Defendants. | |

### CHAPTER 7 TRUSTEE'S COMBINED (I) OPPOSITION BRIEF TO SUN CAPITAL'S AND CIT GROUP/BUSINESS CREDIT, INC.'S MOTIONS FOR JUDGMENT ON THE PLEADINGS, AND (II) REPLY BRIEF IN SUPPORT OF MOTION TO SUBSTITUTE CHAPTER 7 TRUSTEE AS REAL PARTY IN INTEREST

---

[1]     The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Jevic Holding Corp. (8738), Creek Road Properties, LLC (9874) and Jevic Transportation, Inc (3402).

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
Michael J. Barrie (No. 4684)
Jennifer R. Hoover (No. 5111)
Kevin M. Capuzzi (No. 5462)
Sean A. Meluney (No. 5514)
Matthew D. Beebe (No. 5980)
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com
smeluney@beneschlaw.com
mbeebe@beneschlaw.com

*Special Litigation Counsel for
George L. Miller, Chapter 7 Trustee*

Dated:  May 6, 2020

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ATS Prod. Corp.*,
  2003 WL 25947346 (Bankr. E.D. Pa. June 5, 2003) .............................................14

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) .................................................................34, 35

*In re Chas. P. Young Co.*,
  145 B.R. 131 (Bankr. S.D.N.Y. 1992) ..................................................................32

*In re Cybergenics Corp.*,
  226 F.3d 237 (3d Cir. 2000) ................................................................................10

*Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*,
  2014 WL 268613 (D. Del. Jan. 24, 2014), aff'd, 787 F.3d 173 (3d Cir. 2015),
  *rev'd and remanded*, 137 S. Ct. 973 (2017) ......................................................8, 38

*Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*,
  No. 13-104-SLR (D. Del. Nov. 21, 2013), ECF No. 15 ....................................8, 37

*In re DBSI, Inc.*,
  477 B.R. 504 (Bankr. D. Del. 2012) .......................................................................27

*DIRECTV, Inc. v. Crespin*,
  224 Fed. Appx. 741(10th Cir. Mar. 16, 2007) ......................................................13

*In re Energy Future Holdings Corp.*,
  546 B.R. 566 (Bankr. D. Del. 2016) ...........................................................9, 10, 22

*In re Florimonte*,
  599 B.R. 497 (Bankr. M.D. Pa. 2019) ..................................................................31

*In re Frescati Shipping Co., Ltd.*,
  886 F.3d 291 (3d Cir. 2018) ............................................................................29, 30

*Giuliano v. Schnabel, et al. (In re DSI Renal Holdings, LLC)*,
  2020 WL 1509447 (Bankr. D. Del. 2020) .......................................................24, 25

*In re Green Field Energy Servs., Inc.*,
  2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) .........................................34, 36

*In re J & M, Inc.*,
  2020 WL 1237914 (Bankr. D. Del. Mar. 13, 2020) ...............................................21

*In re Jevic Holding Corp.*,
   2011 WL 4345204 ....................................................................................17, 21, 32, 33

*In re Jevic Holding Corp.*,
   Case No. 08-11006 (BLS) (Bankr. D. Del.) ...........................................................3, 33

*In re Lifschultz Fast Freight*,
   132 F.3d 399 (7th Cir. 1997) ...................................................................................34

*Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*,
   176 F.3d 669 (3d Cir. 1999).....................................................................................21

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*
   (138 S. Ct. 883 (2018)) ...............................................................................20, 24, 25

*In re Mervyn's Holdings, LLC*,
   426 B.R. 488 (Bankr. D. Del. 2010) ............................................................... *passim*

*In re Millennium Lab Holdings II, LLC*,
   2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ..........................................31, 32

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*,
   243 F.3d 773 (3d Cir. 2001).....................................................................................37

*In re MS55, Inc.*,
   477 F.3d 1131 (10th Cir. 2007) ....................................................................12, 13, 14

*In re National Forge Co.*,
   344 B.R. 340 (W.D. Pa. 2006)..................................................................................25

*Nord Serv., Inc. v. Palter*,
   548 F. Supp. 2d 366 (E.D. Tex. 2008)......................................................................27

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003)......................................................................................10

*Official Unsecured Creditors' Com. Of Broadstripe, LLC v. Highland Cap.*
   *Management, L.P. (In re Broadstripe, LLC)*,
   444 B.R. 51 (Bankr. D. Del. 2010) ...........................................................................34

*In re PennySaver USA Publ'g, LLC*,
   602 B.R. 256 (Bankr. D. Del. 2019) ...................................................................17, 18

*In re Physiotherapy Holdings, Inc.*,
   No. AP 15-51238-KG, 2017 WL 6524524 (D. Del. Dec. 21, 2017) ..................18, 20

*rel. Bensimon v. Duke Energy Corp.*,
   500 B.R. 464 (W.D. Tex. 2013).................................................................................25

iv

*In re Simplexity, LLC*,
  2017 WL 2385404 (Bankr. D. Del. June 1, 2017) ............................................................9, 10

*In re The IT Grp., Inc.*,
  359 B.R. 97 (Bankr. D. Del. 2006) ......................................................................................19

*In re Thomas*,
  No. 10-38306 MER, 2013 WL 6840527 (Bankr. D. Colo. Dec. 27, 2013) ..........................27

*In re Tribune Co. Fraudulent Conveyance Litigation*,
  No. 13-3875-CV, 2019 WL 6971499 (2d Cir. Dec. 19, 2019) ............................................28

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013) .............................................................................17, 19

*In re TSAWD Holdings, Inc.*,
  565 B.R. 292 (Bankr. D. Del. 2017) ....................................................................................10

*In re World Health Alternatives, Inc.*,
  344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................................12

**Statutes**

11 U.S.C. § 101(22A) ...........................................................................................................27

11 U.S.C. §§ 544, 548 ...........................................................................................................12

11 U.S.C. § 546(e) ........................................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ..................................................................................................17, 18

Bankruptcy Code chapter 7 ............................................................................................. *passim*

Bankruptcy Code Sections 544 through 553 ..........................................................................20

State Law § 544(b) ...........................................................................................................17, 18

**Other Authorities**

Fed. R. Bankr. P. 7025 ...........................................................................................................14

Fed. R. Civ. P. 8(c)(1) ............................................................................................................19

Fed. R. Civ. P. 12(b) ..............................................................................................................19

Fed. R. Bankr. P. 7012 .............................................................................................................9

Rule 12(b)(6) ........................................................................................................................2, 9

Rule 12(c)..........................................................................................................................2, 9

Rule 24(a)(2)...........................................................................................................................11

Rule 25(c)......................................................................................................................10, 12, 14

## PRELIMINARY STATEMENT

This case has a complicated history.  The subject matter is a multi-step leveraged buyout, the full scope of which included the new owners (the Sun defendants) forcing the Debtors to enter into two credit facilities and subsequent sale-leasebacks that left them stripped of nearly all their value.  Procedurally, there was previously a settlement agreement that was overturned on appeal, though that appeal was initially found to be equitably moot (that finding was also overturned), and now the bankruptcy case has been converted to one under chapter 7 of the Bankruptcy Code.

Fortunately, the matter at hand is significantly less complicated: what happens to an adversary proceeding brought derivatively by an unsecured creditors committee when a case converts?  The answer is simple: the chapter 7 trustee, now directly holding the claims asserted derivatively by the committee, should be substituted as the new plaintiff.  Yet according to the Defendants, once the committee was granted the right to pursue avoidance actions, the chapter 7 trustee was permanently divested from his avoidance powers, even when the committee ceased to exist.  That, quite simply, is wrong.

The Defendants will focus on extraneous language in the DIP Financing Order making the "Investigation Period" and challenge procedures binding on all parties in interest, including future chapter 7 trustees, and binding future trustees to the stipulations in the DIP Financing Order.  Yet despite these efforts to complicate the language of the DIP Financing Order, the straightforward analysis is that the stipulations and waivers in the DIP Financing Order were always subject to the challenge procedures, a challenge was properly brought by the committee, and the Trustee now stands ready to directly assert that challenge upon the dissolution of the committee. If the estates had causes of action that the committee was capable of pursuing, it follows that those causes of action continue to exist upon conversion.

Likewise, the other issue addressed by this brief appears complicated but in actuality remains quite simple: should the case be dismissed based on the pleadings under Rule 12(c)? Again, the answer is straightforward: the case should continue. Not only has this Court already ruled on a similar motion to dismiss under Rule 12(b)(6), but the main argument advanced by the Defendants—that the safe harbor under 11 U.S.C. § 546(e) requires dismissal—is not nearly as complicated as it seems.

The 546(e) Safe Harbor is an affirmative defense that prevents trustees from avoiding certain settlement payments or other payments made in connection with a securities transaction, to the extent the payments were made by or to certain enumerated entities that are critical to the securities market.  As discussed in more detail below, in the leveraged buyout context, courts must identify the specific nature of the challenged transfers, eliminate any entities that acted as mere conduits, and then determine the actual economic effect of the challenged transaction. Once that information identified, courts can then turn to application of the complex definitions cross-referenced in section 546(e) to determine its applicability. Overall, it is a detailed, fact-intensive analysis.

While a finding on the merits likely will be complicated, that complicated nature is what makes the motion for judgment on the pleadings relatively simple: in addition to the challenged transactions being unrelated to the acquisition of the Debtors' securities (thus making the 546(e) Safe Harbor inapplicable), there are simply too many open issues of fact to make a judgment on the pleadings. The Second Amended Complaint (the "Complaint") makes plausible, actionable allegations, and nothing in the remaining pleadings forecloses recovery on the Complaint. That ends the inquiry at the current procedural stage.

Again, the Defendants will attempt to cloud this clear-cut analysis, offering up complex defenses; Sun even argues that hypothetical subrogation rights (that are completely outside the pleadings and record) act as a complete bar to the estates' success. The court should ignore these red herrings and focus on the key procedural standard: do the pleadings set out a plausible path to recovery for the estates? Because they do, and because the Defendants have not done the work to clearly demonstrate the applicability of their affirmative defense, the motions for judgment on the pleadings should be denied.

The Defendants structured the leverage buyout scheme to extract value from the Debtors while shifting the risk of failure entirely to other, non-equity stakeholders, and the estates should be permitted to seek recourse under the Bankruptcy Code. The court should permit the case to continue with the Trustee representing the estates' interests.

## BACKGROUND

### I.   Basic Procedural Background

On June 20, 2008, the Court entered the final order [D.I. 118][1] (the "Final DIP Order"). On December 31, 2008, the Committee initiated this adversary proceeding (the "Action"), and the filing of this Action was timely under the Final DIP Order.  On October 7, 2011, the Committee filed the operative second amended Complaint [D.I. 43],[2] which Sun and CIT answered on November 4, 2011 [A.D.I. 44, 45] (the "Sun Answer" and "CIT Answer," respectively).[3]

---

[1]     References herein to documents filed in the main proceeding, *In re Jevic Holding Corp.*, Case No. 08-11006 (BLS) (Bankr. D. Del.), will be cited as "[D.I. ___]."  References to documents filed in this adversary proceeding will be cited as "[A.D.I. ___]."

[2]     All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Complaint.

[3]     CIT asserted a counterclaim in the CIT Answer, which the Committee answered on November 23, 2011 [A.D.I. 47].

## II.     The Prepetition LBO Transactions

On June 30, 2006, Sun purchased the Debtors from SCS Transportation, Inc., through wholly-owned investment vehicle Jevic Holding Corporation ("JHC"), for $77.4 million (the "Acquisition").  Compl. ¶¶ 46-47.  The Acquisition was financed by a $90 million bridge loan made by Harris Bank (the "Bridge Loan"), a division of Bank of Montreal, and the purchase price of $77.4 million consisted of $41.3 million in cash and $36.1 million of assumed liabilities, inclusive of $2 million of direct transaction costs (the "Bridge Loan Fees").  *See id.*  The Bridge Loan was evidenced by a demand note, guaranteed by Sun, and secured by all the Debtors' assets. *Id.* at ¶ 49.  Most of the Bridge Loan was used for Sun's benefit to acquire the Debtors and "to effectuate a change in ownership …, a change that was of no benefit to Jevic."  *Id.* at ¶ 48.

However, the intention was always for CIT to financing the overall transaction. As alleged in the Complaint, "Sun would not have caused JHC to borrow $90 million …, and Sun would not have guaranteed JHC's repayment …, if Sun was not all but certain that CIT would successfully complete a re-financing in a short period of time."  *Id.* at ¶ 50.

During this time, Defendants devoted their attention to two data points:  (a) Jevic's financial projections used to syndicate CIT's "comprehensive financial solution" and (b) appraisals for Jevic's assets.  To attract investors, and despite two and half years of deteriorating financial performance in a highly competitive market, CIT and Sun created overly optimistic and aggressive projections.  *Id.* at ¶ 55.  These projections only benefited Defendants. Over a matter of months, Sun's "upside" projections turned into the "base case" projections (the "Enhanced Projections") used to syndicate the $101.2 million refinancing (the "Refinancing Facility").  *Id.* at ¶ 73.  The Enhanced Projections forecasted a complete "turnaround" in eighteen months.  *Id.*  CIT was prepared to, and ultimately did, lend as much as the assets would support, and Sun made Jevic leverage its assets to the greatest extent possible.  Ultimately, the Enhanced

Projections spelled disaster for Jevic, as the financial covenants in the Refinancing Facility were based off the inflated Enhanced Projections.

Indeed, less than a month later, on July 28, 2006, Sun caused the Debtors to enter into a credit agreement administered by CIT to refinance the $90 million Bridge Loan with a $101.2 million loan, the Refinancing Facility. *See id.* at ¶¶ 18, 76. The Refinancing Facility consisted of a $85 million revolving credit facility secured by all non-real estate assets (the "Revolver"), and a separate $16.2 million term loan secured by the Debtors' real estate assets (the "Term Loan"). *Id.* at ¶¶ 67, 76, 109. The Debtors received no benefit from the Term Loan; as Sun and CIT knew and intended, the proceeds from the Term Loan were used to repay the Bridge Loan, which was obtained to finance Sun's acquisition, not to fund Jevic's operations. *Id.* at ¶ 110.

The Bridge Loan and Refinancing Facility had a catastrophic effect on Jevic's capital structure and left the company insolvent and with unreasonably low capital. Before these transactions, Jevic had $55 million in long-term debt and $46 million in equity on its balance sheet. *Id.* at ¶ 80. Following the transactions, Jevic's long-term debt nearly doubled, to $101.2 million, and its equity dropped by $45 million, to only $1 million. *Id.*

The Bridge Loan and Refinancing Facility, including related transaction costs, "left Jevic with substantially increased borrowing costs and with unreasonably small capital; and Jevic was rendered insolvent." *Id.* at ¶ 86. Between the Bridge Loan and Refinancing Facility, Jevic incurred around $3.2 million in fees and other costs. *Id.* at ¶ 79. And Defendants leveraged every single asset owned by Jevic to the maximum extent possible. *Id.* at ¶ 82.

Because CIT relied on the Enhanced Projections to craft financial covenants, Jevic defaulted almost immediately. In the first three months, Jevic (a) missed revenue targets by more than 6%, (b) achieved EBITDA less than 75% of the projection, and (c) cut capital expenditures

by 50%. *Id.* at ¶ 96. Within six weeks of closing the Refinancing Facility, the Debtors informed Sun that they would be in default as of September 30, 2006. *Id.* at ¶¶ 98-99. On October 11, 2006, the Debtors informed CIT of the default, and CIT promptly declared a default under the Refinancing Facility agreement. *Id.* at ¶ 101. In exchange for eliminating or loosening certain of the Debtors' financial covenants under the Refinancing Facility, the Debtors had to, among other things, pay a $250,000 fee and contribute *all* of the net proceeds of a contemplated sale-leaseback of the Debtors' valuable real property assets to pay off the Term Loan and to pay down the Revolver (which was not secured by the real estate). *See id.* at ¶ 107.

Before the Acquisition, Sun had planned to leverage the Debtors' valuable real estate in New Jersey and Illinois via sale-leaseback transactions (the "Sale-Leaseback," and together with the Bridge Loan and Refinancing Facility, inclusive of associated transaction costs, the "LBO Transactions") to finance the Acquisition to repay the debt under the Term Loan with the Debtors entering into sale-leaseback arrangements for the sold real estate. *Id.* at ¶ 111. According to a Sun representative, "[w]e had looked at potentially performing a sale leaseback from our initial involvement in looking at the opportunity…it took some time for us to go out, contact parties, and negotiate…." *Id.* at ¶ 111. Knowing that the Term Loan was over-secured by the real estate, and that the Revolver needed to be paid down, Sun put that plan into motion, "[w]ith CIT's active assistance," in or around August 2006 to January 2007. *See id.* at ¶¶ 112-113.

On January 17, 2007, Sun caused the Debtors to consummate the Sale-Leasebacks, selling valuable real estate assets for approximately $20 million and simultaneously entering into 20-year leases with the new owners "that contemplated enormous rent obligations." *Id.* at ¶¶ 114, 116. As previously agreed with CIT, as a result of the Debtors' default under the Refinancing—and although the Debtors were insolvent when—all the proceeds of the Sale-Leasebacks were

delivered to CIT to (a) pay off the $16.2 million Term Loan, (b) pay down the Revolver by $3 million, and (c) pay $700,000 in transaction fees. *Id.* at ¶ 116.

The Debtors "received no benefit from the encumbrance of its real estate assets or from the [Sale-Leasebacks]." *Id.* at ¶ 6. Through the LBO Transactions, the Debtors paid Sun—who invested only $1 million— $797,009.85 in financing and management fees. *Id.* at ¶ 83.

As of September 30, 2007, the Debtors were again in default and remained in default for the rest of 2007. *Id.* at ¶ 121. On January 8, 2008, Jevic and the Defendants entered into a Forbearance Agreement and Third Amendment to the Financing Agreement (the "<u>Forbearance Agreement</u>"), but by then it was too late.[4] *Id.* at ¶ 122. The Forbearance Agreement was amended four times over the next ninety days. *Id.* at ¶ 124.

## III.    The Parties' Failed Settlement and Defendants' Pursuit of Equitable Mootness on Appeal

On June 27, 2012, following discovery, the Debtors, the Committee, and Defendants filed a joint motion [A.D.I. 67] to approve that certain Settlement Agreement and Release dated June 22, 2012 [A.D.I. 67-2] (the "<u>Settlement Agreement</u>") settling the Action. The "Effective Date" was further defined in the Settlement Agreement as "the business day following the date that the Settlement Order becomes a Final Order, unless otherwise agreed to by the Parties." *Id.* at ¶ 18.

On December 4, 2012, the Court entered an Order approving the settlement [A.D.I. 78] (the "<u>Settlement Order</u>"), which was timely appealed by certain former employees of the Debtors [D.I. 79] (the "<u>Appeal</u>").

---

[4]    Under the Forbearance Agreement, among other things, the total line of credit under the Refinancing Facility agreement was reduced from $101.2 million to $70 million and the Revolver was reduced from $85 million to $70 million. Compl. ¶ 123 ("<u>i.e.</u>, all forms of financing were eliminated except for the Revolver, which itself was reduced.").

On August 29, 2013, the Committee and the Defendant filed a voluntary stipulation of dismissal with prejudice [A.D.I. 88].

On October 11, 2013, although the Settlement Order was still pending appeal in the district court—and therefore the Settlement Order was not a Final Order and the Effective Date under the Settlement Agreement had not yet occurred—the Debtors and the Committee filed a certification of counsel regarding satisfaction of the conditions of the Settlement Agreement [A.D.I. 89].

On November 11, 2013, shortly after the certification was filed, Defendants filed a joint brief arguing that the Appeal should be dismissed as equitably moot stating that all the Debtors' funds had been disbursed pursuant to the settlement agreement. *See* Joint Brief in Support of Joint Motion of the Debtors, CIT, Sun Capital, and the Official Committee of Unsecured Creditors to Dismiss Appeal of Settlement Order as Equitably Moot at 9, *Czyzewski v. Jevic Holding Corp.* (*In re Jevic Holding Corp.*), No. 13-104-SLR (D. Del. Nov. 21, 2013), ECF No. 15 (the "Equitable Mootness Brief" or "Equitable Mootness Br.").

The district court agreed with the Defendants' argument and, in the alternative, held that the appeal of the Settlement Order was equitably moot. *Czyzewski v. Jevic Holding Corp.* (*In re Jevic Holding Corp.*), 2014 WL 268613, at *4 (D. Del. Jan. 24, 2014), aff'd, 787 F.3d 173 (3d Cir. 2015), *rev'd and remanded*, 137 S. Ct. 973 (2017), *and vacated and remanded*, 688 F. App'x 166 (3d Cir. 2017).   Ultimately, however, the Settlement Order was reversed and remanded.   In accordance with the Supreme Court's March 22, 2017 decision, on May 9, 2017, the Third Circuit issued a Judgment Order remanding the matter to the District Court with direction to vacate this Court's judgment and remand the matter to this Court for further proceedings [A.D.I. 92].

After the matter was remanded to this Court, the Debtors, the Committee, and Defendants filed a second joint motion to approve a settlement of the Action [A.D.I. 99].  The Court denied

the motion and, on May 22, 2018, the Court converted the Debtors' bankruptcy cases from chapter

11 to chapter 7 proceedings [D.I. 1805].  The Trustee was appointed on June 5, 2018 [D.I. 1807].

IV.    **The Trustee Moves for Substitution as the Real Party-in-Interest in the Complaint and Defendants Move for Judgment on the Pleadings**

On April 12, 2019, the Trustee filed its Motion to Substitute Chapter 7 Trustee as Real

Party in Interest [A.D.I. 121] and opening brief in support [A.D.I. 122] (collectively, the "Motion

to Substitute").

On April 6, 2020, Defendants responded to the Motion to Substitute and filed separate

motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) [A.D.I. 125,

130], (the "12(c) Motions")[5] and briefs in support thereof raising substantively similar arguments

[A.D.I. 126, 132] (the "Sun Brief" and "CIT Brief," respectively).

The Trustee now respectfully submits this combined reply in support of the Motion to

Substitute and opposition to the 12(c) Motions.

## ARGUMENT

I.    **Standard of Review**

A court will grant a motion under Rule 12(c) of the Federal Rules of Civil Procedure, as

incorporated by Rule 7012 of the Federal Rules of Bankruptcy Procedure, only where the movant

establishes that "no material issue of fact remains to be resolved and that the movant is entitled to

judgment as a matter of law."  *In re Simplexity, LLC*, 2017 WL 2385404, at *1 (Bankr. D. Del.

June 1, 2017) (quoting *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008)).  "The

standard for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion to dismiss

for failure to state a claim upon which relief can be granted."  *In re Energy Future Holdings Corp.*,

546 B.R. 566, 576 (Bankr. D. Del. 2016).  "'To survive a motion to dismiss, a complaint must

---

[5]    CIT also filed a separate objection to the Motion to Substitute [A.D.I. 131].

contain sufficient factual matter, accepted as true, to "state a claim [for] relief that is plausible on its face."'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).    In making such a determination, the court "must accept the facts presented in the Complaint as true and view them in the light most favorable to the non-moving party." *In re Simplexity, LLC*, 2017 WL 2385404, at *1 (quoting *Rosenau*, 539 F.3d at 221); see also *In re TSAWD Holdings, Inc.*, 565 B.R. 292, 298 (Bankr. D. Del. 2017) (citing *Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008)).

## II.    The Trustee is the Proper Plaintiff and The Waiver in the Final DIP Order Remains Subject to Challenge

The Court should grant the Trustee's motion to substitute the Trustee as the real party in interest in the Complaint. Upon the Trustee's election, all rights and powers to pursue avoidance actions were transferred to the Trustee, and nothing in the Final DIP Order waived the avoidance actions addressed in the Complaint.

### a.    The Trustee May Directly Assert the Rights the Committee Brought Derivatively

The parties do not appear to dispute that the Trustee, upon conversion, steps into the shoes of the Debtors with respect to all rights, responsibilities, and liabilities including, without limitation, the right to bring avoidance actions. *See* CIT Br. at p. 11; *see also In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("[T]rustees and debtors in possession have a variety of statutorily created powers, known as avoidance powers, which enable them to recover property on behalf of the bankruptcy estate."); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d Cir. 2003) (holding that bankruptcy courts, as courts of equity, may confer derivative standing on a creditors' committee to pursue avoidance actions on behalf of the estate).  Rather, the Defendants' mistakenly argue that (i) the chapter 11 debtors-in-possession waived the Trustee's right to pursue the Complaint in the Final DIP Order; and (ii) that the Trustee cannot be a transferee of the Committee's interests under Rule 25(c).  The Defendants'

arguments fail because no transfer of the Committee's interests is necessary: the claims belong to the Debtors' estates and have now vested in the Trustee, and the Final DIP Order did not waive any of the claims set forth in the Complaint.[6]

Both CIT's and Sun's briefs argue that the Trustee is bound by the Debtors' prior waiver of claims in the Final DIP Order (D.I. 118), citing paragraphs 38, 39, 60 and 61 of the Final DIP Order.  However, the waivers and stipulations in those paragraphs always remained subject to the rights of parties in interest to pursue challenges during the "Investigation Period." *See* Final DIP Order ¶ 39 (noting that the binding nature of the stipulations and waivers in the Final DIP Order are subject to whether "any such challenge is timely filed" and whether such challenge is ultimately successful). Given that a challenge was timely filed during the Investigation Period, it is unclear how the Final DIP Order bars this action (or would prevent the Trustee from prosecuting a properly filed challenge).

Instead, the Defendants are attempting to use the complicated procedural history of this case to circumvent the challenge process set forth in the Final DIP Order. According to the Defendants, because the Committee was the first plaintiff to derivatively pursue estate causes of action, those causes of action became inextricably linked to the Committee. *See* Sun Br. At p. 9 ("[T]he Trustee is not the transferee of any tangible interest of the Committee. . . ."); CIT Br. at p. 17 ("[T]he Committee had no independent rights to assign."). Under their theory, a conversion to chapter 7 or creation of a liquidating trust outside of the Investigation Period would act as an

---

[6]    To the extent that the Trustee is not considered a transferee of the avoidance powers, the Trustee should still be permitted to intervene in this case under Rule 24(a)(2), given that he has a clear interest in the avoidance actions covered by the Complaint and, given the dissolution of the Committee, no party is adequately protecting those interests now.

indefeasible bar to any action against the Prepetition Lenders. Quite simply, that approach is not supported by the Final DIP Order.

The Trustee does not need to receive any rights belonging to the Committee because *the relevant causes of action belong to the estates*. The relevant transfer for purposes of Rule 25(c) is the vesting of the avoidance powers in the Trustee upon conversion. It is well established that the right to pursue the avoidance actions in the Complaint is granted to the Trustee under the Bankruptcy Code. *See* 11 U.S.C. §§ 544, 548; *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 303 (Bankr. D. Del. 2006) ("Upon conversion, the Committee will no longer exist. The chapter 7 trustee will then have the right to pursue causes of action on behalf of the estate ....").

Under the Final DIP Order, the Committee was specifically granted standing to pursue those actions derivatively (*see* Final DIP Order ¶ 39), but the Final DIP Order did not exclusively link the right to pursue a challenge to the Committee. In fact, the Final DIP Order specifically states that "*any party-in-interest,* **including a Chapter 7 . . . trustee** appointed or elected during the Investigation Period ..., shall be permitted to ... assert[] any claims or causes of action against the [Defendants] on behalf of the Debtors' estates. . . .") *Id.* (emphasis added).

The fact that the avoidance actions remain as rights of the estate is a critical distinction between this case and *In re MS55, Inc.*, which the Defendants rely upon to argue that the actions in the Complaint were extinguished alongside the Committee's dissolution. 477 F.3d 1131 (10th Cir. 2007).

In *MS55*, the Tenth Circuit noted that the financing order barred both the "Debtor's estate ... [and] debtor" from pursuing any causes of action against the secured creditors. *Id.* at 1135 (internal citations omitted). The right to bring any kind of action against the secured creditors was instead vested exclusively in the creditor's committee. *Id.* at 1136 ("Both the bankruptcy court

and district court agreed the financing order barred MSHOW from bringing an avoidance action and that the trustee was similarly barred. The only reason the bankruptcy court denied summary judgment was its conclusion that the trustee succeeded to the creditors' committee right of action."). Because the Tenth Circuit then determined that the trustee did not inherit the rights of the committee to pursue a challenge, it determined that the trustee's actions were barred. *Id.* at 1140 ("The creditors' committee claims here are derivative of the debtor because MSHOW specifically granted them to the committee in the financing agreement, so the trustee could normally bring those claims forward after conversion as in *Rachles*. But MSHOW also used the financing agreement to bar itself and, post-conversion, the trustee from taking over the reins and acting on those derivative rights.").

In other words, *MS55* does not stand for the proposition that a chapter 7 trustee may never assert claims first raised by a creditor's committee, but rather that a chapter 7 trustee is bound by the terms of the relevant financing order. The critical question is whether the Trustee here is prevented from bringing a challenge under the Final DIP Order, and the answer is no: a challenge was raised during the Investigation Period and the Trustee, as a party in interest, is a permitted party to the challenge.[7]

The situation is quite similar to that found in *In re S. Rachels, Inc.*, whose analysis the *MS55* court did not disagree with. In *S. Rachels*, the court noted that "it is entirely appropriate for

---

[7]    It should be noted that Paragraph 39 of the Final DIP Order permits any party in interest to pursue a challenge. Although the same paragraph references a chapter 7 trustee "appointed or elected during the Investigation Period," the clarification of the phrase beginning with "including" should not be read to limit the breadth of the Final DIP Order's permission for "any party-in-interest" to bring a challenge. *See DIRECTV, Inc. v. Crespin*, 224 Fed. Appx. 741(10th Cir. Mar. 16, 2007) (noting that the use of including is not typically read to be restrictive). To the extent the court reads its Final DIP Order otherwise, the Trustee believes cause exists to extend the Investigation Period solely to permit the Trustee to be an appropriate party to this litigation.

the Chapter 7 Trustee to be substituted as plaintiff in the instant adversary proceeding in the place of the Creditors' Committee which initially filed the adversary complaint on behalf of the Debtor and this estate." 131 B.R. 782, 785 (Bankr. D.N.J. 1991); *accord In re MS55, Inc.*, 477 F.3d 1131, 1140 (10th Cir. 2007) ("[T]he only rights a trustee inherits from a creditors' committee to bring an avoidance action are derivative of the debtor's rights.") (discussing *In re S. Rachels, Inc.*); *see also In re ATS Prod. Corp.*, 2003 WL 25947346, at *2 n.4 (Bankr. E.D. Pa. June 5, 2003) ("[U]pon conversion of a case from chapter 11 to chapter 7, if a trustee seeks to continue the prosecution of the case [initiated by the debtor-in-possession], he should seek substitution as party plaintiff under Fed. R. Bankr. P. 7025 (incorporating Fed.R.Civ.P. 25(c))."). *See also MS55*, 477 F.3d at 1139 ("Thus, as the trustee noted, any rights the creditors' committee has to an avoidance action are derivative of the debtor and the estate's claims. In *Rachles*, the trustee succeeded to just such derivative estate claims. **To the extent the creditors' committee had been bringing those claims on behalf of the debtor, the trustee remained free to direct the claims forward**.") (emphasis added).

Here, as discussed above, the Final DIP Order expressly contemplated that either a chapter 7 trustee or the Committee (or any other party-in-interest) could assert the Complaint's causes of action. Final DIP Order at ¶ 39. The stipulations and waivers were always subject to the rights of those parties to bring a challenge.[8] The Court should therefore grant the Trustee's motion to substitute as the real party in interest. Such a result would be no different than if the cases had converted to a chapter 7 during the investigation period and the Complaint was brought by the

---

[8]    The Defendants' argument that entry of the Final DIP Order permanently bound the Debtors, their estates and therefore the Trustee is circular: the Committee was bringing the actions derivatively; if the rights of the Debtors had already been waived, then what derivative rights existed for the Committee to assert?

Trustee instead of the Committee, which is permitted under the Final DIP Order.  To hold otherwise would allow future DIP lenders to merely wait out the investigation period and defeat timely brought causes of action by forcing the cases toward conversion.

The Committee's Complaint derivatively asserted avoidance rights of the estates. Although the Committee no longer exists, the Trustee has been vested with the right to pursue the actions directly. The Trustee is the proper party to pursue the avoidance actions, and the Court should grant the Trustee's motion for substitution.  A contrary result would create a perverse incentive for DIP lenders to steer cases toward conversion at any time after the investigation period has run to avoid liability for a properly raised complaint brought derivatively by a committee.

### b.   Sun Does Not Fall Within the Final DIP Order.

Sun's attempt to avail itself of the protections afforded by the Final DIP Order is unavailing for two reasons.  One, the Final DIP Order does not extend to Sun.  Thus, even if the Final DIP Order bars the Trustee's claims against CIT (it does not), the Trustee's avoidance actions against Sun may proceed.  Two, the Court authorized the Committee to file a derivative suit on Jevic's behalf against Sun almost seven months after the Final DIP Order.

The Final DIP Order, by its terms, does not extend to Sun.  Paragraph 39 of the Final DIP Order addresses causes of action against "the Prepetition Agent and/or the Prepetition Lenders…." Final DIP Order ¶ 39.  Those terms are defined in the Final DIP Order as "certain lenders and lienholders party [to the Prepetition Senior Credit Agreement] (collectively, the 'Prepetition Lenders') and CIT, as agent (the 'Prepetition Agent')."  *Id.* ¶ 6.  The parties agree that Sun is neither a Prepetition Lender nor a Prepetition Agent.  Instead, Sun argues that it is entitled to subrogate to the rights of CIT.  This argument fails for the multiple reasons, each of which the Trustee details below.  *See infra*, Combined Br. at Argument, Sect. III(d)(i).

As further evidence that the Final DIP Order is inapplicable to Sun, seven months after the Court entered the Final DIP Order, the Debtors and the Committee entered into the Order Approving Stipulation and Order Authorizing Official Committee of Unsecured Creditors to Commence Litigation Against (1) Sun Capital IV LP and Its Affiliates and (2) the Debtors' Present and Former Officers ("Sun Stipulation").  [D.I. 434].  The Sun Stipulation authorized—with no limitations—the Committee "to assert, on behalf of the Debtors' estates, any and all claims of the Debtors' estates against Sun…."  [D.I. 434-1 at ¶ 2]  The Amended Complaint was filed over a year later.  [A.D.I. 17].  The Sun Stipulation makes clear that the Committee, and therefore the Complaint, was pursuing claims against Sun derivatively on behalf of the Debtors' estates.  Those claims have therefore reverted to the Trustee upon conversion as discussed above.

For these reasons, Sun's opposition to the Motion to Substitute must be denied.

## III.    The Pleadings Show the Inapplicability of the 546(e) Safe Harbor to the Targeted Transactions.

Defendants cannot avail themselves of the 546(e) Safe Harbor and the pleadings certainly do not support dismissal at this stage based on 546(e).  This argument fails for four reasons.  First, the 546(e) Safe Harbor does not apply to counts alleging actual fraud. Second, Sun waived the 546(e) Safe Harbor defense, as it was not pled in its answer, filed almost a decade ago.  These initial, straightforward points dispense with much of the scope of the Defendants' motions. Third, the actual transfers that the Complaints seek to avoid are not related to a security transaction in the manner necessary to trigger the 546(e) Safe Harbor.  Fourth, Sun is not an entity covered by the 546(e) Safe Harbor.   Each argument is detailed below.

### a.    The 546(e) Safe Harbor Defense Does Not Apply to Claims of Actual Fraud.

Intentional transfers aimed at hindering, delaying or defrauding creditors, do not fall within the 546(e) Safe Harbor.  Congress broadened the scope of the § 546(e) Safe Harbor several times,

16

but it does not reach claims for actual fraud under bankruptcy or state law.  *See generally* 5 Collier

on Bankr. ¶ 546.06[1].[9]

§ 548(a)(1)(A), Actual Fraud.  The statutory language in 11 U.S.C. § 546(e) is explicit:  the

546(e) Safe Harbor does not apply to claims of actual fraud brought under 11 U.S.C. §

548(a)(1)(A). The Second Amended Complaint pleads 32 avoidance actions.  Of those, seven are

based on section 548(a)(1)(A).  *See* Second Amended Compl. at Counts 1, 2, 13, 14, 15, 16, and

17.  By the plain language of section 546(e), the safe harbor does not apply to these counts. *See* 11

U.S.C. § 546(e). Therefore, the motion for judgment on the pleadings based on the 546(e) Safe

Harbor should be denied for all such counts.

§ 544(b), State Law Claims for Actual Fraud.  Congress clearly intended to prevent

participants in intentional fraud from taking advantage of the 546(e) Safe Harbor. That same policy

and reasoning should apply to identical claims for actual fraud brought under state law pursuant to

section 544(b).  *See* 11 U.S.C. § 546(e).  Indeed, courts in this district have recognized that

"Delaware's Section 1304(a)(1) hold the same requirements as § 548(a)(1)(A) [and] [t]he pleading

requirements for both the state and federal claims are identical."  *In re PennySaver USA Publ'g,*

---

[9]     The same policy considerations for excluding actually fraudulent transactions from the
546(e) Safe Harbor should also be considered in light of the Court's prior finding that the
Complaint adequately alleges facts to support the collapsing doctrine and rejecting CIT's
argument that the Complaint fails to "allege bad faith or an intent to defraud Jevic's
creditors."  *In re Jevic Holding Corp.*, 2011 WL 4345204, at *6 (noting, among other
things, that the Complaint alleges collusion between Sun and CIT and that "the Refinancing
Facility … was the result of a collaborative and calculated effort by Sun and CIT to render
unrealistically high asset valuations and revenue projections for Jevic with an eye towards
obtaining the highest possible loan package.").  Similar to the defendants' strategic use of
the statute of limitations to avoid fraudulent conveyance liability prohibited by the court in
*Tronox*, here "Defendants' view of [546(e) Safe Harbor] law would permit a shrewd and
unscrupulous enterprise to," over-encumber Debtors' assets and divest it of valuable real
estate assets solely for the benefit of Defendants while simultaneously providing no benefit
to the Debtors. *See In re Tronox Inc.*, 503 B.R. 239, 271 (Bankr. S.D.N.Y. 2013).

*LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019).  The state-codified "badges of fraud" are similarly "incorporated through case law into § 548." *Id.* (citing cases).  This Court should therefore find that the 546(e) Safe Harbor is similarly inapplicable to actual fraud claims under § 544(b) as identical claims under § 548(a)(1)(A).  *See Physiotherapy*, 2016 WL 3611831 at *9 (holding that section 546(e) did not bar litigation trust from asserting state law fraudulent transfer claims brought on behalf of creditors because (i) allowing such claims to proceed would not have a "destabilizing effect on the financial markets Congress sought to protect," (ii) payment was received by the transferees for private securities and (iii) transferees were insiders alleged to have acted in bad faith).

Although the Court's holding in *Physiotherapy* was specific to creditors' claims transferred to a litigation trust, the same rationale applied to limit the reach of the 546(e) Safe Harbor applies here.  Here, as in like *Physiotherapy*, there is are no possible "ripple effects" to the securities markets because, the transferees received payment for non-public securities, and the transferees were corporate insiders that acted in bad faith.  As to the last element, there is no dispute that after the Bridge Loan, Sun took over total control of Jevic.  See *id*. at *7-8; *see also In re Physiotherapy Holdings, Inc*., No. AP 15-51238-KG, 2017 WL 6524524, at *10 (D. Del. Dec. 21, 2017) (denying motion for leave for interlocutory appeal and noting that "[b]ecause the transfers here were to corporate insiders, systemic risk concerns were not at issue.").  The Complaint pleads that four weeks after the Acquisition, Sun forced Jevic to re-finance its debt by leveraging all of its assets to the greatest extent possible, with the financing provided by CIT.  And Jevic was in breach almost immediately.  Within months, Sun—through its control of Jevic—caused the company to enter into the Sale-Leasebacks.  All of the money from the Sale-Leasebacks went to the Defendants in a continuation of their scheme to eliminate their risk by siphoning away Jevic's funds and

prioritizing liens to the detriment of other creditors.  This is precisely the type of transferee bad faith that fraudulent avoidance law was meant to address and which the 546(e) Safe Harbor is not meant to reach.

The State statutory claims for actual fraud do not fall within the 546(e) Safe Harbor and the Motion must be denied.

### b. Sun Failed to Plead the 546(e) Safe Harbor And Therefore Waived the Defense.

Sun waived its 546(e) Safe Harbor defense when it answered the Second Amended Complaint almost a decade ago.  Sun's Answer filled up 114 pages and summarily pled eleven affirmative defenses that nearly cover the gamut of cognizable defenses.  *See* Sun Answer at 112-14 (pleading affirmative defenses).  But it did not plead a defense under the 546(e) Safe Harbor. *See generally id.*  There can be no dispute:  the 546(e) Safe Harbor is an affirmative defense.  *See In re Tronox Inc.*, 503 B.R. 239, 339 (Bankr. S.D.N.Y. 2013) ("[Section] 546(e) is a classic affirmative defense …. Cases construing § 546(e) have uniformly treated it as an affirmative defense.") (collecting cases); *see also In re The IT Grp., Inc.*, 359 B.R. 97, 99 (Bankr. D. Del. 2006) (finding that party asserting 546(e) safe harbor had the burden of proof because "[a] movant asserting ***an affirmative defense*** in a summary judgment motion has the burden of proof on that defense") (emphasis added).

A party must "affirmatively state any…affirmative defense…" in responding to a complaint.  Fed. R. Civ. P. 8(c)(1); *see also* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading….").  Sun waived the defense when it failed to plead the 546(e) Safe Harbor affirmative defense—almost ten years ago—when it answered the Second Amended Complaint.  *See In re Tronox Inc.*, 503 B.R. 239, 339-41 (Bankr.

S.D.N.Y. 2013) (holding that party waived 546(e) defense by failing to raise it in the answer and further denying motion to amend answer filed years earlier).

Thus, Sun waived its 546(e) Safe Harbor defense and its 12(c) Motion must be denied.

### c. The 546(e) Safe Harbor Does Not Cover the Targeted Transactions when Considered as a Collapsed Transaction.

Sections 544 through 553 of the Bankruptcy Code affords trustees the authority to "set aside certain types of transfers … and … recapture the value of those avoided transfers for the benefit of the estate." *Merit Mgmt.*, 138 S. Ct. 883 at 888 (internal citations omitted). The 546(e) Safe Harbor operates as a "limit to the general avoiding powers…" for transfers by a financial institutions made as part of a "settlement payment" or "securities contract…." *Id.* 546(e) states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

The original purpose of the statute was to "protect commodities clearing agencies from massive liability based on the theory that avoidance of margin payments could present significant systemic risk in the derivative markets" and to protect securities settlement and clearing process from "systemic risk." *Physiotherapy*, 2016 WL 3611831, at *7; Brubaker, Understanding the Scope of the § 546(e) Securities Safe Harbor Through the Concept of the "Transfer" Sought To Be Avoided, 37 Bkrtcy. L. Letter 11–12 (July 2017). As shown below, the Defendants seek to extend 546(e) Safe Harbor further than the statute permits.

### i.  For the Motion, LBO Transactions Have Been Collapsed.

This Court has already ruled—for pleading stage motion practice—the Second Amended Complaint pleads sufficient facts to collapse the LBO Transactions.  *See In re Jevic Holding Corp.*, 2011 WL 4345204, at *7 (Bankr. D. Del. Sept. 15, 2011) ("The Court is satisfied that the Committee has sufficiently pleaded that there is cause to collapse the series of transactions which are allegedly comprised in the Jevic LBO.").  As discussed below, this ruling disposes of the 12(c) Motions.  Defendants now ask the Court to reconsider that ruling.  But the Defendants do so without identifying any "manifest errors of law or fact" or "newly discovered evidence."  *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  Defendants also missed the deadline for reconsideration by roughly ten years.  *In re J & M, Inc.*, 2020 WL 1237914, at *2 (Bankr. D. Del. Mar. 13, 2020) (party has 14 days to file a motion for reconsideration).

This Court has already held that the Complaint adequately pleads that cause exists to collapse the LBO Transactions including that (1) "CIT, Sun, Bank of Montreal, and Jevic were all apprised of the … separate transactions in which the various parties were involved;" (2) "[a]ssuming the veracity of the Committee's assertions …, the Committee could establish that CIT had sufficient knowledge and notice;" (3) "the various transactions constituting the [LBO Transactions] would not have occurred independently of each other;" and (4) "the Committee has provided enough facts from which the Court could reasonably infer the common aim of these transactions."  *In re Jevic Holding Corp.*, 2011 WL 4345204, at *7.

Defendants belated reconsideration request should be denied, and the Court should uphold its well-reasoned ruling that the LBO Transactions can be collapsed for this Motion based on the reasons set forth in its early opinion.

### ii.  The Targeted Transactions Are Not Subject to the 546(e) Safe Harbor.

21

Defendants' papers relegate to a footnote one of the most fundamental—and fatal—flaws in their request that the Court apply the 546(e) Safe Harbor:  the inapplicability of the 546(e) Safe Harbor to a multi-step, collapsed transaction like the one at hand.  *See* Sun Br. at p. 25 n.6.  When the thrust of the avoidance action focuses on transactions other than the actual securities acquisition, the 546(e) Safe Harbor does not apply. *See In re Mervyn's Hldg.'s, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010).

The *Mervyn's* Opinion.  In *Mervyn's*, defendant Target conveyed its ownership interest in debtor Mervyn's LLC ("Mervyn's") in a transaction structured by a group of three private equity firms.  The private equity firms formed Mervyn's Holdings ("Holdings"), which bought the ownership interest in Mervyn's.  The transaction involved multiple steps, including the use of Mervyn's valuable real estate assets to securitize and fund the transaction followed by the sale and leaseback of those same real estate assets, all of which the Court ultimate collapsed into one.  The *Mervyn's* Court explained that the collapsed transaction included "execution of the Agreement [to purchase Mervyn's], the stripping of the real estate assets, and the leases, into a single conveyance…" to look at the "overall economic consequences." *Id.* at 497.

*Mervyn's* then held that the 546(e) Safe Harbor did not protect the collapsed transaction. In so ruling, the Court found that "as a general rule, section 546(e) does not apply to collapsed transactions…," then used the facts and circumstances of *Mervyn's* to show why.  *Id.* at 500. [10] The 546(e) Safe Harbor reaches "transfer[s] of cash or securities made to complete a securities

---

[10]     CIT cites *Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)* for the proposition that the 546(e) Safe Harbor applies to collapsed LBO transactions. *See* CIT Br. at p. 21. However, *Hechinger* does not discuss the collapsing doctrine with respect to 546(e) but rather with respect to fiduciary duty claims. *See* 274 B.R. 71 (D. Del. 2002) (relying on the binding Third Circuit precedent of *Lowenschuss v. Resorts Int'l., Inc.* to apply the 546(e) Safe Harbor).

transaction." *Id.* at 499.  So, the court reasoned that even though "'settlement payments' include non-publicly traded securities, section 546(e) does not apply to the other transactions surrounding the sale [in *Mervyn's*] because they do not fall within the … definition of 'settlement payment.'" *Id.* at 500.  The Court then found that multiple steps of the collapsed transaction were not securities transactions nor were the payments made for a securities transaction.  *Id.*  For example, the 546(e) Safe Harbor did not apply to the use of Mervyn's real estate to securitize and obtain financing to close the company's sale, nor did the sale and leaseback of Mervyn's real estate assets to service the acquisition debt, and funnel monies back to the purchasers, constitute a "securities transaction." *Id.* ("[Defendant's] attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive ... The other transactions to this sale do not fall within the parameters of section 546(e).")

The reason that the *Mervyn's* Court declined to apply the 546(e) Safe Harbor defense applies with even greater force here.  The Second Amended Complaint pleads facts showing that Defendants used overly aggressive projections to leverage Sun's assets to the greatest extent possible, Sun used the Debtors' assets to pay the purchase price, Jevic was in immediate default and financial distress following the Refinancing Facility, and the Debtors were facing a liquidity crisis at the time of the Sale-Leasebacks and could not feasibly take on more debt—but Defendants, for their benefit only, forced the sale of the Debtors' valuable real estate.  Like in *Mervyn's*, the complaint and collapsed LBO transaction deals with transactions far removed from settlement payments that implicate the systemic validity of the securities market. Instead, the challenged transfers in the Complaint revolve around the Sale-Leasebacks, the over-leveraged nature of the Refinancing Facility, and the overall conduct of the Defendants in stripping value of the Debtors, nearly all of which occurred well after the actual equity acquisition was completed. As with the

*Mervyn's* court's holding, CIT and Sun should not be able to shield their conduct because there was a settlement payment involved in the complicated LBO scheme.

<u>Post-*Mervyn's* Decisions Strengthen the Trustee's Position.</u> *Mervyn's* disposes of the Defendants' 546(e) Safe Harbor arguments.  Knowing that, Defendants argue that Mervyn's was overturned by *Giuliano v. Schnabel, et al. (In re DSI Renal Holdings, LLC)*, 2020 WL 1509447 (Bankr. D. Del. 2020) ("<u>*Schnabel*</u>") and is therefore no longer good law.  Defendants are wrong. *Schnabel* bases its analysis on the Supreme Court's decision in *Merit Management*, which in turn is consistent with the ruling in *Mervyn's*.  All three cases support the Trustee's position that the 546(e) Safe Harbor is inapplicable to this case.

Similar to how the *Mervyn's* court looked to the overall economic consequences of the LBO transactions, the Court in *Schnabel* looked at the "relevant transfer" under *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.* (138 S. Ct. 883 (2018)) and determined that the ultimate transfer attacked by the trustee was "those transfers of CDSI I stock made to the Defendants in the Restructuring." *Id.* at *8.

In *Merit Management*, the U.S. Supreme Court severely curtailed the scope of transferee protections provided by 546(e) Safe Harbor by requiring courts to look at the actual transfers being targeted by the avoidance actions.  The Court held that to determine the applicability of the 546(e) Safe Harbor, only the "relevant" or "overarching" transfer must be analyzed.  *Merit Management*, 138 S. Ct. at 888 (finding that the involvement of financial institutions as conduits did not trigger the 546(e) Safe Harbor when the avoidance action was targeting a transfer that ultimately did not involve those institutions).  In *Merit Management*, Merit asked the Supreme Court to find that courts "should look not only to the … end-to-end transfer, but also to all its component parts…[including] the transmission of the $16.5 million from Credit Suisse…and two transactions

by Citizens Bank to Merit….” *Id.* at 892.  The Supreme Court rejected Merit's argument holding that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid." *Id.* at 893.

The *Schnabel* Court held, and the plaintiff trustee did not dispute, that the relevant, "overarching" transfer to be avoided was a stock sale—a textbook example of a securities transaction.[11]  *Schnabel* did not involve multiple real estate transactions, a sale-leaseback of real property, a leveraged buyout, nor the existence of a series of self-interested transactions to repay Defendants at the expense of a cash-strapped, insolvent company.  Thus, *Schnabel* is of limited relevance here beyond its support for the proposition that the initial step in analyzing 546(e) is to identify the targeted transactions.

The Overarching Transaction.  Under *Merit Management*, the overarching transfer that the Trustee seeks to avoid is a collapsed, leveraged buyout that included "multiple conveyances...," and the transfer of "real estate assets…."  *Mervyn's*, 426 B.R. 488 at 500.  The 546(e) Safe Harbor does not apply to collapsed transactions, like those the Trustee seeks to avoid here, which are well beyond the definition of "settlement payment" and do not implicate systemic risk to the securities market.  *See id.*  Because the targeted transfers fall outside the scope of 546(e), the Defendants' motions based on the Safe Harbor must be denied.

Evaluation of Each Transfer Also Shows Inapplicability of 546(e) Safe Harbor.  Even if the Court evaluates each avoidable transfer separately, the 546(e) Safe Harbor does not apply.

---

[11]    Defendants also cite *Crescent Resources Litig. Trust es rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013) in support of this argument.  But this nonbinding, out-of-circuit opinion involved a claim to avoid a transaction through which money was exchanged for "a 49% stake in Crescent Holdings…for approximately $414 million." *Id.* at 476.  All the cases cited by the Defendants here, with the exception of *Mervyn's*, involved "obviously … common securities transactions…" and are of little utility.  *In re National Forge Co.*, 344 B.R. 340, 360 (W.D. Pa. 2006) (discussing Third Circuit cases).

Defendants gloss over the fact that the "overarching transfer[s]" are not the purchase of shares from Jevic shareholders, but the fraudulent and one-sided loan and real estate transactions— orchestrated by Sun, an insider—as well as the millions-of-dollars the Defendants received in fees. The LBO Transactions consist of loan and real estate transactions that do not involve a securities contract.  Thus, even if the Court evaluates the different components of the LBO Transactions, the 546(e) Safe Harbor does not apply.

Fact-Intensive Evaluation.  Finally, it is critical to place this analysis within the procedural context: the Defendants are seeking judgment on the pleadings. Based on the pleadings, and given the Court's prior rulings in this case, the Defendants simply have not met their burden. The allegations contained within the four-corners of the pleadings are not sufficient to clearly establish application of the 546(e) Safe Harbor affirmative defense.  Determining the applicability of the 546(e) Safe Harbor requires a "[c]lose inspection of the plain text of each agreement" and a factually-intensive evaluation of each specific transfer.  *In re Lehman Bros. Hldg.'s Inc.*, 469 B.R. 415, 438 (S.D.N.Y. 2012).  And, for that reason alone, the Defendants' Motion must be denied.

### d. The 546(e) Safe Harbor Does Not Apply Because Sun Is Not the Type of Entity Covered by the 546(e) Safe Harbor.

Before discussing the merits of Sun's arguments regarding its entitlement to the 546(e) Safe Harbor, the Trustee objects to Sun's use of tax returns attached as an exhibit to the Opposition in support of its argument that it constitutes a "financial participant."  The Trustee does not agree that Sun has properly requested judicial notice of its tax returns; moreover, the Trustee disagrees with the implied assertion by Sun that the accuracy of its tax returns cannot be reasonably questioned.[12]  In this second round of initial dispositive briefing, occurring almost a decade after

---

[12]    The cases cited by Sun where courts took judicial notice of tax returns did not use the tax returns as evidence of the information summarized by those returns but rather as evidence

the first, Sun is limited to what falls within the four-corners of the Second Amended Complaint,

unless some exception applies.  As in the *Mervyn's* case, a moving defendant can only rely on a

document at this stage if it is "is integral or explicitly relied upon in the complaint…" or the "courts

may take judicial notice of public records ….."  *Mervyn's* ˏ426 B.R. 488 at 496.  The Court may

not "consider the truth of the information in the records."  *Id.*  Thus, the tax returns attached to

Sun's brief do not fall within either category and cannot be considered at this stage in ruling on

the Motion.

This leads to the key issue in the Defendants' motion for summary on the pleadings: the

question of whether Defendants are financial institutions or participants under § 546(e) is a deeply

factual inquiry, which is not ripe for determination.  *See In re DBSI, Inc.*, 477 B.R. 504, 515-16

(Bankr. D. Del. 2012) (noting that "application of the [546(e)] defense is a fact-based inquiry,"

and declining decide whether defense applied on motion to dismiss where it was not clear from

the face of the complaint that party met the definition of "stockbroker" or that transaction was a

"settlement payment").  As discussed in more detail below, Sun has failed to establish that it falls

within the scope of 546(e) and its motion should be denied.

### i.  The transfers involving just Sun do not fall within the 546(e) Safe Harbor because they were not "made by or to" a protected securities market intermediary.

Sun appears to base most of its argument that it is protected by 546(e) on the theory that it

is a financial participant under 11 U.S.C. § 101(22A). *See* Sun Br. at p. 21. However, even if the

---

of statements made by or actions taken by the filing entity. *See In re Thomas*, No. 10-38306 MER, 2013 WL 6840527, at *4 & n.20 (Bankr. D. Colo. Dec. 27, 2013) (using tax returns to evaluate veil piercing claims based on how defendants accounted for expenses); *Nord Serv., Inc. v. Palter*, 548 F. Supp. 2d 366, 369 (E.D. Tex. 2008) (franchise tax returns controlled how many shares of common stock corporation could issue and identified certain officers and directors).

proffered tax returns are taken at face value—which, as noted above, the Trustee objects to at this stage of the proceeding—they only relate to Sun Capital Partners IV, LP. The definition of "financial participant" does not extend to affiliates or subsidiaries and therefore does little to satisfy the requirements of the 546(e) Safe Harbor for the other Sun entities included in the Complaint. Indeed, in order for the 546(e) Safe Harbor to be relevant, Sun would need to track each targeted transfer, establish how the transfer implicated both (i) a transfer to or from an enumerated securities market intermediary and (ii) a protected settlement payment or was in connection with an enumerated securities contract. Given that 546(e) acts as an affirmative defense, *see infra* III.b, Sun has not met its burden to show that 546(e) justifies dismissal at this stage.

Likewise, any argument that any Defendant (or any Debtors) is a customer of a financial institution would require a factual inquiry into which transfers involved which entities and whether a financial institution was acting as an agent for that entity. *See In re Tribune Co. Fraudulent Conveyance Litigation*, No. 13-3875-CV, 2019 WL 6971499, at *9 (2d Cir. Dec. 19, 2019) ("Tribune III"). Again, given the current procedural posture, that requirement prevents the Sun from carrying its burden on its 546(e) Safe Harbor defense.

### ii. Sun cannot subrogate into the 546(e) Safe Harbor or the Challenge Bar in the Final DIP Order.

Sun is not a "financial institution" under § 546(e). The parties do not dispute that. Likewise, it would take a detailed factual inquiry to evaluate the other avenues Sun argues justifies application of the 546(e) Safe Harbor to the transfers targeting Sun. However, Sun also seeks the protections afforded to financial institutions by arguing that it is "subrogated to CIT's position as a result of the Guaranty." Sun Br. at ¶ 59. Likewise, Sun argues that it is shielded from all claims

due to its subrogation rights in the Financing Agreement. These arguments simply misunderstand how subrogation works.

According to Sun (without any references to specific allegations in the Complaint supporting the existence of such payments), because of payments it made under the Guaranty, it has inherited the defenses and rights of CIT and the other lenders under the Financing Agreement to the extent set forth in the Guaranty.[13] Sun Br. at p. 5. From there, Sun makes the extraordinary claim that subrogation entitles it to all defenses available to CIT, *even in circumstances unrelated to the rights under the Financing Agreement*.

As noted in the cases cited by Sun, "[s]ubrogation itself is not unusual; in general terms, it 'simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party.'" *In re Frescati Shipping Co., Ltd.*, 886 F.3d 291, 309 (3d Cir. 2018). For example, if an insurer paid its customer for damages caused by a third party, the insurer is subrogated to the rights of the insured and may pursue the third party with the same rights as the insured. *See id.* But those rights are limited to the capacity in which the subrogee is subrogated; the functional effect of this kind of contractual subrogation is no different than if the subrogor had assigned a portion of its rights to the subrogee. That is why, in *Frescati Shipping Co.*, the defendant was not able to assert its equitable recoupment defense against the United States: the parties were limited to the rights contained within the roles they had assumed and, even though equitable recoupment was a valid argument against the United States

---

[13] The Guaranty is not attached to the Complaint, so for the purposes of this brief, the Trustee assumes that Sun is correct in its description of its rights under the Guaranty and that payments were actually made under the Guaranty. However, given that Sun is moving for dismissal on the pleadings, the failure to attach the Guaranty and a lack of supporting allegations on underlying payments should be fatal to its argument.

in its capacity as the federal government, the United States was appearing only in its capacity as subrogee. *See id.* at 309-10.

Here, assuming that Sun actually has a subrogation right, Sun only inherits the rights and defenses available to CIT to the extent they relate to Sun's rights as subrogee.  So, to the extent the Prepetition Lenders' rights in the Financing Agreement are affected by the Complaint, Sun may assert the defenses available to such lenders under the Financing Agreement. But, just as the arguments against the United States in *Fescati Shipping Co.* were limited to the specific capacity in which the United States was involved in the litigation, Sun cannot use subrogation rights related to the Financing Agreement in order to protect its actions as an insider and equity holder of the Debtors.

Considered another way, under Sun's theory of subrogation, any party-in-interest concerned about potential avoidance liability could simply purchase a small portion of a prepetition loan after the relevant investigation period had ended in order to "inherit" the protections of the challenge bar and avoid all liability whatsoever. Clearly, that is not how an assignment of interests works and it is not how subrogation works.

Quite simply, (i) there are no facts pled within the Complaint showing that Sun meets the requirements of a subrogee and (ii) even if Sun has rights under the Financing Agreement, that does not create any additional defenses for Sun for conduct unrelated to the rights of the lenders in the Financing Agreement.   There is no basis at this early stage to rule that Sun is entitled to subrogation, let alone that such subrogation rights are so fully proven as to justify dismissal on a motion on the pleadings.

IV.    **The Court Has Already Held that the Complaint Adequately Alleges Lack of Reasonably Equivalent Value.**

CIT argues that the Complaint has "pled itself out of court" because it recognizes that there was a nominal debt forgiveness at one stage of the LBO scheme. *See* CIT Brief at 31-33.  However, CIT once again fails to acknowledge that LBO Transactions should be collapsed and viewed holistically, with each individual transaction analyzed in light of the overarching scheme to transfer value to equity and shift risk onto unsecured creditors.  The allegations that CIT focuses on have always been part of the Complaint (even prior to its amendments), and this court has already acknowledged that, at least for pleading purposes, the Complaint adequately alleges the elements necessary to collapse the LBO Transactions. *Compare* CIT Br. at p. 32-33 (citing Compl. ¶¶ 47-48, 80), *with* Original Compl. [A.D.I. 1] at ¶¶ 42-43, 75 (providing substantively similar allegations). As such, CIT's argument fails again, for the same reason its argument regarding lack of reasonably equivalent value failed in the prior Motion to Dismiss.

Although the Trustee sets forth arguments below regarding the reasonably equivalent value issue, this Court's prior ruling should be dispositive: CIT has already made this argument in this litigation based on this Complaint and lost. It should not be permitted to re-raise this issue now. Indeed, other courts in this Circuit have applied law of the case to preclude arguments that were previously decided on a motion to dismiss.  *See In re Florimonte*, 599 B.R. 497, 504 (Bankr. M.D. Pa. 2019) (holding that prior decision on motion to dismiss was law of the case and denying *pro se* debtor's post-answer motion to dismiss (interpreted by the court as a motion for judgment on the pleadings) with prejudice on "substantively identical" counts).

In order to determine whether a party has received reasonably equivalent value, courts will perform "a two-part inquiry: (i) 'whether the debtor received any value [for the transfer] at all,' and (ii) if so, whether that value was 'reasonably equivalent' to the value of the transfer." *In re*

31

*Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *5 (Bankr. D. Del. Feb. 28, 2019) (quoting *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 149, 152 (3d Cir. 1996)). In order to survive the 12(c) Motion, the Complaint merely needs to plausibly set forth allegations that the LBO Transactions as a whole removed value from the Debtors.

When the components of the LBO Transactions are collapsed, the Court looks at the overarching transaction and not just a single component of the Bridge Loan as CIT suggests. *See In re Mervyn's Holdings, LLC*, 426 B.R. 488, 500 (Bankr. D. Del. 2010); *see also In re Chas. P. Young Co.*, 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992) ("Regardless of the number of steps taken to complete a transfer of debtor's property . . . if they reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange, the transaction will not be exempt from the Code's avoidance sections."). As this Court previously observed in deciding the Motion to Dismiss, the overarching principle is the "overall intent" of the parties to the transaction and the "substance" and "impact" of their arrangements, not the "form" of the individual components. *Jevic*, 2011 WL 4345204, at *5; *see also In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *6 ("In other words, the court focuses on the overall financial consequences of the transactions and how they impact creditors.").

CIT, mistakenly focusing solely on the Acquisition, argues that a lack of reasonably equivalent value cannot be proved because the Complaint "indirectly … acknowledges that Jevic received the cancellation of $53.259 million in [intercompany] debt … in exchange for the $41.3 million paid" as part of the Bridge Loan. However, as the Court determined on CIT's Motion to Dismiss, "CIT's argument does not take into account the [Complaint's] argument that when the transactions relating to the Jevic LBO are collapsed, the aggregate value of the obligation incurred

and the transfers made by Jevic exceeds and is therefore not reasonably equivalent to the aggregate value that CIT provided to Jevic in return." *In re Jevic Holding Corp.*, 2011 WL 4345204, at *9. Indeed, viewed as a whole, the purported cancellation of approximately $53 million in intercompany debt is far less than the value transferred to CIT in the LBO Transactions including securing more than $100 million of debt with the Debtors' collateral and the sale of $20 million in valuable real estate assets.

The Court should therefore hold that the Complaint sufficiently alleges facts supporting that any cancellation of intercompany debt failed to provide reasonably equivalent value to the Debtors in exchange for the accumulated value the Debtors transferred to CIT in the LBO Transactions.

## V.    The Complaint Adequately Alleges Equitable Subordination.

The Complaint pleads facts showing that the Defendants engaged in inequitable conduct that both (i) injured creditors of Jevic and (ii) conferred an unfair advantage to the Defendants.  In the *Jevic* opinion, this Court found that the now-replaced First Amended Complaint only set forth "sparse allegations" to support Jevic's claims for equitable subordination.  The Complaint accepted that feedback and pled a number of additional facts showing the existence of each element of the claim.

Proof of three elements is required to establish equitable subordination:  "(1) the defendant engaged in some type of inequitable conduct; (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (3) equitable subordination of the claim is consistent with bankruptcy law." *In re Jevic Holding Corp.*, 2011 WL 4345204 at *14 (citation omitted).  As this Court noted earlier, "[t]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." *Id.*  An insider includes

33

both a party that "(1) meets the statutory definition of insider, or (2) [is] in a close relationship

with the debtor to such an extent as to suggest transactions were not conducted at arm's length."

*Official Unsecured Creditors' Com. Of Broadstripe, LLC v. Highland Cap. Management, L.P. (In

re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010).

But the claim is not limited to only insiders.  Instead, for "an outsider" the plaintiff must

plead facts suggesting that the defendant engaged in "fraud, spoliation or overreaching…." *Id.*  To

the extent that a complaint alleges that the outsider defendant perpetrated a "masquerade" or

deception on the debtor or other creditors. *See In re Lifschultz Fast Freight*, 132 F.3d 399 (7th Cir.

1997).  Determination of whether a party engaged in this type of conduct is a highly factual inquiry,

which can rarely be resolved on a motion to dismiss.  *See In re Autobacs Strauss, Inc.*, 473 B.R.

525, 583 (Bankr. D. Del. 2012) ("[C]ourts recognize that determining whether a creditor's claim

should be subordinated is a fact-intensive inquiry which should not necessarily be determined on

a motion to dismiss."); *see also In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *19

(Bankr. D. Del. Aug. 31, 2015) (same) (citing *In re Autobacs Strauss, Inc.*).

Here, the Complaint sets forth a number of allegations against CIT which suggest that

either CIT was, for purposes of an equitable subordination analysis, an insider: according to the

complaint, the entire LBO Transaction was orchestrated with the knowledge and active assistance

of CIT. Compl. At ¶¶ 50 (CIT was involved with the planned LBO from the beginning and

provided informal assurances regarding its financial support of the initial acquisition); 70 (CIT

knew existing models would not support syndication of the loan); 73 (CIT used "Enhanced

Projections" that were substantively similar to the previous upside projections), 111 (the Sale-

Leasebacks were part of Sun's scheme from the beginning), 112 (CIT participated in forcing the

Sale-Leasebacks), 150 (CIT was an integral part of the entire LBO Transaction and actively

participated throughout the process, even before it had an actual lending relationship with the Debtors). The Complaint alleges that, absent CIT's active collaboration with Sun, the fraudulent transfers could not have occurred. Given the hand-in-hand nature of the Sun/CIT relationship alleged in the Complaint, the Complaint adequately alleges that CIT did not operate at arms' length with the Debtors and should be considered an insider. Given that these allegations suggest that CIT leveraged that cozy position with Sun to protect its interests (to the detriment of other creditors) and to secure fees and repayment of obligations owing by Sun, the Complaint adequately alleges inequitable conduct.

Even viewing CIT as an outsider, its actions represent an overreach by a lender and a masquerade that enabled Sun and CIT to strip value from the Debtors: the Complaint alleges that, to its borrowers' detriment, CIT worked with Sun to syndicate a loan that was not supported by the Debtors' performance or realistic projections. Compl. ¶ 73. It leveraged its relationship with Sun to force the Debtors to accept unrealistic financial covenants, which inevitably (and nearly immediately) resulted in a default that enabled CIT to extract fees and repayments beyond the original intent of the financing, eventually forcing the Sale-Leasebacks and leaving the Debtors undercapitalized. Compl. ¶¶ 88-90, 98-101, 107. This overreach harmed other creditors and is the exact type of inappropriate lender behavior that inequitable subordination was designed to limit.

As for Sun, the Complaint adequately pleaded that it used its position as an insider following the Acquisition to carry out a series of self-serving transactions that enriched itself and CIT at the expense of Jevic. Following the Acquisition, Sun—through its wholly owned subsidiary—owned a majority of the outstanding securities in Jevic. Additionally, there can be no dispute that the self-serving LBO Transactions, none of which benefited Jevic nor its stakeholders, were the product of arm's-length transactions. Based on this, the Motion must be denied. *See In*

*re Autobacs Strauss, Inc.*, 473 B.R. 525, 582 (Bankr. D. Del. 2012) ("A party may be found to constitute an 'insider' for purposes of equitable subordination if the party either (i) meets the statutory definition of insider, or (ii)[is] in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's-length."); *see also In re Green Field Energy ervs., Inc.*, 2015 WL 5146161 at *18-19.

Turning to CIT, it engaged in inequitable conduct that resulted in the diversion of assets away from the estate, thus conferring an unfair advantage to itself. As discussed in detail above, the Complaint details that CIT actively assisted Sun in its acquisition of Jevic. This Court—before the substantially bolstered Second Amended Complaint was filed—already held that Jevic sufficiently pled facts suggesting that the CIT colluded with Sun, an insider, to carry out the LBO Transactions, whose loan proceeds provided no benefit to the borrower, rendered the company insolvent, and left its creditors responsible for the Defendants' failed gamble. The additional details clearly lay out the inequitable conduct and justify permitting the equitable subordination claims to proceed.

## VI.    The Defendants Should be Judicially Estopped from Arguing that Settlement Contributions Should be Returned.

The Defendants should be barred from arguing that their settlement contributions should be returned before the Trustee can pursue claims against the Defendants. *See* Sun Brief at ¶¶ 73-77; CIT Brief at 19-20.

"Three requirements must be met before a district court may properly apply judicial estoppel. First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. … Second, judicial estoppel is unwarranted unless the party changed his or her position "in bad faith—i.e., with intent to play fast and loose with the court." … Finally, a district court may not employ judicial estoppel unless it is "'tailored to address the harm identified'" and

36

no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001)

The Defendants made a strategic decision to make contributions under the settlement before the order approving the settlement was final and non-appealable and they should bear the risk of that decision.  Specifically, while the settlement order was pending on appeal in the District Court, the Defendants made their settlement contributions even though they were not required to do so absent a final, non-appealable order. The Defendants then filed a joint brief on appeal arguing for dismissal of the appeal as equitable moot because "[a]ny attempt to undo these transaction and events and return to the status quo that existed before the … Settlement Order and the parties consummated the Settlement Agreement **would be virtually impossible**" and that "it likely is **impossible** to put CIT, the Lender Group, and Sun back in the position they occupied before they relied on the unstayed Settlement Order."  *See* Equitable Mootness Br. at p. 8, 12, *Czyzewski v. Jevic Holding Corp.* (*In re Jevic Holding Corp.*), No. 13-104-SLR (D. Del. Nov. 21, 2013), ECF No. 15 (emphasis added).

Despite arguing that it would be impossible to return the parties to the status quo on appeal to the District Court, the Defendants now argue for just that in their briefs for judgment on the pleadings.  *See* CIT Brief at 20 ("The Trustee's failure to return CIT's funds to restore the Lender Group **to their pre-Approval Order position** is yet another reason that the Trustee cannot proceed with the Adversary Proceeding.") (emphasis added); Sun Brief at ¶ 74 ("[T]he parties to the settlement must be **returned to the status quo** prior to entry of the Settlement and Dismissal Order.") (emphasis added).  The Defendants have therefore taken irreconcilably inconsistent positions and the first element of judicial estoppel is satisfied.

The Defendants' change in position also appears to be an attempt to play fast and loose with the court.  In the appeal of the settlement order to the district court, the Defendants made the strategic decision to pay their respective settlement contributions before the settlement order became a final order and then made an equitable mootness argument shortly thereafter.  Indeed, the Defendants benefitted from taking this position in the District Court that alternatively dismissed the appeal on equitable mootness grounds.  *See Jevic Holding Corp.*, 2014 WL 268613, at *4 (D. Del. Jan. 24, 2014), vacated and remanded on other grounds, 688 F. App'x 166 (3d Cir. 2017) ("The court finds that the settlement has been substantially consummated as all the funds have been distributed.").   Moreover, the risk of reversal of the settlement order was clearly contemplated in the settlement agreement that did not require Defendants to contribute funds until the settlement order became a final, non-appealable order.   The Defendants should not now be allowed to bar the Trustee from pursuing the Complaint, absent a return of the settlement funds Defendants were not required to contribute, now that their gamble on equitable mootness has failed.[14]

Finally, no lesser sanction would remedy Defendants' conduct here.  Defendants paid their respective settlement contributions when they were not required to do so to gain a strategic, litigation advantage in the appeal of the settlement order.  Under the specific circumstances here, the Court should not, as Defendants request, bar the Trustee from pursuing the Complaint against the Defendants absent repayment of their settlement contributions over six years after those funds were disbursed.

---

[14]    Defendants' cited cases in support of its argument that the parties should be returned to the status quo are inapposite.  *See generally* Sun Br. at ¶¶ 75-76; CIT Br. at p. 19-20.  None of those cases address the issues present here where a party acted outside of the terms court-approved settlement agreement by tendering payment before it was required to do so in an effort to—successfully—gain a litigation advantage.

The court should therefore apply the doctrine of judicial estoppel to prevent the Defendants from arguing that their settlement contributions must be returned before the Trustee may proceed with the Complaint.

## **CONCLUSION**

For all of the foregoing reasons, the Trustee respectfully requests that this Court enter an Order:  (i) substituting the Trustee for the Committee as the real party in interest to assert the claims and causes of action set forth in the Complaint against Defendant; (ii) denying the Defendants' motions for judgment on the pleadings; and (iii) granting such other and further relief as the Court deems just a proper.

Dated:  May 6, 2020
       Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Michael J. Barrie_

Michael J. Barrie (No. 4684)
Jennifer R. Hoover (No. 5111)
Kevin M. Capuzzi (No. 5462)
Sean A. Meluney (No. 5514)
Matthew D. Beebe (No. 5980)
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com
smeluney@beneschlaw.com
mbeebe@beneschlaw.com

_Special Litigation Counsel for George L. Miller_, _Chapter 7 Trustee_